# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Hussey Copper Corp.,[1] | ) | Case No. 11-13010 (BLS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Hussey Copper Ltd., | ) | Case No. 11-13012 (BLS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| OAP Real Estate, LLC, | ) | Case No. 11-13013 (BLS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Cougar Metals, Inc., | ) | Case No. 11-13014 (BLS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Orbie Trading, L.P., | ) | Case No. 11-13015 (BLS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Hussey Exports Ltd., | ) | Case No. 11-13016 (BLS) |
| | ) | |
| Debtor. | ) | Joint Administration Requested |
| | ) | |

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Hussey Copper Corp. (9993); Hussey Copper Ltd. (9994); OAP Real Estate, LLC (1298); Cougar Metals, Inc. (1674); Orbie Trading, L.P. (4969); and Hussey Exports Ltd. (8997). The Debtors' address is 100 Washington Street, Leetsdale, Pennsylvania 15056.

## DECLARATION OF DALTON T. EDGECOMB
## IN SUPPORT OF FIRST DAY MOTIONS FOR RELIEF

I, Dalton T. Edgecomb, hereby state that the following is true to the best of my knowledge, information and belief.

1. I am the Chief Restructuring Officer of Hussey Copper Corp., Hussey Copper Ltd., OAP Real Estate, LLC, Cougar Metals, Inc., Orbie Trading, L.P. and Hussey Exports Ltd. (collectively, the "Debtors"). I am also a Managing Director of Huron Consulting Services LLC.

2. I am generally familiar with the Debtors' day-to-day operations, business affairs and books and records. Except as otherwise indicated, all facts set forth in this Declaration are offered to the best of my knowledge, information and belief, and are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors' management or professionals working with me or under my supervision, or my informed opinion based upon my experience and knowledge of the Debtors' industry, operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration on behalf of the Debtors.

3. On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief with the Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). To enable the Debtors to operate effectively and preserve the value of estate assets, the Debtors have requested various types of relief in "first-day" applications and motions filed with this Court contemporaneously herewith (the "First Day Pleadings").

4. I submit this Declaration in support of the First Day Pleadings. Any capitalized term not defined herein shall have the meaning ascribed to such term in the relevant First Day

2

Pleading. The First Day Pleadings seek, among other things, to: (a) ensure the continuation of the Debtors' cash management systems and other business operations without interruption; (b) maintain customers' confidence; (c) maintain employee morale and confidence; and (d) establish certain other administrative procedures to promote a smooth transition into chapter 11. Gaining and maintaining the support of the Debtors' employees, customers, vendors and other key constituencies, as well as maintaining the day-to-day operations of the Debtors' businesses with minimal disruption, will be critical to the Debtors' reorganization.

5. Part I of this Declaration describes the Debtors' businesses and the circumstances surrounding the filing of the chapter 11 petitions. Part II sets forth the relevant facts in support of the First Day Pleadings. Part III concludes that the relief requested in the First Day Pleadings is in the best interests of the Debtors, their creditors and estates and therefore should be granted.

## PART I: BACKGROUND

### A.    General Background

6. Together with its affiliated Debtors, Hussey Copper Ltd. ("Hussey"), a Pennsylvania limited partnership, is one of the leading manufacturers of copper products in the United States. Founded in Pittsburgh, Pennsylvania in 1848, Hussey provides, among other things, a wide range of value-added copper products and copper-nickel products including sheet, strip, plate and bar, certain alloys, architectural products, tape/fin (used in power cable and heat exchanger products), fabricated products and gaskets. Hussey has one manufacturing facility in Leetsdale, Pennsylvania (near Pittsburgh) and two facilities in Eminence, Kentucky. Roy D. Allen and Florence L. Allen own the controlling interest in Hussey.

7. Hussey has five affiliated entities, all of which are debtors in these proceedings:

- ***Hussey Copper Corp.*** ("Hussey Corp."). Hussey Corp., a Delaware Corporation, was incorporated in 1984 and is the general partner of Hussey. Hussey Corp.

3

conducts no business and has no assets or liabilities other than its obligations as a guarantor under the Credit Facility, as defined and described below.

- **OAP Real Estate, LLC** ("OAP"). OAP, a Pennsylvania limited liability company, is successor by merger to O-A-P Partnership, a Pennsylvania general partnership that was formed in 1984. OAP is the owner of the real estate in Pennsylvania and Kentucky, where Hussey's primary operations are located. OAP leases this real estate to Hussey pursuant to leases dated as of May 18, 1984. Other than the real estate and proceeds from the rental income, OAP has no other assets or other business activities and has no employees. OAP has no liabilities other than its obligations as a guarantor under the Credit Facility and in favor of Schneider Electric USA, Inc., as further described below.

- **Cougar Metals, Inc.** ("Cougar"). Cougar is a Delaware corporation that was incorporated in 1993. It was formed to acquire certain equipment, including equipment for the production of trapezoidal shapes for the locomotive industry (the "Cougar Equipment"). Hussey operates the Cougar Equipment and sells the product produced from the Cougar Equipment primarily to General Electric Corporation and General Motors Corporation. Cougar has no employees. Its assets consist of the Cougar Equipment and certain accounts receivable. Cougar is a guarantor under the Credit Facility.

- **Orbie Trading, L.P.** ("Orbie"). Orbie, a Pennsylvania limited partnership, was formed on April 28, 1999. Orbie was formed to purchase and sell scrap metals and conducted such operations for several years at Hussey's facilities in Pennsylvania, using Hussey personnel. Orbie no longer conducts business activities, and has no employees or liabilities other than its obligations as guarantor under the Credit Facility.

- **Hussey Exports, Ltd.** ("Hussey Exports"). Hussey Exports is a Delaware corporation that was incorporated in 2007. Hussey Exports was formed for the purpose of becoming a Domestic International Sales Corporation. Hussey Exports has never conducted any operations and has no employees, assets or liabilities other than its obligations as a guarantor under the Credit Facility, as discussed below. Hussey is the sole owner of Hussey Exports.

## B. Facilities and Products

8. Since its formation in the mid-1800's, Hussey established a reputation for producing quality copper products. Hussey produced copper products at its original Pittsburgh facility until 1963, when it moved to a larger and more modern site in Leetsdale, Pennsylvania (approximately fourteen miles west of Pittsburgh). Currently, Hussey maintains a 350,000

4

square foot manufacturing facility, warehouse and corporate office in Leetsdale that serve as the corporate headquarters of the company and a large manufacturing center for copper strip, sheet, plate and bar production. As noted above, Hussey leases the Leetsdale facility from OAP.

9. In 1966, Hussey opened its facility in Eminence, Kentucky specifically to produce electrical copper bus bar. The Eminence facility has since been expanded four times and now contains over 120,000 square feet of manufacturing space on 55 acres. This facility is the leading electrical copper bus bar manufacturer in the United States, controlling 70% of the domestic market. In addition, adjacent to the Eminence facility, Hussey Fabricated Products ("HFP"), a division of Hussey, constructed a 30,000 square foot facility that was expanded in 2006 to 45,000 square feet (the "HFP Facility"). At the HFP Facility, bus bar, sheet and shapes are fabricated into finished parts. Hussey leases the Eminence facility from OAP.

10. Hussey and its affiliated companies employ approximately 536 full-time employees.

11. Hussey is a party to three collective bargaining agreements with the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (United Steelworkers, AFL-CIO): (a) an agreement covering 69 employees at HFP (KY), which expires in November 2011; (b) an agreement covering 190 employees at Hussey (PA), which expires in November 2012; and (c) an agreement covering 124 employees at HCE (KY), which expires in November 2013.

12. The Debtors are the sponsors of two defined benefit plans, one of which covers substantially all hourly rate employees at the Eminence plant (the "Kentucky Pension Plan") and the other of which covers the former employees of a New Jersey plant that was closed and subsequently sold (the "NJ Pension Plan," and together with the Kentucky Pension Plan, the

"Pension Plans"). Under the Pension Plans, benefits are based on years of service. Benefits under the NJ Pension Plan were frozen as of January 1, 2004. Effective as of January 10, 2011, the Kentucky Pension Plan was frozen as to Hussey employees. With respect to the HFP employees, the Kentucky Pension Plan has not been frozen for employees hired prior to January 1, 2009, although employees hired after such date are not eligible to participate.

13.     The Pension Plans are underfunded by approximately $161,000.

## C.     Recent Operating Results and Events

14.     Since late 2008, the overall economic downturn has had an adverse impact on Hussey. As a result of this economic downturn, and due to related fluctuations in the price of copper, Hussey has faced significant economic challenges. Annual revenue for the Debtors, on a consolidated basis, was approximately $453.6 million in the year ending on December 31, 2008, approximately $308.4 million in the year ending on December 31, 2009 and approximately $381.9 million in the year ending on December 31, 2010. Net income for the last three fiscal years was as follows:

| | |
|---|---|
| 2008: | $3.1 million |
| 2009: | $1.1 million |
| 2010: | ($3.0 million) |

## D.     Credit Facility and Debt Structure

15.     Hussey is a party to a Revolving Credit, Term Loan and Security Agreement dated as of January 20, 2006 (as amended, the "Credit Facility") with a group of lenders comprised of PNC Bank, National Association, successor to National City Bank and National City Business Credit, Inc. ("PNC"), Wells Fargo Capital Finance, LLC and Bank of America, N.A. (collectively with PNC, the "Bank Group"). In addition to being a member of the Bank

Group, PNC also serves as lender, issuer and agent for the Bank Group with respect to the Credit Facility.

16.     Hussey is the borrower under the Credit Facility. Debtors OAP, Cougar, Hussey Exports and Orbie are guarantors.

17.     The Credit Facility originally provided for aggregate borrowings of up to $66.5 million, consisting of (a) a revolving credit facility up to the amount of $62 million, including swing loans of up to $5 million; and (b) term loans from each lender equaling a percentage of $4.5 million. The Credit Facility also provided for the issuance of letters of credit on behalf of Hussey, not to exceed $5 million at any one time. As of the Petition Date, only the revolving credit facility exists and there are no outstanding letters of credit.

18.     The obligations to the Bank Group under the Credit Facility are secured by liens on substantially all of Hussey's assets, subject to, without limitation, certain permitted liens (the "Prepetition Collateral").

