# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Hussey Copper Corp.,[1] | ) | Case No. 11-13010 (BLS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Hussey Copper Ltd., | ) | Case No. 11-13012 (BLS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| OAP Real Estate, LLC, | ) | Case No. 11-13013 (BLS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Cougar Metals, Inc., | ) | Case No. 11-13014 (BLS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Orbie Trading, L.P., | ) | Case No. 11-13015 (BLS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Hussey Exports Ltd., | ) | Case No. 11-13016 (BLS) |
| | ) | |
| Debtor. | ) | Joint Administration Requested |
| | ) | |

---

[1]     The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Hussey Copper Corp. (9993); Hussey Copper Ltd. (9994); OAP Real Estate, LLC (1298); Cougar Metals, Inc. (1674); Orbie Trading, L.P. (4969); and Hussey Exports Ltd. (8997). The Debtors' address is 100 Washington Street, Leetsdale, Pennsylvania 15056.

**MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS
(1)AUTHORIZING THE DEBTORS TO (A) OBTAIN POST PETITION FINANCING
ON AN INTERIM BASIS AND (B) UTILIZE CASH COLLATERAL OF PRE-
PETITION SECURED PARTIES ON AN INTERIM BASIS, (II) GRANTING
ADEQUATE PROTECTION, (III) MODIFYING THE AUTOMATIC STAY,
(IV) GRANTING RELATED RELIEF, PURSUANT TO 11 U.S.C. SECTIONS 105, 361,
362, 363(C), (D) & (E), 364(C), 364(D) (1), 364(E) AND 507(B), AND (V) SCHEDULING
A FINAL HEARING AUTHORIZING FINANCING ON A FINAL BASIS
PURSUANT TO BANKRUPTCY RULE 4001**

The above-captioned debtors and debtors-in-possession (the "Debtors"), by and through

their proposed undersigned counsel, hereby move the Court (the "Motion") for the entry of an

order, pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1)

and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy

Code") and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") for entry of interim and final orders (together, the "DIP Orders"):

(i) authorizing the Debtors to obtain postpetition secured financing; (ii) granting liens and

security interests and providing superpriority administrative expense status to the Debtors'

obligations under the DIP Facility (as hereinafter defined); (iii) authorizing the use of cash

collateral and granting adequate protection to the Pre-Petition Secured Parties and Schneider

Electric USA, Inc.; (iv) scheduling a final hearing on the Motion pursuant to Bankruptcy Rules

4001(b) and 4001(c); and (v) granting related relief. In support of this Motion, the Debtors rely

on the Declaration of Dalton T. Edgecomb in Support of First Day Motions for Relief, which is

being filed contemporaneously herewith, and respectfully state as follows:

## JURISDICTION

1.      This Court has jurisdiction over this Motion under 28 U.S.C. § § 157 and 1334.

This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper

in this judicial district pursuant to 28 U.S.C. §§ 1408 and 1409.

2

2.     The statutory bases for the relief sought herein are sections 105, 361, 362, 363(c)(2), 363(d) & 363 (e), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014, and Rules 2002-1(b) and 4001-2 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## GENERAL BACKGROUND

3.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief with the Court under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases (the "Chapter 11 Cases") and, as of the date of the filing of this Motion, no official committees have been appointed or designated.

4.     Together with its affiliated Debtors, Hussey Copper Ltd. ("Hussey") is one of the leading manufacturers of copper products in the United States. Among other things, it offers a wide range of value-added copper products and copper-nickel products including sheet, strip, plate and bar, certain alloys, architectural products, tape/fin (used in power cable and heat exchanger products), fabricated products and gaskets. Founded in 1848, Hussey has one manufacturing facility in Leetsdale, Pennsylvania (near Pittsburgh) and two facilities in Eminence, Kentucky. Hussey employs approximately 536 full-time employees.

5.     Since late 2008, the overall economic downturn has had an adverse impact on Hussey. As a result of this economic downturn, and due to related fluctuations in the price of copper, Hussey has faced significant economic challenges. Annual revenue for the Debtors, on a consolidated basis, was approximately $453.6 million in the year ending December 31, 2008,

3

approximately $308.4 million in the year ending December 31, 2009 and approximately $381.9 million in the year ending December 31, 2010. Net income for the last three years was as follows:

| | |
|---|---|
| 2008: | $3.1 million |
| 2009: | $1.1 million |
| 2010: | ($3.0 million) |

6.      Hussey is a party to a Revolving Credit, Term Loan and Security Agreement dated as of January 20, 2006 (as amended, the "Credit Facility") with a group of lenders comprised of PNC Bank, National Association, successor to National City Bank and National City Business Credit, Inc. ("PNC"), Wells Fargo Capital Finance, LLC and Bank of America, N.A. (collectively with PNC, the "Bank Group"). In addition to being a member of the Bank Group, PNC serves as issuer and agent for the Bank Group with respect to the Credit Facility.

7.      Hussey is the borrower under the Credit Facility. Debtors OAP Real Estate, LLC, Hussey Exports Ltd., Cougar Metals, Inc. and Orbie Trading, L.P. are guarantors (collectively, the "Guarantors").

8.      The Credit Facility originally provided for aggregate borrowings of up to $66.5 million, consisting of (a) a revolving credit facility up to the amount of $62 million, including swing loans of up to $5 million; and (b) term loans from each lender equaling a percentage of $4.5 million. The Credit Facility also provided for the issuance of letters of credit on behalf of Hussey, not to exceed $5 million at any one time.

9.      The obligations to the Bank Group under the Credit Facility (the "Credit Facility Indebtedness") are secured by first priority perfected liens on substantially all of Hussey's assets, subject to, without limitation, certain permitted liens (the "Pre-Petition Collateral").

4

10.     In addition, Roy D. Allen holds a last-out participation in the Credit Facility in the amount of $2.5 million.

11.     On March 4, 2010, Hussey received a notice of default from PNC of its failure to comply with certain provisions of the Credit Facility.  On May 5, 2010, Hussey, the Bank Group and PNC, entered into a Seventh Amendment[2] to the Credit Facility, which, among other things, waived the existing identified defaults.  Subsequent to that amendment, the parties entered into a further amendment, dated January 20, 2011, which extended the maturity date to March 31, 2011.

12.     On April 13, 2011 the parties entered into a forbearance agreement, and thereafter a series of amendments to such forbearance agreement (the "Forbearance Agreement").  The most recent forbearance agreement amendment expired on September 26, 2011.  Under the terms of the Forbearance Agreement, the Bank Group agreed to forbear from exercising its rights and remedies with respect to existing defaults under the Credit Facility, pursuant to certain terms and conditions, including a reduction of the amount of maximum borrowing available and the requirement that Hussey engage an investment banker to market substantially all of its assets for sale.  To that end, Hussey engaged SSG Capital Advisors, LLC ("SSG") as its exclusive investment banker.

13.     In the months leading up to the filing of the Debtors' bankruptcy petitions, the Debtors concurrently pursued two alternative tracks: (a) a sale of substantially all of their assets, with the assistance of SSG, and (b) the satisfaction of the amounts due under the Credit Facility (which, as of the Petition Date, are approximately $38,170,958.24 principal plus accrued

---

[2]     Hussey, its lenders and PNC had entered into a series of prior amendments to the Credit Facility, namely the First Amendment dated as of May 25, 2006, the Second Amendment dated as of August 11, 2006, the Third Amendment dated as of September 1, 2006, the Fourth Amendment dated as of May 23, 2007, the Fifth Amendment dated as of August 31, 2007 and the Sixth Amendment dated as of July 2, 2008.

interest) through a refinancing, with the assistance of Huron Consulting Services, LLC. Although the Debtors diligently sought to effectuate a refinancing, it could not be achieved. As a result, the Debtors concluded that the sale of substantially all of their assets, subject to a competitive bidding process, was the best option to maximize value for all creditor constituencies.

