# Exhibit A

Intercreditor Agreement

# INTERCREDITOR AGREEMENT

This Intercreditor Agreement, dated as of January 20, 2006 (this "Agreement"), is among National City Business Credit, Inc., an Ohio corporation, as agent (in such capacity, the "Agent") for the Senior Creditors (as defined below), Square D Company, a Delaware corporation (the "Subordinated Creditor"), and Hussey Copper Ltd., a Pennsylvania limited partnership (the "Company").

## PRELIMINARY STATEMENTS:

1. The Company, as borrower, the lenders party thereto, as lenders (together with the Agent, the "Senior Creditors" and each, a "Senior Creditor"), and the Agent are parties to the Revolving Credit, Term Loan and Security Agreement dated as of January 20, 2006 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), under which the Senior Creditors agreed to make loans and provide certain financial assistance to the Company. Capitalized terms used in this Agreement and not otherwise defined have the meanings set forth for such terms in the Credit Agreement.

2. The Company is indebted to the Subordinated Creditor under the agreements, instruments and other documents listed on the attached Schedule 1 (as amended, supplemented or otherwise modified from time to time and, together with the other documents entered into in connection with such agreements, instruments and documents, the "Subordinated Documentation"). The whole or part of any amounts owing by the Company or any successor or assignee of the Company, including, without limitation, a receiver or debtor in possession (the term "Company" in this Agreement includes any such successor or assign of the Company), to the Subordinated Creditor under the Subordinated Documentation now or in the future (whether such amounts represent principal or interest, fees, costs or expenses (including attorneys' fees) or obligations that are due or not due, direct or indirect, absolute or contingent or guaranteed) are referred to in this Agreement as the "Subordinated Obligations."

3. The execution and delivery of this Agreement is a condition precedent to the effectiveness of the Credit Agreement and the Senior Creditors are unwilling to extend any credit to the Company under the Credit Agreement or otherwise absent the subordination of the Subordinated Obligations to the Senior Obligations (as defined below) under the terms of this Agreement.

4. The Subordinated Creditor acknowledges that the extension of the Senior Obligations to the Company is of value to the Subordinated Creditor and to fulfill such condition precedent described above and to induce the Senior Creditors to extend credit now and hereafter under the Credit Agreement or otherwise, the Subordinated Creditor and the Company desire to enter into this Agreement.

**AGREEMENT:**

In consideration of the foregoing and the mutual agreements contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Agent, the Subordinated Creditor and the Company agree as follows:

1. Agreement to Subordinate Obligations. (A)The Subordinated Creditor and the Company agree that the payment and performance of the Subordinated Obligations are subordinate, to the extent and in the manner set forth in this Agreement, in right of payment to the prior payment in full of all Obligations, liabilities and indebtedness of the Company to the Senior Creditors, whether secured or unsecured, joint or several, absolute or contingent, due or to become due, whether for payment or performance, whether now existing or hereafter arising, including, without limitation, those arising under the Credit Agreement and the Other Documents and those owed by the Company to a Senior Creditor (including, without limitation, those owed by the Company to a Senior Creditor under any financing provided to the Company as a debtor-in-possession under the United States Bankruptcy Code, 11 U.S.C. § § 101-1330 (as amended the "Bankruptcy Code")), either owned directly or indirectly, incurred directly out of transactions acquired by a Senior Creditor, either conditionally or as collateral security from another person or entity, whether for principal, interest (including, without limitation, interest after the filing of a petition initiating any proceeding referred to in Section 5(A), whether or not allowed), fees, expenses, indemnities or otherwise, together with all extensions, renewals, modifications, supplementations or amendments thereof or any part thereof (all such obligations, liabilities and indebtedness being the "Senior Obligations").

(B) For the purposes of this Agreement, the Senior Obligations are not deemed to have been paid in full until the Senior Creditors have received irrevocable payment of the Senior Obligations in cash and all financing arrangements between the Senior Creditors and the Company have been terminated.