19.     On March 4, 2010, Hussey received a notice of default from PNC of its failure to comply with certain provisions of the Credit Facility. On May 5, 2010, Hussey, the Bank Group and PNC, entered into a Seventh Amendment[2] to the Credit Facility, which, among other things, waived the existing identified defaults. Subsequent to that amendment, the parties entered into a further amendment, dated January 20, 2011, which extended the maturity date to March 31, 2011.

20.     On March 31, 2011, the Credit Facility matured.

---

[2]     Hussey, its lenders and PNC had entered into a series of prior amendments to the Credit Facility, namely the First Amendment dated as of May 25, 2006, the Second Amendment dated as of August 11, 2006, the Third Amendment dated as of September 1, 2006, the Fourth Amendment dated as of May 23, 2007, the Fifth Amendment dated as of August 31, 2007 and the Sixth Amendment dated as of July 2, 2008.

21.     Thereafter, on April 13, 2011, the parties entered into a forbearance agreement, and thereafter a series of amendments to such forbearance agreement.  The most recent forbearance amendment expired on September 26, 2011.  Under the terms of the forbearance agreements, the Bank Group agreed to forbear from exercising its rights and remedies with respect to existing defaults under the Credit Facility pursuant to certain terms and conditions, including a reduction of the amount of maximum borrowing available and the requirement that Hussey engage an investment banker to market substantially all of its assets for sale.

22.     As of the Petition Date, the Debtors owe the Bank Group an aggregate principal amount of not less than $38,170,958.24 principal plus accrued interest.

23.     In addition to the above-referenced amount owed under the Credit Facility, Hussey is a party to a certain subordinated loan agreement dated as of February 3, 2003 with Schneider Electric USA, Inc., formerly known as Square D Company ("Schneider," and together with the Bank Group, the "Prepetition Lenders") that was subsequently amended on January 20, 2006 (the "Schneider Loan Agreement") in the original principal amount of $5,000,000.  The Schneider Loan Agreement is secured by a second lien on Hussey's senior assets and is subject to an Intercreditor Agreement with the Bank Group.  The obligations owing under the Schneider Loan Agreement are guaranteed (subject to certain limitations) by OAP Real Estate, LLC, one of the Debtors herein.  As of the Petition Date, the amount owing under the Schneider Loan Agreement was approximately $2,400,000.

24.     The Debtors estimate that they also have approximately $29 million of trade debt, which is owed primarily to supplier of copper and other metals to Hussey.

**E.     Events Leading to Filing**

8

25. As discussed above, as a result of the occurrence of certain events of default under the Credit Facility related to Hussey's failure to repay the amounts thereunder as of the maturity date, PNC issued a default notice in March 2010. As part of the Bank Group's agreement to forbear from exercising its rights and remedies under the Credit Facility, Hussey was required to retain a financial advisor and chose RAS Management Advisors, LLC ("RAS") to provide financial advisory assistance.

26. The Bank Group expressed interest in the satisfaction of the amounts due under the Credit Facility through a refinancing. To that end, Hussey retained PNC in June 2010 to attempt to arrange a refinancing. PNC was unable to obtain this replacement financing and, in late December 2010, Hussey retained Huron Consulting Services LLC ("Huron") to replace RAS and to formulate, evaluate and recommend viable financing alternatives. Huron's role was modified in August 2011 to that of chief restructuring advisor, pursuant to which Huron served as Hussey's primary point of contact with the Bank Group.

27. As part of its efforts to locate subordinated debt, Huron identified a lender to lead a consortium of additional lenders to provide a refinanced credit facility for Hussey. Such credit facility was scheduled to close on March 31, 2011. Prior to the scheduled closing, the lender determined not to proceed with the transaction.

28. Shortly thereafter, as required by the forbearance agreement, Hussey hired SSG Capital Advisors, LLC ("SSG") as its exclusive investment banker to begin to market substantially all of Hussey's assets for sale.

29. In the months leading up to the filing of the Debtors' bankruptcy petitions, the Debtors concurrently pursued two alternative tracks: (a) a sale of substantially all of their assets, with the assistance of SSG; and (b) satisfaction of the amounts due under the Credit Facility

9

through a refinancing, with the assistance of Huron. Although the Debtors diligently sought to effectuate a refinancing, it could not be achieved. As a result, the Debtors concluded that a sale of substantially all of their assets, subject to a competitive bidding process, was the best option to maximize value for all creditor constituencies.

**F.    Sale and Restructuring Efforts**

30.    Following its engagement by Hussey, SSG commenced an extensive sale process. In mid-May 2011, SSG began contacting international investors and then domestic investors, including financial buyers. Of the 134 parties contacted, SSG sent a confidential informational memorandum about the Debtors and their business operations to 43 parties. Of those parties receiving the confidential memorandum, five submitted letters of intent. A data room was created to allow potential purchasers to conduct due diligence. SSG, along with the Debtors, their counsel and financial advisors, and in conjunction with the Bank Group, carefully evaluated and compared the offers to determine which offer was the highest and best bid. Ultimately, the Debtors executed a letter of intent on August 5, 2011, and accordingly entered into an Asset Purchase Agreement with KHC Acquisition, LLC prior to the petitions which, subject to Court approval, will serve as the stalking horse bidder in a competitive bidding process before this Court.

<u>**PART II: FIRST DAY PLEADINGS**</u>

31.    An important (and in many respects critical) element of the success of these chapter 11 cases (the "Chapter 11 Cases") will be the entry of orders granting the relief requested in each of the First Day Pleadings. Generally, the First Day Pleadings are designed to facilitate: (a) continuation of the Debtors' existing cash management systems and other business operations without interruption; (b) preservation of customer and vendor relationships; (c) maintenance of

employee morale and confidence; and (d) establishment of certain other administrative procedures to promote a smooth transition into chapter 11.

32.     I believe that the approval of the Debtors' First Day Pleadings submitted concurrently herewith is critical and necessary to the success of the Chapter 11 Cases. The factual background and support for each of the Debtors' First Day Pleadings is provided below.[3]

**Motion of the Debtors for Entry of an Order Directing Joint Administration of Their Related Chapter 11 Cases Pursuant to Federal Rule of Bankruptcy Procedure 1015(b) and Local Rule 1015-1 (the "<u>Joint Administration Motion</u>")**

33.     In the Joint Administration Motion, the Debtors seek the joint administration of their Chapter 11 Cases for procedural purposes only. The Debtors are affiliates as defined in section 101(2) of the Bankruptcy Code. Joint administration of their cases will promote the economical, efficient and convenient administration of the Debtors' estates.

34.     The Debtors' operations are closely integrated and there will be numerous motions, applications and other pleadings filed in the Chapter 11 Cases that will affect all of the Debtors. Joint administration will allow for the efficient administration of the Debtors' six (6) chapter 11 cases.

35.     Joint administration of the Chapter 11 Cases will permit the Clerk of the Court to use a single general docket for each of the Debtors' cases and for the proposed claims agent to combine notices to creditors and other parties in interest of the Debtors' respective estates.

36.     Moreover, allowing joint administration will significantly reduce the volume of pleadings that otherwise would be filed with the Clerk of this Court, render the completion of various administrative tasks less costly and minimize the number of unnecessary delays. The

---

[3]     Capitalized terms not defined in this section shall have the same meaning ascribed in the respective First Day Pleading.

11

relief requested by this Motion will also simplify supervision of the administrative aspects of these cases by the Office of the United States Trustee.

37.     The proposed joint administration order also will save time and money and avoid duplicative and potentially confusing filings by permitting counsel for all parties in interest to: (a) use a single caption on the numerous documents that will be served and filed herein; and (b) file the papers in one case rather than in multiple cases. Finally, joint administration will protect parties in interest by ensuring that parties in each of the Debtors' respective chapter 11 cases will be apprised of the various matters before the Court in these cases.

38.     I have read the Joint Administration Motion and believe that the relief requested in the Motion is in the best interests of the Debtors and the Debtors' estate.

**Motion of the Debtors for Entry of an Order Extending the Time within which the Debtors Must File Their (i) Schedules of Assets and Liabilities; (ii) Schedules of Executory Contracts and Unexpired Leases; and (iii) Statements of Financial Affairs (the "Schedule Extension Motion")**

39.     In the Schedule Extension Motion, the Debtors seek a fifteen (15)-day extension of the deadline by which they must file their schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules and Statements"). Pursuant to the Bankruptcy Code, the Debtors' deadline to file the Schedules and Statements is fifteen (15) days from the Petition Date. In addition, Local Rule 1007(1)(b) provides that the deadline for filing Schedules and Statements is automatically extended for an additional 15 days if the debtor has more than 200 creditors and if the petition is accompanied by a creditor list. Here, the Debtors filed a list of creditors on the Petition Date and have more than 200 creditors. Accordingly, in the absence of an extension, Bankruptcy Rule 1007(c) and Local Rule 1007-1(b) require the Debtors to file their Schedules and Statements within thirty (30) days of the Petition Date.

1331431.6 09/27/2011

40. Given the size and complexity of the Debtors' businesses, a significant amount of information must be accumulated, reviewed and analyzed in order to properly prepare the Schedules and Statements. In addition, there are a number of critical issues facing the Debtors in the thirty days following the Petition Date. These issues and others will require substantive attention by the Debtors' personnel and their professionals. Thus, while the Debtors have initiated the major task of assembling the data necessary for the Schedules and Statements, they will not be able to complete this undertaking within thirty days from the Petition Date.

41. In light of the circumstances outlined above, the Court should extend by an additional fifteen (15) days, for a total of forty-five (45) days, until November 7, 2011, the date by which the Debtors must file their Schedules and Statements.

**Motion of the Debtors for an Entry of an Order Authorizing the Debtors to: (I) File a Consolidated List of Creditors, (II) File a Consolidated List of Debtors' Twenty Creditors Holding Largest Unsecured Claims; and (III) Mail Initial Notices (the "Creditor List Motion")**

42. In the Creditor List Motion, the Debtors seek permission to file (i) a consolidated list of creditors and (ii) a consolidated list of the Debtors' twenty (20) largest creditors. The Debtors also seek permission to complete all mailings of notices, including notices of the commencement of these cases and the meeting of creditors.