14.     In addition to the above-referenced amount owed under the Credit Facility, Hussey is a party to a certain subordinated loan agreement dated as of February 3, 2003 with Schneider Electric USA, Inc., formerly known as Square D Company ("Schneider or "Square D," and together with the Bank Group, the "Prepetition Lenders") that was subsequently amended on January 20, 2006 (the "Schneider Loan Agreement"), under which Hussey is obligated to Schneider in the original principal amount of $5,000,000 (the "Schneider Indebtedness," and together with the Credit Facility Indebtedness, the "Prepetition Indebtedness"). The Schneider Loan Agreement is secured by a second lien on the Prepetition Collateral, subordinated to the Bank Group, and is subject to an Intercreditor Agreement with the Bank Group, a copy of which is attached hereto as **Exhibit "A."** The obligations owing under the Schneider Loan Agreement are guaranteed (subject to certain limitations) by OAP Real Estate, LLC, one of the Debtors herein. As of the Petition Date, the amount owing under the Schneider Loan Agreement was approximately $2,400,000.    The Debtors also have approximately $29 million of trade debt, which is owed primarily to suppliers of copper and other metals to Hussey.

15.     Additional information regarding Hussey and its affiliated Debtors, and the background to the Debtors' bankruptcy filing, is set forth in the Declaration of Dalton T.

Edgecomb in Support of First Day Motions for Relief filed substantially contemporaneously herewith and incorporated herein.

### IMMEDIATE NEED FOR POSTPETITION FINANCING

16.     As discussed above, the Debtors are seeking to conduct an efficient auction process to sell substantially all of their assets with the goal of confirming and consummating a liquidating chapter 11 plan. In order to manage and preserve their assets and properties while achieving an orderly liquidation, preserve value by allowing the Debtors to continue to operate pending consummation of a sale, and fund other costs needed to allow the Debtors to consummate a plan,  the Debtors require liquidity and working capital.

17.     The Debtors, however, as a result of the expiration of the Forbearance Agreement, have no further availability under the Credit Facility and do not have sufficient available sources of working capital to continue to operate their businesses without additional financing. Simply put, without an immediate infusion of working capital, the Debtors will have no choice but to liquidate their assets immediately in a "free fall" bankruptcy. This would destroy the Debtors' remaining businesses and harm the Debtors' employees, customers, trade vendors and other creditors.

18.     In light of the Debtor's financial condition, the Debtors were unable to obtain additional equity financing or unsecured financing prior to the Petition Date. Moreover, it became apparent that the Debtors would not be able to obtain secured financing junior to the liens of the Prepetition Lenders. The Bank Group also would not consent to the Debtors obtaining third party financing secured by liens in the Pre-Petition Collateral senior to, or *pari passu* with, the liens of the Bank Group, and the Bank Group would only agree to provide further financing in the context of a chapter 11 debtor-in-possession ("DIP") facility.

7

19.     As such, the Debtors negotiated in good faith with the Bank Group concerning the terms of a possible DIP facility and were ultimately able to procure a commitment from the "DIP Lenders" for postpetition financing (the "DIP Facility") on the terms and conditions set forth in the DIP Credit Agreement and Interim Order and Final Order (as such terms are hereinafter defined). The purpose of the DIP Facility is to permit, among other things, (i) the management and preservation of the Debtors' assets and properties, (ii) a sale of substantially all of the Debtors' assets (the "Sale") at an auction (the "Auction") pursuant to an order entered by the Court approving bid procedures (the "Bid Procedures") related thereto, and (iii) the Debtors' confirmation and effectuation of a chapter 11 plan of liquidation (the "Plan").

20.     The Debtors, with the assistance of, and in consultation with, their Chief Restructuring Officer, have prepared a budget (as amended from time to time to the extent permitted under the DIP Credit Agreement (as hereinafter defined), the "Budget")[3] that reflects the Debtors' projected operating cash expenditures during the period from the Petition Date to November 18, 2011 (as may be extended from time to time, the "Budget Period") and estimates the period in which such cash expenditures will either need to be paid or accrue. The Debtors' cash on hand as of the Petition Date and receipts from operations will be insufficient to satisfy their operating cash needs during the Budget Period. Accordingly, additional financing is necessary in order to permit the Debtors to conduct their Chapter 11 Cases. Given their financial circumstances, the Debtors believe that the DIP Facility is the only available source of such financing.

21.     The terms of the DIP Credit Agreement are reasonable under the circumstances and were: (a) negotiated by the parties in good faith and at arm's length; and (b) instituted for the

---

[3]     The Budget is attached as **Exhibit "2"** to the proposed Interim Order.

1336489.9 9/27/11

purpose of enabling the Debtors to meet ongoing operational expenses while in chapter 11 and consummate the Sale of the company in accordance with the Bid Procedures. In the absence of such financing, the Debtors will suffer immediate and irreparable harm because they will be forced to wind down their operations and liquidate their assets piecemeal, which will undoubtedly yield less value for the Debtors' estates than sale of the assets through the Proposed Sale.

## **RELIEF REQUESTED**

22.     By this Motion, the Debtors request entry of an interim order (the "Interim Order"), substantially in the form attached to this Motion:

(a)     authorizing Hussey to obtain postpetition financing pursuant to the terms set forth in the Debtor-In-Possession Financing Agreement (the "DIP Credit Agreement"),[4] substantially in the form attached to the proposed Interim Order as **Exhibit "1,"** in an aggregate maximum amount up to $35,000,000 on an interim basis and on a final basis in an aggregate amount of $50,000,000;

(b)     authorizing Borrower and OAP Real Estate, LLC ("OAP"), Cougar Metals, Inc. ("Cougar"), Orbie Trading, L.P. ("Orbie") and Hussey Exports Ltd. ("Exports", together with OAP, Cougar and Orbie, collectively, the "Guarantors") to enter into guarantees and security agreements, pursuant to Guaranty Agreements and Guaranty Security Agreements (the Guaranty Security Agreement, the Mortgage Modifications, the DIP Credit Agreement, the Interim Order, the Final Order, together with all other agreements, documents, and instruments to be executed or delivered in connection therewith, collectively, the "DIP Financing Documents");

(c)     providing that, pursuant to Bankruptcy Code sections 364(c), all financing under the DIP Financing Documents, shall have a superpriority administrative claim over any and all claims of any entity, including, without limitation, any claims specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 330, 331, 503(b), 506(c) (upon entry of the Final Order), 507, 726, 1113, 1114 or any other provisions of the Bankruptcy Code, subject only to the Carve-Out (as set forth below);

---

[4]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Credit Agreement or the Interim Order, as applicable.

1336489.9 9/27/11

(d)     providing that, the DIP Agent, for the benefit of itself and the other DIP Lenders, shall have and is granted, as of the Petition Date, valid and perfected first priority (subject to the Permitted Liens and Carve-Out), security interests and liens, senior and above all other liens upon all of the DIP Collateral (as defined below) pursuant to Sections 364(c)(2), 364(c)(3) and 364(d) as set forth in the Interim Order, in and upon (such security interests and liens collectively, the "<u>DIP Liens</u>") all present and after acquired property of the Debtors of any nature whatsoever, including, without limitation, all accounts receivable, inventory, general intangibles, chattel paper, real property, leaseholds, fixtures, machinery, equipment, deposit accounts, cash and cash equivalents, investments, patents, trademarks, trade names, copyrights, rights under license agreements and other intellectual property, inter-company notes or receivables due to each Debtor, all of the Collateral (as defined in the DIP Credit Agreement), all of the Collateral (as defined in the Guaranty Security Agreement, all of the Mortgaged Property (as defined in the Mortgages) and, upon the entry of the Final Order, all claims and causes of action under Chapter 5 of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code, and the proceeds thereof and property received thereby whether by judgment, settlement, or otherwise, whether pursuant to federal law or applicable state law (collectively "<u>Avoidance Actions</u>") of the Debtors or their estates, and as to all of the foregoing, all rents issues, products, proceeds and profits generated by any of the foregoing (the "<u>DIP Collateral</u>"). Further, as consideration to the Pre-Petition Secured Parties for their agreement to the terms hereof and as replacement collateral for the Pre-Petition Collateral used, consumed, or sold by the Borrower and/or Guarantors in the Case, to the extent of any diminution in value of the Pre-Petition Collateral, the DIP Collateral shall also secure the Pre-Petition Obligations;