2. Agreement to Subordinate Liens. (A)The Subordinated Creditor acknowledges that, pursuant to the Credit Agreement and the Other Documents, the Company has granted the Agent, for the benefit of the Senior Creditors, a valid and perfected security interest in and lien against substantially all of the Company's assets, which security interest and lien secures the full, prompt and complete payment of the Senior Obligations. After the commencement of a case involving the Company under the Bankruptcy Code, a Senior Creditor may also be granted a security interest in or lien on (i) all property in which the Company grants to such Senior Creditor a lien or security interest pursuant to any financing order or credit agreement relating to debtor-in-possession financing and (ii) all post-petition property of the Company in which such Senior Creditor is granted a replacement lien or other interest. All of the property of the Company in which a Senior Creditor is granted a security interest or lien under the preceding two sentences is referred to collectively as the "Collateral."

(B) Notwithstanding any understanding between the Subordinated Creditor and the Company, the order or time of creation, acquisition, attachment, or the order, time or manner of perfection, or the order or time of filing or recordation of any document or instrument, or other method of perfecting a security interest or lien on and against any of the Collateral or

2

other assets of the Company, any lien or security interest now or hereafter existing in and to the Collateral in favor of the Subordinated Creditor shall be and at all times remain subject and subordinate in all respects to any lien or security interest that may now or hereafter at any time or from time to time be granted to the Agent, for the benefit of the Senior Creditors, on or in any or all of the Collateral as security for the Senior Obligations.

3. Restrictions on Payment of the Subordinated Obligations. Until the Agent, for the benefit of the Senior Creditors, has received payment of the Senior Obligations in full, no Company will make, and the Subordinated Creditor will not accept, payments (of any nature whatsoever, whether for principal, interest, fees or expenses or return of capital) for or on account of the Subordinated Obligations; provided that so long as a notice of an Event of Default has not been delivered to the Company (with a copy to the Subordinated Creditor) and the Event of Default giving rise to such notice has not been waived, the Company may make, and the Subordinated Creditor may accept scheduled payments of interest on the Subordinated Obligations made in accordance with the terms of the Subordinated Documentation. In addition, the Company may make, and the Subordinated Creditor may accept, principal payments on the Subordinated Obligations provided that (i) no Default or Event of Default shall exist prior to or after giving effect to such payment, including without limitation, any Default under Section 6.6 [Fixed Charge Coverage Ratio] after giving pro forma effect to such payment, (ii) after giving effect to such payment, the Borrower shall have Undrawn Availability of at least $7,500,000, (iii) the aggregate of all such payments in any fiscal year shall not exceed the lesser of twenty-five percent (25%) of the Borrower's Excess Cash Flow (as hereinafter defined) for the immediately preceding fiscal year or $300,000, and (iv) no such principal payments shall be made until the Agent's receipt of the audited financial statements of the Borrower for the fiscal year ended December 31, 2006. For purposes of this Agreement, "Excess Cash Flow" shall mean the difference between (x) EBITDA minus Capital Expenditures that were not specifically funded by Indebtedness (other than a Revolving Advance) of the Borrower with respect to such fiscal year, minus cash taxes paid of the Borrower with respect to such fiscal year minus cash distributions permitted under Section 7.7 of the Credit Agreement with respect to such fiscal year and (y) Fixed Charges for such fiscal year, all the foregoing as set forth in the audited financial statements of the Borrower for such fiscal year.

4. Limitation on Liens. Without the prior written consent of the Agent (i) the Subordinated Creditor will not obtain as security for the Subordinated Obligations any lien or security interest on any assets or properties of the Company other than those assets that are currently subject to the security interest (including, without limitation, the security interest with respect to after-acquired property) granted under the Subordinated Documentation as now in force and effect and without giving effect to any modification or amendment thereof and (ii) any lien or security interest that the Subordinated Creditor at any time obtains on any assets or properties of the Company will only secure the Subordinated Obligations and the costs of collecting or enforcing the Subordinated Obligations.

5. In Furtherance of Subordination. (A) Upon any distribution of all or any of the assets of the Company to creditors of the Company upon the dissolution, winding up, liquidation, arrangement or reorganization of the Company, whether in any bankruptcy, insolvency, arrangement, reorganization or receivership proceedings or upon an assignment for the benefit of

3

creditors or any other marshalling of the assets and liabilities of the Company or otherwise, any payment or distribution of any kind (whether in cash, property or securities) that otherwise would be payable or deliverable upon or with respect to the Subordinated Obligations will be paid or delivered directly to the Agent for the benefit of the Senior Creditors for application (in the case of cash) to or as collateral (in the case of noncash property or securities) for the payment or prepayment of the Senior Obligations until the Senior Obligations have been paid in full (in all cases as set forth in Section 14 hereof and in Section 11.5 of the Credit Agreement).