43. The Debtors have identified over 2,500 entities to which notice of certain proceedings in the Chapter 11 Cases must be provided. The Debtors presently maintain various computerized lists of the names and addresses of their respective creditors that are entitled to receive notices and other documents in these cases. The information, as maintained in the Debtors' computer files (or those of the Debtors' agents), may be consolidated and utilized in an efficient manner to provide notices and other pleadings to parties in interest as required by Local Rule 1007-2. As such, the Debtors request authorization of the Court to file the lists in a

13

consolidated form, identifying their creditors and equity security holders in substantially the same formats that are currently maintained by the Debtors in the ordinary course of business.

44.    Pursuant to Bankruptcy Rule 1007(d), a debtor in a voluntary chapter 11 reorganization case must file with the petition "a list containing the name, address and claim of the creditors that hold the 20 largest unsecured claims, excluding insiders, as prescribed by the Official Form." Fed. R. Bankr. P. 1007(d). The Debtors submit that a single consolidated list of their combined twenty (20) largest unsecured creditors in these cases would be more reflective of the body of unsecured creditors that have the greatest stake in these cases than separate lists for each of the Debtors. Accordingly, the Debtors respectfully request authorization to file a single consolidated list of their twenty (20) largest unsecured creditors in these cases (the "Consolidated Top 20 List").

45.    The Debtors also respectfully request that the Court authorize the Debtors or Donlin, Recano & Company, Inc., their proposed claims agent, to complete all mailings to creditors and equity holders in the Debtors' Chapter 11 Cases in lieu of effecting service through the Office of the Clerk of the United States Bankruptcy Court for the District of Delaware (the "Clerk's Office").

46.    For the foregoing reasons, the relief requested in the Creditor List Motion should be granted.

**Motion of the Debtors for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Official Committee Members (the "Interim Compensation Motion")**

47.    The Debtors will file an application to retain Saul Ewing LLC as their bankruptcy counsel. The Debtors anticipate that they may retain other professionals in these Chapter 11 Cases as the need arises. In addition, if an official committee is appointed in these Chapter 11 Cases, such committee may also seek to retain various professionals. The Debtors' professionals

14

will carry out unique functions and will coordinate with one another to avoid unnecessary duplication of services while obtaining maximum advantage from each firm's expertise and knowledge of the Debtors.

48.     Briefly stated, the requested procedures would require the presentation to the Debtors, and certain parties in interest, of a detailed statement of services rendered and expenses incurred by each professional for the prior month. If there is no timely objection, the professional would be permitted to be paid 80 percent of the amount of fees incurred for the month, with a 20 percent hold-back, and 100 percent of expenses for the month. These payments would be subject to the Court's subsequent approval as part of the normal interim fee application process. I believe that these procedures will enable all parties to monitor closely the costs of administration of these Chapter 11 Cases and not unduly burden the Debtors.

49.     Accordingly, I believe that the relief requested in the Interim Compensation Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest.

**Application of the Debtors for Entry of an Order Authorizing and Approving the Employment and Retention of Donlin, Recano & Company, Inc. as Notice, Claims and Balloting Agent to the Debtors (the "Claims Agent Application")**

50.     The sheer size of the Debtors' creditor body may make it impracticable for the Clerk's Office to (a) serve notice on the large number of creditors and interested parties and (b) administer claims during these Chapter 11 Cases.

51.     I respectfully submit that the most effective and efficient manner of noticing these creditors and interested parties of the filing of these Chapter 11 Cases, and to transmit, receive, docket, maintain, photocopy and scan claims, is for the Debtors to engage an independent third party to act as the Debtors' notice and claims agent. The Debtors may also require the services of an agent to administer votes pursuant to a plan of liquidation. Accordingly, the Debtors propose to employ Donlin Recano & Company, Inc. ("Donlin Recano") as claims, noticing and

15

balloting agent, to assist the Debtors in distributing notices, as necessary, and to process other administrative information in these Chapter 11 Cases.

52.    Donlin Recano is a firm that specializes in noticing, claims processing, balloting and other administrative tasks in chapter 11 cases. The Debtors chose Donlin Recano based on both its experience and the competitiveness of its fees. The Debtors wish to engage Donlin Recano to send out certain designated notices and to collect and monitor claims and perform certain ballot-related functions with respect to these Chapter 11 Cases.

53.    I believe that the services provided by Donlin Recano do not and will not duplicate the services that are being provided to the Debtors in these Chapter 11 Cases by any other professional. Donlin Recano has further ensured the Debtors that it will coordinate with the Debtors' other professionals retained in these Chapter 11 Cases to ensure there is no duplication of services.

54.    Accordingly, I believe that Donlin Recano is well qualified and uniquely able to provide services to the Debtors as notice, claims and balloting agent in these Chapter 11 Cases in an efficient and timely manner.

**Motion for the Debtors for Entry of an Order (A) Authorizing the Debtors to Pay Prepetition (I) Sales, Use, Fuel and Property Taxes and (II) Tolls, Fees, Licenses and Other Similar Charges and Assessments and (B) Authorizing Applicable Banks and Other Financial Institutions to Receive, Process, Honor and Pay Checks Presented for Payment Related Thereto (the "Tax Motion")**

55.    In the Tax Motion, the Debtors seek authority it pay, in their sole discretion, certain Taxes and Fees (as defined below) in the ordinary course of business.

56.    In connection with the normal operation of their businesses, the Debtors, as described more fully below, (a) incur sales, use, fuel, property and other taxes necessary to operate their businesses (collectively, the "Taxes"), and (b) are charged for tolls, fees, licenses, permits, and other similar charges and assessments (collectively, the "Fees") by various taxing,

tolling, and licensing authorities (collectively, the "Taxing Authorities"). The Taxes and Fees are paid to the various Taxing Authorities on a periodic basis and, depending on the nature and incurrence of a particular Tax or Fee, are remitted monthly, quarterly or yearly. More specifically, the Taxes and Fees incurred by the Debtors fall into one of the following categories:

**Sales Taxes**

57.     In the normal course of business, the Debtors are required to collect sales taxes (the "Sales Taxes") from non-exempt purchasers of certain products on a per sale basis and periodically remit such taxes to the applicable Taxing Authorities. Typically, Sales Taxes accrue as products are sold and are calculated based on a statutory percentage of the sales price. Currently, the Debtors only collect Sales Taxes on the sale of gaskets. Thus, the Debtors typically collect less than $100 per month in Sales Taxes. The process by which the Debtors remit the Sales Taxes varies, depending on the Taxing Authority that is to be paid.

58.     As of the Petition Date, the Debtors estimate that approximately $500 in Sales Taxes relating to the prepetition period will be due and owing to the Taxing Authorities in the ordinary course of business. Payment of the Sales Taxes is critical to the continued, uninterrupted operations of the Debtors. Nonpayment of such obligations may cause Taxing Authorities to take precipitous action, including, but not limited to, filing liens on the Debtors' assets, preventing the Debtors from conducting business in the applicable jurisdictions and seeking to lift the automatic stay, all of which would disrupt the Debtors' operations and potentially impose significant costs on the Debtors' estates.

**Use Taxes**

59.     In addition to the Sales Taxes, the Debtors are sometimes required to pay use taxes (collectively, the "Use Taxes") in certain limited circumstances. For example, the Debtors may be required to pay Use Taxes when a vendor does not collect and remit sales tax on account

17

of an item that is otherwise taxable. The Debtors typically pay $1,500 per month in Use Taxes. The Debtors estimate that they are current with respect to any Use Taxes incurred prior to the Petition Date. To the extent Use Taxes are unpaid, however, the Debtors, out of an abundance of caution, seek authority to pay any prepetition Use Taxes in the ordinary course of business.[4] Indeed, as stated above, nonpayment of such obligations may cause the applicable Taxing Authorities to take such actions as filing liens on the Debtors' assets or preventing the Debtors from conducting business, which would in turn impose considerable harm upon the Debtors in their efforts to reorganize.

### Real and Personal Property Taxes

60. The Debtors' personal property and real property in Leetsdale, Pennsylvania and Eminence, Kentucky (collectively, the "Real Property") is subject to state and local property taxes (the "Personal Property Taxes" and the "Real Property Taxes" respectively, and collectively, the "Property Taxes"). The Real Property Taxes – which are approximately $171,000 per year – are paid on an annual basis in arrears. The Debtors estimate that as of the Petition Date, approximately $23,000 in Real Property Taxes has accrued but has not been paid. If unpaid, the Real Property Taxes could create a lien on the Real Property.

61. The Debtors' Personal Property Taxes are approximately $120,000 per year, which the Debtors similarly pay on an annual basis. The Debtors estimate that, as of the Petition Date, approximately $70,000 in Personal Property Taxes has accrued but has not been paid. As

---

[4] The Use Taxes may constitute "trust fund" taxes. In other words, the Debtors are holding these funds in trust for the benefit of the Taxing Authorities, in which instance such funds may not constitute property of the Debtors' estates. 11 U.S.C. § 541(d). Hence, payment of the Use Taxes will not prejudice the rights of unsecured creditors since such amounts would not be available for distribution.

with Real Property Taxes, certain jurisdictions place a lien for unpaid Personal Property Taxes on the property so taxed.

62.     To the extent that liens are placed on properties that exceed the value of the unpaid Property Taxes, the Debtors' Property Tax obligations could be increased by the accumulation of interest and the Debtors' operations could generally be disrupted by collection efforts instituted by the applicable Taxing Authorities, including the imposition of tax liens on the Debtors' assets. Accordingly, the Debtors seek authority to pay any prepetition Property Taxes in the ordinary course of business.

**Fuel Taxes**

63.     The Debtors' manufacturing and distribution operations depend on the transport of goods and materials between their facilities and to customers. To this end, the Debtors rely on tractor-trailer units and other company vehicles (collectively, the "Rigs") to transport goods and materials on interstate highways. This transport in turn causes the Debtors to incur fuel taxes (collectively, the "Fuel Taxes"). The amount of the Fuel Taxes that the Debtors pay to a state Taxing Authority varies based on the mileage and weight of the Rigs operated in the state. Notably, because the Debtors carry an International Fuel Tax Agreement ("IFTA") license, the Debtors need not file fuel tax reports in each state in which their vehicles operate.