(e)     providing that the DIP Agent, for the benefit of itself and the other DIP Lenders, shall have and is granted, (a) continuing valid, perfected, enforceable, first priority, fully perfected liens on and security interests in all of the Debtors' right, title, and interest in and to and under all DIP Collateral that is not otherwise encumbered by a validly perfected security interest on or lien on the Petition Date; (b) a continuing valid, enforceable second priority perfected lien on and security interest in all of the Debtors' right, title, and interest in, and to and under all DIP Collateral which is subject to, as of the Petition Date, a Permitted Lien that was perfected prior to the Petition Date or that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code; and (c) subject to Permitted Liens, valid, enforceable, fully perfected first priority senior priming security interest in and senior priming liens upon all of the Debtors' right, title and interest in, to and under all DIP Collateral, including priming security interests and priming liens which are senior to (i) the security interests and liens held by the Pre-Petition Agent, on behalf of the Pre-Petition Secured Parties; (ii) the security

1336489.9 9/27/11

interests and liens held by Square D; and (iii) the Adequate Protection Liens;

(f)     providing that the liens and security interest granted to the Secured Parties to secure the Obligations shall have priority over any and all liens and security interests granted to Schneider to secure obligations of any of the Debtors owing to Schneider in accordance with the Intercreditor Agreement;

(g)     authorizing the Debtors' use of the Pre-Petition Lenders' cash collateral pursuant to section 363(c)(2) of the Bankruptcy Code and granting the Pre-Petition Agent, for the benefit of the Pre-Petition Secured Parties (as defined in the Interim Order), on account of the Adequate Protection Obligations, the First Lien Adequate Protection Liens which shall consist of valid and perfected replacement and additional security interests in, and liens on, the DIP Collateral to the extent of the Adequate Protection Obligations, which shall be junior in all respects to the DIP Liens, the Permitted Liens and the Carve-Out and granting, as further adequate protection, an allowed administrative claim (the "First Lien Adequate Protection Claim") against the Debtors Estates under sections 503 and 507(b) of the Bankruptcy Code to the extent that the First Lien Adequate Protection Liens do not adequately protect the diminution in the value of the liens and security interests of the Pre-Petition Secured Parties in the Pre-Petition Collateral, which First Lien Adequate Protection Claim shall be subject and subordinate only to the DIP Superpriority Claim and the Carve Out and shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, which are now existing, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (upon the entry of a Final Order), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code;

(h)     granting Square D valid and perfected replacement security interests in, and liens on, all of Hussey's right, title and interest in, and to the same items and types of DIP Collateral on which Square D held a valid, perfected, enforceable and unavoidable lien as of the Petition Date (the "Second Lien Adequate Protection Liens"), which liens are valid, binding enforceable and fully perfected as of the Petition Date and which liens are subordinate and subject to (i) the DIP Liens, (ii) the First Lien Adequate Protection Liens, (iii) the Permitted Liens and (iv) the Carve Out, and granting, as further adequate protection, to the extent it is determined that Square D is entitled thereto, to the extent that the Second Lien Adequate Protection Liens do not adequately protect the diminution in the value of Square D's interest in the Pre-Petition Square D Collateral provided that such liens were valid perfected, enforceable and unavoidable, Square D is hereby an allowed administrative claim (the "Second Lien Adequate

11

Protection Claim") against the Debtors Estates under sections 503 and 507(b) of the Bankruptcy Code, which Second Lien Adequate Protection Claim shall have priority over all administrative expense claims and unsecured claims against the Debtors or the Estates, which are now existing, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code; provided, however, that the Second Lien Adequate Protection Claim shall be subject and subordinate only to the (i) DIP Superpriority Claim, (ii) the First Lien Adequate Protection Claim and the (iii) Carve Out;

(i)   granting certain rights and remedies to the Secured Parties upon the occurrence and during the continuance of an Event of Default, without the necessity of seeking relief from the automatic stay or further Order of the Bankruptcy Court, specifically, (i) to cease making advances under the DIP Facility; (ii) accelerating all Obligations; (iii) terminating the right to use cash collateral; iv) charging default interest under the DIP Facility; and other rights and remedies provided in the Interim Order and further after providing three (3) business days' prior written notice thereof (in certain circumstances and to specified parties), the DIP Agent for the benefit of itself and the DIP Lenders, and the Pre-Petition Agent, for the benefit of itself and the other Pre-Petition Secured Parties, shall be entitled to take any action and exercise all rights and remedies provided to them by the Interim Order, the DIP Financing Documents or the Pre-Petition Financing Documents or applicable law to proceed against and realize upon the DIP Collateral or Pre-Petition Collateral or any other assets or properties of the Debtors' estates upon which the DIP Agent and the Pre-Petition Agent has been or many hereafter be granted liens or security interests to obtain the full and indefeasible payment of all the Obligations including the Pre-Petition Obligations;

(j)   providing that, upon the occurrence and during the continuance of an Event of Default and the exercise by the DIP Agent or the Pre-Petition Agent of their respective rights and remedies under this Interim Order, the DIP Financing Documents or Pre-Petition Financing Documents, provided that the Debtors and the DIP Agent agree upon an acceptable wind down budget with agreed upon carve-out amounts for Debtor's counsel, the Debtors shall assist the DIP Agent and the Pre-Petition Agent in effecting any sale or other disposition of the DIP Collateral or Pre-Petition Collateral required by the DIP Agent and Pre-Petition Agent, including any sale of DIP Collateral or Pre-Petition Collateral pursuant to section 363 of the Bankruptcy Code or assumption and assignment of DIP Collateral or Pre-Petition Collateral consisting of contracts and leases pursuant to section 365 of the Bankruptcy Code, in each case, upon such terms that are designed to maximize the proceeds obtainable from such

1336489.9 9/27/11

sale or other disposition and otherwise acceptable to the DIP Agent and the Pre-Petition Agent, and the Debtors shall fully cooperate with the Secured Parties in their exercise of rights and remedies;

(k)    providing that the DIP Liens, Superpriority Claims, Adequate Protection Liens and Adequate Protection Claims shall be subject to the right of the following expenses: (i) statutory fees payable to the U.S. Trustee; (ii) the reasonable fees and expenses actually incurred on or after the Petition Date, with respect to services performed solely with respect to Debtors and that are allowed and payable by final order of the Court under Sections 328, 330, or 331 of the Bankruptcy Code, any interim compensation procedures order, and/or any order authorizing the engagement of a CRO (as defined herein), as applicable (collectively, the "Allowed Professional Fees"), by attorneys, accountants and other professionals retained by the Debtors, any Committee(s) appointed for the Debtors in the Cases, under Section 327 or 1103(a) of the Bankruptcy Code, and any Chief Restructuring Officer and his/her support personnel approved by Order pursuant to Section 363 of the Bankruptcy Code (collectively with the support personnel, the "CRO") (collectively, the "Professionals"), in a cumulative, aggregate sum of (i) for the period prior to the occurrence of an Event of Default, not to exceed the lesser of (A) the weekly amounts budgeted to be funded for each such Professional for such week in accordance with the Budget for the time period preceding the occurrence of an Event of Default (to the extent any Event of Default occurs mid-week, pro-rated for such week) and (B) the actual amount of such Allowed Professional Fees incurred on or after the Petition Date up through and including the occurrence of an Event of Default and (ii) for the time period following an Event of Default, an amount equal to A) for counsel to the Debtors, the remaining weekly amounts budgeted to be funded for counsel for the Debtor in accordance with the Budget in an amount but not to exceed $200,000 and B) for the CRO, the remaining weekly amounts budgeted to be funded for the CRO in accordance with the Budget but not to exceed $75,000 (collectively, the "Carve-Out Cap") and (iii) subject to the terms of the Interim Order, the Carve-Out Cap shall be allocated on a Professional by Professional basis based on the amounts budgeted to be funded for each Professional pursuant to the Budget, provided, however, that with respect to the Debtors and the CRO, the allocated amounts should be set forth in a schedule consistent with the Budget attached to the Agreement;

(l)    providing for a forty-four (44) day Challenge Period from the Petition Date for any party in interest with requisite standing to seek to challenge, among other things, the extent, legality, validity, perfection, enforceability and other matters with respect to the Pre-Petition Financing Documents, the Pre-Petition Obligations and Secured Parties' liens in the Pre-Petition

Collateral and in the DIP Collateral as security for the Pre-Petition Obligations and the Adequate Protection Obligations;

(m)     providing that, upon the entry of a Final Order, no costs or expenses of administration which have or may be incurred in these bankruptcy cases at any time shall be charged against the DIP Agent or any DIP Lender, their respective claims or the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code without the prior written consent of the DIP Agent and, further providing that, upon entry of a Final Order, the Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under Section 552(b) of the Bankruptcy Code shall not apply to the Secured Parties with respect to proceeds, product, offspring or profits of any of the Pre-Petition Collateral or DIP Collateral;

(n)     authorizing the Debtors, on an interim basis, to obtain financing in an amount up to $35,000,000 pursuant to the terms of the DIP Credit Agreement; and

(o)     scheduling a final hearing (the "Final Hearing") pursuant to Bankruptcy Rule 4001 for this Court to consider entry of a final order (the "Final Order") authorizing and approving the balance of the terms of the DIP Credit Agreement.