(B) If any proceeding referred to in Section 5(A) is commenced by or against the Company:

(i) the Agent is irrevocably authorized and empowered (in its own name or in the name of the Subordinated Creditor or otherwise), but has no obligation, to demand, sue for, collect and receive every payment or distribution referred to in Section 5(A) and give acquittance therefor and to file claims and proofs of claim and take such other action (including, without limitation, voting and proving the Subordinated Obligations or enforcing any security interest or other lien securing payment of the Subordinated Obligations) as it may deem necessary or advisable for the exercise or enforcement of any of the rights or interests of the Agent and the other Senior Creditors under this Agreement; and

(ii) the Subordinated Creditor will duly and promptly take such reasonable actions as the Agent may request (a) to collect the Subordinated Obligations for the account of the Senior Creditors and to file and prove appropriate claims or proofs of claim in respect of the Subordinated Obligations, (b) to execute and deliver to the Agent such powers of attorney, assignments or other instruments as it may request in order to enable it to enforce any and all claims with respect to, and any security interests and other liens securing payment of, the Subordinated Obligations and (c) to collect and receive any and all payments or distributions that may be payable or deliverable upon or with respect to the Subordinated Obligations.

(C) All payments or distributions upon or with respect to the Subordinated Obligations that are received by the Subordinated Creditor contrary to the provisions of this Agreement are received in trust for the benefit of the Senior Creditors, will be segregated from other funds and property held by the Subordinated Creditor and will be immediately paid over to the Agent for the benefit of the Senior Creditors in the same form as so received (with any necessary indorsement) to be applied (in the case of cash) to or held as collateral (in the case of noncash property or securities) for the payment or prepayment of the Senior Obligations in accordance with Section 14 and in Section 11.5 of the Credit Agreement.

(D) The Agent on behalf of the Senior Creditors is authorized to demand specific performance of this Agreement, whether or not the Company has complied with any of the provisions of this Agreement applicable to it, at any time when the Subordinated Creditor has failed to comply with any provision of this Agreement applicable to it.

(E) The Agent and the other Senior Creditors are under no obligation to marshal any collateral or any other assets of the Company or any other person in favor of the Subordinated Creditor or otherwise in connection with obtaining payment of any or all of the

4

Senior Obligations from any person or source and hereby waives any right that it may now or in the future have to the fullest extent permitted by applicable law to any such marshalling of assets or similar relief.

6. No Commencement of Any Proceeding or Remedies; No Offset. (A) So long as any of the Senior Obligations have not been paid in full, the Subordinated Creditor (i) will not commence, or join with any creditor other than the Senior Creditors in commencing, any proceeding referred to in Section 5(A) or take any other action, judicial or otherwise, to enforce the Subordinated Obligations, (ii) will refrain from exercising any and all remedies available to it under the Subordinated Documentation and any and all remedies otherwise permitted by applicable law upon a default under any Subordinated Obligations and (iii) will not contest the validity, priority or enforceability of the Agent's or the Senior Creditors' rights or the Company's obligations under the Credit Agreement or the Other Documents.

(B) So long as any of the Senior Obligations have not been paid in full, the Subordinated Creditor waives all rights of setoff, recoupment, withholding, claim, counterclaim or any other deductions or defenses it may have against the Company in connection with Receivables now or hereafter payable by Subordinated Creditor to the Company or against Agent (as assignee or secured party with respect to such Receivables), in each case with respect to the Subordinated Debt or any other amounts which may now or hereafter be due to Subordinated Creditor from the Company for any reason. The Subordinated Creditor acknowledges that the Senior Creditors are relying on the waiver set forth in this Section 6(B) in extending credit to the Company under the Credit Agreement. Notwithstanding anything to the contrary set forth in this Agreement, the Agent and the Senior Creditors acknowledge that the Subordinated Creditor may from time to time have Toll Inventory at the Company premises, that such Toll Inventory is not part of the Collateral, and that such Toll Inventory shall remain the sole property of Subordinated Creditor. Such Toll Inventory is not covered by this Agreement and the Subordinated Creditor may take or refrain from any action with respect to such Toll Inventory without accounting or notice to the Agent or the Senior Creditors.