64.     Because the Rigs are registered in both Pennsylvania and Kentucky, the Debtors file fuel tax reports and make quarterly Fuel Tax payments to the Pennsylvania and Kentucky Taxing Authorities. For the past two quarters, the Debtors have applied an IFTA tax credit to their payments to the Pennsylvania Taxing Authority and thus have not had to pay any amounts otherwise due. The Debtors paid $14 in Fuel Taxes to the relevant Kentucky Taxing Authority last quarter.

1331431.6 09/27/2011

65. Given that (i) the Debtors will be continuing to conduct business and (ii) the amount of the Fuel Taxes is de-minimis, the Debtors believe that it is appropriate to pay the Fuel Taxes in the ordinary course of business. Paying these amounts is critical to the Debtors' continued operations given that the ability to operate on highways and fulfill customer requests could be curtailed if the Fuel Taxes are not paid. For these reasons, although the Debtors estimate that they are current with respect to any Fuel Taxes incurred prepetition, out of an abundance of caution, the Debtors seek authority to pay prepetition Fuel Taxes in the ordinary course of business.

**Tolls**

66. In the ordinary course of business, certain of the Debtors have drivers who routinely drive Rigs (whether owned by the Debtors or third parties) on highways that require the payment of tolls (collectively, the "Tolls"). In such circumstances, a driver may simply pay a Toll in cash and be reimbursed from the Debtors through an expense reimbursement request.

67. If the Debtors were unable to reimburse their drivers for Tolls, the Debtors would likely experience difficulties in efficiently delivering purchased materials to destinations that involve a toll road.

**Registration Fees**

68. The Debtors are required to register and pay annual license registration fees (the "License Registration Fees") and commercial vehicle registration fees (the "Commercial Vehicle Registration Fees, and together with the License Registration Fees, the "Registration Fees") for their corporate vehicles, including the Rigs. Specifically, the Debtors pay License Registration Fees for all thirty-six of their vehicles in the amount of $65 per registration. This amount is paid annually when each license registration is due to expire. Furthermore, the Debtors pay the Commercial Vehicle Registration Fees on an annual basis. In 2011, the Debtors' Commercial

Vehicle Registration Fees for Pennsylvania were $2,672 and the Commercial Vehicle Registration Fees for Kentucky were $337.

69.    The nonpayment of certain of the Registration Fees could result in a massive disruption of the Debtors' operations. For example, the Debtors' failure to pay the Registration Fees may lead a base state to revoke the registration credentials of the Debtors' Rigs in such state *as well in all other states* in which the Debtors operate. Since all state laws require an operator of a vehicle to properly obtain registration credentials prior to the operation of such vehicle, the lack of registration credentials would render the Debtors unable to legally operate the Rigs in effectively all states in which the Debtors operate and potentially result in a total cessation of business.

70.    The Registration Fees are paid in advance and the Debtors have timely paid their Registration Fees. The Debtors therefore do not believe that they owe any prepetition amounts relating to Registration Fees. Nevertheless, out of an abundance of caution, the Debtors seek authority to pay, in their discretion, any prepetition amounts relating to Registration Fees in the ordinary course of business to the extent that the Debtors subsequently discover any such prepetition amounts are due and owing.

**Environmental Permits**

71.    The Debtors currently maintain, or are in the process of applying for, certain environmental permits necessary for the Debtors' continued operations. These permits regulate, *inter alia*, the Debtors' air emissions to ensure compliance with relevant environmental regulations and statutes. From time to time, the Debtors must pay costs associated with these permits, such as application costs and renewal costs (collectively, the "Permit Costs"). Failure to pay such costs could result in the revocation of a permit and in turn expose the Debtor to regulatory actions or litigation due to any resulting noncompliance with environmental laws. As

21

such, while the Debtors believe that they are current with respect to all Permit Costs, out of an abundance of caution, the Debtors request authority to pay any outstanding prepetition costs in the ordinary course of business.

72.     While the Debtors believe that they are substantially current with respect to all of the above-described Taxes and Fees, out of an abundance of caution, the Debtors seek the relief requested hereunder only to the extent that (i) any Taxes and Fees accrued prepetition were not in fact paid prepetition or were paid in an amount that was less than the amount actually owed, or (ii) any payments sought to be made prepetition are lost or otherwise not received in full by any of the Taxing Authorities.  Further, there may be Taxes and Fees incurred prepetition that may become due shortly after the commencement of the Chapter 11 Cases.

73.     I believe that the failure to pay the Taxes and Fees could trigger a material adverse impact on the Debtors' operations, including the potential suspension of the Debtors' ability to operate in certain jurisdictions.  Moreover, if any of the Taxing Authorities attempt to exercise certain remedies against the Debtors, it would have the devastating effect of distracting the attention of the Debtors' management and professionals away from the important task of the Debtors' successful chapter 11 case.

74.     Accordingly, I believe that the relief requested in the Tax Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest.

**Motion of the Debtors for Entry of an Order (A) Authorizing the Debtors to (i) Continue Using Existing Cash Management System and (ii) Maintain Existing Bank Accounts and Business Forms; and (B) Granting Postpetition Intercompany Claims Administrative Expense Priority (the "Cash Management Motion")**

75.     In the Cash Management Motion, the Debtors seek authorization to continue to use their existing cash management system (the "Cash Management System"), maintain their

existing bank and accounts and business forms and provide administrative expense status to intercompany claims.

76.     The Debtors' Cash Management System consists of eleven bank accounts (collectively, the "Bank Accounts"), each of which is described below and in the charts of the Cash Management System attached to the Cash Management Motion as Exhibits "A" and "B." The Cash Management System enables the Debtors to centrally control and monitor corporate funds, ensure cash availability and liquidity, comply with the requirements of the Debtors' financing agreements, reduce administrative expenses by facilitating the movement of funds, and enhance the development of accurate account balance and presentment information.

77.     As detailed on the flowchart attached as Exhibit "B" to the Cash Management Motion, prior to the Petition Date, the Debtors' cash receipts and disbursements flow as follows:

a.  ***Collection Accounts.*** The Debtors maintain two collection accounts at PNC Bank for the purpose of receiving payments from customers: one for Hussey and one for HFP, a division of Hussey (together, the "Collection Accounts"). Each Collection Account is tied to a separate lockbox, which holds any payments with respect to customer receivables directed to the Debtors' post office box. Such payments may be in the form of cash, checks, credit card deposits, wire transfers or automatic clearing house ("ACH") receipts. Amounts in the lockboxes are deposited on a daily basis into the Collection Accounts. Moreover, amounts in the Collection Accounts are in turn transferred on a daily basis to a cash concentration account held by PNC, where such funds are used to pay down the Debtors' obligations under the Credit Facility.

b.  ***Funding Account.*** On a daily basis, in accordance with the terms of the Credit Facility, the Debtors request an advance from PNC to fund the Debtors' payroll and other operating requirements. Specifically, the Debtors have two check presentments each day and thus are able to request an advance from the Credit Facility to cover the precise amounts of the presented checks. The advance from the Credit Facility is transferred to a Master Operating/Funding Account (the "Funding Account") maintained by Hussey at PNC. Amounts in the Funding Account are in turn automatically transferred by wire or ACH to one of three Controlled Disbursement Accounts (as defined below) to cover any disbursements made from those accounts. Transfers to the Controlled

23

Disbursement Accounts are typically made on a daily basis based on the Debtors' operating requirements.

c. ***Controlled Disbursement Accounts.*** The Debtors maintain three controlled disbursement accounts at PNC, each of which is automatically funded by the Funding Account: (i) a Hussey Copper Ltd. Accounts Payable Controlled Disbursement Account; (ii) a Hussey Fabricated Products Accounts Payable Controlled Disbursement Account; and (iii) a Hussey Copper Ltd. Payroll Controlled Disbursement Account (collectively, the "Controlled Disbursement Accounts"). The Controlled Disbursement Accounts are "zero balance" accounts. The Hussey Copper Ltd. Payroll Controlled Disbursement Account is used to fund the Debtors' payroll obligations. The Hussey Copper Ltd. Accounts Payable Account and Hussey Fabricated Products Accounts Payable Account are both used to fund respective accounts payable, ACH debits, credit card fees and debits, lockbox and deposited check returns and other obligations.

d. ***Flexible Fund Accounts.*** The Debtors maintain three flexible fund accounts at Citizens Bank. Specifically, Hussey Corp. maintains two flexible fund accounts[5] and OAP maintains one flexible fund account. One Hussey Corp. flexible fund account is funded by Hussey and is used to reimburse Hussey Corp., its general partner, for the costs of Hussey Corp.'s officer and director salaries and other reimbursable expenses. Hussey's rent payments under the OAP real property lease are deposited into OAP's flexible fund and are used to make distributions to OAP's partnership.

e. ***Checking Accounts.*** Orbie and Cougar each maintain an independent checking account at PNC and Citizens Bank, respectively, from which minor obligations are paid.

78. The Debtors have utilized their Cash Management System in its current basic structure for years as a mainstay of their ordinary, usual and essential business practices. The Cash Management System is similar in form to those commonly employed by corporate enterprises comparable to the Debtors in size and complexity. I believe that shutting down the Debtors' Cash Management System only to establish a new, nearly-identical system would involve significant and unnecessary effort and cost (related to opening new accounts, revising

---

[5] One of the HCC accounts does *not* bear interest despite its title, and thus this account is used infrequently.

1331431.6 09/27/2011

cash management procedures and instructing customers to redirect payments) and potentially cause significant disruptions to the Debtors' businesses. I believe that preserving the "business as usual" atmosphere and avoiding the unnecessary distractions associated with such a process will facilitate the Debtors' reorganization efforts.

79. As part of their Cash Management System, the Debtors maintain their prepetition Bank Accounts and utilize numerous preprinted business forms (the "Business Forms") in the ordinary course of business. For example, all of the Debtors' Bank Accounts have preprinted check stock. The Debtors also maintain books and records to document, among other things, their revenues and expenses (collectively, the "Books & Records"). To minimize expenses to their estates and avoid confusion on the part of employees, customers and suppliers, the Debtors request that the Court authorize them to continue to use all correspondence and business forms (including, without limitation, letterhead, purchase orders, invoices and preprinted checks) as such forms were in existence immediately before the Petition Date – without reference to the Debtors' status as debtors in possession – rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms. The Debtors shall replace existing stock with new forms identifying their status as debtors in possession as existing check stock is depleted.