## TERMS AND CONDITIONS OF DIP FACILITY AND PROPOSED ADEQUATE PROTECTION PACKAGE FOR THE PRE-PETITION LENDERS

### A.     Summary of Material Terms of the DIP Credit Agreement[5]

23.     The material terms of the DIP Credit Agreement are as follows, which is presented by way of summary only and is qualified in its entirety by the terms of the DIP Credit Agreement, which control:

| | |
|---|---|
| **Borrower:** | Hussey Copper Ltd. (in such capacity, the "Borrower") and any other person that may be joined as a Borrower. |
| **Guarantors:** | OAP Real Estate, LLC, Hussey Exports Ltd., Cougar Metals, Inc., Orbie Trading, LP and any other person who may guarantee payment or performance of the obligations under the agreement in whole or in part (collectively, in such capacity, the "Guarantors"). |

---

[5]     To the extent that there are any conflicts between this summary and the Interim Order or the DIP Credit Agreement, the terms of the Interim Order or the DIP Credit Agreement shall govern, as applicable.

1336489.9 9/27/11

| | |
|---|---|
| **DIP Agent:** | PNC Bank, National Association |
| **DIP Lenders:** | PNC Bank, National Association, Wells Fargo Capital Finance, LLC and Bank of America, N.A. (in such capacity, collectively, the "DIP Lenders") |
| **Type and Amount of the DIP Facility:** | Secured revolving loan, with revolving Advances, in the aggregate principal amount of $50,000,000. This includes Swing Loans that the DIP Agent may make to the Borrowers at any time until the last day of the loan term, in an aggregate principal amount of up to $5,000,000. |
| **Maturity:** | The maturity date is the earliest to occur of: (a) November 28, 2011; (b) the effective date or substantial consummation of a reorganization plan that has been confirmed by an order of the Bankruptcy Court; (c) the closing of a sale of all or substantially all of the Borrowers' or any Borrower's assets or business pursuant to section 363 of the Bankruptcy Code approved by the Agent; (d) the date of the conversion of the case to a case under chapter 7 of the Bankruptcy Code; (e) the date of the dismissal of the case; (f) such earlier date on which all Obligations (as defined in the Agreement) shall become due and payable; and (g) the date that is twenty one (21) days after the entry of the Interim Order if the Final Order has not been entered. |
| **Purpose:** | The Borrowers shall use the proceeds of the Advances to (i) refinance upon entry of the final financing order, in whole or in part, at the DIP Agent's option, the Obligations (including the Pre-Petition Obligations); (ii) pay fees and expenses owed to the DIP Agent and DIP Lenders; (iii) provide for its working capital needs in accordance with the Budget; (iv) reimburse drawings under Letters of Credit; (v) fund the Carve-Out strictly in accordance with the Budget; and (vi) pay for Allowed Professional Fees and Statutory Fees allocated to the Borrowers during the case in accordance with the Budget. |

1336489.9 9/27/11

| | |
|---|---|
| **Interest:** | Interest charges are to be computed on the actual principal amount of Advances outstanding hereunder during the month at a rate equal to the Revolving Interest Rate (i.e. the sum of the Alternate Base Rate plus five percent (5.00%)), and shall be payable on all Advances in cash in arrears on the first (1st) day of each calendar month.<br><br>The Alternate Base Rate means, for any day, a rate per annum equal to the higher of (i) the base commercial lending rate of PNC as publicly announced to be in effect from time to time in effect on such day, (ii) the sum of the Federal Funds Open Rate in effect on such day plus one half of one-percent (1/2 of 1%), and (iii) the sum of the Daily LIBOR Rate in effect on such day plus one percent (1.0%), so long as a Daily LIBOR Rate is offered, ascertainable and not unlawful. |
| **Default Interest:** | Upon and after the occurrence of an Event of Default, and during the continuation thereof, the Obligations shall bear interest at the applicable Revolving Interest Rate (which is an interest rate per annum equal to the sum of the Alternate Base Rate, plus two (2%) percent per annum. |
| **Fees:** | Letter of Credit Fee: The Borrowers shall pay to the DIP Agent, for the ratable benefit of the DIP Lenders, fees for each Letter of Credit for the period from and excluding the date of issuance of same to and including the date of expiration or termination equal to the average daily face amount of each outstanding Letter of Credit multiplied by 5% per annum.<br><br>Commitment Fee: The Borrowers shall pay to the DIP Agent a commitment fee in the amount of $1,000,000, which fee is fully earned upon entry of the Interim Order and payable as follows: (i) $500,000 upon entry of the Interim Order and (ii) $500,000 on the Maturity Date.<br><br>Facility Fee: If, for any calendar month during the Term, the average daily unpaid balance of the Revolving Advances and undrawn amount of any outstanding Letters of Credit for each day of such calendar month does not equal the Maximum Revolving Advance Amount, the Borrowers shall pay to DIP Agent for the ratable benefit of DIP Lenders a fee at a rate equal to one-half of one percent (0.50%) per annum multiplied by the amount by which the Maximum Revolving Advance Amount exceeds such average daily unpaid balance. |

1336489.9 9/27/11

| | |
|---|---|
| | Collateral Monitoring: The Borrowers shall pay the DIP Agent a collateral monitoring fee equal to $2,000 per month commencing on the first day of the month following the Closing Date and on the first day of each month thereafter during the Term. |
| | Appraisal Fees: The DIP Agent may, in its sole discretion, engage the services of an independent appraisal firm or firms of reputable standing, satisfactory to DIP Agent, for the purpose of appraising the then current values of Borrowers' assets. All of the fees and out-of-pocket costs and expenses of any such firm shall be paid for when due, in full and without off-set, by Borrowers. |
| | Collateral Evaluation Fee: The Borrowers shall pay to the Agent on demand, after Agent performs any collateral evaluation - namely any field examination, collateral analysis or other business analysis, the need for which is to be determined by Agent and which evaluation is undertaken by Agent or for Agent's benefit - a collateral evaluation fee in an amount equal to $850 per day for each person employed to perform such evaluation, plus all costs and disbursements incurred by Agent in the performance of such examination or analysis. |
| **Costs and Expenses:** | All costs and expenses including, without limitation, reasonable attorneys' fees and disbursements incurred by DIP Agent on its behalf or on behalf of DIP Lenders and/or the Issuer, including, but not limited to costs and expenses incurred in efforts to enforce payment of any Obligation or effect collection of any Collateral, may be charged to Borrowers' Account and shall be part of the Obligations. |
| **Collections:** | All proceeds of Collateral received after entry of the Interim Order shall be applied by the DIP Agent to the Pre-Petition Obligations or the Post-Petition Obligations as the DIP Agent may determine in its sole discretion, subject to Borrower's ability to reborrow Revolving Advances in accordance with the terms of the Agreement. |

1336489.9 9/27/11

| | |
|---|---|
| **Mandatory Prepayments:** | When any Borrower sells or otherwise disposes of any Collateral, the Borrowers shall repay the Obligations in an amount equal to the net proceeds of such sale. These repayments must be made promptly but in no event more than one (1) Business Day following receipt of such net proceeds. Until the date of payment, such proceeds shall be held in trust for the DIP Agent. The repayments shall be applied to either the Pre-Petition Obligations or the Post-Petition Obligations as the DIP Agent may determine in its sole discretion, subject to Borrowers' ability to reborrow Revolving Advances in accordance with the terms of the Agreement. |
| **Priority and Security under DIP Credit Facility:** | The Borrower's Obligations:<br><br>• shall at all times constitute a Superpriority Claim having priority, pursuant to section 364(c)(1) of the Bankruptcy Code, over any right of payment and any and all other obligations, liabilities and indebtedness of Borrowers and claims of any person, subject, as to priority, only to the Carve-Out; and<br><br>• shall, pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, the Agreement and the Other Documents, be secured at all times by a first priority perfected lien, subject as to priority, only to the Permitted Liens and the Carve-Out, in all assets, whether now owned or hereafter acquired of Borrowers and their estates. Such Liens shall be senior to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Bankruptcy Court or otherwise. |