7. Rights of Subrogation. No payment or distribution to the Senior Creditors under the provisions of this Agreement entitles the Subordinated Creditor to exercise any rights of subrogation in respect of such payments or distributions until the Senior Obligations have been paid in full.

8. Further Assurances. (A) The Subordinated Creditor and the Company will cause each instrument evidencing Subordinated Obligations to be endorsed with a legend indicating that the obligations evidenced by such instrument is subordinated to the prior payment in full of the Senior Obligations as set forth in this Agreement. The Subordinated Creditor and the Company will further mark their respective books of account in such manner as is effective to give proper notice of the effect of this Agreement and will, in the case of any Subordinated Obligations that are not evidenced by any instrument, upon the Agent's request cause such Subordinated Obligations to be evidenced by an appropriate instrument or instruments endorsed with the above described legend.

(B) The Subordinated Creditor and the Company will, at the Company's expense and at any time and from time to time, promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary, or that the Agent may reasonably request, in order to protect any right or interest granted or purported to be granted by this Agreement or to enable the Senior Creditors to exercise and enforce their rights and remedies under this Agreement.

9. No Change in or Disposition of Subordinated Obligations. (A) The Subordinated Creditor will not (i) sell, assign, pledge, encumber or otherwise dispose of any of the Subordinated Obligations, (ii) assign or transfer any lien or security interest now or hereafter existing in and to the collateral provided under the Subordinated Documentation or release such collateral from the liens and security interests granted under the Subordinated Documentation, (iii) cancel or otherwise discharge any of the Subordinated Obligations (except upon payment in full of the Senior Obligations) or (iv) subordinate any of the Subordinated Obligations to any other indebtedness of the Company other than to the Senior Obligations.

(B) Without the prior written consent of the Agent, the Subordinated Creditor shall not amend, modify, restate or supplement any of the Subordinated Documents if the direct or indirect effect of such amendment, modification, restatement or supplement would (i) cause the effective rate of interest charged on the Subordinated Obligations to increase, (ii) cause the principal amount of the Subordinated Obligations to increase (other than an increase in principal amount resulting from the capitalization of any interest payment that is not paid in cash to Subordinated Creditor), (iii) change the due date of any payment for principal of or interest on the Subordinated Obligations, if the effect thereof would be to accelerate the payment thereof, (iv) change the form or method of payment of the Subordinated Obligations, (v) increase the amount of any fees payable by the Company to the Subordinated Creditor under the Subordinated Documents or (vi) impose covenants upon the Company in addition to, or that are more restrictive than, the covenants set forth in the Subordinated Documents as in effect on the date hereof (or as amended in accordance with this Section 9(B)).

(C) Without the prior written consent of the Subordinated Creditor, the Senior Creditors shall not extend credit to the Company under the Credit Agreement in excess of $73,000,000, exclusive of any Obligations under Interest Rate Protection Agreements and Hedging Contracts.

10. Collateral Matters. (A) The Senior Creditors shall have complete and sole discretion in, and shall not be liable to the Subordinated Creditor for, determining how, when and in what manner the Senior Creditors administer the Senior Obligations or foreclose or otherwise realize upon the Collateral or exercise any rights or remedies of a secured party or lien creditor or any other rights with respect to the Collateral or otherwise take any action with respect thereto. Without in any way limiting the foregoing, the Senior Creditors may take such action as they deem appropriate to enforce the Agent's lien on and security interest in the Collateral, whether or not such action is beneficial to the Subordinated Creditor's interest. In order for the Agent to enforce its rights in the Collateral, there shall be no obligation on the part of the Agent or any other Senior Creditor, at any time, to resort for payment of the Senior Obligations to any obligor thereon or any guarantor thereof, or to any other person or corporation, their properties or estates,

or to resort to any other rights or remedies whatsoever, and the Senior Creditors shall have the right to foreclose or otherwise realize upon the Collateral upon which they have a security interest irrespective of whether or not other proceedings or steps are pending seeking resort to or realization upon or from any of the foregoing.

(B) In the event any Senior Creditor shall come into the possession, custody and control of any property or assets of the Company as the result of any security interest granted to secure the Senior Obligations, such Senior Creditor may, to the extent such Senior Creditor does not apply the same to the payment or partial payment of the Senior Obligations, release the same to or upon the order of the Company, without notice, or accounting for the same, to the Subordinated Creditor or any other person, firm or corporation whomsoever, it being specifically understood and agreed that any property so released shall remain subject to all claims of the Subordinated Creditor and the Senior Creditors thereto in accordance herewith. Without limiting the foregoing, the Senior Creditors in the course of administering credit extensions to the Company may from time to time in their discretion release proceeds of the Collateral in which the Senior Creditors have a security interest to the Company or otherwise deal with the Collateral in which the Senior Creditors have a security interest, without any notice or accounting to the Subordinated Creditor whatsoever.