80. Because of the nature and scope of the Debtors' business operations and the large number of suppliers of goods and services with whom the Debtors deal on a regular basis, I believe that it is important that the Debtors be permitted to continue to use their Business Forms without alteration or change. Indeed, I believe that parties doing business with the Debtors will most likely be aware of the Debtors' status as a debtor in possession as a result of the publicized nature of these Chapter 11 Cases.

81.     Next, from time to time, in the ordinary course of business, the Debtors engage in intercompany transactions both between the Debtors and between the Debtors and their affiliates (collectively, the "Intercompany Transactions")[6] consisting of Hussey's sale of product to Cougar and non-debtor affiliate, Challenger Brass and Copper Co., Inc. Hussey also leases real property from OAP and non-debtor affiliate Mulberry Lane Associates, LLC and covers payroll and certain other expenses of Cougar. that are later charged to Cougar via the Debtors' general ledger account The Debtors respectfully submit that these transfers are necessary to preserve and enhance the value of their estates, including the value of their non-debtor affiliates, and therefore represent an appropriate exercise of their business judgment.

82.     To ensure each individual Debtor will not fund, at the expense of its creditors, the operations of another entity, the Debtors respectfully request that, pursuant to the Bankruptcy Code sections 503(b)(1) and 364(b), all claims against a Debtor by another Debtor or the Debtors' affiliates arising after the Petition Date as a result of Intercompany Transactions through the Cash Management System (collectively, "Intercompany Claims") be accorded administrative priority expense status. If Intercompany Claims are accorded administrative priority expense status, each entity utilizing funds flowing through the Cash Management System should continue to bear the ultimate repayment responsibility for such ordinary course transactions.

---

[6]     Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises like that of the Debtors, the Debtors believe the Intercompany Transactions are ordinary course transactions within the meaning of the Bankruptcy Code section 363(c)(1) and do not require the Court's approval. Nevertheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions on a postpetition basis. Moreover, the continued performance of the ordinary course Intercompany Transactions is integral to ensure the Debtors' ability to operate their businesses as debtors in possession.

1331431.6 09/27/2011

83.    Accordingly, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest.

**Motion of the Debtors for or the Entry of an Order (a) Authorizing the Debtors to Pay Certain Prepetition (i) Wages, Salaries, Bonuses and other Compensation, (ii) Reimbursable Employee Expenses, and (iii) Employee Medical and Similar Benefits, (b) Confirming the Debtors May Continue Certain Prepetition Employee Programs in the Ordinary Course of Business, and (c) Directing Banks and Other Financial Institutions to Honor All Related Checks and Electronic Payment Requests (the "Wage Motion")**

84.    The Debtors currently employ approximately 536 full-time employees (the "Employees"). The Employees perform a variety of critical functions and the Employees' skills, knowledge and understanding of the Debtors' operations and infrastructure are essential to the effective reorganization of the Debtors' businesses. The Debtors, through the Wage Motion, seek authority to pay and honor, in their sole discretion, certain prepetition claims for, among other items, wages, salaries, commissions, bonuses and other compensation, expense reimbursement, federal and state withholding taxes and other amounts withheld (including garnishments and taxes), health benefits, insurance benefits, workers' compensation benefits, vacation time, sick leave, life insurance, long-term disability coverage and all other benefits that the Debtors have historically provided in the ordinary course of business (collectively, and as more fully described below, the "Employee Obligations"), and to pay all costs incident to the foregoing. In an abundance of caution, the Debtors request the right to modify, change and discontinue any of their employee compensation programs, policies and benefits, and to implement new programs, policies and benefits in the ordinary course of business during these Chapter 11 Cases in their sole discretion without the need for further Court approval.

**Employee Obligations**

*Unpaid Compensation*

85.     In the ordinary course of business, the Debtors incur payroll obligations to the Employees. Such obligations comprise wages, salaries and, for certain salaried Employees, commissions. The Debtors pay their salaried Employees on the 30th day of each month, with a pre-set advance paid on the 15th day of each month. Hourly Employees working at the Debtors' Leetsdale, Pennsylvania facility (the "Leetsdale Facility") are paid bi-weekly, hourly Employees at the Debtors' Eminence, Kentucky facility (the "HCE Facility") are paid weekly, and hourly Employees at the Debtors' HFP facility in Eminence, Kentucky (the "HFP Facility") are paid weekly. On average, the Debtors have gross payroll expenses of approximately $2,506,000 per month or $578,000 per week.

86.     In the ordinary course of business, the Debtors incur compensation obligations to temporary employees. The Debtors pay approximately $13,520 per month (the "Temporary Agency Fees") to two temporary agencies on account of the work performed by three temporary employees currently working for the Debtors.

87.     In addition, certain of the Debtors' Employees act as sales and marketing representatives. Specifically, the Debtors employ seven direct sales representatives, a National Sales Manager, a National Accounts Manager, a Marketing Director and, in the Western and Northeastern regions of the United States, five manufacturers' representatives (the "Outside Salespersons"). To incentivize these Employees to generate new business, the Debtors, in addition to providing the Employees with a base salary, allow these Employees to participate in an incentive program under which the Employees can earn a commission on any new business generated (the "Commissions"). The Debtors estimate that as of the Petition Date, $139,896 in Commissions were owed in connection with the incentive program.

28

88.     Because all of the Employees are paid in arrears, as of the Petition Date, the Employees have not been paid all of their prepetition wages and compensation. Additionally, some Employees may be entitled to compensation because (a) discrepancies may exist between the amounts paid and the amounts that should have been paid and (b) some checks issued to Employees prior to the Petition Date may not have been presented for payment or may not have cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date (the "Uncashed Checks").

89.     The Debtors estimate that, as of the Petition Date, approximately $1,379,580 in prepetition accrued wages, salaries, Temporary Agency Fees, Commissions, bonuses, expense reimbursements and other compensation (but excluding vacation pay) earned prior to the Petition Date remains unpaid (together with the Uncashed Checks, the "Unpaid Compensation").

90.     The Debtors submit that no Employees are owed Employee Unpaid Compensation in excess of the $11,725 statutory priority cap imposed by sections 507(a)(4) and (5) of the Bankruptcy Code. To the extent any Employee Unpaid Compensation exceeds the statutory priority cap imposed by sections 507(a)(4) and (5) of the Bankruptcy Code, such payments would be de minimis. Nonetheless, the Debtors are not hereby seeking authority to pay any of the Employees on account of prepetition accrued wage or benefit obligations in excess of the $11,725 priority cap.

*Deductions and Withholdings*

91.     During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, (a) garnishments, child support, and similar deductions, and (b) other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed herein (such as an Employee's legally ordered deductions,

union dues, 401(k) contributions, voluntary donations, certain local taxes, health and dental insurance, fees and assessments and other, miscellaneous deductions) (collectively, the "Deductions"). The Debtors forward the amount of the Deductions to the appropriate third-party recipients. On average, the Debtors have deducted approximately $56,967 from the Employees' paychecks per each weekly payroll. Due to the commencement of the Chapter 11 Cases, however, certain Deductions that were deducted from Employees' earnings may not have been forwarded to the appropriate third-party recipients prior to the Petition Date. The Debtors estimate that as of the Petition Date, $154,680 in Deductions may not have been forwarded to the appropriate third-party recipients. Accordingly, the Debtors request authority, but not direction, to forward any unpaid Deductions to the appropriate third-party recipients and to continue to forward these prepetition Deductions to the applicable third-party recipients on a postpetition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

92. Further, the Debtors are required by law to withhold from an Employee's wages amounts related to federal, state and local income taxes, social security and Medicare taxes for remittance to the appropriate federal, state or local taxing authority (collectively, the "Withheld Amounts"). The Withheld Amounts are approximately $115,213 per each weekly payroll. The Debtors must then pay social security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively, the "Employer Payroll Taxes"). The Employer Payroll Taxes are approximately $39,020 per weekly payroll.

93. Prior to the Petition Date, the Debtors withheld the appropriate amounts from Employees' earnings for the Withheld Amounts and the Employer Payroll Taxes (collectively, the "Payroll Taxes"), but such funds may not yet have been forwarded to the appropriate taxing

authorities. The Debtors estimate that as of the Petition Date, $428,962 in Payroll Taxes (which comprise the Withheld Amounts and Employer Payroll Taxes) have not been forwarded to the appropriate taxing authorities. The Debtors request authority, but not direction, to forward any outstanding Payroll Taxes to the appropriate third parties, and to continue to honor and process the prepetition payments for Payroll Taxes on a postpetition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

*Honoring Checks for, and Payment of, Reimbursable Expenses*

94.    Prior to the Petition Date, and in the ordinary course of their businesses, the Debtors reimbursed Employees for certain reasonable and customary expenses incurred on behalf of the Debtors in the scope of their employment (the "Reimbursable Expenses"). The Reimbursable Expenses are paid on a weekly basis and include reimbursements for air and ground transportation, lodging, car rental, tolls, meals, entertainment and any other miscellaneous necessary expenses incurred while conducting authorized company business. Hourly Employees are also reimbursed for up to $100 for the cost of work boots. As of the Petition Date, the Debtors have approximately $3,000 in pending requests for expense reimbursement. In addition, it is possible that certain Employees may have incurred prepetition expenses for which they have not yet submitted requests for reimbursement and will submit such requests to the Debtors after the Petition Date. The Debtors estimate that the amount of postpetition requests for reimbursement of prepetition expenses will not exceed $10,000.

95.    The Debtors request authority, to be exercised in their sole discretion, to (a) continue paying Reimbursable Expenses in accordance with prepetition practices, (b) modify their prepetition policies relating thereto as they deem appropriate and (c) pay all Reimbursable Expenses that relate to the prepetition period and are submitted to the Debtors postpetition.