1336489.9 9/27/11

| | |
|---|---|
| **Carve-Out** | The term "<u>Carve-Out</u>" shall mean: (i) statutory fees payable to the U.S. Trustee; (ii) the reasonable fees and expenses actually incurred on or after the Petition Date, with respect to services performed solely with respect to Debtors and that are allowed and payable by final order of the Court under Sections 328, 330, or 331 of the Bankruptcy Code, any interim compensation procedures order, and/or any order authorizing the engagement of a CRO (as defined herein), as applicable (collectively, the "<u>Allowed Professional Fees</u>"), by attorneys, accountants and other professionals retained by the Debtors, any Committee(s) appointed for the Debtors in the Cases, under Section 327 or 1103(a) of the Bankruptcy Code, and any Chief Restructuring Officer and his/her support personnel approved by Order pursuant to Section 363 of the Bankruptcy Code (collectively with the support personnel, the "<u>CRO</u>") (collectively, the "<u>Professionals</u>"), in a cumulative, aggregate sum not to exceed the Carve-Out Cap (as defined above). Subject to the terms of the Interim Order, the Carve-Out Cap shall be allocated on a Professional by Professional basis based on the amounts budgeted to be funded for each Professional pursuant to the Budget; <u>provided</u>, <u>however</u>, that with respect to the Debtors and the CRO, the allocated amounts should be set forth in a schedule consistent with the Budget attached to the Agreement. |

1336489.9 9/27/11

| | |
|---|---|
| **Conditions Precedent to Loans on Each Draw Date:** | Conditions to Initial Advances. The agreement of the DIP Lenders to make the Initial Advances requested to be made on the Closing Date is subject to certain conditions precedent, including the DIP Agent's receipt of duly executed notes, resolutions authorizing performance under the Agreement, Incumbency Certificates, evidence of the entry of the Interim DIP Order and an order adopting and implementing cash management arrangements acceptable to DIP Agent and copies of the Borrower's casualty insurance policies. In addition, Borrowers shall have terminated the existing hedge contract with Wells Fargo Bank, N.A. bearing trade ID No. 23556985 and purchased a put option for not less than 6,500,000 lbs. of copper through November 30, 2011 with a strike price agreed to among Agent and Borrower based on the prevailing market price of copper and instructed Wells Fargo Bank, N.A. to remit the balance of any proceeds received from the termination of trade ID No. 23556985 to Borrower's collection account maintained with Agent; <br><br> Conditions to Each Advance. The agreement of the DIP Lenders to make any Advance requested to be made is subject to the satisfaction of certain conditions precedent, including the absence of a default or event of default, the delivery to the DIP Agent of a written notice identifying the line-items on the applicable Budget that Borrowers intend to pay with the proceeds of such Advance and the Interim Order being in full force and effect. |
| **Representations and Warranties:** | Customary and required representations and warranties including, the Borrower's authority to enter into the agreement, corporate existence, the filing of tax returns, environmental compliance and compliance with laws and regulations. |

20

| | |
|---|---|
| **Affirmative Covenants:** | Customary and required covenants concerning, for example, the payment of fees to the DIP Agent, the operation of the business according to good business practices, compliance with requirements for minimum cash receipts, maximum disbursements and minimum inventory.<br><br>The Borrowers are also required to:<br><br>• File with the Bankruptcy Court and deliver to DIP Agent, within thirty (30) days of the Closing Date, all schedules of the Borrowers;<br><br>• Serve all secured creditors, all judgment creditors (if any), the twenty (20) largest unsecured creditors, the federal and state taxing authorities, any and all Governmental Bodies holding a claim, the PBGC, the union, Environmental Protection Agency and any other party claiming an interest in the Collateral in accordance with the Federal Rules of Bankruptcy Procedure a copy of the Motion and Interim Order as approved by the Bankruptcy Court in accordance with the Federal Rules of Bankruptcy Procedure;<br><br>• At the request of Agent, or with the consent of Agent at the request of Borrowers, maintain, purchase, sell, terminate or modify hedge contract(s) or any portion thereof relating to Borrowers' Inventory at times and on terms and conditions deemed acceptable to, Agent and Lenders in their sole discretion;<br><br>• Maintain at all times the Carve-Out Reserve Account and fund the escrowed amounts for the Professionals as contemplated in accordance with the Budget and this Agreement; and<br><br>• Retain Dalton Edgecomb as the chief restructuring officer of Borrowers and Guarantors at all times. |
| **Negative Covenants:** | Customary and required covenants concerning, for example, the creation of liens upon or against any of the Borrower's property or assets now owned or hereafter acquired, except Permitted Encumbrances (as defined in the Agreement), the ability to purchase or acquire equity interests, with certain exceptions, the ability to incur additional indebtedness, changes in corporate structure or the ability engage in certain transactions with affiliates. |

1336489.9 9/27/11

| | |
|---|---|
| | The Borrowers must also refrain from, *inter alia*: |
| | <ul><li>Directly or indirectly, seeking, consenting to or suffering to exist: (i) any modification, stay, vacation or amendment to the Interim Order or Final Order, unless the DIP Agent has consented to such modification, stay, vacation or amendment in writing; (ii) entry of any order that is not reasonably satisfactory to DIP Agent in form and substance; (iii) a priority claim for any administrative expense or unsecured claim equal or superior to the Superpriority Claim of the Agent and the DIP Lenders in respect of the Obligations, except for the Carve-Out; or (iv) any Lien on any Collateral, having a priority equal or superior to the Lien in favor of the Agent in respect of the Obligations (subject to the Permitted Liens and the Carve-Out); and</li></ul><ul><li>With certain exceptions, paying any administrative claims until the Obligations have been indefeasibly paid in full in cash and the DIP Agent and the DIP Lenders' commitment to make Advances has been terminated.</li></ul> |
| **Events of Default:** | Customary and required events of default, including, for example, nonpayment, breach of a representation or warranty, failure to furnish financial information when requested, failure or neglect of any Borrower or any Guarantor to perform, keep or observe any term contained in any Other Document or any other agreement or arrangement, now or hereafter entered into between any Borrower, any Guarantor or any other person, or any of the Secured Parties.<br><br>There are also a number of Events of Default relating to the Debtors' Chapter 11 Cases, including:<br><ul><li>The entry of an order (i) revoking, reversing, staying, vacating, rescinding, modifying, supplementing or amending the Interim Order, the Final Order, the Cash Management Order, the Bidding Procedures Order, the Sale Order, any "first day" orders, the Agreement, the Pre-Petition Loan Documents or any "Other Document" or (ii) permitting any administrative expense or any claim to have administrative priority as to any Borrower equal or superior to the priority of the DIP Agent and DIP Lenders in respect of the Obligations, with certain exceptions or (iii) granting or permitting the grant of a Lien on the Collateral superior to, or pari passu with, the</li></ul> |

1336489.9 9/27/11

Liens of Pre-Petition Agent on the Pre-Petition Collateral or the Collateral (other than the Permitted Liens, the Carve-Out);

- The entry of an order (i) appointing a Chapter 11 trustee under section 1104 of the Bankruptcy Code, (ii) appointing an examiner under section 1106(b) of the Bankruptcy Code, (iii) appointing a fiduciary or representative of the estate with decision-making or other management authority over some or all of any Borrower's or Guarantor's senior management, (iv) substantively consolidating the estate of Borrowers and/or any Guarantor with the estate of any other Person, (v) dismissing the case or converting the case to a Chapter 7 case; or (vi) approving a sale of any Borrower's or Guarantor's assets which order does not provide that upon consummation of such sale, all of the Obligations shall be indefeasibly paid and satisfied in full and which shall otherwise be satisfactory to Secured Parties, and in connection with such sale order, Secured Parties shall not have received a release of Secured Parties in full from all claims of Borrowers and their estates on or before the entry thereof;