(C) Whether or not a default has occurred in payment of the Subordinated Obligations, the Subordinated Creditor's lien on or security interest in the Collateral or any portion thereof shall automatically be released ipso facto as to all indebtedness secured thereby owing to the Subordinated Creditor if, when and to the same extent that the Agent releases its Lien on such Collateral or portion thereof unless such release is being conducted in connection with a refinancing in full of the Senior Obligations. The Subordinated Creditor will execute and deliver such further instruments and do such further acts as the Agent may deem necessary or proper to carry out more effectively the foregoing.

(D) So long as the Senior Obligations are outstanding, the Subordinated Creditor will without demand or request being made upon them deliver any parts or proceeds of the Collateral which shall come into their possession, control or custody (other than pursuant to Section 3) to the Agent for the benefit of the Senior Creditors for application as set forth in Section 14 and in the Credit Agreement.

11. Obligations under this Agreement Not Affected. (A) All rights and interests of the Senior Creditors under this Agreement, and all agreements and obligations of the Subordinated Creditor and the Company under this Agreement, remain in full force and effect irrespective of:

(i) any lack of validity or enforceability of the Credit Agreement or the Other Documents;

(ii) any increase or decrease in the amount of the Senior Obligations or the commitments therefor, any increase or decrease in the interest rates applicable to the Senior Obligations, any change in the time, manner or place of payment of, or in any other term of, all or

7

any of the Senior Obligations, or any other amendment or waiver of or any consent to or departure from the Credit Agreement or the Other Documents;

        (iii) any exchange, release or nonperfection of any collateral granted by the Company under the Credit Agreement or the Other Documents, or any release or amendment or wavier of or consent to or departure from any guaranty, for all or any of the Senior Obligations; or

        (iv) any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Company in respect of the Senior Obligations or the Subordinated Creditor in respect of this Agreement.

        (B) To the extent that the Company or any guarantor of or provider of collateral for the Senior Obligations makes any payment on the Senior Obligations that is subsequently invalidated, declared to be a fraudulent or preferential transfer, conveyance or set aside or is required to be repaid to the Company or such other person as a debtor in possession, a trustee, receiver or any other party under any bankruptcy, insolvency or reorganization act, state or federal law, common law or equitable cause (such payment being a "Voided Payment"), then to the extent of such Voided Payment, that portion of the Senior Obligations that had been previously satisfied by such Voided Payment will be revived and continue in full force and effect as if such Voided Payment had never been made. If a Voided Payment is recovered from a Senior Creditor, an Event of Default is deemed to have existed and to be continuing under the Credit Agreement from the date of such Senior Creditor's initial receipt of such Voided Payment until the full amount of such Voided Payment is restored to such Senior Creditor. During any continuance of any such Event of Default, this Agreement remains in full force and effect with respect to the Subordinated Obligations. To the extent that the Subordinated Creditor has received any payments with respect to the Subordinated Obligations subsequent to the date of a Senior Creditor's initial receipt of such Voided Payment and such payments have not been invalidated, declared to be a fraudulent or preferential transfer, conveyance or set aside or are required to be repaid to the Company as a debtor in possession, a trustee, receiver, or any other party under any bankruptcy, insolvency or reorganization act, state or federal law, common law or equitable cause, the Subordinated Creditor will be obligated and agrees that any such payment so made or received will be deemed to have been received in trust for the benefit of the Senior Creditors and the Subordinated Creditor agrees to pay to the Agent for the benefit of the Senior Creditors upon demand, the full amount so received by the Subordinated Creditor during such period of time to the extent necessary fully to restore to such Senior Creditor the amount of such Voided Payment.