31

**Employee Benefits**

96.     The Debtors offer Employees the ability to participate in a number of insurance and benefits programs, including medical and dental plans, vacation time and other paid leaves of absence, retirement savings plans, tuition reimbursement, employee assistance programs, severance benefits, workers' compensation, union contributions, life insurance, accidental death and dismemberment insurance, and long- and short-term disability insurance (collectively, the "Employee Benefit Programs").

*Medical and Dental Plans*

97.     The Debtors offer health insurance to their Employees for medical and dental coverage (as specified below collectively, the "Health Insurance").

    a.    ***Medical Plan.***  The Debtors' self-insured medical plans (the "Medical Plans") are administered through HealthAssurance/HealthAmerica ("HA") for Employees at the Leetsdale Facility and Highmark Blue Cross/Blue Shield ("HM") for Employees at the HCE and HFP Facilities.  The Debtors' Outside Salespersons and certain of its equity holders also receive coverage through HM.  Approximately 527 Employees participate in the Medical Plans, which cost the Debtors approximately $400,962 per month.  Subject to various co-pays, deductibles and limitations, Employees who participate in the Medical Plans are provided with coverage for, *inter alia*, routine physical examinations, diagnostic services, mammograms, pediatric services, inpatient and outpatient hospital services and mental health services.  Participants are also enrolled in a prescription plan that is provided by Medco Health Solutions, Inc. but administered through HA and HM.  The Debtors receive a weekly bill from HA and HM for coverage costs, which are paid by wire transfer within 48 hours.

        Furthermore, the Medical Plans each include a stop-loss policy (the "Stop-Loss").  For HA, the Stop-Loss is provided by Coventry Health Care and the limit is $125,000, with the Debtors having responsibility for the first $125,000 of charges for a single event and HA covering all charges beyond such amount. The Debtors pay a monthly charge in the amount of approximately $155 per Employee to cover the costs of administering the Stop-Loss (the "Stop-Loss Administrative Fees"), which is included in the weekly bills received from HA and HM.  As of the Petition Date, the Debtors are current with respect to their Stop-Loss Administrative Fees.

**b.** ***Dental Plans.*** The Debtors' dental plan (the "Dental Plan") is provided by Sun Life & Health Insurance Company. For salaried Employees, there is a $1,500 per year maximum benefit for dental coverage. For hourly Employees, participation in the Dental Plans is optional, and if elected, the Employee pays the full group rate as charged to the Debtors by the carrier. Approximately 359 Employees participate in the Dental Plan, which costs the Debtors approximately $10,305 per month.

98.    The Debtors seek authority, in their sole discretion, to (a) continue the Health Insurance for Employees in the ordinary course of business, (b) continue making the above-described contributions to such benefit programs, and (c) pay any amounts related thereto, including the Stop-Loss Administrative Fees and any other amounts on account of any premiums, claim amounts and administration fees to the extent that they remain unpaid as of the Petition Date.

*Workers' Compensation*

99.    The Debtors provide workers' compensation insurance for their Employees at the statutorily-required level for each state (the "Workers' Compensation Program"). These benefits are currently provided for Employees through UPMC Health Benefits, Inc., Kentucky Employers Mutual Insurance and Federal Insurance Co. (the "Workers' Compensation Providers"). The Workers' Compensation Providers administer and pay the Debtors' workers' compensation claims. Premium costs and claims reimbursement costs are approximately $56,000 per month for the Leetsdale Facility and $55,000 per month for the HCE and HFP Facilities. The Debtors expect to pay annual insurance premiums and fees to the Workers' Compensation Providers in an aggregate amount of approximately $1,337,000. At this time, the Debtors have ten Employees receiving workers' compensation benefits and are not aware of any Employees that plan to file a workers' compensation claim. It is possible, however, that an Employee may have a workers' compensation claim that accrued prepetition but was not submitted to the Debtors prior to the Petition Date.

33

100.    For the claims administration process to operate in an efficient manner and to ensure that the Debtors comply with their state law requirements, claim assessment, determination and adjudication must continue. The costs associated with the Workers' Compensation Program may fluctuate according to the various claims submitted.

101.    The Debtors request authority to continue to maintain, in their sole discretion, the Workers' Compensation Program in the ordinary course of business and to pay, in their sole discretion, any and all prepetition amounts related thereto, including, without limitation, any payments for workers' compensation claims, deductibles, premiums and fees owed for administrative costs, and other amounts required in connection with the Workers' Compensation Program as such amounts become due in the ordinary course of the Debtors' businesses.

*Vacation, Sick Leave and Other Leaves of Absence*

102.    The Debtors provide vacation time to their Employees as a paid time-off benefit (the "Vacation Time"). The amount of Vacation Time available to a particular Employee and the rate at which such Vacation Time accrues is generally determined by the Employee's length of employment, the facility at which the Employee works and whether the Employee is a salaried or hourly Employee. Although the Debtors estimate that approximately $1.15 million of earned but unused Vacation Time will have accrued as of the Petition Date, the Debtors believe that Employees will use such Vacation Time in the ordinary course of business.

103.    The Debtors also provide all of their Employees with 10 holidays as a paid time-off benefit, plus one day off for an Employee's birthday ("Holidays"). The Debtors estimate that approximately $79,705 in Holiday pay will have accrued as of the Petition Date; however, the Debtors believe that Employees will use such Holidays in the ordinary course of business.

1331431.6 09/27/2011

104.     In addition, in the ordinary course of business, Employees are eligible for sick leave due to illness or injury ("Sick Leave").  It is left to the discretion of a respective department head to excuse an Employee, with pay, for short-term illness.  There are further no provisions in the Debtors' collective bargaining agreements (the "CBAs") that allow for paid sick days (with the exception of short-term disabilities).

105.     Next, the Debtors allow their Employees to take certain unpaid leaves of absence for personal reasons, many of which are required by law ("Leaves of Absence").  Leaves of Absence include family medical leaves, pregnancy, adoption and foster care leaves, military leaves and bereavement leaves.  The Debtors also provide their Employees with paid leaves to attend jury duty or a funeral.  Under the CBAs, with the exception of Vacation Time, funeral leave and jury service, there is no paid leave.  Accordingly, the CBAs allow *unpaid* leave at management's discretion.  Moreover, Employees also receive personal days each year to take care of personal matters such as moving, religious holidays or personal emergencies ("Personal Days").  It is left to the discretion of a department head to excuse a salaried Employee, with pay, for Personal Days.  There are no provisions in the CBAs allowing for Personal Days.

106.     The Debtors request that they be authorized, but not directed, to continue to honor their Vacation Time, Holidays, Sick Leave, Leaves of Absence and Personal Days policies in the ordinary course of business, and to honor and pay any prepetition amounts related thereto.  Moreover, the Debtors anticipate that their Employees will utilize any accrued Vacation Time, Holidays, Sick Leave, and Leaves of Absence in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations.

*Tuition Reimbursement*

107.     The Debtors offer tuition reimbursement to Employees (the "Tuition Reimbursement Program").  In order to receive this benefit, Employees must have regular full-

35

time status and at least six months of active service. Eligible Employees may be reimbursed only for courses of study that are directly related to the Employee's present job or that will enhance the Employee's potential for advancement to a position within the Company.

108. Employee reimbursement for eligible educational assistance is typically based upon the grade received for the course. For example, 100% is reimbursed where one receives the grade of "A," 75% is reimbursed where one receives a grade of "B" and 50% is reimbursed where one receives a grade of "C."

109. The Debtors also offer reimbursement for attendance at relevant seminars, conferences and other training events, pending the requisite approvals.

110. Currently, there are no Employees participating in the Tuition Reimbursement Program and thus no outstanding reimbursement amounts will have accrued as of the Petition Date. Nevertheless, the Debtors request that they be authorized, but not directed, to continue their Tuition Reimbursement Program in the ordinary course of business.

*Additional Employee Benefits*

### Life Insurance, Accidental Death and Dismemberment Insurance and Long- and Short-Term Disability Benefits

111. The Debtors provide their Employees with primary life insurance coverage through Sun Life & Health Insurance Company (the "Life Insurance"). This coverage costs the Debtors approximately $6,700 per month. Salaried Employees receive life insurance benefits in an amount equal to two times their annual salaries, with $400,000 as the maximum benefit. Hourly Employees at the Leetsdale Facility receive life insurance in the amount of $25,000, hourly Employees at the HCE Facility receive life insurance in the amount of $68,000 and hourly Employees at the HFP Facility receive life insurance in the amount of $50,000.

1331431.6 09/27/2011

112. The Debtors also provide their Employees with coverage for accidental death and dismemberment through Sun Life & Health Insurance Company ("AD&D Coverage"), which costs the Debtors approximately $260 per month. Moreover, the maximum benefits afforded to the Debtors' Employees under this policy are as follows: (i) for salaried Employees, $25,000; (ii) for hourly Employees at the Leetsdale Facility and the HFP Facility, $25,000; and (iii) for hourly Employees at the HCE Facility, $20,000.

113. In addition, the Debtors provide their Employees with long-term disability benefits administered through Sun Life & Health Insurance Company (the "Long-Term Disability Benefits"). The Long-Term Disability Benefits apply to salaried Employees only and cost the Debtors approximately $2,400 per month. Under this policy, after a 90-day disability period, an Employee may receive 60% of his or her salary per month, not to exceed $10,000 per month.

114. Finally, the Debtors provide their Employees with short-term disability benefits (the "Short-Term Disability Benefits"). The Short-Term Disability Benefits, which are administered through Sun Life & Health Insurance Company, cost the Debtors approximately $10,000 per month. Under this plan, weekly benefits vary depending upon the facility at which the Employee works and whether an Employee is a salaried or hourly Employee. Moreover, such benefits typically run for up to twenty-six weeks.

**Severance Benefits**

115. The Debtors provide their Employees certain severance benefits (the "Severance Benefits") in accordance with a certain payment schedule, which is based on years of continuous service, the location of the facility at which the Employee works and whether the Employee is hourly or salaried. Generally, salaried Employees are entitled to one week of pay for each year

of service, with a maximum of twelve week's pay. For hourly Employees, severance is paid according to the following schedule:

| Years of Service | Leetsdale Facility (No. of Weeks) | HCE Facility (No. of Weeks) | HFP Facility (No. of Weeks) |
|---|---|---|---|
| 0-3 | Not eligible | Not eligible | Not eligible |
| 3-5 | 1 | 1 | 1 |
| 5-10 | 2 | 2 | 2 |
| 10 Plus | 5 | 3 | 3 |

The Debtors request authority, but not direction, to pay any Severance Benefits owed as of the Petition Date.