- The Agreement, any of the "Other Documents," the Interim Order or the Final Order for any reason ceasing to be in full force and effect or declared null and void by a court of competent jurisdiction, or any of the Borrowers, Guarantors or any third party shall seek to, or shall support any other Person's motion to disallow in whole or in part the Secured Parties' claim in respect of the Obligations or to challenge the validity and enforceability of the Liens in favor of any Secured Parties;

- The filing of a motion or support for a motion by a Borrower or Guarantor that fails to provide that the Secured Parties have the right to credit bid for any assets of the Borrowers or Guarantors in connection with any sale pursuant to section 363(k) of the Bankruptcy Code;

- The entry of an order granting relief from the automatic stay to any creditor holding or asserting a lien or reclamation claim on the assets of any Borrower or any Guarantor;

- Any application for any of the orders described in the first, second and fourth bullet points in this "Events of Default" section shall be made and, if made by a Person other than a Borrower or a Guarantor, such application is not being diligently contested by such Borrower or Guarantors in good faith;

- Except as permitted by the Interim Order or Final Order and set forth in the Budget or as otherwise agreed to by DIP Agent in writing, no Borrower or Guarantor shall make any Pre-petition Payment (including, without limitation, related to any reclamation claims) following the Closing Date;

- Any Borrower or Guarantor shall be unable to pay its postpetition debts as they mature, shall fail to comply with any order of the Bankruptcy Court in any material respect, or shall fail to make, as and when such payments become due or otherwise;

- The filing of a motion (i) to use cash collateral under section 363(c) of the Bankruptcy Code without DIP Agent's prior written consent except to the extent expressly permitted in the Interim Order, (ii) to sell a material portion of the assets of any Borrower or any Guarantor, or the sale of any business unit of any Borrower or any Guarantor without DIP Agent's prior written consent, (iii) to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under section 506(c) of the Bankruptcy Code, or to cut off rights in the Collateral under Section 552(b) of the Bankruptcy Code, (iv) to obtain additional financing under Sections 364(c) or (d) of the Bankruptcy Code not otherwise permitted under the DIP Credit Agreement, or (v) to take any other action or actions adverse to Secured Parties or their rights and remedies;

- The filing of a reorganization plan that does not contain provisions for termination of the DIP Agent's and the DIP Lenders' commitment to make Advances hereunder and indefeasible payment in full in cash of all Obligations and the release of Secured Parties in full from all claims of Borrowers, Guarantors and their estates, in each case, on or before, and the continuation

of the Liens and security interests granted to DIP Agent until, the effective date of such reorganization plan, or an order shall be entered by the Bankruptcy Court confirming a reorganization plan which does not contain provisions for termination of DIP Agent's and DIP Lenders commitment to make Advances under the DIP Credit Agreement and indefeasible payment in full in cash of all Obligations and the release of Secured Parties, from all claims of Borrowers, Guarantors and their estates on or before, and the continuation of the Liens and security interests granted to Secured Parties until, the effective date of such reorganization plan upon entry thereof;

- The expiration of the "exclusive period" of Borrowers under section 1121 of the Bankruptcy Code for the filing of a plan of reorganization;

- Any Borrower or Guarantor's engaging in or supporting any challenge to the validity, perfection or priority of the Credit Facility or the liens securing the Obligations, or any Borrower or Guarantor engaging in or supporting any investigation or asserting any claims or causes of action (or directly or indirectly support assertion of the same) against Secured Parties; provided, however, that it shall not constitute an Event of Default if any Borrower or Guarantor provides information with respect to the Pre-Petition Loan Documents to a party in interest or is compelled to provide information by an order of the Bankruptcy Court and provides prior written notice to the DIP Agent and the DIP Lenders of any intention or requirement to do so;

- Any Person shall obtain a judgment under Section 506(a) Bankruptcy Code or similar determination with respect to the Pre-Petition Obligations that is unacceptable to DIP Agent and DIP Lenders;

- The termination or rejection of any material contract of any Borrower which could reasonably be expected to result in a Material Adverse Effect (as defined in the DIP Credit Agreement);

- A breach or default occurs under the Asset Purchase Agreement (as defined in the DIP Credit Agreement) or

1336489.9 9/27/11

|  | the Asset Purchase Agreement is terminated for any reason;

- Borrowers and Guarantors failure to file a motion under section 363 of the Bankruptcy Code seeking authority to sell all or substantially all of the Borrowers' and Guarantors' assets to the buyer under the Asset Purchase Agreement, subject to the receipt of "higher and better" bids, together with Bidding Procedures, in each case, in form and substance satisfactory to the DIP Agent, on the Petition Date;

- The Borrower and/or the Guarantor's failure to obtain the Bidding Procedures Order on or before the 21st day following the Petition Date;

- The Borrowers' failure to conduct an auction in accordance with the Bidding Procedures on or before the 45th day following the Petition Date.

- The Borrowers' failure to obtain a sale order on or before the 2nd Business Day following the completion of the Auction, such sale order to be in form and substance satisfactory to DIP Agent;

- The Sale is not consummated on or before 62 days after the Petition Date;

- The Final Order is not entered immediately following the expiration of the Interim Order, and in any case, not later than 21 days after the Petition Date; and

- A breach of the terms or provisions of the Interim Order or Final Order. |

**Remedies:**

Upon the occurrence of an Event of Default, (i) all Obligations (including all Pre-Petition Obligations) shall be immediately due and payable, (ii) the DIP Agent may terminate the Borrower's right to use Cash Collateral upon the delivery of certain written notices and (iii) the Lenders shall have the right to terminate the obligation of Lenders to make Advances.

Upon the occurrence of any Event of Default and without any further order of the Bankruptcy Court, DIP Agent shall have the right to exercise any and all rights and remedies, including the

| | right to foreclose the security interests granted under the Agreement and to realize upon any Collateral by any available judicial procedure and/or to take possession of and sell any or all of the Collateral. |
| --- | --- |
| | Prior to exercising any foreclosure on any of the Collateral or otherwise to exercise remedies against the Collateral, the DIP Agent shall provide three (3) Business Days' written notice to counsel for the Borrowers, counsel for the Creditors Committee (if appointed) and the U.S. trustee (such notice shall not relieve any Borrower of any obligation under the DIP Credit Agreement); provided that the only issue that may be raised by any such party in opposition to the actions proposed or available to DIP Agent shall be whether an Event of Default has actually occurred and is existing. |
| | In furtherance of exercising its remedies, the DIP Agent may enter any of any Borrower's premises or other premises without legal process and without incurring liability to any Borrower therefor, and DIP Agent may thereupon, or at any time thereafter, in its discretion without notice or demand, take the Collateral and remove the same to such place as DIP Agent may deem advisable and DIP Agent may require Borrowers to make the Collateral available to DIP Agent at a convenient place. The DIP Agent may further sell the Collateral, or any part thereof, at public or private sale, at any time or place, in one or more sales, at such price or prices, and upon such terms, either for cash, credit or future delivery, as DIP Agent may elect. |
| **Indemnification:** | Borrower is required to indemnify the DIP Agent, each Lender, the Issuer and each of their respective officers, directors, Affiliates, attorneys, employees and agents from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including fees and disbursements of counsel) which may be imposed on, incurred by, or asserted against DIP Agent, any Lender or the Issuer in any claim, litigation, proceeding or investigation instituted or conducted by any Governmental Body or instrumentality or any other Person with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, arising out of or in connection with this Agreement or the Other Documents, whether or not DIP Agent, any Lender or the Issuer is a party thereto, except to the extent that any of the foregoing arises out of the willful misconduct of the party being |
| | indemnified (as determined by a court of competent jurisdiction |

1336489.9 9/27/11

| | in a final and non-appealable judgment). |
| | |
| | Additionally, if any taxes (excluding taxes imposed upon or measured solely by the net income of DIP Agent and DIP Lenders, but including any intangibles taxes, stamp tax, recording tax or franchise tax) shall be payable by DIP Agent, DIP Lenders or Borrowers on account of the execution or delivery of this Agreement, or the execution, delivery, issuance or recording of any of the Other Documents, or the creation or repayment of any of the Obligations hereunder, by reason of any Applicable Law now or hereafter in effect, Borrowers will pay (or will promptly reimburse DIP Agent and DIP Lenders for payment of) all such taxes, including interest and penalties thereon, and will indemnify and hold the indemnitees described above harmless from and against all liability in connection therewith. |

## B.   Use of Cash Collateral and Adequate Protection

24.     During the ordinary course of operations, the Debtors generate cash collateral from the use of the Prepetition Collateral (the "Cash Collateral"). The Debtors use Cash Collateral in the normal course of their businesses in order to continue to finance their operations, make essential payments such as employee payroll and taxes, and purchase goods and services essential to their businesses. It is imperative that the Debtors obtain authority to use Cash Collateral, in accordance with the Interim Order and the DIP Credit Agreement, because the use of Cash Collateral is necessary in conjunction with the financing provided by the DIP Credit Agreement in order to fund the continued business operations.