        (C) Except as specifically described in this Agreement, nothing contained in this Agreement or in any instrument evidencing any Subordinated Obligations is intended to or impairs, as between the Company, its creditors other than the Senior Creditors and the Subordinated Creditor, the obligations of the Company, which are absolute and unconditional, to pay to the Subordinated Creditor the Subordinated Obligations as and when they become due and payable in accordance with their terms, subject, however, to the terms of this Agreement. Except as specifically described in this Agreement, nothing contained in this Agreement or in any instrument evidencing any Subordinated Obligations is intended to or affects the relative rights of

the Subordinated Creditor and creditors of the Company other than the Senior Creditors. As between the Company, its creditors other than the Senior Creditors and the Subordinated Creditor, no payments or distributions otherwise payable or deliverable in respect of the Subordinated Obligations, that are paid or delivered to the Senior Creditors under this Agreement, are deemed to be a payment by the Company on account of the Subordinated Obligations.

12. <u>Subordinated Creditor's Waivers.</u> (A)The Subordinated Creditor and the Company expressly waive any notice of the acceptance by the Senior Creditors of the subordination and other provisions of this Agreement and all other notices not specifically required under the terms of this Agreement whatsoever, and the Subordinated Creditor and the Company expressly consent to reliance by the Senior Creditors upon the subordination and other agreements as provided in this Agreement.

(B) The Senior Creditors:

(i) have made no warranties or representations with respect to the due execution, legality, validity, completeness or enforceability of the Credit Agreement or the Other Documents or the collectibility of the Senior Obligations;

(ii) are entitled to manage and supervise loans to the Company in accordance with applicable law and the terms of the Credit Agreement or the Other Documents and without regard to the existence of any rights that the Subordinated Creditor may now or in the future have in or to any of the assets of the Company;

(iii) have no liability to the Subordinated Creditor for, and the Subordinated Creditor waives and releases the Senior Creditors from any and all liability with respect to, any claim that the Subordinated Creditor may now or in the future have against any Senior Creditor arising out of (a) any and all actions that a Senior Creditor takes or omits to take in connection with the Senior Obligations (including, without limitation, actions with respect to the creation, perfection or continuation of liens or security interests in collateral and other security for the Obligations), (b) any and all actions with respect to the occurrence of an Event of Default, actions with respect to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, any collateral or (c) any and all actions with respect to the collection of any claim securing all or any part of the Obligations from any account debtor, guarantor or any other party with respect to the Credit Agreement or the Other Documents or the collection of the Obligations or the valuation, use, protection or release of Collateral or other security for the Obligations; and

(iv) may elect, in any bankruptcy proceeding of the Company, the application of section 1111(b)(2) of the Bankruptcy Code.

13. <u>Information Concerning Financial Condition of the Company.</u> The Subordinated Creditor assumes responsibility for keeping itself informed of the financial condition of the Company and of all other circumstances bearing upon the risk of nonpayment of all or any part of the Subordinated Obligations. The Subordinated Creditor agrees that no Senior Creditor has a duty to advise it of information known to such Senior Creditor regarding such condition or any

such circumstance. In the event that a Senior Creditor in its sole discretion undertakes at any time or from time to time to provide any such information to the Subordinated Creditor, such Senior Creditor is under no obligation (i) to undertake any investigation, (ii) to disclose any information that it wishes to maintain confidential or (iii) to make any other or future disclosures of such information or any other information to the Subordinated Creditor.

14. Application of Payments. Payments received by the Agent on behalf of the Senior Creditors under this Agreement will be applied by the Senior Creditors to payment of the Senior Obligations in the following order, unless a court of competent jurisdiction otherwise directs:

(i) first, to payment of all costs, expenses and fees of the Senior Creditors incurred in connection with the collection and enforcement of the Obligations and the Senior Obligations;

(ii) second, to payment of that portion of the Senior Obligations until paid in full; and

(iii) third, the balance, if any, after all of the Senior Obligations have been satisfied, will be returned by the Senior Creditors to the Subordinated Creditor, its successors or assigns or to whomsoever may be lawfully entitled to receive the same as a court of competent jurisdiction may direct.

15. Amendment; Waiver. This Agreement may be amended only by a writing executed by the Subordinated Creditor, the Company and the Agent. No waiver of any provision of this Agreement is effective unless it is in writing and signed by the Subordinated Creditor, the Company and the Agent.

16. Expenses. The Company and the Subordinated Creditor, jointly and severally, agree to pay, upon demand, to the Agent for the benefit of the Senior Creditors the amount of any and all reasonable expenses, including the reasonable fees and expenses of its attorneys and paralegals, that any Senior Creditor may incur in connection with the exercise or enforcement of its rights or interests under this Agreement.