### Contributions on Behalf of Union Employees

116.    On a monthly basis, the Debtors deduct approximately $29,000 from hourly Employees for union dues. The Employee contributions held by the Debtors for transfer to the respective unions are included in the Deductions described herein.

### 401(k) Retirement Plan

117.    The Debtors' offer their Employees a 401(k) defined contribution plan (the "401(k)"), which costs the Debtors approximately $1,000 per month to administer. Approximately 57% of salaried Employees, 56% of hourly Employees at the Leetsdale Facility, 55% of hourly Employees at the HCE Facility and 27% of hourly Employees at the HFP Facility contribute to the 401(k). Under the terms of the 401(k), salaried Employees, hourly Employees at the Leetsdale and HCE Facilities, and hourly Employees at the HFP facility that were hired after December 1, 2009 or enrolled prior to January 31, 2009, may defer up to 15% of their monthly salaries to the 401(k). The Debtors will match half of the first 10% deposited by each Employee. Currently, salaried Employees have contributed approximately $11.6 million to the 401(k) and hourly Employees have contributed approximately $10.8 million.

38

**Pension Plans**

118.    The Debtors sponsor two defined benefit pension plans (the "Pension Plans"), one of which covers substantially all hourly rate Employees at the HCE and HFP Facilities and is administered by the Principal Group, and a second which covers former Employees of a manufacturing plant in New Jersey that closed in 2003, which is administered by UBS. The cost to the Debtors in administering the Pension Plans is approximately $90 per month.

119.    Because the New Jersey plant closed, the Pension Plan covering the Employees at that facility was frozen. Currently, there are 21 pensioners or surviving spouses receiving benefits under the New Jersey Pension Plan and 77 terminated vested employees. The Debtors contributed $12,694 to the plan in 2011.

120.    The Pension Plan covering Employees at the HCE and HFP Facilities contains an amendment that separates the HCE and HFP Employees into two groups. As of January 1, 2011, the Pension Plan for all HCE Employees with an accrued benefit was frozen following collective bargaining negotiations that took place in October and November of 2010. As a result, any Employees in the HCE Facility that were hired after January 1, 2011 are not participants in the Pension Plan. With respect to the HFP Employees, only Employees hired prior to December 21, 2008 are participants in the Pension Plan. Currently, there are 21 pensioners or surviving spouses receiving pension benefits under the Pension Plan for the HCE and HFP Employees, and approximately 212 vested and terminated vested Employees. The Debtors contributed $151,942 to the Pension Plan covering such Employees in 2011.

**Employee Assistance Program**

121.    The Debtors offer an employee assistance program (the "Employee Assistance Program") for Employees at the Leetsdale Facility to assist with certain "life challenges." For example, the Employee Assistance Program provides support for those seeking to improve

39

family relationships, experiencing drug and alcohol problems, having difficulty balancing work and personal responsibilities, among other things. The services are provided through a contract with EAP Solutions, a locally and nationally-recognized employee assistance program that is part of the UPMC behavioral health division. The Employee Assistance Program costs the Debtors approximately $6,000 per year, which the Debtors pay in October of each year.

### Credit Cards

122.    The Debtors currently maintain two company credit cards (the "Credit Cards"), one of which is a Chase Business card. Approximately $6,000 to $8,000 is spent on this card each month for small trade vendor and supply items. The Debtors' second Credit Card, which is held by the Debtors' vice president of sales and marketing at the HFP Facility, is not used.

123.    For all of the foregoing reasons, the relief requested in the Wage Motion will benefit the Debtors' estates and creditors by allowing the Debtors' businesses to continue to operate efficiently and effectively without interruption. In the absence of such payments, the Debtors believe that their Employees may seek alternative employment opportunities. Such a development would result in a costly distraction at a time when the Debtors need to focus on maximizing the value of the estates. Accordingly, the Debtors must be able to pursue all reasonable measures to retain their Employees by, among other things, continuing to honor all wage, benefits and related obligations.

124.    Accordingly, I believe that the relief requested in the Wage Motion is in the best interests of the Debtors' estates, their creditors and other parties in interest.

1331431.6 09/27/2011

**Motion of the Debtors for Entry of Interim and Final Orders Pursuant to Sections 105 and 366 of the Bankruptcy Code (i) Determining that Utility Providers are Adequately Assured of Future Performance, (ii) Enjoining Utility Providers from Altering, Refusing, Discontinuing or Interfering with Utility Service, and (iii) Establishing Procedures for Determining Requests for Adequate Assurance (the "Utility Motion")**

125.     The Debtors incur expenses for gas, water, waste, electric, telecommunications, and other similar utility services (collectively, the "Utility Services") provided by approximately 13 utility providers (the "Utility Providers"). In the Utilities Motion, the Debtors seek entry of an order: (i) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (ii) approving procedures whereby the Utility Providers may request additional or different adequate assurance; (iii) prohibiting the Utility Providers from altering, refusing or discontinuing services on account of pre-petition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance; (iv) establishing a process by which Utility Providers may object to the Debtors' proposed adequate assurance procedures; and (v) setting a final hearing on the Debtors' proposed adequate assurance. A list of the Utility Providers who rendered services to the Debtors as of the Petition Date is attached as Exhibit A to the Utility Motion. The Debtors' forecasted, postpetition run rate for the Utility Services is approximately $560,000 per month.

126.     Uninterrupted utility services are essential for securing the Debtors' various locations and preserving the collateral therein. I believe that any interruption of the Utility Services, even for a brief period of time, would negatively affect the Debtors' property and seriously jeopardize the Debtors' ability to conduct an efficient bidding process to sell substantially all of their assets. It, therefore, is critical that the Utility Services continue uninterrupted during these Chapter 11 Cases.

1331431.6 09/27/2011

127. The Debtors intend to pay all postpetition obligations owed to the Utility Providers in a timely manner, consistent with the ordinary course of their businesses. The Debtors expect that the funding to be obtained through the use of cash collateral and under proposed postpetition financing will be sufficient to pay postpetition obligations related to their Utility Services, as set forth in the cash collateral and proposed financing budgets. Additionally, to provide adequate assurance of payment for future services as required by section 366(c) of the Bankruptcy Code, the Debtors propose to deposit (within twenty (20) days of the Petition Date) into an interest-bearing, newly-created, segregated account an amount equal in the aggregate to two weeks of the forecasted postpetition monthly run rate for the Utility Providers (the "Adequate Assurance Deposit"), pending further order of the Court. Because the Debtors' forecasted, postpetition run rate for the Utility Services is approximately $560,000 per month, the initial Adequate Assurance Deposit will be approximately one half of that amount, or $280,000.

128. Accordingly, I believe that the relief requested in the Utility Motion is in the best interests of the Debtors' estates, their creditors and all parties in interest.

**Motion of the Debtors for Entry of an Order Authorizing the Debtors to Maintain, Renew, Cancel or Replace Existing Insurance Programs and Pay all Premiums, Fees and Insurance Premium Financing Obligations in Connection Therewith (the "Insurance Motion")**

129. In connection with the operation of their businesses, the Debtors maintain: (i) workers' compensation and employee liability programs (the "Workers' Compensation Programs"); and (ii) various liability, property and other insurance programs and policies (the "Liability and Property Insurance Programs," and together with the Workers' Compensation Programs, the "Insurance Programs") through several different insurance carriers (the "Insurance Carriers").

1331431.6 09/27/2011

130.    For certain of the Insurance Programs, the Debtors have determined that it is not economically advantageous to pay premiums on an annualized basis. Accordingly, from time to time, in the ordinary course of their businesses, the Debtors finance premiums with respect to these Insurance Programs. Prior to the Petition Date, the Debtors financed certain insurance premiums pursuant to a Premium Finance Agreement, Security Agreement, Disclosure Statement and Limited Power of Attorney (the "Premium Finance Agreement") with Flatiron Capital, a division of Wells Fargo Bank, N.A. As of the Petition Date, the Debtors were current with respect to payments due under the Premium Finance Agreement.

131.    In the Insurance Motion, the Debtors request entry of an order, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, authorizing, but not directing, the Debtors to: (i) continue their Insurance Programs on an uninterrupted basis in accordance with the same practices and procedures as were in effect prior to the Petition Date, and to renew or cancel such Insurance Programs or seek new insurance coverage as the Debtors, in their reasonable business judgment, deem necessary, appropriate or desirable, without the need to seek leave of Court, and (ii) pay, in their sole discretion, all undisputed premiums, finance payments, administrative fees and broker fees necessary to maintain the insurance coverage provided under the Insurance Programs, regardless of whether they relate to the period before the Petition Date (collectively, the "Insurance Obligations").

132.    The Debtors also request, as a precaution, that the Court authorize and direct the Debtors' banks, at the Debtors' instruction, to receive, honor, process and pay, to the extent of funds on deposit, any and all checks or electronic fund transfers relating to the Insurance Obligations that may not have been honored prior to the Petition Date.

1331431.6 09/27/2011

133. The continuation of the Insurance Programs, on an uninterrupted basis, and the payment of all undisputed prepetition and postpetition Insurance Obligations arising under the Insurance Programs are essential to preserve the Debtors' businesses and preserve the value of the Debtors' estates for all creditors.

134. For the foregoing reasons, the Insurance Motion should be granted.

**Motion of Debtors for Entry of an Order Authorizing Debtors to Pay, in the Ordinary Course of Business, (A) Prepetition Claims of Shippers and Warehousemen and (B) Prepetition Claims for Goods Delivered Postpetition (the "Administrative Expense Confirmation Motion")**

135. Pursuant to sections 105, 363(c) and 503(b)(1)(A) of the Bankruptcy Code, the Debtors hereby seek the entry of an order authorizing, but not directing, the Debtors to pay, as administrative expense claims, and in the ordinary course of business: (a) prepetition claims of certain third-party shippers and warehousemen and (b) prepetition claims for goods delivered postpetition.