25.     The Debtors and the DIP Lenders have agreed that the Pre-Petition Lenders and Schneider should receive adequate protection of their interests in the Pre-Petition Collateral, as set forth in the Interim Order and as described above.

26.     The Debtors believe the foregoing adequate protection package adequately protects the Pre-Petition Lenders on account of the priming of the Pre-Petition Lender's liens and the Debtors' proposed use of Cash Collateral. In addition, the Pre-Petition Lenders have

1336489.9 9/27/11

consented to the foregoing Adequate Protection Obligations. Therefore, the Debtors respectfully request that the Adequate Protection Obligations be approved.

## C. Highlighted Provisions under Bankruptcy Rule 4001 and Local Rule 4001-2

27. Provisions of the DIP Credit Agreement and Interim Order required to be highlighted pursuant to Bankruptcy Rule 4001(c)(1)(B)(i)-(xi) and Local Rule 4001-2(a)(i)(A)-(G), to the extent applicable (collectively, the "Highlighted Provisions"), are as follows:

(a) Grant of Priority or a Lien on Property of the Estates and Cross-Collateralization. DIP Credit Agreement §§ 4.1, 4.2, 5.1, 5.2(a)-(b); Interim Order ¶¶ 2.1.1.

(b) Adequate Protection or Priority for a Claim that Arose before the Commencement of the Cases. DIP Credit Agreement §§ 4.1, 4.2, 5.1, 5.2; Interim Order ¶¶ 2.1.1, 2.2, 3.1, 3.2, 3.3.

(c) Determination of the Validity, Enforceability, Priority, or Amount of a Claim that Arose before the Commencement of the Cases and Provisions that bind estate. DIP Credit Agreement §§ 1.5(b), 4.1, 5.1; Interim Order ¶¶ D(ii), (iii), (iv), (v); 5.1. The Interim Order provides for a 44 day (as opposed to a 60 day) "Challenge Period". As a result of the extreme fluxuation in the price of copper, in order to maximize value, it is essential that the sale of substantially all of the Debtors' assets occur as quickly as possible. As such, the Debtors are requesting that the auction to sell such assets be he held 45 days after the Petition Date. Thus, the Pre-Petition Lenders require that any challenges to the Pre-Petition Lenders' liens be made by day 44 after the Petition Date and therefore prior to the auction.

(d) Waiver or Modification of the Automatic Stay. DIP Credit Agreement § 1.2 (definitions of Interim Order and Final Order); Interim Order ¶ 6.6.

(e) Waiver or Modification of Authority to Request Use of Cash Collateral or Request Authority to Obtain Credit. DIP Credit Agreement §§ 5.7, 11.18(i); Interim Order ¶ 5.2.

(f) Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection of a Lien on Property of the Estate, or on the Foreclosure or Other Enforcement of the Lien. DIP Credit Agreement § 5.6(c); Interim Order ¶ 2.1.2.

(g) Release, Waiver or Limitation on any Claim or Cause of Action Belonging to the Estate. DIP Credit Agreement § 1.6; Interim Order ¶¶ 2.1.1., 5.1, 5.4.1.

1336489.9 9/27/11

(h)     <u>Indemnification of Any Entity</u>. DIP Credit Agreement § 2.17, 4.19(h), 15.7, 17.5; Interim Order ¶ 2.1.1.

(i)     <u>Release, Waiver or Limitation on Rights under Section 506(c)</u>. DIP Credit Agreement § 5.9; Interim Order ¶ 5.3 (subject to entry of Final Order).

(j)     <u>Liens Granted on Claims Arising Under Chapters 5 (Avoidance Actions)</u>. DIP Credit Agreement §§ 1.2 (definitions of Avoidance Actions and Collateral), 4.1; Interim Order ¶ 2.1.1 (subject to entry of a Final Order).

(k)     <u>Provisions to Use Post-Petition loans from a pre-petition secured creditor to pay prepetition debt</u>. DIP Credit Agreement §2.22, Interim Order 1.2 (upon entry of final order)

(l)     <u>Collections to be applied to Pre-Petition Obligations or Post-Petition Obligations, at DIP Agent's discretion</u>. DIP Credit Agreement §2.21, 4.15(h), 12.5, Interim Order 1.5.

28.     The Highlighted Provisions were negotiated as material terms to the DIP Facility and are necessary for the Debtors to procure the financing made available under the DIP Credit Agreement in a sufficient amount and on a timely basis.

## BASIS FOR RELIEF

29.     Bankruptcy Code section 364(c) provides:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt —
>
> (1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3)     secured by a junior lien on property of the estate that is subject to a lien.

30.     Courts have articulated a three-part test to determine whether a debtor is authorized to obtain secured financing under Bankruptcy Code section 364(c). Specifically, courts look to whether: (i) the debtor is unable to obtain unsecured credit under Bankruptcy Code

section 364(b) by, for example, allowing a lender only an administrative claim; (ii) the credit transaction is necessary to preserve the assets of the estate; and (iii) the terms of the transaction are fair, reasonable and adequate given the circumstances of the debtor-borrower and the proposed lender. *In re Ames Dep't Stores*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hospital*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).

31.    If a debtor is unable to obtain credit under the provisions of Bankruptcy Code section 364(c), the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien." *See* 11 U.S.C. § 364(d). Bankruptcy Code section 364(d)(1), which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien, only if—

(A)    the trustee is unable to obtain credit otherwise; and

(B)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

32.    Based on current capital markets conditions and the Debtors' financial condition, the Debtors determined that postpetition financing on an unsecured basis or on a junior priority basis to the Pre-Petition Lenders would be unobtainable in amounts necessary to fund the Debtors' operations during the course of these Chapter 11 Cases.    Moreover, because substantially all of the Debtors' assets are subject to the liens of the Bank Group, the Debtors were unable to obtain financing secured by liens in their unencumbered assets, nor were the Debtors able to obtain financing secured by junior liens in the Pre-Petition Collateral.

31

Accordingly, the circumstances of these cases require the Debtors to obtain financing under both Bankruptcy Code sections 364(c) and (d).

33.     The DIP Facility is absolutely essential to the Debtors' ability to conduct their Chapter 11 Cases, and their ability to maximize value by conducting an orderly liquidation of their assets. Without the infusion of additional capital, the Debtors will suffer immediate and irreparable harm, including the cessation of their operations and the orderly wind-down currently in progress. Accordingly, entry of the Interim Order is necessary to preserve the Debtors' estates.

34.     The Debtors believe that the Pre-Petition Agent and the Pre-Petition Lenders are over-secured as of the Petition Date and therefore believe that the provisions that permit Advances to be used under the DIP Credit Agreement, to refinance in whole or in part, the Pre-Petition Obligations, upon entry of the Final Order, are reasonable under the circumstances.

35.     As set forth more fully above, the Debtors negotiated the DIP Credit Agreement in good faith with the DIP Lenders. Given the Debtors' current financial circumstances and the lack of unencumbered assets to serve as collateral for a new secured credit facility, the Debtors had no alternative but to pursue funding from the DIP Lenders. *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (noting that a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by Bankruptcy Code sections 364(c) and (d)); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).

36.     The proposed DIP Facility provided by the DIP Lenders was quite literally the only financing available to the Debtors. Even so, the terms of the DIP Facility were negotiated by the Debtors and the DIP Lenders in good faith and at arm's length, and are fair and reasonable

under the circumstances. For example, the proposed DIP Credit Agreement and the Interim Order provide that the security interests and administrative expense claims granted to the DIP Lenders, the Pre-Petition Lenders and Schneider are subject to the Carve-Out. In *In re Ames Dep't Stores*, the United States Bankruptcy Court for the Southern District of New York found that such "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel. *See Ames Dep't Stores*, 115 B.R. at 40.