17. Addresses for Notices. Any notice or other communication required hereunder shall be in writing (messages sent by e-mail or other electronic transmission (other than by facsimile) shall not constitute a writing), and shall be deemed to have been validly served, given or delivered when received by the recipient if hand delivered, sent by commercial overnight courier or sent by facsimile, or three Business Days after deposit in the United States mail, with proper first class postage prepaid and addressed to the party to be notified at the address specified on the signature page of this Agreement or at such other address as is designated by such party in a written notice to each other party complying as to delivery with the terms of this Section 17. Any notice required to be given by or to the Company hereunder will be deemed received or given, as the case may be, if such notice is given by or to the Company in compliance with this Section 17.

18. No Waiver; Remedies. No failure on the part of a Senior Creditor to exercise, and no delay in exercising, any right under this Agreement operates as a waiver of such right, nor does any single or partial exercise of any right under this Agreement preclude any other or further exercise of such right or the exercise of any other right. The remedies provided in this Agreement are cumulative and not exclusive of any remedies provided by law.

19. Continuing Agreement; Transfer of Senior Obligations. This Agreement is a continuing agreement and (i) remains in full force and effect until the Senior Obligations have been paid in full, (ii) is binding upon the Subordinated Creditor, the Company, the Agent and their respective successors, transferees, participants and assigns and (iii) inures to the benefit of and is enforceable by the Agent and the Subordinated Creditor and their successors, transferees, participants and assigns. Without limiting the generality of clause (iii) above, the Senior Creditors may, in accordance with the Credit Agreement, assign, participate or otherwise transfer the Senior Obligations to any other person or entity, which person or entity upon such transfer becomes vested with all the rights in respect of such Senior Obligations granted to the Senior Creditors in this Agreement or otherwise.

20. Bankruptcy. (A) The Subordinated Creditor will not contest, oppose, object or withhold its consent to, directly or indirectly, (i) any request by a Senior Creditor for adequate protection of such Senior Creditor's claims under the Bankruptcy Code, (ii) any objection filed by a Senior Creditor to any motion, relief, action or proceeding, if such Senior Creditor bases such objection (in whole or in part) on a lack of adequate protection of such Senior Creditor's claims, (iii) the entry of any cash collateral order supported by a Senior Creditor, (iv) the entry of any order or sale of all or any portion of the Collateral supported by the Senior Creditors (whether pursuant to section 363 of the Bankruptcy Code or otherwise), (v) the entry of any financing order involving a Senior Creditor as a lender (whether under section 364 of the Bankruptcy Code or otherwise) or (vi) the entry of an order approving any plan of reorganization (including, without limitation, a liquidating plan) that provides for the sale of any of the Collateral, if the Senior Creditors approve of such plan of reorganization.

(B) The Subordinated Creditor agrees not to seek or request relief from the automatic stay under any provision of the Bankruptcy Code, or seek or request any adequate protection of the Subordinated Creditor's claims under any provision of the Bankruptcy Code.

21. Credit Documentation. The Agent and the Subordinated Creditor each represent and warrant to the other that it has (i) in the case of the Agent, delivered to the Subordinated Creditor true, correct and complete copies of the Credit Agreement and the primary Other Documents and (ii) in the case of the Subordinated Creditor, delivered to the Agent true, correct and complete copies of the Subordinated Documentation.

22. Construction. (A) Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against any party, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by each of the parties and their counsel and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

(B) Unless the context of this Agreement requires otherwise, the plural includes the singular, the singular includes the plural, and "including" has the inclusive meaning of "including without limitation." The words "hereof," "herein," "hereby", "hereunder" and other similar terms of this Agreement refer to this Agreement as a whole and not exclusively to any particular provision of this Agreement. All pronouns and any variations thereof shall be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the person or persons may require.

(C) Section and other headings are for reference only, and shall not affect the interpretation or meaning of any provision of this Agreement. Unless otherwise provided, references to articles, sections, schedules, annexes and exhibits shall be deemed references to articles, sections, schedules, annexes and exhibits of this Agreement. References in this Agreement (i) to any other agreement are deemed to refer to such agreements as the same may be amended, restated, supplemented or otherwise modified from time to time under the provisions hereof or thereof (unless expressly stated otherwise) and (ii) to any law, rule or regulation are deemed to refer to such law, rule or regulation as it may be amended, supplemented or otherwise modified from time to time, and any successor law, rule or regulation. Any reference to a person includes the successors and assigns of such person, but such reference shall not increase, decrease or otherwise modify in any way the provisions in this Agreement governing the assignment of rights and obligations under or the binding effect of any provision of this Agreement.