### The Shippers and Warehousemen

136. As a fully integrated producer of copper products and alloys, the Debtors convert metallic raw materials (mostly copper) into finished goods and parts and in turn ship such products to customers or other facilities. Given the constant movement of products and raw materials between and among the Debtors' facilities, warehouses and customers, the Debtors, in the ordinary course of business, rely upon common carriers, shippers, freight forwarders and truckers (collectively, the "Shippers") to ship, transport and deliver their raw materials, goods and finished products.

137. The Debtors employ McSource Technologies as a third-party logistics coordinator to manage their freight payments and logistical reporting for in-bound, out-bound and inter-facility transport of goods. Instead of paying the Shippers directly, the Debtors pay shipping

costs to McSource Technologies, which in turn disburses the appropriate amounts to the Shippers. As of the Petition Date, the Debtors are current with respect to any amounts due and owing to McSource Technologies for shipping costs incurred prior to the Petition Date.

138.    Another integral component of the Debtors' manufacturing and distribution process is their ability to store raw materials, valuable by-products, finished goods and other inventory in certain warehouse facilities (the "Warehousemen"). At present, the Debtors utilize forty-one warehouses in sixteen states to store goods and materials until such goods are needed by the Debtors or shipped to customers. The Debtors estimate that as of the Petition Date, the value of the warehoused goods is approximately $2.5 million and the amounts owed to Warehousemen for the storage of such goods is approximately $262,000.

139.    Under certain state laws,[7] Shippers or Warehousemen may have a lien on goods in their possession that secures the charges or expenses incurred in connection with the transportation or storage of such goods. In addition, pursuant to section 363(e) of the Bankruptcy Code, Shippers or Warehousemen, as bailees, may be entitled to adequate protection for a valid possessory lien.

140.    In the event that, as of the Petition Date, Shippers or Warehousemen have outstanding invoices for goods transported or stored prior to the Petition Date, the Shippers and Warehousemen will likely argue that they have possessory liens for transportation or storage costs, and may refuse to deliver or release those goods held in their possession until their

---

[7]    For example, section 7-307 of the Uniform Commercial Code provides that a "carrier has a lien on the goods covered by a bill of lading or on the proceeds thereof in its possession for charges after the date of the carrier's receipt of the goods for storage or transportation, including demurrage and terminal charges, and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law." U.C.C. § 7-307(a); *see also* 13 PA Cons. Stat. Ann. § 7307(a) (2008); Ky. Rev. Stat. Ann. § 355.7-307 (2011).

1331431.6 09/27/2011

invoices are paid and their liens are redeemed. The Shippers and Warehousemen may further be unwilling to release the goods in their possession to which they may be entitled to liens since this may result in their claims against the Debtors becoming unsecured.

141. As such, the Debtors seek authority to pay, in their sole discretion, the prepetition claims of the Shippers (through McSource Technologies or otherwise) and Warehousemen.

**Outstanding Supply Orders**

142. Prior to the Petition Date, the Debtors ordered approximately $693,706 worth of goods in the ordinary course of business for which delivery will not occur until after the Petition Date (the "Outstanding Orders"). Many of these goods are in transit as of the Petition Date.

143. Upon learning of the commencement of these Chapter 11 Cases, the Debtors' suppliers may be concerned that amounts owed for goods ordered prior to the Petition Date but delivered after the Petition Date will be treated as general unsecured claims against the Debtors' estates. Suppliers may also refuse to ship or transport goods subject to the Outstanding Orders, or recall the shipments of such goods, unless the Debtors issue substitute purchase orders postpetition or obtain a Court order confirming the administrative expense priority of payments for the goods.

144. To avoid these results, the Debtors, request the entry of an order, pursuant to sections 105(a) and 503(b) of the Bankruptcy Code, authorizing, but not directing, the Debtors to pay, as administrative expense claims, prepetition claims based on the Outstanding Orders.

145. For the foregoing reasons, the Administrative Expense Confirmation Motion should be granted.

1331431.6 09/27/2011

**Motion of the Debtors for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(C)(2), 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) and 364(E) (I) Authorizing and Approving Debtors' Post-Petition Financing; (II) Granting Liens and Security Interests and Providing Superpriority Administrative Expense Status; (III) Authorizing Use of Cash Collateral and Affording Adequate Protection; (IV) Modifying Automatic Stay; and (V) Scheduling Final Hearing**

146.   As discussed above, the Debtors have filed a motion (the "DIP Motion") seeking entry of interim and final orders authorizing them to enter into a debtor-in-possession credit facility with the Bank Group. The Debtor's Credit Facility and the Schneider Loan Agreement are also discussed in detail above.

147.   The Debtors are seeking to conduct an efficient auction process to sell substantially all of their assets with the goal of confirming and consummating a chapter 11 plan. In order to manage and preserve their assets and properties while achieving an orderly liquidation, preserve value by allowing the Debtors to continue to operate pending consummation of a sale and fund other costs needed to allow the Debtors to consummate a plan, the Debtors require liquidity and working capital.

148.   The Debtors, however, as a result of the expiration of the Forbearance Agreement, have no further availability under the Credit Facility and do not have sufficient available sources of working capital to continue to operate their businesses without additional financing. Simply put, without an immediate infusion of working capital, the Debtors would have no choice but to liquidate their assets immediately in a "free fall" bankruptcy. This would destroy the Debtors' remaining businesses and harm the Debtors' employees, customers, trade vendors and other creditors.

1331431.6 09/27/2011

149. In light of the Debtor's financial condition, the Debtors were unable to obtain additional equity financing or unsecured financing prior to the Petition Date. Moreover, it became apparent that the Debtors would not be able to obtain secured financing junior to the liens of the Pre-Petition Lenders. The Bank Group also would not consent to the Debtors obtaining third party financing secured by liens in the Pre-Petition Collateral senior to, or *pari passu* with, the liens of the Pre-Petition Agent, and the Bank Group would only agree to provide further financing in the context of a chapter 11 debtor-in-possession ("DIP") facility.

150. As such, the Debtors negotiated in good faith with the Bank Group on the terms of a possible DIP facility and were ultimately able to procure a commitment from the "DIP Lenders" for postpetition financing (the "DIP Facility") on the terms and conditions set forth in the DIP Credit Agreement and Interim and Final Order (as such terms are hereinafter defined). The purpose of the DIP Facility is to permit, among other things, (i) the management and preservation of the Debtors' assets and properties, (ii) a sale of substantially all of the Debtors' assets (the "Sale") at an auction (the "Auction") pursuant to an order entered by the Court approving bid procedures (the "Bid Procedures") related thereto, and (iii) the Debtors to confirm and effectuate a chapter 11 plan of liquidation. (the "Plan").

151. The Debtors, with the assistance of, and in consultation with, their Chief Restructuring Officer, have prepared a budget (as amended from time to time to the extent permitted under the DIP Credit Agreement (as hereinafter defined) the "Budget") that reflects the Debtors' projected operating cash expenditures during the period from the Petition Date to November 18, 2011 (as may be extended from time to time, the "Budget Period") and estimates the period in which such cash expenditures will either need to be paid or accrue. The Debtors cash on hand as of the Petition Date and receipts from operation will be insufficient to satisfy

their operating cash needs during the Budget Period. Accordingly, additional financing is necessary in order to permit the Debtors to conduct their Chapter 11 Cases. Given their financial circumstances, the Debtors believe that the DIP Facility is the only available source of such financing.

152. The terms of the DIP Facility are reasonable under the circumstances, and the terms and conditions of the DIP Credit Agreement (as defined below) were: (a) negotiated by the parties in good faith and at arm's length; and (b) instituted for the purpose of enabling the Debtors to meet ongoing operational expenses while in chapter 11 and consummate the Sale of the company in accordance with the Bid Procedures. In the absence of such financing, the Debtors will suffer immediate and irreparable harm because they will be forced to wind down their operations and liquidate their assets piecemeal, which will undoubtedly yield less value for the Debtors' estates than sale of the assets through the Proposed Sale.

153. During the ordinary course of operations, the Debtors generate cash collateral from the use of the Pre-Petition Collateral (the "Cash Collateral"). The Debtors use Cash Collateral in the normal course of their businesses in order to continue to finance their operations, make essential payments, such as employee payroll, taxes and to purchase goods and services essential to their businesses. I believe that it is imperative that the Debtors obtain authority to use Cash Collateral, in accordance with the Interim Order and the DIP Credit Agreement, because the use of Cash Collateral is necessary in conjunction with the financing provided by the DIP Credit Agreement in order to fund the Debtors' continuing business operations.

154. Based on current capital markets conditions and the Debtors' financial condition, the Debtors determined that postpetition financing on an unsecured basis or on a junior priority

basis would be unobtainable in amounts necessary to fund the Debtors' operations during the course of these chapter 11 cases.

155. I believe that the DIP Facility is absolutely essential to the Debtors' ability to conduct their Chapter 11 Cases and their ability to maximize value by conducting an orderly liquidation of their assets. Without the infusion of additional capital, the Debtors will suffer immediate and irreparable harm, including the cessation of their operations and the orderly wind-down currently in progress. Accordingly, entry of the Interim Order is necessary to preserve the Debtors' estates.

156. The terms of the DIP Credit Agreement were negotiated by the Debtors and the DIP Lenders in good faith and at arm's length, and I believe that they are fair and reasonable under the circumstances.

157. Accordingly, I believe that the relief requested in the DIP Motion is in the best interests of the Debtors' estates, their creditors and all parties in interest

## PART III: CONCLUSION

158. For the reasons stated herein and each of the First Day Pleadings, the relief sought therein is in the best interests of the Debtors, their creditors and estates. Therefore, on behalf of the Debtors, I respectfully request that the First Day Pleadings be granted.

I declare under penalty of perjury that, to the best of my knowledge, and after reasonable inquiry, the foregoing is true and correct.

Dated: _Sept. 27, 2011_

Respectfully submitted,

Dalton T. Edgecomb, on behalf of himself and the affiliated Debtors and Debtors-in-Possession

Name: Dalton T. Edgecomb
Title: Proposed Chief Restructuring Officer

1331431.6 09/27/2011