37.    For the foregoing reasons, among others, the terms of the DIP Credit Agreement are fair, reasonable and adequate, and DIP Lenders should be accorded the benefits of Bankruptcy Code section 364(e).

38.    Finally, in accordance with Bankruptcy Code sections 361 and 364(d), the proposed Interim Order provides the Pre-Petition Lenders with adequate protection as described above. In light of this adequate protection, the Pre-Petition Lenders have consented to the priming of their liens in the Pre-Petition Collateral.

39.    In sum, the DIP Facility should be approved as a valid exercise of the Debtors' business judgment consistent with the letter and the spirit of the Bankruptcy Code. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (approving debtor-in-possession financing necessary to sustain seasonal business); *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 40 (S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest.").

33

40. The Debtors further request that the automatic stay provisions of Bankruptcy Code section 362 be vacated and modified to the extent necessary so as to permit the DIP Lenders to exercise all remedies provided for in the DIP Credit Agreement and Interim Order upon the occurrence of an Event of Default (as defined in the DIP Credit Agreement and the proposed Interim Order); provided, that prior to the exercise of any enforcement or liquidation remedies against the Collateral, the DIP Lenders shall be required to give three business days written notice to the counsel to the Debtors, counsel for any official committee of unsecured creditors, and the U.S. Trustee, during which notice period the Debtors may seek an emergency hearing with the Court to address the issue of whether an Event of Default actually occurred

## A. Interim Approval of the DIP Credit Agreement is Appropriate

41. Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit pursuant to Bankruptcy Code sections 363 and 364 may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the Court is empowered to conduct an expedited preliminary hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates.

42. The Debtors request that the Court hold and conduct an interim hearing immediately to consider entry of the proposed Interim Order authorizing the Debtors to obtain up to $35,000,000 under the DIP Facility. This relief will enable the Debtors to preserve and maximize estate value, conduct the Auction, complete the Proposed Sale, consummate a chapter 11 plan of liquidation and avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing. It will also provide the Debtors' vendors and suppliers with the necessary confidence to continue relationships with the Debtors during

1336489.9 9/27/11

their process of liquidation and be viewed favorably by the Debtors' employees and customers, thereby enhancing the Debtors' efforts to maximize the value of their assets for the benefit of creditors.

**B.    The Bankruptcy Code Section 506(c) Waiver in the Final Order Should Be Approved**

43.    The Court should approve the Debtors' waiver, subject to entry of the Final Order, of any right to surcharge the DIP Collateral and the Pre-Petition Collateral. Such waivers and provisions are standard and customary under financings between sophisticated parties. As one court noted in discussing the later enforceability of such waivers, "the Trustee and Debtors-in-Possession in this case had significant interests in asserting claims under § 506(c) and have made use of their rights against the Lender under § 506(c) by waiving them in exchange for concessions to the estates (including a substantial carve-out for the benefit of administrative creditors)." *In re Molten Metal Technology, Inc.*, 244 B.R. 515, 527 (Bankr. D. Mass. 2000); *see also In re Nutri/System of Florida Assocs.*, 178 B.R. 645, 650 (E.D. Pa. 1995) (noting that debtor had waived its section 506(c) rights in obtaining debtor in possession financing); *In re Telesphere Communications, Inc.*, 179 B.R. 544, 549 (Bank. N.D. Ill. 1994) (approving settlement between debtor and certain lenders wherein debtor waived certain rights — including 506(c) rights — against the lenders in exchange for valuable consideration).

44.    The waiver of surcharge rights is particularly appropriate where, as here, it is tied to the benefit to be received from the Carve-Out. Under the DIP Facility, the Debtors agree to waive any rights to charge costs and expenses against the DIP Collateral or the Pre-Petition Collateral except for the Carve-Out. In other words, the Debtors have waived the uncertainty of surcharge rights in exchange for the valuable and predictable rights granted to the Debtors' other estate professionals under the Carve-Out. *See In re Lunan Family Restaurants Ltd. P'ship*, 192

1336489.9 9/27/11

B.R. 173, 178 (N.D. Ill. 1996) ("The burden of proof is on any proponent of section 506(c) treatment, who must show by a preponderance of evidence that [(1) the expenditure was necessary, (2) the amounts were reasonable, and (3) the secured creditor was the party primarily benefited by the expenditure]." (citing *In re Flagstaff*, 739 F.2d 73, 77 (2d Cir. 1984) and *New Orleans Public Service Inc. v. Delta Towers, Ltd. (In re Delta Towers)*, 112 B.R. 811, 815 (E.D. La. 1990), *rev'd on other grounds sub nom.*, *In re Delta Towers*, 924 F.2d 74 (5th Cir. 1991))).

## C.     **Final Hearing**

45.     The Debtors further respectfully request that the Court schedule the Final Hearing and authorize the Debtors to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, by first-class mail upon the: (a) the Office of the United States Trustee for the District of Delaware; (b) the Office of the United States Attorney for the District of Delaware; (c) the Offices of the United States Attorney for the Commonwealth of Pennsylvania; (d) the Offices of the United States Attorney for the Commonwealth of Kentucky; (e) the Office of the Attorney General for the State of Delaware; (f) the Office of the Attorney General for the Commonwealth of Pennsylvania; (g) the Office of the Attorney General for the Commonwealth of Kentucky; (h) the State of Delaware Department of Labor and Industry; (i) the Commonwealth of Pennsylvania Department of Labor and Industry; (j) the Commonwealth of Kentucky Department of Labor and Industry; (k) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed by the Debtors pursuant to Bankruptcy Rule 1007(d); (l) counsel to PNC Bank, National Association, as lender, issuer and agent for the Debtors' pre-petition and post-petition secured lenders; (m) Schneider Electric USA, Inc., f/k/a Square D Company; (n) the Internal Revenue Service; (o) counsel to the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service

Workers International Union (United Steelworkers, AFL-CIO); (p) the Pension Benefit Guaranty Corporation; (q) counsel to KHC Acquisition, LLC; (r) the United States Environmental Protection Agency; (s) the Commonwealth of Pennsylvania Department of Environmental Protection; (t) the Commonwealth of Kentucky Department of Environmental Protection; (u) all applicable state and local taxing authorities; (v) all parties known to the Debtors asserting liens against the Debtors' assets; (w) all landlords and warehouseman of the Debtors; (x) all guarantors of the Pre-Petition Obligations; (y) all creditors known to the Debtors to be holding a judgment; (z) certain other parties identified in the certificates of service filed with the Court; (aa) the DIP Lenders; (bb) the Pre-Petition Secured Parties; (cc) Roy D. Allen; and (dd) the Equal Employment Opportunity Commission (collectively, the "Notice Parties"). The Debtors request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001 and Local Rule 2002-1.6

## NOTICE

46.    Notice of this Motion has been given to the Notice Parties as set forth above. In light of the nature of the relief requested, the Debtors submit that no further notice is required.

## NO PRIOR REQUEST

47.    No prior request for the relief sought herein has been made to this or any other court.

---

6    Local Rule 2002-1(b) provides that "[i]n chapter 11 cases, all motions . . . shall be served only upon counsel for the debtor, the United States Trustee, counsel for all official committees, all parties who file a request for service of notices pursuant to Fed. R. Bankr. P. 2002(i) and all parties whose rights are affected by the motion. If an official unsecured creditors' committee has not been appointed, service shall be made on the twenty (20) largest unsecured creditors in the case in lieu of the committee."

1336489.9 9/27/11

WHEREFORE, the Debtors respectfully request that the Court enter an interim order substantially in the form attached hereto granting: (i) the relief requested in the Motion; and (ii) such other and further relief as is just and proper.

Dated: September 27, 2011

SAUL EWING LLP

Mark Minuti (DE Bar No. 2659)
Teresa K.D. Currier (DE Bar No. 3080)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6840
Facsimile: (302) 421-5873

-and-

Jeffrey C. Hampton
Adam H. Isenberg
Robyn F. Pollack
Monique A. Bair
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7777
Facsimile: (215) 972-7725

*Proposed Counsel for Debtors
and Debtors-in-Possession*

1336489.9 9/27/11