23. Governing Law; Severability. THE VALIDITY, INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA. If any provision of this Agreement is held to be illegal or unenforceable, such provision shall be fully severable, and the remaining provisions of the applicable agreement shall remain in full force and effect and shall not be affected by such provision's severance. Furthermore, in lieu of any such provision, there shall be added automatically as a part of the applicable agreement a legal and enforceable provision as similar in terms to the severed provision as may be possible.

24. WAIVER OF JURY TRAIL, PERSONAL SERVICE; DAMAGES. THE COMPANY, THE SUBORDINATED CREDITOR AND THE AGENT EACH WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF THIS AGREEMENT. THE COMPANY AND THE SUBORDINATED CREDITOR IRREVOCABLY WAIVES PERSONAL SERVICE OF PROCESS AND CONSENTS TO SERVICE OF PROCESS BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED. IN NO EVENT WILL THE SENIOR CREDITORS BE LIABLE FOR LOST PROFITS OR OTHER SPECIAL OR CONSEQUENTIAL DAMAGES.

25. CONSENT TO JURISDICTION. THE SUBORDINATED CREDITOR, IN CONNECTION WITH ANY LITIGATION ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED BY THIS AGREEMENT, CONSENTS TO THE JURISDICTION OF THE FEDERAL COURT OF THE WESTERN DISTRICT OF PENNSYLVANIA OR, IF SUCH COURT LACKS JURISDICTION, THEN TO THE JURISDICTION OF THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY,

PENNSYLVANIA, AND WAIVES ANY OBJECTION BASED UPON FORUM NON CONVENIENS AND ANY OBJECTION TO VENUE OF ANY ACTION INSTITUTED UNDER THIS AGREEMENT.

26. <u>Agreement by the Company</u>. The Company agrees that it will not make any payment of any of the Subordinated Obligations, or take any other action, in contravention of the provisions of this Agreement.

27. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts and by the different parties to this Agreement on separate counterparts and each such counterpart is deemed to be an original, but all such counterparts together constitute but one and the same Agreement.

**[SIGNATURE PAGE FOLLOWS]**

**[SIGNATURE PAGE 1 OF 3 TO INTERCREDITOR AGREEMENT]**

Executed and delivered as of the day and year first above written.

                                NATIONAL CITY BUSINESS CREDIT,
                                INC., as Agent

                                By:_____
                                Title:_____

                                1965 East Sixth Street, 4th Floor
                                Cleveland, OH 44114
                                Attention: Anthony Alexander
                                Facsimile: (216) 222-9302

SQUARE D COMPANY

By: /s/ [signature]
Title: Sr. V.P Chief Financial Officer

Address: 1415 S. Roselle Rd.
Palatine IL 60067
Attention: Patricia Tauchert
Facsimile: 847-925-7419

HUSSEY COPPER LTD.
By: Hussey Copper Corp., its general partner

By: /s/ Roy D. Allen
Name: Roy D. Allen
Title: President

100 Washington Street
Leetsdale, Pennsylvania 15056
Attention: Roy D. Allen
Facsimile Number: (724) 251-4497

## SCHEDULE 1

### Description of the Subordinated Documentation

1. Amended and Restated Promissory Note dated as of January ___, 2006, made by Hussey Copper Ltd. In favor of Square D Company in the original principal amount of $3,000,000.

2. Security Agreement dated as of January ___, 2006, between Hussey Copper Ltd. and Square D Company.

3. Open-End Fee and Leasehold Mortgage, Fixture Filing and Assignment of Leases and Rents dated as of January ___, 2006, by and among Hussey Copper Ltd., O-A-P Partnership and Square D Company relating to property located at 100 Washington Street, Leetsdale, Pennsylvania 15056.

4. Fee and Leasehold Mortgage, Fixture Filing and Assignment of Lease and Rents by and among Hussey Copper Ltd., O-A-P Partnership and Square D Company dated as of January ___, 2006 relating to property located at 1178 Mulberry Road, Eminence, Kentucky 40019.