# Exhibit 1

Debtor-in-Possession Financing Agreement

**DEBTOR-IN-POSSESSION FINANCING AGREEMENT**

**PNC BANK, NATIONAL ASSOCIATION**

**(AS LENDER AND AS AGENT)**

**WITH**

**HUSSEY COPPER LTD.**

**and**

**EACH OTHER PERSON THAT MAY BE JOINED AS A BORROWER HERETO**

**(as BORROWERS)**

**SEPTEMBER___, 2011**

# TABLE OF CONTENTS

I.   DEFINITIONS AND ACKNOWLEDGMENT. ...............................................................2
     1.1.   Accounting Terms...............................................................................................2
     1.2.   General Terms.....................................................................................................2
     1.3.   Uniform Commercial Code Terms ...................................................................29
     1.4.   Certain Matters of Construction.......................................................................29

II.  ADVANCES, PAYMENTS......................................................................................31
     2.1.   Revolving Advances. ........................................................................................31
     2.2.   Procedure for Revolving Advances Borrowing. ..............................................33
     2.3.   Disbursement of Advance Proceeds .................................................................33
     2.4.   Reserved.............................................................................................................33
     2.5.   Maximum Advances ..........................................................................................33
     2.6.   Repayment of Advances. ...................................................................................34
     2.7.   Repayment of Excess Advances .......................................................................34
     2.8.   Statement of Account.........................................................................................34
     2.9.   Letters of Credit ................................................................................................35
     2.10.  Issuance of Letters of Credit. ...........................................................................35
     2.11.  Requirements For Issuance of Letters of Credit. .............................................36
     2.12.  Disbursements, Reimbursement.......................................................................36
     2.13.  Repayment of Participation Advances. .............................................................37
     2.14.  Documentation ..................................................................................................38
     2.15.  Determination to Honor Drawing Request .......................................................38
     2.16.  Nature of Participation and Reimbursement Obligations .................................38
     2.17.  Indemnity ..........................................................................................................40
     2.18.  Liability for Acts and Omissions .....................................................................40
     2.19.  Additional Payments .........................................................................................41
     2.20.  Manner of Borrowing and Payment..................................................................41
     2.21.  Mandatory Prepayments ...................................................................................43
     2.22.  Use of Proceeds.................................................................................................43
     2.23.  Defaulting Lender. ............................................................................................44

III. INTEREST AND FEES. ...........................................................................................45
     3.1.   Interest...............................................................................................................45
     3.2.   Letter of Credit Fees. ........................................................................................45
     3.3.   Commitment Fee, Facility Fee and Termination Fee. ......................................46
     3.4.   Collateral Evaluation Fee, Collateral Monitoring Fee and Appraisals. ...........46
     3.5.   Computation of Interest and Fees .....................................................................47
     3.6.   Maximum Charges.............................................................................................47
     3.7.   Increased Costs .................................................................................................47
     3.8.   Reserved.............................................................................................................48
     3.9.   Capital Adequacy. .............................................................................................48
     3.10.  Gross Up for Taxes ...........................................................................................48
     3.11.  Withholding Tax Exemption..............................................................................49

IV.  COLLATERAL:  GENERAL TERMS......................................................................50

| | | |
|---|---|---|
| 4.1. | Security Interest in the Collateral | 50 |
| 4.2. | Perfection of Security Interest | 50 |
| 4.3. | Disposition of Collateral | 51 |
| 4.4. | Preservation of Collateral | 51 |
| 4.5. | Ownership of Collateral. | 51 |
| 4.6. | Defense of Agent's and Lenders' Interests | 52 |
| 4.7. | Books and Records | 52 |
| 4.8. | Financial Disclosure. | 52 |
| 4.9. | Compliance with Laws | 53 |
| 4.10. | Inspection of Premises | 53 |
| 4.11. | Insurance | 53 |
| 4.12. | Failure to Pay Insurance. | 54 |
| 4.13. | Payment of Taxes. | 54 |
| 4.14. | Payment of Leasehold Obligations | 55 |
| 4.15. | Receivables. | 55 |
| 4.16. | Inventory | 58 |
| 4.17. | Maintenance of Equipment | 58 |
| 4.18. | Exculpation of Liability | 58 |
| 4.19. | Environmental Matters. | 58 |
| 4.20. | Financing Statements | 60 |
| V. | SUPERPRIORITY CLAIMS, COLLATERAL SECURITY, ETC. | 61 |
| 5.1. | Superpriority Claims and Collateral Security | 61 |
| 5.2. | No Filings Required | 62 |
| 5.3. | Grants, Rights and Remedies | 62 |
| 5.4. | No Discharge; Survival of Claims | 62 |
| 5.5. | Survival | 63 |
| 5.6. | Disavowal and Waiver of Any Subsequent Relief Based on Changed Circumstances | 63 |
| 5.7. | Exclusive Remedy For Any Alleged Post-Petition Claim | 64 |
| 5.8. | Prohibition on Surcharge; Etc | 64 |
| 5.9. | Marshalling Obligations. | 64 |
| 5.10. | Bankruptcy Notices. | 65 |
| VI. | REPRESENTATIONS AND WARRANTIES. | 65 |
| 6.1. | Authority | 65 |
| 6.2. | Formation and Qualification. | 65 |
| 6.3. | Survival of Representations and Warranties | 66 |
| 6.4. | Tax Returns | 66 |
| 6.5. | Financial Statements. | 66 |
| 6.6. | Entity Names. | 66 |
| 6.7. | O.S.H.A. and Environmental Compliance. | 66 |
| 6.8. | No Litigation, Violation, Indebtedness or Default. | 67 |
| 6.9. | Patents, Trademarks, Copyrights and Licenses | 68 |
| 6.10. | Licenses and Permits. | 68 |
| 6.11. | Default of Indebtedness | **Error! Bookmark not defined.** |
| 6.12. | No Default. | 69 |

| | | |
|---|---|---|
| 6.13. | No Burdensome Restrictions | 69 |
| 6.14. | No Labor Disputes | 69 |
| 6.15. | Margin Regulations | 69 |
| 6.16. | Investment Company Act | 69 |
| 6.17. | Disclosure | 69 |
| 6.18. | Swaps | 69 |
| 6.19. | Conflicting Agreements | 70 |
| 6.20. | Application of Certain Laws and Regulations | 70 |
| 6.21. | Business and Property of Borrowers | 70 |
| 6.22. | Section 20 Subsidiaries | 70 |
| 6.23. | Anti-Terrorism Laws. | 70 |
| 6.24. | Trading with the Enemy | 71 |
| 6.25. | Federal Securities Laws | 71 |
| 6.26. | Equity Interests | 71 |
| 6.27. | Bankruptcy Matters. | **Error! Bookmark not defined.** |
| VII. | AFFIRMATIVE COVENANTS. | 71 |
| 7.1. | Payment of Fees | 71 |
| 7.2. | Conduct of Business and Maintenance of Existence and Assets | 72 |
| 7.3. | Violations | 72 |
| 7.4. | Government Receivables | 72 |
| 7.5. | Financial Covenants. | 72 |
| 7.6. | Execution of Supplemental Instruments | 73 |
| 7.7. | Payment of Indebtedness | 73 |
| 7.8. | Standards of Financial Statements | 73 |
| 7.9. | Federal Securities Laws | 73 |
| 7.10. | Bankruptcy Schedules. | 73 |
| VIII. | NEGATIVE COVENANTS. | 74 |
| 8.1. | Merger, Consolidation, Acquisition and Sale of Assets. | 74 |
| 8.2. | Creation of Liens. | 74 |
| 8.3. | Guaranties | 74 |
| 8.4. | Investments | 74 |
| 8.5. | Loans | 74 |
| 8.6. | Capital Expenditures | 74 |
| 8.7. | Dividends / Distributions | 75 |
| 8.8. | Indebtedness | 75 |
| 8.9. | Nature of Business | 75 |
| 8.10. | Transactions with Affiliates | 75 |
| 8.11. | Leases | 75 |
| 8.12. | Subsidiaries. | 75 |
| 8.13. | Fiscal Year and Accounting Changes | 75 |
| 8.14. | Pledge of Credit | 76 |
| 8.15. | Amendment of Articles of Incorporation, By-Laws, Certificate of Formation or Operating Agreement | 76 |
| 8.16. | Compliance with ERISA | 76 |
| 8.17. | Prepayment of Indebtedness | 76 |

074658.01807/12123123v.11

| 8.18. | Anti-Terrorism Laws | 76 |
|---|---|---|
| 8.19. | Trading with the Enemy Act | 77 |
| 8.20. | Bankruptcy Matters | 77 |

| IX. | CONDITIONS PRECEDENT. | 77 |
|---|---|---|
| 9.1. | Conditions to Initial Advances | 77 |
| 9.2. | Conditions to Each Advance | 81 |

| X. | INFORMATION AS TO BORROWERS | 82 |
|---|---|---|
| 10.1. | Disclosure of Material Matters | 82 |
| 10.2. | Schedules | 82 |
| 10.3. | Environmental Reports | 83 |
| 10.4. | Litigation | 83 |
| 10.5. | Material Occurrences | 83 |
| 10.6. | Government Receivables | 83 |
| 10.7. | Annual Financial Statements | 83 |
| 10.8. | Quarterly Financial Statements | 84 |
| 10.9. | Monthly Financial Statements | 84 |
| 10.10. | Other Reports | 84 |
| 10.11. | Additional Information | 84 |
| 10.12. | Budget | 84 |
| 10.13. | Variances From Operating Budget | 85 |
| 10.14. | Notice of Suits, Adverse Events | 85 |
| 10.15. | ERISA Notices and Requests | 85 |
| 10.16. | Other Bankruptcy Documents | 86 |
| 10.17. | Additional Documents | 86 |

| XI. | EVENTS OF DEFAULT. | 86 |
|---|---|---|
| 11.1. | Nonpayment | 86 |
| 11.2. | Breach of Representation | 86 |
| 11.3. | Financial Information | 86 |
| 11.4. | Judicial Actions | 86 |
| 11.5. | Noncompliance | 87 |
| 11.6. | Judgments | 87 |
| 11.7. | Material Adverse Effect. The occurrence of any Material Adverse Effect; | 87 |
| 11.8. | Lien Priority | 87 |
| 11.9. | Default of Material Agreements | 87 |
| 11.10. | Cross-Default | 87 |
| 11.11. | Change of Control | 87 |
| 11.12. | Invalidity | 87 |
| 11.13. | Licenses | 88 |
| 11.14. | Seizures | 88 |
| 11.15. | Operations | 88 |
| 11.16. | Pension Plans | 88 |
| 11.17. | Bankruptcy Defaults and Events of Default. | 88 |

| XII. | LENDERS' RIGHTS AND REMEDIES AFTER DEFAULT | 91 |
|---|---|---|

iv

| | | |
|---|---|---|
| 12.1. | Rights and Remedies | 91 |
| 12.2. | Agent's Discretion | 93 |
| 12.3. | Setoff | 93 |
| 12.4. | Rights and Remedies not Exclusive | 93 |
| 12.5. | Allocation of Payments After Event of Default | 93 |
| XIII. | WAIVERS AND JUDICIAL PROCEEDINGS. | 93 |
| 13.1. | Waiver of Notice | 93 |
| 13.2. | Delay | 94 |
| 13.3. | Jury Waiver | 94 |
| XIV. | EFFECTIVE DATE AND TERMINATION. | 94 |
| 14.1. | Term | 94 |
| 14.2. | Termination | 94 |
| XV. | REGARDING AGENT. | 95 |
| 15.1. | Appointment | 95 |
| 15.2. | Nature of Duties | 95 |
| 15.3. | Lack of Reliance on Agent and Resignation | 96 |
| 15.4. | Certain Rights of Agent | 96 |
| 15.5. | Reliance | 96 |
| 15.6. | Notice of Default | 97 |
| 15.7. | Indemnification | 97 |
| 15.8. | Agent in its Individual Capacity | 97 |
| 15.9. | Delivery of Documents | 97 |
| 15.10. | Borrowers' Undertaking to Agent | 97 |
| 15.11. | No Reliance on Agent's Customer Identification Program | 98 |
| 15.12. | Other Agreements | 98 |
| XVI. | BORROWING AGENCY. | 98 |
| 16.1. | Borrowing Agency Provisions. | 98 |
| 16.2. | Waiver of Subrogation | 99 |
| XVII. | MISCELLANEOUS. | 99 |
| 17.1. | Governing Law. | 99 |
| 17.2. | Entire Understanding. | 100 |
| 17.3. | Successors and Assigns; Participations; New Lenders. | 102 |
| 17.4. | Application of Payments | 106 |
| 17.5. | Indemnity | 106 |
| 17.6. | Notice | 106 |
| 17.7. | Survival | 108 |
| 17.8. | Severability | 108 |
| 17.9. | Expenses | 109 |
| 17.10. | Injunctive Relief | 109 |
| 17.11. | Consequential Damages | 109 |
| 17.12. | Captions | 109 |
| 17.13. | Counterparts; Facsimile Signatures | 110 |

17.14. Construction ........................................................................................................ 110

17.15. Confidentiality; Sharing Information ............................ **Error! Bookmark not defined.**

17.16. Publicity ............................................................................................................... 110

17.17. Certifications From Banks and Participants; USA PATRIOT Act .............................. 110

074658.01807/12123123v.11

## LIST OF EXHIBITS AND SCHEDULES

Exhibits

| | |
|---|---|
| Exhibit 1.2 | Borrowing Base Certificate |
| Exhibit 2.1(a) | Revolving Credit Note |
| Exhibit 2.1(c) | Swing Loan Note |
| Exhibit 2.2(b) | Swing Loan Request |
| Exhibit 6.5(a) | Financial Projections |
| Exhibit 9.1(l) | Financial Condition Certificate |
| Exhibit A | Budget |

Schedules

| | |
|---|---|
| Schedule 1.2(a) | Permitted Encumbrances |
| Schedule 4.5 | Equipment and Inventory Locations |
| Schedule 4.15(c) | Locations of Borrowers |
| Schedule 4.15(g) | Deposit and Investment Accounts |
| Schedule 4.19 | Real Property |
| Schedule 6.1 | Consents |
| Schedule 6.2(a) | States of Qualification and Good Standing |
| Schedule 6.2(b) | Subsidiaries |
| Schedule 6.4 | Federal Tax Identification Number |
| Schedule 6.6 | Prior Names |
| Schedule 6.7(a) | Compliance with Environmental Laws |
| Schedule 6.7(b) | Licenses relating to Environmental Laws |
| Schedule 6.7(c) | Environmental Releases |
| Schedule 6.8(b) | Litigation |
| Schedule 6.8(d) | Plans |
| Schedule 6.9 | Intellectual Property, Source Code Escrow Agreements |
| Schedule 6.10 | Licenses and Permits |
| Schedule 6.14 | Labor Disputes |
| Schedule 6.21 | Business of Borrowers |
| Schedule 6.26 | Capitalization Chart |
| Schedule 8.3 | Guarantees |
| Schedule 8.4 | Investments |

## DEBTOR-IN POSSESSION FINANCING AGREEMENT

Pursuant to Section 364(c) and (d) of the Bankruptcy Code, this DEBTOR-IN-POSSESSION FINANCING AGREEMENT ("Agreement") is made as of September __, 2011 among **HUSSEY COPPER LTD.**, a Pennsylvania limited partnership ("Hussey") and **EACH OTHER PERSON THAT MAY BE JOINED AS A BORROWER HERETO** (collectively, the "Borrowers" and each a "Borrower"), the financial institutions which are now or which hereafter become a party hereto (collectively, the "Lenders" and each individually a "Lender") and **PNC BANK, NATIONAL ASSOCIATION** ("PNC"), as agent for Lenders (PNC, in such capacity, the "Agent").

## RECITALS

A.     Hussey, Hussey Copper Corp., OAP Real Estate, LLC, Cougar Metals, Inc., Orbie Trading, L.P. and Hussey Exports, Ltd. (collectively, the "Debtors") filed a voluntary petition for relief on September 27, 2011] (the "Petition Date") under Chapter 11 of the Bankruptcy Code (as defined below), which petition was identified as Bankruptcy Case No. _____ (the "Case") before the Bankruptcy Court (as defined below). Debtors remain in possession of their assets and are operating their businesses as a debtors-in-possession under Chapter 11 of the Bankruptcy Code.

B.     Agent and Lenders have provided the Borrowers with a credit facility pursuant to that certain Revolving Credit, Term Loan and Security Agreement dated January 20, 2006 (as has been amended or modified from time to time, the "Pre-Petition Revolving Credit Agreement"), originally entered into by and among the Borrowers, PNC, as agent, as successor to National City Business Credit, Inc. and Lenders.

C.     Hussey has requested that during the Case, Agent and Lenders make loans, advances and extensions of credit in an amount up to $50,000,000 on a senior secured, superpriority basis, pursuant to, inter alia, Section 364(c) and (d) of the Bankruptcy Code.

D.     Agent and Lenders are willing to provide loans and advances to Hussey on a senior secured, superpriority basis on the terms and subject to the conditions of this Agreement, so long as such post-petition credit obligations are (i) secured by Liens on all of the assets, property and interests, real and personal, tangible and intangible, of the Borrowers, whether now owned or hereafter acquired, which liens (other than the Permitted Liens (as defined in the Interim Order) and the Carve-Out) are superior to all other liens pursuant to Sections 364(c) and (d) of the Bankruptcy Code; (ii) given priority over any administrative expenses of the kind specified in the Bankruptcy Code, including without limitation, Sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503, 506(c) (upon entry of the Final Order), 507, 546, 726, 1113 or 1114 of the Bankruptcy Code, subject, as to priority, only to the Carve-Out, as provided in the Interim Order; (iii) secured by Liens on all of the assets, property and interests, real and personal, tangible and intangible, of each Guarantor, whether now owned or hereafter acquired, which liens are superior to all other liens; and (iv) guaranteed by each Guarantor pursuant to the Guaranty Agreements in favor of Agent and Lenders.

IN CONSIDERATION of the foregoing Recitals, which are incorporated into the operative provisions of this Agreement by this reference, the mutual covenants and undertakings herein contained, Borrowers (acting for themselves and as debtors-in-possession in the Case), Lenders and Agent hereby agree as follows:

## I. DEFINITIONS AND ACKNOWLEDGMENT.

1.1. <u>Accounting Terms</u>. As used in this Agreement, the Other Documents or any certificate, report or other document made or delivered pursuant to this Agreement, accounting terms not defined in Section 1.2 or elsewhere in this Agreement and accounting terms partly defined in Section 1.2 to the extent not defined, shall have the respective meanings given to them under GAAP; provided, however, whenever such accounting terms are used for the purposes of determining compliance with financial covenants in this Agreement, such accounting terms shall be defined in accordance with GAAP as applied in preparation of the audited financial statements of Borrowers for the fiscal year ended December 31, 2009.

1.2. <u>General Terms</u>. For purposes of this Agreement the following terms shall have the following meanings:

"<u>Accountants</u>" shall have the meaning set forth in Section 10.7 hereof.

"<u>Administrative Questionnaire</u>" means a Documentation Information Questionnaire in a form supplied by the Agent.

"<u>Advance Rates</u>" shall have the meaning set forth in Section 2.1(a)(y)(ii) hereof.

"<u>Advances</u>" shall mean and include the Revolving Advances, Letters of Credit and Swing Loans.

"<u>Affiliate</u>" of any Person shall mean (a) any Person which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person, or (b) any Person who is a director, managing member, general partner or officer (i) of such Person, (ii) of any Subsidiary of such Person or (iii) of any Person described in clause (a) above. For purposes of this definition, control of a Person shall mean the power, direct or indirect, (x) to vote 5% or more of the Equity Interests having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for any such Person, or (y) to direct or cause the direction of the management and policies of such Person whether by ownership of Equity Interests, contract or otherwise.

"<u>Agent</u>" shall have the meaning set forth in the preamble to this Agreement and shall include its successors and assigns.

"<u>Agreement</u>" shall mean this Debtor-in-Possession Financing Agreement, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"<u>Allowed Professional Fees</u>" shall have the meaning given to the term "Allowed Professional Fees" in the Final Order, or, prior to the entry of the Final Order, the Interim Order.

2

"Alternate Base Rate" shall mean, for any day, a rate per annum equal to the higher of (i) the Base Rate in effect on such day, (ii) the sum of the Federal Funds Open Rate in effect on such day plus one half of one-percent (1/2 of 1%), and (iii) the sum of the Daily LIBOR Rate in effect on such day plus one percent (1.0%), so long as a Daily LIBOR Rate is offered, ascertainable and not unlawful.

"Anti-Terrorism Laws" shall mean any Applicable Laws relating to terrorism or money laundering, including Executive Order No. 13224, the USA PATRIOT Act, the Applicable Laws comprising or implementing the Bank Secrecy Act, and the Applicable Laws administered by the United States Treasury Department's Office of Foreign Asset Control (as any of the foregoing Applicable Laws may from time to time be amended, renewed, extended, or replaced).

"Applicable Law" shall mean all laws, rules and regulations applicable to the Person, conduct, transaction, covenant, Other Document or contract in question, including all applicable common law and equitable principles; all provisions of all applicable state, federal and foreign constitutions, statutes, rules, regulations and orders of any Governmental Body, and all orders, judgments and decrees of all courts and arbitrators.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Approved Sale" shall have the meaning set forth in Section 11.18(o) hereof.

"Asset Purchase Agreement" shall mean that certain Asset Purchase Agreement among Hussey, Cougar and O-A-P, as sellers, and Buyer dated as of September __, 2011.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 17.3), and accepted by the Agent, in substantially the form of Exhibit 17.3 or any other form approved by the Agent.

"Auction" has the meaning set forth in Section 11.18(q) hereof.

"Authority" shall have the meaning set forth in Section 4.19(d) hereof.

"Availability Reserve" shall mean $7,500,000.

"Avoidance Actions" means all actions of Borrowers or their estates under Chapter 5 or Section 724(a) of the Bankruptcy Code and all proceeds thereof.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy", as the same may be amended, modified or supplemented from time to time, and any successor statute thereto.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware, or such other court having jurisdiction over the Case.

"Base Rate" shall mean the base commercial lending rate of PNC as publicly announced to be in effect from time to time, such rate to be adjusted automatically, without notice, on the effective date of any change in such rate. This rate of interest is determined from time to time by PNC as a means of pricing some loans to its customers and is neither tied to any external rate of interest or index nor does it necessarily reflect the lowest rate of interest actually charged by PNC to any particular class or category of customers of PNC.

"Benefited Lender" shall have the meaning set forth in Section 2.20(d) hereof.

"Bidding Procedures" shall have the meaning set forth in Section 11.18(o) hereof.

"Bidding Procedures Order" shall have the meaning set forth in Section 11.18(p).

"Blocked Person" shall have the meaning set forth in Section 6.23(b) hereof.

"Borrower" or "Borrowers" shall have the meaning set forth in the preamble to this Agreement and shall extend to all permitted successors and assigns of such Persons.

"Borrowers on a Consolidated Basis" shall mean the consolidation in accordance with GAAP of the accounts or other items of the Borrowers and their respective Subsidiaries.

"Borrowers' Account" shall have the meaning set forth in Section 2.8 hereof.

"Borrowing Agent" shall mean Hussey.

"Borrowing Base Certificate" shall mean a certificate in substantially the form of Exhibit 1.2 duly executed by the Chief Restructuring Officer, President, Vice President, Chief Financial Officer or Controller of the Borrowing Agent and delivered to the Agent, appropriately completed, by which such officer shall certify to Agent the Formula Amount and calculation thereof as of the date of such certificate.

"Borrowing Base Reserves" means, as of any date of determination, such amounts (expressed as either a specified amount or as a percentage of a specified category or item) as the Agent may from time to time reasonably establish (a) to reflect events, conditions, contingencies or risks which, as reasonably determined by the Agent in good faith, do or may affect (i) the Receivables or Inventory or its respective value, (ii) the assets, business or prospects of the Borrowers, or (iii) the security interests and other rights of the Agent in the Collateral (including the enforceability, perfection and priority thereof), or (b) to reflect the Agent's good faith judgment that any collateral report or financial information furnished by or on behalf of a Borrower to the Agent is or may have been incomplete, inaccurate or misleading in any material respect, or (c) in respect of any state of facts that the Lender determines constitutes an Event of Default.

"Budget" shall mean a budget prepared by Borrowers in good faith based upon assumptions which the Borrowers believe to be reasonable and delivered to Agent on or before the Closing Date and attached hereto as Exhibit A, setting forth Borrowers' cash flow forecast in reasonable detail satisfactory to Agent including receipts, disbursements and such line item detail as satisfactory to Agent, as well as projected borrowings and availability for the period

4

commencing the Closing Date through and including December 2, 2011 (the "Initial Period"), and to the extent Agent consents to the extension of the Initial Period, for each thirteen week period subsequent to the Initial Period, shall mean a budget prepared by Borrowers in good faith based upon assumptions which the Borrowers believe to be reasonable setting forth Borrowers' cash flow forecast in reasonable detail satisfactory to Agent including receipts, disbursements and such line item detail as satisfactory to Agent, as well as projected borrowings and availability for the immediately succeeding thirteen (13) week period.

"Business Day" shall mean any day other than Saturday or Sunday or a legal holiday on which commercial banks are authorized or required by law to be closed for business in East Brunswick, New Jersey.

"Buyers" shall mean KHC Acquisition LLC, a Delaware limited liability company, or such assignee to the extent permitted under the Asset Purchase Agreement.

"Capital Expenditures" shall mean expenditures made or liabilities incurred for the acquisition of any fixed assets or improvements, replacements, substitutions or additions thereto which have a useful life of more than one year, including the total principal portion of Capitalized Lease Obligations, which, in accordance with GAAP, would be classified as capital expenditures.

"Capitalized Lease Obligation" shall mean any Indebtedness of any Borrower represented by obligations under a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Carve-Out" shall have the meaning given to the term "Carve-Out" in the Final Order, or, prior to the entry of the Final Order, the Interim Order.

"Carve-Out Reserve Account" shall mean a deposit account of Borrowers maintained by Saul Ewing which shall be used solely to escrow funds for the Professionals (as defined in the Interim Order or Final Order as applicable), which funds shall be funded by Borrowers in accordance with the Budget.

"Carve-Out Reserve Amount" shall mean an amount equal to $2,000,000 less all amounts funded into the Carve-Out Reserve Account in accordance with the Budget.

"Case" shall have the meaning set forth in the Recitals to this Agreement.

"Cash Concentration Account" shall mean, with respect to Borrowers, that certain commercial deposit account at PNC Bank, National Association in the name of PNC, designated as "PNC Bank, National Association (as Agent for the benefit of the Lenders and the Issuer) Hussey Copper Ltd. Cash Concentration Account", which shall be: (a) maintained by the Agent, without liability by the Agent or PNC to pay interest thereon, (b) the funds within which shall be the sole and exclusive property of the Agent for the pro rata benefit of the Lenders and (c) from which account the Agent shall have the irrevocable and exclusive right to withdraw funds until all of the Obligations are paid, performed, satisfied and enforced in full and the commitments of the Lenders to make Advances hereunder and all Letters of Credit have terminated.

"Cash Management Order" shall have the meaning set forth in Section 9.1(g) hereof.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §§9601 et seq.

"Change of Control" shall mean (a) the occurrence of any event (whether in one or more transactions) which results in a transfer of control of any Borrower from Roy D. Allen to any other Person or (b) any merger or consolidation of or with any Borrower or sale of all or substantially all of the property or assets of any Borrower. For purposes of this definition, "control of Borrower" shall mean the power, direct or indirect (x) to vote a majority of the securities having ordinary voting power for the election of directors (or the individuals performing similar functions) of any Borrower or (y) to direct or cause the direction of the management and policies of any Borrower by contract or otherwise.

"Changed Circumstances" shall have the meaning set forth in Section 5.6 hereof.

"Charges" shall mean all taxes, charges, fees, imposts, levies or other assessments, including all net income, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation and property taxes, custom duties, fees, assessments, liens, claims and charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts, imposed by any taxing or other authority, domestic or foreign (including the Pension Benefit Guaranty Corporation or any environmental agency or superfund), upon the Collateral, any Borrower or any of its Affiliates.

"Closing Date" shall mean September __, 2011 or such other date as may be agreed to by the parties hereto.

"Code" shall mean the Internal Revenue Code of 1986, as the same may be amended or supplemented from time to time, and any successor statute of similar import, and the rules and regulations thereunder, as from time to time in effect.

"Collateral" shall mean and include:

      (a)      all Receivables;

      (b)      all Equipment;

      (c)      all General Intangibles;

      (d)      all Inventory;

      (e)      all Investment Property;

      (f)      the Carve-Out Reserve Account and all funds on deposit in the Carve-Out Reserve Account;

      (g)      upon entry of the Final Order, all Avoidance Actions;

(h)     all Real Property and all real property owned by O-A-P located in Leetsdale, Pennsylvania, and Eminence, Kentucky and subject to the Mortgages;

(i)     all of each Borrower's right, title and interest in and to, whether now owned or hereafter acquired and wherever located; (i) its respective goods and other property including, but not limited to, all merchandise returned or rejected by Customers, relating to or securing any of the Receivables; (ii) all of each Borrower's rights as a consignor, a consignee, an unpaid vendor, mechanic, artisan, or other lienor, including stoppage in transit, setoff, detinue, replevin, reclamation and repurchase; (iii) all additional amounts due to any Borrower from any Customer relating to the Receivables; (iv) other property, including warranty claims, relating to any goods securing the Obligations; (v) all of each Borrower's contract rights, rights of payment which have been earned under a contract right, instruments (including promissory notes), documents, chattel paper (including electronic chattel paper), warehouse receipts, deposit accounts (including, without limitation, the Carve-Out Reserve Account), letters of credit and money; (vi) all commercial tort claims (whether now existing or hereafter arising); (vii) if and when obtained by any Borrower, all real and personal property of third parties in which such Borrower has been granted a lien or security interest as security for the payment or enforcement of Receivables; (viii) all letter of credit rights (whether or not the respective letter of credit is evidenced by a writing); (ix) all supporting obligations; (x) any hedge agreements of any kind and (xi) any other goods, personal property or real property now owned or hereafter acquired in which any Borrower has expressly granted a security interest or may in the future grant a security interest to Agent hereunder, or in any amendment or supplement hereto or thereto, or under any other agreement between Agent and any Borrower;

(j)     all property and assets described in the Interim Order and the Final Order;

(k)     all of each Borrower's ledger sheets, ledger cards, files, correspondence, records, books of account, business papers, computers, computer software (owned by any Borrower or in which it has an interest), computer programs, tapes, disks and documents relating to (a), (b), (c), (d), (e), (f), (g), (h), (i) or (j) of this paragraph; and

(l)     all proceeds and products of (a), (b), (c), (d), (e), (f), (g), (h), (i), (j) and (k) in whatever form, including, but not limited to:  cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard, flood and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents, eminent domain proceeds, condemnation proceeds and tort claim proceeds.

"Collateral Assignment of Life Insurance Policies" shall mean that certain Collateral Assignment of Life Insurance Policies executed by Hussey in favor of Agent, and acknowledged by the insurer, in form and substance satisfactory to Agent.

"Commitment Percentage" of any Lender shall mean the percentage set forth below such Lender's name on the signature page hereof as same may be adjusted upon any assignment by a Lender pursuant to Section 17.3(b) hereof.

"Compliance Certificate" shall mean a compliance certificate to be signed by the Vice President, Chief Financial Officer, Chief Restructuring Officer or Controller of Borrowing Agent, which shall state that, based on an examination sufficient to permit such officer to make an informed statement, no Default or Event of Default exists, or if such is not the case, specifying such Default or Event of Default, its nature, when it occurred, whether it is continuing and the steps being taken by Borrowers with respect to such default and, such certificate shall have appended thereto calculations which set forth Borrowers' compliance with the requirements or restrictions imposed by Sections 7.5, 8.4, 8.5, 8.6, 8.7, 8.8 and 8.11 hereof.

"Consents" shall mean all filings and all licenses, permits, consents, approvals, authorizations, qualifications and orders of Governmental Bodies and other third parties, domestic or foreign, necessary to carry on any Borrower's business or necessary (including to avoid a conflict or breach under any agreement, instrument, other document, license, permit or other authorization) for the execution, delivery or performance of this Agreement and the Other Documents, including any Consents required under all applicable federal, state or other Applicable Law.

"Consigned Inventory" shall mean Inventory of any Borrower that is in the possession of another Person on a consignment, sale or return, or other basis that does not constitute a final sale and acceptance of such Inventory.

"Controlled Group" shall mean, at any time, each Borrower and all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control and all other entities which, together with any Borrower, are treated as a single employer under Section 414 of the Code.

"Cougar Guaranty" shall mean that Guaranty executed and delivered by Cougar Metals, Inc. to Agent for the benefit of Lenders.

"Creditors' Committee" means the official unsecured creditors' committee appointed in the Case.

"Cumulative Period" shall mean (i) initially, the period from the Petition Date through and including the fourth Friday subsequent to the Petition Date, and (ii) thereafter, the most recent four week period then ended.

"Customer" shall mean and include the account debtor with respect to any Receivable and/or the prospective purchaser of goods, services or both with respect to any contract or contract right, and/or any party who enters into or proposes to enter into any contract or other arrangement with any Borrower, pursuant to which such Borrower is to deliver any personal property or perform any services.

"Customs" shall have the meaning set forth in Section 2.11(b) hereof.

"Daily LIBOR Rate" shall mean, for any day, the rate per annum determined by the Agent by dividing (x) the Published Rate by (y) a number equal to 1.00 minus the percentage prescribed by the Federal Reserve for determining the maximum reserve requirements with respect to any Eurocurrency funding by banks on such day.

8

"Damage Lawsuit" shall have the meaning set forth in Section 5.7 hereof.

"Default" shall mean an event, circumstance or condition which, with the giving of notice or passage of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning set forth in Section 3.1 hereof.

"Defaulting Lender" shall have the meaning set forth in Section 2.23(a) hereof.

"Documents" shall have the meaning set forth in Section 9.1(c) hereof.

"Dollar" and the sign "$" shall mean lawful money of the United States of America.

"Drawing Date" shall have the meaning set forth in Section 2.12(b) hereof.

"Eligible Assignee" shall mean any of the following Persons: (a) a Lender; (b) an Affiliate of a Lender; (c) an Approved Fund; and (d) any other Person (other than a natural person) approved by (i) the Agent, and (ii) in the case of any assignment of a commitment to make Advances hereunder, the Issuer; provided that, notwithstanding the foregoing, "Eligible Assignee" shall not include Borrowers or any of Borrowers' Affiliates and; provided, further, that, notwithstanding the foregoing, a Person shall only be an "Eligible Assignee" if (i) such Person shall have complied with the requirements of Section 17.17, and (ii) the assignment to or participation of such Person shall not constitute a "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code).

"Eligible Inventory" shall mean and include with respect to Inventory, including work-in-process Inventory (unless otherwise deemed ineligible by Agent), with respect to each Borrower, valued at market value (as quoted by Commodity Exchange, Inc.), which is not, in Agent's opinion, obsolete, slow moving or unmerchantable and which Agent, in its reasonable discretion, shall not deem ineligible Inventory, based on such considerations as Agent may in its reasonable discretion from time to time deem appropriate including whether the Inventory is subject to a perfected, first priority security interest in favor of Agent and no other Lien (other than a Permitted Encumbrance). In addition, Inventory shall not be Eligible Inventory if it: (i) does not conform to all standards imposed by any Governmental Body which has regulatory authority over such goods or the use or sale thereof; (ii) is in transit; (iii) is located outside the continental United States; (iv) constitutes Consigned Inventory; (v) is the subject of an Intellectual Property Claim; (vi) is subject to a License Agreement or other agreement that limits, conditions or restricts any Borrower's or Agent's right to sell or otherwise dispose of such Inventory, unless Agent is a party to a Licensor/Agent Agreement with the Licensor under such License Agreement; or (vii) or is situated at a location not owned by a Borrower unless the owner or occupier of such location has executed in favor of Agent a Lien Waiver Agreement.

In addition, no Inventory of any Borrower shall be Eligible Inventory if it:

(a)    is not owned by such Borrower free and clear of all Liens and rights of any other Person (including the rights of a purchaser that has made progress payments and the rights of a surety that has issued a bond to assure such Borrower's performance with respect to that Inventory), except the Liens in favor of the Agent, on behalf of itself and the Lenders, and other

9

Permitted Encumbrances (subject to reserves established by the Agent in accordance with the terms of this Agreement);

(b)     (i) is not located on premises owned, leased or rented by such Borrower and set forth in Schedule 4.5 (as such Schedule may be updated from time to time), or (ii) is stored at a leased location, unless a reasonably satisfactory landlord waiver has been delivered to the Agent, or reserves reasonably satisfactory to the Agent have been established by the Agent with respect thereto or (iii) is stored with a bailee or warehouseman unless a reasonably satisfactory warehouseman waiver or a reasonably satisfactory acknowledged bailee letter has been received by the Agent or reserves reasonably satisfactory to the Agent have been established by the Agent with respect thereto, or (iv) is located at a location owned by a Borrower or O-A-P that is subject to a mortgage in favor of a lender other than the Agent unless a reasonably satisfactory mortgagee waiver has been delivered to the Agent, or reserves reasonably satisfactory to the Agent have been established by the Agent with respect thereto;

(c)     Reserved;

(d)     is covered by a negotiable document of title, unless such document has been delivered to the Agent with all necessary endorsements, free and clear of all Liens except those in favor of the Agent and the Lenders;

(e)     is placed on consignment (or is being held pursuant to a consignment agreement);

(f)     is excess, obsolete, unsalable, shopworn, seconds, damaged or unfit for sale, other than goods available for reprocessing in the ordinary course of business;

(g)     consists of goods which have been returned by the Customer, excluding goods returned for reprocessing in the ordinary course of business;

(h)     consists of display items or packing or shipping materials, manufacturing supplies or replacement parts;

(i)     is not of a type held for sale in the ordinary course of such Borrower's business;

(j)     breaches any of the representations or warranties pertaining to Inventory of such Borrower set forth in this Agreement or in any of the Other Documents;

(k)     consists of any costs associated with "freight-in" charges;

(1)     consists of any gross profit mark-up in connection with the sale and distribution thereof to any division of such Borrower or to any Affiliate of a Borrower;

(m)     consists of Hazardous Substances or goods that can be transported or sold only with licenses that are not readily available;

(n)     is not covered by casualty insurance as required by terms of this Agreement reasonably acceptable to the Agent;

10

(o)    was produced in violation of the Fair Labor Standards Act and subject to the "hot goods" provision contained in Title 29 U.S..C. Section 215(a)(1); or

(p)    is not otherwise satisfactory to the Agent as determined in good faith by the Agent in the exercise of its discretion in a reasonable manner.

"Eligible In-Transit Inventory" shall mean Inventory which meets the criteria set forth in the definition of Eligible Inventory, except subsection (iii) thereof, and has been deemed acceptable to Agent in its reasonable credit judgment, which is insured to the full value thereof and is subject to documentation in form and substance satisfactory to Agent.

"Eligible Receivables" shall mean and include with respect to each Borrower, each Receivable of such Borrower arising in the Ordinary Course of Business and which Agent, in its sole credit judgment, shall deem to be an Eligible Receivable, based on such considerations as Agent may from time to time deem appropriate. A Receivable shall not be deemed eligible unless such Receivable is subject to Agent's first priority perfected security interest and no other Lien (other than Permitted Encumbrances), and is evidenced by an invoice or other documentary evidence satisfactory to Agent. In addition, no Receivable shall be an Eligible Receivable if:

(a)    it arises out of a sale made by any Borrower to an Affiliate of any Borrower or to a Person controlled by an Affiliate of any Borrower;

(b)    it is due or unpaid more than ninety (90) days after the original invoice date;

(c)    fifty percent (50%) or more of the Receivables from such Customer are not deemed Eligible Receivables hereunder. Such percentage may, in Agent's sole discretion, be increased or decreased from time to time;

(d)    any covenant, representation or warranty contained in this Agreement with respect to such Receivable has been breached;

(e)    the Customer shall (i) apply for, suffer, or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property or call a meeting of its creditors, (ii) admit in writing its inability, or be generally unable, to pay its debts as they become due or cease operations of its present business, (iii) make a general assignment for the benefit of creditors, (iv) commence a voluntary case under any state or federal bankruptcy laws (as now or hereafter in effect), (v) be adjudicated a bankrupt or insolvent, (vi) file a petition seeking to take advantage of any other law providing for the relief of debtors, (vii) acquiesce to, or fail to have dismissed, any petition which is filed against it in any involuntary case under such bankruptcy laws, or (viii) take any action for the purpose of effecting any of the foregoing;

(f)    the sale is to a Customer outside the continental United States of America;

(g)    the sale to the Customer is on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment or any other repurchase or return basis or is evidenced by chattel paper;

11

(h)     Agent believes, in its sole reasonable judgment, that collection of such Receivable is insecure or that such Receivable may not be paid by reason of the Customer's financial inability to pay;

(i)     the Customer is the United States of America, any state or any department, agency or instrumentality of any of them, unless the applicable Borrower assigns its right to payment of such Receivable to Agent pursuant to the Assignment of Claims Act of 1940, as amended (31 U.S.C. Sub-Section 3727 et seq. and 41 U.S.C. Sub-Section 15 et seq.) or has otherwise complied with other applicable statutes or ordinances;

(j)     the goods giving rise to such Receivable have not been delivered to and accepted by the Customer or the services giving rise to such Receivable have not been performed by the applicable Borrower and accepted by the Customer or the Receivable otherwise does not represent a final sale;

(k)     the Receivables of the Customer exceed a credit limit determined by Agent, in its sole reasonable discretion, to the extent such Receivable exceeds such limit;

(l)     the Receivable is subject to any offset, deduction, defense, dispute, or counterclaim (to the extent of such offset, deduction, defense or counterclaim), the Customer is also a creditor or supplier of a Borrower (to the extent of monies owed by Borrowers to such customer) or the Receivable is contingent in any respect or for any reason;

(m)     the applicable Borrower has made any agreement with any Customer for any deduction therefrom, except for discounts or allowances made in the Ordinary Course of Business for prompt payment, all of which discounts or allowances are reflected in the calculation of the face value of each respective invoice related thereto;

(n)     any return, rejection or repossession of the merchandise has occurred or the rendition of services has been disputed;

(o)     such Receivable is not payable to a Borrower; or

(p)     such Receivable is not otherwise satisfactory to Agent as determined in good faith by Agent in the exercise of its discretion in a reasonable manner.

"Environmental Complaint" shall have the meaning set forth in Section 4.19(d) hereof.

"Environmental Laws" shall mean all federal, state and local environmental, land use, zoning, health, chemical use, safety and sanitation laws, statutes, ordinances and codes relating to the protection of the environment and/or governing the use, storage, treatment, generation, transportation, processing, handling, production or disposal of Hazardous Substances and the rules, regulations, policies, guidelines, interpretations, decisions, orders and directives of federal, state and local governmental agencies and authorities with respect thereto.

"Equipment" shall mean and include as to each Borrower all of such Borrower's tangible personal property (other than Inventory) whether now owned or hereafter acquired and wherever located including: all equipment; machinery; manufacturing; distribution; selling; data

12

processing and office equipment; assembly systems, tools; molds; dies; fixtures; appliances; apparatus; motor vehicles; fittings; furniture; furnishings; fixtures; parts; accessories; and any and all accessions, parts, appurtenances attached to any of the foregoing or used in connection therewith; and any replacements, products, proceeds, and substitutions therefor or accessions thereto.

"Equity Interests" of any Person shall mean any and all shares, rights to purchase, options, warrants, general, limited or limited liability partnership interests, member interests, participation or other equivalents of or interest in (regardless of how designated) equity of such Person, whether voting or nonvoting, including common stock, preferred stock, convertible securities or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time and the rules and regulations promulgated thereunder.

"Event of Default" shall have the meaning set forth in Article XI hereof.

"Exchange Act" shall have the mean the Securities Exchange Act of 1934, as amended.

"Executive Order No. 13224" shall mean the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Federal Funds Effective Rate" for any day shall mean the rate per annum (based on a year of 360 days and actual days elapsed and rounded upward to the nearest 1/100 of 1%) announced by the Federal Reserve Bank of New York (or any successor) on such day as being the weighted average of the rates on overnight federal funds transactions arranged by federal funds brokers on the previous trading day, as computed and announced by such Federal Reserve Bank (or any successor) in substantially the same manner as such Federal Reserve Bank computes and announces the weighted average it refers to as the "Federal Funds Effective Rate" as of the date of this Agreement; provided, if such Federal Reserve Bank (or its successor) does not announce such rate on any day, the "Federal Funds Effective Rate" for such day shall be the Federal Funds Effective Rate for the last day on which such rate was announced.

"Federal Funds Open Rate" shall mean the rate per annum determined by the Agent in accordance with its usual procedures (which determination shall be conclusive absent manifest error) to be the "open" rate for federal funds transactions as of the opening of business for federal funds transactions among members of the Federal Reserve System arranged by federal funds brokers on such day, as quoted by Garvin Guybutler Corporation, any successor entity thereto, or any other broker selected by the Agent, as set forth on the applicable Telerate display page; provided, however; that if such day is not a Business Day, the Federal Funds Open Rate for such day shall be the "open" rate on the immediately preceding Business Day, or if no such rate shall be quoted by a Federal funds broker at such time, such other rate as determined by the Agent in accordance with its usual procedures.

"Final Order" means a final order of the Bankruptcy Court in the Case authorizing and approving this Agreement and the Other Documents under Sections 364(c) and (d) of the

Bankruptcy Code on a final basis and entered at or after a final hearing, in form and substance satisfactory to Agent. The Final Order shall, among other things, have:

(a)     authorized the transactions contemplated by this Agreement and the extensions of credit under this Agreement in an amount not less than the Maximum Loan Amount provided for herein;

(b)     granted the claim and Lien status and Liens described in Section 5.1, and prohibited the granting of additional Liens on the assets of Borrowers except for any Liens specifically provided for in such order;

(c)     provided that such Liens are automatically perfected as of the Petition Date by the entry of the Final Order and also granted to the Agent for the benefit of Agent and the Lenders relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable the Agent, if the Agent elects to do so in its discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by the Agent to perfect, protect and insure the priority of its Liens upon the Collateral as a matter of non-bankruptcy law;

(d)     provided that no Person will be permitted to surcharge the Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral, except for the Carve-Out; and

(e)     provided Agent with relief from the automatic stay in a manner consistent with the terms of Section 12.1.

"Foreign Subsidiary" of any Person, shall mean any Subsidiary of such Person that is not organized or incorporated in the United States or any State or territory thereof.

"Formula Amount" shall have the meaning set forth in Section 2.1(a) hereof.

"Fund" shall mean any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" shall mean generally accepted accounting principles in the United States of America in effect from time to time.

"General Intangibles" shall mean and include as to each Borrower all of such Borrower's general intangibles, whether now owned or hereafter acquired, including all present and future: (i) general intangibles; (ii) rights, interests, payment intangibles, choses in action, causes of action, claims and other intangible property of every kind and nature (other than Receivables); (iii) corporate and other business records; (iv) loans, royalties, and other obligations receivable; (v) trademarks, registered trademarks, trademark applications, service marks, registered service marks, service mark applications, patents, registered patents, patent applications, trade names, rights of use of any name, labels, fictitious names, inventions, designs, design rights, trade secrets, computer programs, software, printouts, computer information, source codes, codes, records and updates, registrations, and other computer materials, equipment formulations, manufacturing procedures, quality control procedures, goodwill, copyrights, copyright

applications, permits, licenses, franchises, customer lists, credit files, correspondence, and advertising materials; (vi) customer and supplier contracts, firm sale orders, rights under license and franchise agreements, rights under tax sharing agreements, rights under non-compete agreements, and other contracts and contract rights; (vii) interests in partnerships and joint ventures; (viii) tax refunds and tax refund claims; (ix) right, title and other agreements relating to property; (x) deposit accounts (general or special with any bank or other financial institution; (xi) credits with and other claims against third parties (including carriers and shippers); (xii) rights to indemnification and with respect to support and keep-well agreements; (xiii) reversionary interests in pension and profit sharing plans and reversionary, beneficial and residual interest in trusts; (xiv) letters of credit, guarantees, Liens, security interests and other security held by or granted to such Person; (xvi) uncertificated securities; (xvii) investment property; (xviii) all claims under guaranties, security interests or other security held by or granted to such Borrower to secure payment of any of the Receivables by a Customer (other than to the extent covered by Receivables) all rights of indemnification and all other intangible property of every kind and nature (other than Receivables).

"Governmental Acts" shall have the meaning set forth in Section 2.17 hereof.

"Governmental Body" shall mean any nation or government, any federal, state, local or other political subdivision thereof and any entity, authority, agency, division or department exercising the executive, legislative, judicial, regulatory or administrative functions of or pertaining to a government.

"Guarantor" shall mean O-A-P, Hussey Exports, Cougar Metals, Inc., Orbie Trading, LP and any other Person who may hereafter guarantee payment or performance of the whole or any part of the Obligations and "Guarantors" means collectively all such Persons.

"Guarantor Security Agreement" shall mean that certain (i) Security Agreement executed by Hussey Exports in favor of Agent securing the obligations of Hussey Exports under its Guaranty dated as of even date herewith, (ii) Security Agreement executed by O-A-P in favor of Agent securing the obligations of O-A-P under its Guaranty dated as of even date herewith, (iii) Security Agreement executed by Cougar Metals, Inc. in favor of Agent securing the obligations of Cougar Metals, Inc. under its Guaranty dated as of even date herewith, (iv) Security Agreement executed by Orbie Trading, L.P. in favor of Agent securing the obligations of Orbie Trading, L.P. under its Guaranty dated as of even date herewith, in each case, together with any extensions, renewals, amendments, supplements, modifications, substitutions and replacements thereto and thereof, and (v) any other Security Agreement executed by any Guarantor in favor of Agent securing the Guaranty of such Guarantor.

"Guaranty" shall mean the O-A-P Guaranty, Hussey Guaranty, Cougar Guaranty, Orbie Guaranty and any other guaranty of the obligations of Borrowers executed by a Guarantor in favor of Agent for its benefit and for the ratable benefit of Lenders.

"Hazardous Discharge" shall have the meaning set forth in Section 4.19(d) hereof.

"Hazardous Substance" shall mean, without limitation, any flammable explosives, radon, radioactive materials, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls,

petroleum and petroleum products, methane, hazardous materials, Hazardous Wastes, hazardous or Toxic Substances or related materials as defined in CERCLA, the Hazardous Materials Transportation Act, as amended (49 U.S.C. Sections 1801, et seq.), RCRA, Articles 15 and 27 of the New York State Environmental Conservation Law or any other applicable Environmental Law and in the regulations adopted pursuant thereto.

"Hazardous Wastes" shall mean all waste materials subject to regulation under CERCLA, RCRA or applicable state law, and any other applicable Federal and state laws now in force or hereafter enacted relating to hazardous waste disposal.

"Hedge Liabilities" shall have the meaning provided in the definition of "Lender-Provided Interest Rate Hedge".

"Hedging Contracts" shall mean foreign exchange contracts, currency swap agreements, futures contracts, interest rate protection agreements, interest rate future agreements, interest rate swap agreements, interest rate cap agreements, interest rate collar agreements, option agreements or any other similar hedging agreements or arrangements entered into by Borrowers in the ordinary course of business and not for speculative purposes.

"Hussey Exports" shall mean Hussey Exports Ltd., a Delaware corporation.

"Hussey Guaranty" shall mean that Guaranty executed and delivered by Hussey Exports to Agent for the benefit of Lenders.

"Indebtedness" of a Person at a particular date shall mean all obligations of such Person which in accordance with GAAP would be classified upon a balance sheet as liabilities (except capital stock and surplus earned or otherwise) and in any event, without limitation by reason of enumeration, shall include all Hedge Liabilities, indebtedness, debt and other similar monetary obligations of such Person whether direct or guaranteed, and all premiums, if any, due at the required prepayment dates of such indebtedness, and all indebtedness secured by a Lien on assets owned by such Person, whether or not such indebtedness actually shall have been created, assumed or incurred by such Person. Any indebtedness of such Person resulting from the acquisition by such Person of any assets subject to any Lien shall be deemed, for the purposes hereof, to be the equivalent of the creation, assumption and incurring of the indebtedness secured thereby, whether or not actually so created, assumed or incurred.

"Ineligible Professional Expenses" shall mean fees or expenses incurred by any Person, including the Creditors' Committee, in connection with any of the following: (a) an assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination or similar relief: (i) challenging the legality, validity, priority, perfection, or enforceability of the Obligations or the Agent's and the Lenders' liens on and security interests in the Collateral, (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Obligations or the Agent's and the Lenders' liens on and security interests in the Collateral, or (iii) preventing, hindering or delaying the Agent's or the Lenders' assertion or enforcement of any lien, claim, right or security interest or realization upon any in accordance with the terms and conditions of the Interim Order or Final Order, (b) a request to use the cash collateral (as such term is defined in Section 363 of

16

the Bankruptcy Code) without the prior written consent of the Agent, (c) a request for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to Section 364(c) or (d) of the Bankruptcy Code, other than from the Agent or the Lenders without the prior written consent of the Agent, (d) the commencement or prosecution of any action or proceeding of any claims, causes of action or defenses against the Agent, any Lender or any of their respective officers, directors, employees, agents, attorneys, affiliates, successors or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from the Agent or any Lender under Chapter 5 of the Bankruptcy Code, or (e) any act which has or could have the effect of materially and adversely modifying or compromising the rights and remedies of the Agent or any Lender, or which is contrary, in a manner that is material and adverse to the Agent or any Lender, to any term or condition set forth in or acknowledged by this Agreement, the Other Documents or the Interim Order and which results in the occurrence of an Event of Default under this Agreement, the Interim Order or the Final Order.

"Ineligible Security" shall mean any security which may not be underwritten or dealt in by member banks of the Federal Reserve System under Section 16 of the Banking Act of 1933 (12 U.S.C. Section 24, Seventh), as amended.

"Initial Period" shall have the meaning set forth in the definition of "Budget" herein.

"Intellectual Property" shall mean property constituting under any Applicable Law a patent, patent application, copyright, trademark, service mark, trade name, mask work, trade secret or license or other right to use any of the foregoing.

"Intellectual Property Claim" shall mean the assertion by any Person of a claim (whether asserted in writing, by action, suit or proceeding or otherwise) that any Borrower's ownership, use, marketing, sale or distribution of any Inventory, Equipment, Intellectual Property or other property or asset is violative of any ownership of or right to use any Intellectual Property of such Person.

"Intercreditor Agreement" shall mean the Intercreditor Agreement, dated January 20, 2006, entered into by and among Square D, PNC, as agent, successor to National City Business Credit, Inc. and Borrowers, together with all amendments, supplements, modifications, substitutions and replacements thereto and thereof.

"Interest Rate Hedge" shall mean an interest rate exchange, collar, cap, swap, interest rate future or option, currency swap, currency future, forward, or option, adjustable strike cap, adjustable strike corridor or similar agreements entered into by any Borrower or its Subsidiaries in order to provide protection to, or minimize the impact upon, such Borrower, any Guarantor and/or their respective Subsidiaries of fluctuation in interests rates or increasing floating rates of interest applicable to Indebtedness, and/or foreign exchange rates or conversion rates for conversion of foreign currencies to Dollars.

"Interim Order" means a final order of the Bankruptcy Court in the Case authorizing and approving this Agreement and the Other Documents, for an interim period, under Sections 364(c) and (d) of the Bankruptcy Code and entered at or after a hearing, in form and substance satisfactory to Agent. The Interim Order shall, among other things, have:

(a)     authorized the transactions contemplated by this Agreement and the extensions of credit under this Agreement in an amount up to $35,000,000 on an interim basis and in an amount not less than the Maximum Loan Amount provided for herein on a final basis;

(b)     granted the claim and Lien status and Liens described in Section 5.1, and prohibited the granting of additional Liens on the assets of Borrowers except for any Liens specifically provided for in such order;

(c)     provided that such Liens are automatically perfected as of the Petition Date by the entry of the Interim Order and also granted to the Agent for the benefit of Agent and the Lenders relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable the Agent, if the Agent elects to do so in its discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by the Agent to perfect, protect and insure the priority of its Liens upon the Collateral as a matter of non-bankruptcy law;

(d)     upon entry of the Final Order, provided that no Person will be permitted to surcharge the Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral, except for the Carve Out; and

(e)     provided Agent with relief from the automatic stay in a manner consistent with the terms of Section 12.1.

"Inventory" shall mean and include as to each Borrower all of such Borrower's now owned or hereafter acquired goods, merchandise and other personal property, wherever located, to be furnished under any consignment arrangement, contract of service or held for sale or lease, all raw materials, work in process, finished goods and materials and supplies of any kind, nature or description which are or might be used or consumed in such Borrower's business or used in selling or furnishing such goods, merchandise and other personal property, and all documents of title or other documents representing them.

"Inventory Advance Rate" shall have the meaning set forth in Section 2.1(a)(y)(ii) hereof.

"Investment Property" shall mean and include as to each Borrower, all of such Borrower's now owned or hereafter acquired securities (whether certificated or uncertificated), securities entitlements, securities accounts, commodities contracts and commodities accounts.

"Issuer" shall mean any Person who issues a Letter of Credit and/or accepts a draft pursuant to the terms hereof.

"Lender" and "Lenders" shall have the meaning ascribed to such term in the preamble to this Agreement and shall include each Person which becomes a transferee, successor or assign of any Lender.

"Lender-Provided Interest Rate Hedge" shall mean an Interest Rate Hedge which is provided by any Lender and with respect to which the Agent confirms meets the following requirements: such Interest Rate Hedge (i) is documented in a standard International Swap Dealer Association Agreement, (ii) provides for the method of calculating the reimbursable amount of the provider's credit exposure in a reasonable and customary manner, and (iii) is

entered into for hedging (rather than speculative) purposes. The liabilities of any Borrower to the provider of any Lender-Provided Interest Rate Hedge (the "Hedge Liabilities") shall be "Obligations" hereunder, guaranteed obligations under any Guaranty and secured obligations under any Guarantor Security Agreement and otherwise treated as Obligations for purposes of each of the Other Documents. The Liens securing the Hedge Liabilities shall be pari passu with the Liens securing all other Obligations under this Agreement and the Other Documents.

"Letter of Credit Fees" shall have the meaning set forth in Section 3.2 hereof.

"Letter of Credit Borrowing" shall have the meaning set forth in Section 2.12(d) hereof.

"Letter of Credit Sublimit" shall mean $0.

"Letters of Credit" shall have the meaning set forth in Section 2.9 hereof.

"License Agreement" shall mean any agreement between any Borrower and a Licensor pursuant to which such Borrower is authorized to use any Intellectual Property in connection with the manufacturing, marketing, sale or other distribution of any Inventory of such Borrower or otherwise in connection with such Borrower's business operations.

"Licensor" shall mean any Person from whom any Borrower obtains the right to use (whether on an exclusive or non-exclusive basis) any Intellectual Property in connection with such Borrower's manufacture, marketing, sale or other distribution of any Inventory or otherwise in connection with such Borrower's business operations.

"Licensor/Agent Agreement" shall mean an agreement between Agent and a Licensor, in form and content satisfactory to Agent, by which Agent is given the unqualified right, vis-a-vis such Licensor, to enforce Agent's Liens with respect to and to dispose of any Borrower's Inventory with the benefit of any Intellectual Property applicable thereto, irrespective of such Borrower's default under any License Agreement with such Licensor.

"Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, security interest, lien (whether statutory or otherwise), Charge, claim or encumbrance, or preference, priority or other security agreement or preferential arrangement held or asserted in respect of any asset of any kind or nature whatsoever including any conditional sale or other title retention agreement, any lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction.

"Lien Waiver Agreement" shall mean an agreement which is executed in favor of Agent by a Person who owns or occupies premises at which any Collateral may be located from time to time and by which such Person shall waive any Lien that such Person may ever have with respect to any of the Collateral and shall authorize Agent from time to time to enter upon the premises to inspect or remove the Collateral from such premises or to use such premises to store or dispose of such Inventory.

"Life Insurance Policies" shall mean the following life insurance policies issued by AXA Equitable Life Insurance Company which are owned by Hussey and underwritten with respect to

19

the life of Roy D. Allen: (i) Policy No. 156205988 in the amount of $5,000,000, (ii) Policy No. 156206000 in the amount of $3,400,000 and (iii) Policy No. 156210127 in the amount of $4,500,000.

"Lockbox" shall mean a post office box rented by and in the name of Borrowers as required by this Agreement and as to which only the applicable Lockbox Bank and the Agent have access pursuant to the requirements of this Agreement and which can not be closed by the applicable Lockbox Bank without the consent of the Agent pursuant to the applicable Blocked Account Agreement.

"Lockbox Agreement" shall have the meaning set forth in Section 4.15(g) hereof.

"Lockbox Bank" shall mean PNC Bank, National Association.

"Material Adverse Effect" shall mean a material adverse effect on (a) the condition (financial or otherwise), results of operations, assets, business, properties or prospects of the Borrowers and Guarantor on a consolidated basis, (b) any Borrower's ability to duly and punctually pay or perform the Obligations in accordance with the terms thereof, (c) the value of the Collateral or Agent's Liens on the Collateral or the priority of any such Lien, or (d) the practical realization of the benefits of Agent's and each Lender's rights and remedies under this Agreement and the Other Documents.

"Maturity Date" means the earliest to occur of: (a) November 28, 2011; (b) the effective date or substantial consummation of a Reorganization Plan that has been confirmed by an order of the Bankruptcy Court; (c) the closing of a sale of all or substantially all of the Borrowers' or any Borrower's assets or business pursuant to Section 363 of the Bankruptcy Code approved by Agent; (d) the date of the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code; (e) the date of the dismissal of the Case; (f) such earlier date on which all Obligations shall become due and payable, in whole, in accordance with the terms of this Agreement (including by acceleration by Agent); and (g) the date that is twenty one (21) days after the entry of the Interim Order (October 18, 2011) if the Final Order has not been entered.

"Maximum Face Amount" shall mean, with respect to any outstanding Letter of Credit, the face amount of such Letter of Credit including all automatic increases provided for in such Letter of Credit, whether or not any such automatic increase has become effective.

"Maximum Loan Amount" shall mean $50,000,000.

"Maximum Revolving Advance Amount" shall mean $50,000,000.

"Maximum Undrawn Amount" shall mean with respect to any outstanding Letter of Credit, the amount of such Letter of Credit that is or may become available to be drawn, including all automatic increases provided for in such Letter of Credit, whether or not any such automatic increase has become effective.

"Monthly Advances" shall have the meaning set forth in Section 3.1(a) hereof.

20

"**Mortgages**" shall mean that certain (i) Open-End Fee and Leasehold Mortgage, Fixture Filing and Assignment of Leases and Rents executed by Hussey and O-A-P in favor of Agent, successor to National City Business Credit, Inc. dated January 20, 2006 relating to Real Property located in Leetsdale, Pennsylvania and (ii) Fee and Leasehold Mortgage, Fixture Filing and Assignment of Leases and Rents executed by Hussey and O-A-P in favor of Agent, successor to National City Business Credit, Inc. dated January 20, 2006 relating to Real Property located in Eminence, Kentucky, each as modified by those certain Mortgage Modification executed by Hussey and O-A-P in favor of Agent dated as of even date herewith, each securing the Obligations, together with all extensions, renewals, amendments, supplements, modifications, substitutions and replacements thereto and thereof.

"**Multiemployer Plan**" shall mean a "multiemployer plan" as defined in Sections 3(37) and 4001(a)(3) of ERISA.

"**Multiple Employer Plan**" shall mean a Plan which has two or more contributing sponsors (including any Borrower or any member of the Controlled Group) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"**Non-Consenting Lender**" shall have the meaning set forth in Section 17.3(h) hereof.

"**Note**" shall mean the Revolving Credit Note and Swing Loan Note.

"**O-A-P**" shall mean OAP Real Estate, LLC, a Pennsylvania limited liability company.

"**O-A-P Guaranty**" shall mean that Guaranty executed and delivered by O-A-P to Agent for the benefit of Lenders.

"**O-A-P Subordination**" shall mean that certain Subordination Agreement, dated January 18, 2006, entered into by and among O-A-P, Pre-Petition Lenders and Borrowers, together with all amendments, supplements, modifications, substitutions and replacements thereto and thereof.

"**Obligations**" shall mean and include (i) all Pre-Petition Obligations, including without limitation all indemnification obligations of Borrowers to Agent and Lenders arising under the Pre-Petition Loan Documents, including without limitation the obligations arising under Sections 2.2(f), 3.7, 3.8, 3.9, 4.19(h) and 16.5 of the Pre-Petition Credit Agreement, and (ii) any and all loans (including without limitation, all Advances), advances, debts, liabilities, obligations, covenants and duties owing by any Borrower to Lenders or Agent or to any other direct or indirect subsidiary or affiliate of Agent or any Lender of any kind or nature, present or future (including, without limitation, any interest or other amounts accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to Borrowers, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether or not evidenced by any note, guaranty or other instrument, whether arising under any agreement, instrument or document, (including without limitation this Agreement, the Other Documents and the Pre-Petition Loan Documents or the Interim Order or Final Order, whether or not for the payment of money, whether arising by reason of an extension of credit, opening or amendment of a letter of credit, loan, equipment lease or guarantee, under any interest or currency swap, future, option or other similar agreement, or in any other manner, whether arising out of overdrafts or deposit or other

21

accounts or electronic funds transfers (whether through automated clearing houses or otherwise) or out of the Agent's or any Lenders non-receipt of or inability to collect funds or otherwise not being made whole in connection with depository transfer check or other similar arrangements, whether direct or indirect (including those acquired by assignment or participation), absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, contractual or tortious, liquidated or unliquidated, regardless of how such indebtedness or liabilities arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, including, but not limited to, any and all of any Borrower's Indebtedness and/or liabilities under this Agreement, the Other Documents or under any other agreement between Agent or Lenders and any Borrower and any amendments, extensions, renewals or increases and all costs and expenses of Agent and any Lender incurred in the documentation, negotiation, modification, enforcement, collection or otherwise in connection with any of the foregoing, including but not limited to reasonable attorneys' fees and expenses and all obligations of any Borrower to Agent or Lenders to perform acts or refrain from taking any action.

"Orbie Guaranty" shall mean that Guaranty executed and delivered by Orbie Trading, L.P. to Agent for the benefit of Lenders.

"Ordinary Course of Business" shall mean with respect to any Borrower, the ordinary course of such Borrower's business as conducted on the Closing Date.

"Other Documents" shall mean the Note, the Interim Order, the Final Order, any Guaranty, any Guarantor Security Agreement, the Mortgages, the Pledge Agreement, any Patent, Trademark and Copyright Security Agreement, the Intercreditor Agreement, the O-A-P Subordination Agreement, Collateral Assignment of Insurance Policies, any Lender-Provided Interest Rate Hedge and any and all other agreements, instruments and documents, including guaranties, pledges, powers of attorney, consents, interest or currency swap agreements or other similar agreements and all other writings heretofore, now or hereafter executed by any Borrower or any Guarantor and/or delivered to Agent or any Lender in respect of the transactions contemplated by this Agreement.

"Out-of-Formula Loans" shall have the meaning set forth in Section 17.2(b).

"Parent" of any Person shall mean a corporation or other entity owning, directly or indirectly at least 50% of the shares of stock or other ownership interests having ordinary voting power to elect a majority of the directors of the Person, or other Persons performing similar functions for any such Person.

"Participant" shall mean each Person who shall be granted the right by any Lender to participate in any of the Advances and who shall have entered into a participation agreement in form and substance satisfactory to such Lender as set forth in Section 17.3(d) hereof.

"Participation Advance" shall have the meaning set forth in Section 2.12(d) hereof.

"Participation Commitment" shall mean each Lender's obligation to buy a participation of the Letters of Credit issued hereunder.

"Patent, Trademark and Copyright Security Agreement" shall mean any Patent, Trademark and Copyright Security Agreement executed and delivered by Borrowers to the Agent for the benefit of the Lenders.

"Payment Office" shall mean initially Two Tower Center Boulevard, East Brunswick, New Jersey 08816; thereafter, such other office of Agent, if any, which it may designate by notice to Borrowing Agent and to each Lender to be the Payment Office.

"PBGC" shall mean the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA or any successor.

"Pension Benefit Plan" shall mean at any time any employee pension benefit plan (including a Multiple Employer Plan, but not a Multiemployer Plan) which is covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code and either (i) is maintained by any member of the Controlled Group for employees of any member of the Controlled Group; or (ii) has at any time within the preceding five years been maintained by any entity which was at such time a member of the Controlled Group for employees of any entity which was at such time a member of the Controlled Group.

"Permitted Encumbrances" shall mean: (a) Liens in favor of Agent for the benefit of Agent and Lenders; (b) Liens for taxes, assessments or other governmental charges not delinquent or being contested in good faith and by appropriate proceedings and with respect to which proper reserves have been taken by Borrowers; provided, that, the Lien shall have no effect on the priority of the Liens in favor of Agent or the value of the assets in which Agent has such a Lien and a stay of enforcement of any such Lien shall be in effect; (c) deposits or pledges to secure obligations under worker's compensation, social security or similar laws, or under unemployment insurance; (d) deposits or pledges to secure bids, tenders, contracts (other than contracts for the payment of money), leases, statutory obligations, surety and appeal bonds and other obligations of like nature arising in the Ordinary Course of Business; (e) Liens placed upon fixed assets hereafter acquired to secure a portion of the purchase price thereof, provided that (x) any such lien shall not encumber any other property of any Borrower and (y) the aggregate amount of Indebtedness secured by such Liens incurred as a result of such purchases during any fiscal year shall not exceed the amount provided for in Section 8.6; and (f) carriers', warehousemen's, mechanics', materialmen's, suppliers' repairmen's, landlord's or other similar Liens arising in the Ordinary Course of Business for amounts which are not overdue or that are being contested in good faith by appropriate proceedings (in any event, so long as no foreclosure proceedings have been commenced with respect thereto or if commenced, such proceedings are stayed during the pendency of such contest); provided, that adequate reserves with respect to such obligations contested in good faith are maintained on the books of the applicable Borrower, to the extent required by GAAP; (g) easements, covenants, rights-of-way, restrictions, subdivisions, parcelizations, encroachments and other similar encumbrances and other minor defects and irregularities in title affecting any Real Property that, in the aggregate, are not substantial in amount and do not materially detract from the value of any such Real Property; (h) Liens of sellers of goods to any Borrower arising under Article 2 of the Uniform Commercial Code or similar provisions of applicable law in the Ordinary Course of Business, which shall be junior to the liens of the Agent on such goods and which shall cover only the goods sold and securing only the unpaid purchase price for such goods and related expenses; and (i) Liens

disclosed on Schedule 1.2(a); provided that the principal amount secured thereby is not hereafter increased, and no additional assets (other than the Liens of Square D on after-acquired property which are subject to the terms of the Intercreditor Agreement) become subject to such Lien.

"Person" shall mean any natural person, individual, sole proprietorship, partnership, corporation, business trust, joint stock company, trust, unincorporated organization, association, limited liability company, limited liability partnership, institution, public benefit corporation, joint venture, entity, the Creditors' Committee or Governmental Body (whether federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof).

"Petition Date" has the meaning set forth in the Recitals.

"Plan" shall mean any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Benefit Plan), maintained for employees of any Borrower or any member of the Controlled Group or any such Plan to which any Borrower or any member of the Controlled Group is required to contribute on behalf of any of its employees.

"Pledge Agreement" shall mean that certain Collateral Pledge Agreement executed by Hussey in favor of Agent dated as of even date herewith, as amended, restated, supplemented and modified from time to time.

"PNC" shall have the meaning set forth in the preamble to this Agreement and shall extend to all of its successors and assigns.

"Post-Petition Obligations" shall mean all Obligations other than Pre-Petition Obligations.

"Pre-Petition Collateral" shall mean all Collateral (as defined in Pre-Petition Credit Agreement) in existence as of the Petition Date.

"Pre-Petition Credit Agreement" shall have the meaning set forth in the Recitals of this Agreement.

"Pre-Petition Lenders" shall mean the Agent and Lenders (as defined in the Pre-Petition Credit Agreement).

"Pre-Petition Loan Documents" shall mean the Pre-Petition Credit Agreement, the Other Documents (as defined in the Pre-Petition Credit Agreement) and each document, agreement and instrument (and all schedules and exhibits thereto) executed in connection therewith, as in effect immediately prior to the Petition Date.

"Pre-Petition Obligations" shall mean all Obligations (as defined in the Pre-Petition Credit Agreement) outstanding as of the Petition Date.

"Pre-Petition Payment" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness or trade payables or other pre-petition claims against any Borrower.

"Pre-Petition Released Claim" shall have the meaning set forth in Section 1.6 herein.

"Properly Contested" shall mean, in the case of any Indebtedness or Lien, as applicable, of any Person (including any taxes) that is not paid as and when due or payable by reason of such Person's bona fide dispute concerning its liability to pay same or concerning the amount thereof, (i) such Indebtedness or Lien, as applicable, is being properly contested in good faith by appropriate proceedings promptly instituted and diligently conducted; (ii) such Person has established appropriate reserves as shall be required in conformity with GAAP; (iii) the non-payment of such Indebtedness will not have a Material Adverse Effect and will not result in the forfeiture of any assets of such Person; (iv) no Lien is imposed upon any of such Person's assets with respect to such Indebtedness unless such Lien is at all times junior and subordinate in priority to the Liens in favor of the Agent (except only with respect to property taxes that have priority as a matter of applicable state law) and enforcement of such Lien is stayed during the period prior to the final resolution or disposition of such dispute; (v) if such Indebtedness or Lien, as applicable, results from, or is determined by the entry, rendition or issuance against a Person or any of its assets of a judgment, writ, order or decree, enforcement of such judgment, writ, order or decree is stayed pending a timely appeal or other judicial review; and (vi) if such contest is abandoned, settled or determined adversely (in whole or in part) to such Person, such Person forthwith pays such Indebtedness and all penalties, interest and other amounts due in connection therewith.

"Projections" shall have the meaning set forth in Section 6.5(a) hereof.

"Published Rate" shall mean the rate of interest published each Business Day in the Wall Street Journal "Money Rates" listing under the caption "London Interbank Offered Rates" for a one month period (or, if no such rate is published therein for any reason, then the Published Rate shall be the Eurodollar rate for a one month period as published in another publication selected by the Agent).

"RCRA" shall mean the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq., as same may be amended from time to time.

"Real Property" shall mean all of each Borrower's right, title and interest in and to the owned and leased premises identified on Schedule 4.19 hereto.

"Receivables" shall mean and include, as to each Borrower, all of such Borrower's present and future: (i) accounts; (ii) contract rights, chattel paper (including electronic chattel paper), instruments (including those evidencing indebtedness owed to such Borrower by its Affiliates), documents, general intangibles relating to accounts, drafts and acceptances, credit card receivables, deposit accounts, and other rights to payment of any kind, whether or not arising out of or in connection with the sale or lease of goods or the rendering of services, and whether or not earned by performance; (iii) any of the foregoing which are not evidenced by instruments or chattel paper; (iv) inter-company receivables, and any security documents executed in connection therewith; (v) proceeds of any letters of credit or insurance policies on which such Borrower is named as beneficiary; (vi) claims against third parties for advances and other financial accommodations and any other obligations whatsoever owing to such Borrower; (vii) rights in and to all security agreements, leases, guarantees, instruments, securities,

25

documents of title and other contracts securing, evidencing, supporting or otherwise relating to any of the foregoing, together with all rights in any goods, merchandise or Inventory which any of the foregoing may represent: (viii) rights in returned and repossessed goods, merchandise and Inventory which any of the same may represent, including, without limitation, any right of stoppage in transit; and (ix) and all other forms of obligations owing to such Borrower arising out of or in connection with the sale or lease of Inventory or the rendition of services, all supporting obligations, guarantees and other security therefor, whether secured or unsecured, now existing or hereafter created, and whether or not specifically sold or assigned to Agent hereunder.

"Receivables Advance Rate" shall have the meaning set forth in Section 2.1(a)(y)(i) hereof.

"Register" shall have the meaning set forth in Section 17.3(c) hereof.

"Reimbursement Obligation" shall have the meaning set forth in Section 2.12(b) hereof.

"Release" shall have the meaning set forth in Section 6.7(c)(i) hereof.

"Releasee" shall have the meaning set forth in Section 1.6 hereof.

"Releasors" shall have the meaning set forth in Section 1.6 hereof.

"Reorganization Plan" means a plan or plans of reorganization in the Case.

"Reportable Event" shall mean a reportable event described in Section 4043(c) of ERISA or the regulations promulgated thereunder.

"Required Lenders" shall mean Lenders holding at least fifty-one percent (51.0%) of the Advances and, if no Advances are outstanding, shall mean Lenders holding fifty-one percent (51.0%) of the Commitment Percentages.

"Revolving Advances" shall mean Advances made other than Letters of Credit.

"Revolving Credit Note" shall mean, collectively, the promissory notes referred to in Section 2.1(a) hereof.

"Revolving Interest Rate" shall mean an interest rate per annum equal to the sum of the Alternate Base Rate plus five percent (5.00%).

"Sale Order" shall have the meaning set forth in Section 11.18(r) hereof.

"Schedules" shall mean all schedules and statement of financial affairs required to be filed with the Bankruptcy Court under the Federal Rules of Bankruptcy Procedure with respect to the Borrowers and the other debtors in the Case.

"SEC" shall mean the Securities and Exchange Commission or any successor thereto.

"Section 20 Subsidiary" shall mean the Subsidiary of the bank holding company controlling PNC, which Subsidiary has been granted authority by the Federal Reserve Board to underwrite and deal in certain Ineligible Securities.

"Secured Parties" shall mean, collectively, PNC as Agent under the Pre-Petition Loan Documents, Issuer under the Pre-Petition Credit Agreement, Pre-Petition Lenders, Agent, Lenders and Issuer.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Settlement Date" shall mean the Closing Date and thereafter Wednesday or Thursday of each week or more frequently if Agent deems appropriate unless such day is not a Business Day in which case it shall be the next succeeding Business Day.

"Square D" shall mean Schneider Electric, USA, Inc. f/k/a Square D Company, a Delaware corporation.

"Subordinated Debt Documentation" shall mean the Subordinated Note, and all other promissory notes, agreements, documents, and instruments now or at any time hereafter executed in connection therewith, including without limitation, the documents set forth on Schedule 1 to the Intercreditor Agreement, as the same may be amended, restated, modified, or supplemented in accordance with this Agreement and the Intercreditor Agreement.

"Subordinated Note" shall mean that Amended and Restated Promissory Note dated as of January 20, 2006, made by Hussey Copper Ltd. in favor of Square D in the original principal amount of $3,000,000.

"Standby Letters of Credit" shall mean letters of credit constituted with all the documents complying with the Uniform Customs and Practice for International Standby Practices as most recently published by the International Chamber of Commerce at the time the letter of credit is issued.

"Statutory Fees" shall have the meaning given to the term "Statutory Fees" in the Final Order, or, prior to the entry of the Final Order, the Interim Order.

"Subsidiary" of any Person shall mean a corporation or other entity of whose Equity Interests having ordinary voting power (other than Equity Interests having such power only by reason of the happening of a contingency) to elect a majority of the directors of such corporation, or other Persons performing similar functions for such entity, are owned, directly or indirectly, by such Person, one or more of the other Subsidiaries of such Person or any combination thereof.

"Superpriority Claim" means an allowed claim against any Borrower or such Borrower's estate in the Case which is an administrative expense claim having priority over (a) any and all allowed administrative expenses and (b) all unsecured claims now existing or hereafter arising, including any administrative expenses of the kind specified in the Bankruptcy Code, including without limitation Sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503, 506(c) (upon entry of the Final Order), 507, 546, 726, 1113 or 1114 of the Bankruptcy Code.

27

"Swing Loan Commitment" shall mean the Agent's commitment to make Swing Loans to Borrowers pursuant to Section 2.1(c).

"Swing Loan Note" shall mean the Swing Loan Note of Borrowers in the form of Exhibit 2.1(c) evidencing the Swing Loans, together with all amendments, extensions, renewals, replacements, refinancings or refundings thereof in whole or in part.

"Swing Loan Request" shall mean a request for Swing Loans made in accordance with Section 2.2(b) hereof.

"Swing Loans" shall mean collectively and separately all Swing Loans or any Swing Loan made by the Agent to Borrowers pursuant to Section 2.1(c) hereof.

"Term" shall have the meaning set forth in Section 14.1 hereof.

"Termination Event" shall mean: (i) a Reportable Event with respect to any Plan or Multiemployer Plan; (ii) the withdrawal of any Borrower or any member of the Controlled Group from a Plan or Multiemployer Plan during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA; (iii) the providing of notice of intent to terminate a Plan in a distress termination described in Section 4041(c) of ERISA; (iv) the institution by the PBGC of proceedings to terminate a Plan or Multiemployer Plan; (v) any event or condition (a) which might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan or Multiemployer Plan, or (b) that may result in termination of a Multiemployer Plan pursuant to Section 4041A of ERISA; or (vi) the partial or complete withdrawal within the meaning of Sections 4203 and 4205 of ERISA, of any Borrower or any member of the Controlled Group from a Multiemployer Plan.

"Toxic Substance" shall mean and include any material present on the Real Property or the Leasehold Interests which has been shown to have significant adverse effect on human health or which is subject to regulation under the Toxic Substances Control Act (TSCA), 15 U.S.C. §§ 2601 et seq., applicable state law, or any other applicable Federal or state laws now in force or hereafter enacted relating to toxic substances. "Toxic Substance" includes but is not limited to asbestos, polychlorinated biphenyls (PCBs) and lead-based paints.

"Trading with the Enemy Act" shall mean the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any enabling legislation or executive order relating thereto.

"Transactions" shall mean the transactions contemplated by this Agreement.

"Undrawn Availability" shall mean, at a particular date, an amount equal to (a) the lesser of (i) the Formula Amount or (ii) the Maximum Revolving Advance Amount, minus the aggregate amount of outstanding Letters of Credit, minus (b) the outstanding amount of Revolving Advances and Swing Loans.

"Uniform Commercial Code" shall have the meaning set forth in Section 1.3 hereof.

074658.01807/12123123v.11

"USA PATRIOT Act" shall mean the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"Week" shall mean the time period commencing with the opening of business on a Wednesday and ending on the end of business the following Tuesday.

1.3. <u>Uniform Commercial Code Terms</u>. All terms used herein and defined in the Uniform Commercial Code as adopted in the State of Pennsylvania from time to time (the "Uniform Commercial Code") shall have the meaning given therein unless otherwise defined herein. Without limiting the foregoing, the terms "accounts", "chattel paper", "instruments", "general intangibles", "payment intangibles", "supporting obligations", "securities", "investment property", "documents", "deposit accounts", "software", "letter of credit rights", "inventory", "equipment" and "fixtures", as and when used in the description of Collateral shall have the meanings given to such terms in Articles 8 or 9 of the Uniform Commercial Code. To the extent the definition of any category or type of collateral is expanded by any amendment, modification or revision to the Uniform Commercial Code, such expanded definition will apply automatically as of the date of such amendment, modification or revision.

1.4. <u>Certain Matters of Construction</u>. The terms "herein", "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision. All references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement. Any pronoun used shall be deemed to cover all genders. Wherever appropriate in the context, terms used herein in the singular also include the plural and vice versa. All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations. Unless otherwise provided, all references to any instruments or agreements to which Agent is a party, including references to any of the Other Documents, shall include any and all modifications or amendments thereto and any and all extensions or renewals thereof. All references herein to the time of day shall mean the time in Philadelphia, Pennsylvania. Unless otherwise provided, all financial calculations shall be performed with Inventory valued on a first-in-first-out basis. Whenever the words "including" or "include" shall be used, such words shall be understood to mean "including, without limitation" or "include, without limitation". A Default or Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing pursuant to this Agreement or, in the case of a Default, is cured within any period of cure expressly provided for in this Agreement; and an Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by the Required Lenders. Any Lien referred to in this Agreement or any of the Other Documents as having been created in favor of Agent, any agreement entered into by Agent pursuant to this Agreement or any of the Other Documents, any payment made by or to or funds received by Agent pursuant to or as contemplated by this Agreement or any of the Other Documents, or any act taken or omitted to be taken by Agent, shall, unless otherwise expressly provided, be created, entered into, made or received, or taken or omitted, for the benefit or account of Agent and Lenders. Wherever the phrase "to the best of Borrowers' knowledge" or words of similar import relating to the knowledge or the awareness of any Borrower are used in this Agreement or Other Documents, such phrase shall mean and refer to (i) the actual

29

knowledge of a senior officer of any Borrower or (ii) the knowledge that a senior officer would have obtained if he had engaged in good faith and diligent performance of his duties, including the making of such reasonably specific inquiries as may be necessary of the employees or agents of such Borrower and a good faith attempt to ascertain the existence or accuracy of the matter to which such phrase relates. All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or otherwise within the limitations of, another covenant shall not avoid the occurrence of a default if such action is taken or condition exists. In addition, all representations and warranties hereunder shall be given independent effect so that if a particular representation or warranty proves to be incorrect or is breached, the fact that another representation or warranty concerning the same or similar subject matter is correct or is not breached will not affect the incorrectness of a breach of a representation or warranty hereunder.

1.5.    Acknowledgment.

(a)    Borrowers hereby acknowledge, confirm and agree, that as of September __, 2011, Borrowers are indebted to Agent and Lenders, without defense, setoff, claim or counterclaim, in the aggregate principal amount of $_____ under the Pre-Petition Credit Agreement, plus all accrued but unpaid interest, fees, costs and expenses in connection with the Pre-Petition Credit Agreement and the Pre-Petition Loan Documents.

(b)    Borrowers hereby, and shall cause each other debtor to, acknowledge, confirm and agree that Agent, for the benefit of itself and the other Lenders, has and shall continue to have valid, enforceable and perfected first priority and senior security interest and Liens upon Pre-Petition Collateral heretofore granted to Agent and Lenders pursuant to the Pre-Petition Loan Documents as in effect immediately prior to the Petition Date to secure all of the Pre-Petition Obligations arising under the Pre-Petition Credit Agreement, as well as valid and enforceable first priority and senior security interests in and Liens upon all Collateral granted to Agent, in accordance with the Interim Order and the Final Order, for the benefit of itself and the Lenders, upon the entry of, and under, the Interim Order or Final Order, and under this Agreement.

1.6.    Release.

(a)    In consideration of and as a condition to the Agent and the Lenders making Advances and providing other credit and financial accommodations to the Borrowers pursuant to the provisions of this Agreement, the Interim Order and the Final Order, each Borrower, on behalf of itself, its estate, its successors and assigns, and other legal representatives (collectively, the "Releasors"), hereby absolutely releases, forever discharges and acquits the Agent, each Lender and their respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (Agent, each Lender and all such other parties being hereinafter referred to collectively as "Releasees") of and from any and all claims, demands, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages,  and any and all other claims, counterclaims, defenses rights of set-off, demands and liabilities whatsoever (individually, a "Pre-Petition Released Claim" and collectively, the "Pre-Petition Released Claims") of every kind, name,

30

nature and description, known or unknown, suspected or unsuspected, both at law and in equity, which, including, without limitation, any so-called "lender liability" claims or defenses, that any Releasor may now or hereafter own, hold, have or claim to have against Releasees, or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or prior to the date of this Agreement, including in respect of the Pre-Petition Obligations, the Pre-Petition Loan Documents and any Advances, letters of credit or other financial accommodations made by the Agent and Lenders to the Borrowers pursuant to the Pre-Petition Loan Documents. In addition, upon the indefeasible payment in full of all Obligations owed to the Agent and Lenders by the Borrowers and termination of the rights and obligations arising under this Agreement, either a Final Order or extended Interim Order, as the case may be (which payment and termination shall be on terms and conditions acceptable to the Agent), the Agent and the Lenders shall be released from any and all obligations, liabilities, actions, duties, responsibilities and causes of action arising or occurring in connection with or related to this Agreement or the applicable financing order (including without limitation any obligation or responsibility (whether direct or indirect, absolute or contingent, due or not due, primary or secondary, liquidated or unliquidated), on terms and conditions acceptable to the Agent.

(b)     Upon the entry of the Interim Order, each Borrower, on behalf of itself and the Releasors, hereby, absolutely, unconditionally and irrevocably, covenants and agrees, and will cause each other debtor to absolutely, unconditionally and irrevocably, covenant and agree, with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Pre-Petition Released Claim released, remised and discharged by each Releasee pursuant to this Section 1.6. If any Releasor violates the foregoing covenant, Borrowers agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

1.7.   Adoption and Ratification. Each Borrower hereby (a) ratifies, assumes, adopts and agrees to be bound by all of the Pre-Petition Loan Documents to which it is a party and (b) agrees to pay all Pre-Petition Obligations in accordance with the terms of the Pre-Petition Loan Documents and in accordance with the Interim Order and Final Order. All of the Pre-Petition Loan Documents are hereby incorporated herein by reference and hereby are and shall be deemed adopted and assumed in full by Borrowers, each as a debtor and debtor-in-possession, and considered as agreements among Borrowers, on the one hand, and Agent and Lenders, on the other hand.

II.    ADVANCES, PAYMENTS.

2.1.   Revolving Advances.

(a)     Amount of Revolving Advances. Subject to the terms and conditions set forth in this Agreement including Sections 2.1(b) and (d), each Lender, severally and not jointly, will make Revolving Advances to Borrowers in aggregate amounts outstanding at any time equal to such Lender's Commitment Percentage of the lesser of (x) the Maximum Revolving Advance Amount less the aggregate Maximum Undrawn Amount, less the outstanding Pre-Petition Obligations or (y) an amount equal to the sum of:

(i)    up to 85%, subject to the provisions of Section 2.1(b) hereof ("Receivables Advance Rate"), of Eligible Receivables, <u>plus</u>

(ii)    up to eighty percent (80%), subject to the provision of Section 2.1(b) hereof, ("Inventory Advance Rate," together with the Receivables Advance Rate, the "Advance Rates"), of the value of Eligible Inventory and Eligible In-Transit Inventory; provided, however, that the aggregate amount of Advances supported by item (ii) above shall not exceed sixty five percent (65%) of the aggregate Advances supported by the Borrowing Base Certificate, <u>minus</u>

(iii)    the aggregate amount of outstanding Letters of Credit, <u>minus</u>

(iv)    the Carve-Out Reserve Amount, <u>minus</u>

(v)    the Availability Reserve; <u>minus</u>

(vi)    such other reserves as Agent may reasonably deem proper and necessary from time to time.

The amount derived from the sum of (x) Sections 2.1(a)(y)(i) and (ii) <u>minus</u> (y) Sections 2.1(a)(y)(iii), (iv), (v) and (vi) at any time and from time to time shall be referred to as the "Formula Amount". The Revolving Advances shall be evidenced by one or more secured promissory notes (collectively, the "Revolving Credit Note") substantially in the form attached hereto as Exhibit 2.1(a).

(b)    <u>Discretionary Rights</u>. Based on a material change in the composition, or performance, of the collateral base as determined by Agent from the results of field examinations and/or other collateral evaluations performed after the Closing Date, the Advance Rates may be increased or decreased by Agent at any time and from time to time in the exercise of its reasonable discretion after reasonable prior notice to Borrowers. Each Borrower consents to any such increases or decreases and acknowledges that decreasing the Advance Rates or increasing or imposing reserves may limit or restrict Advances requested by Borrowing Agent. The rights of Agent under this subsection are subject to the provisions of Section 17.2(b).

(c)    <u>Swing Loans.</u> Subject to the terms and conditions hereof and relying upon the representations and warranties herein set forth, and in order to facilitate advances and repayments between Settlement Dates, the Agent may, at its option, cancelable at any time for any reason whatsoever, make swing loans (the "Swing Loans") to Borrowers at any time or from time to time after the date hereof to, but not including, the last day of the Term, in an aggregate principal amount up to but not in excess of $5,000,000 (the "Swing Loan Commitment"), provided that the aggregate principal amount of the Agent's outstanding Swing Loans and the outstanding Revolving Advances of all the Lenders and the aggregate amount of outstanding Letters of Credit shall not exceed the lesser of the Maximum Revolving Advance Amount or the Formula Amount plus the aggregate amount of outstanding Letters of Credit. Within such limits of time and amount and subject to the other provisions of this Agreement, Borrowers may borrow, repay and reborrow pursuant to this Section 2.1(c). The obligation of Borrowers to repay the unpaid principal amount of the Swing Loans made to it by the Agent together with interest thereon shall be evidenced by a demand promissory note of Borrowers

32

dated the Closing Date in substantially the form attached hereto as Exhibit 2.1(c) payable to the order of the Agent in a face amount equal to the Swing Loan Commitment.

(d)    Eligible In-Transit Inventory.    Notwithstanding anything to the contrary contained herein, Advances against Eligible In-Transit Inventory shall not exceed in the aggregate at anytime $2,500,000.

2.2.    Procedure for Revolving Advances Borrowing.

(a)    Borrowing Agent on behalf of any Borrower may notify Agent prior to 12:00 p.m. on a Business Day of a Borrower's request to incur, on that day, a Revolving Advance hereunder.  Should any amount required to be paid as interest hereunder, or as fees or other charges under this Agreement or any other agreement with Agent or Lenders, or with respect to any other Obligation, become due, same shall be deemed a request for a Revolving Advance as of the date such payment is due, in the amount required to pay in full such interest, fee, charge or Obligation under this Agreement or any other agreement with Agent or Lenders, and such request shall be irrevocable.

(b)    Except as otherwise provided herein, Borrowers may from time to time prior to the last day of the Term request the Agent to make Swing Loans by delivery to the Agent not later than 12:00 p.m. on the proposed date of such borrowing of a duly completed request therefor substantially in the form of Exhibit 2.2(b) hereto or a request by telephone immediately confirmed in writing by letter, facsimile or telex (each, a "Swing Loan Request"), it being understood that the Agent may rely on the authority of any individual making such a telephonic request without the necessity of receipt of such written confirmation.  Each Swing Loan Request shall be irrevocable and shall specify the proposed date of such borrowing and the principal amount of such Swing Loan, which shall be not less than $500,000.

2.3.    Disbursement of Advance Proceeds.    All Advances shall be disbursed from whichever office or other place Agent may designate from time to time and, together with any and all other Obligations of Borrowers to Agent or Lenders, shall be charged to Borrowers' Account on Agent's books.  During the Term, Borrowers may use the Revolving Advances by borrowing, prepaying and re-borrowing, all in accordance with the terms and conditions hereof. The proceeds of each Revolving Advance requested by Borrowing Agent on behalf of any Borrower or deemed to have been requested by any Borrower under Section 2.2(a) hereof shall, with respect to requested Revolving Advances to the extent Lenders make such Revolving Advances, be made available to the applicable Borrower on the day so requested by way of credit to such Borrower's operating account at PNC, or such other bank as Borrowing Agent may designate following notification to Agent, in immediately available federal funds or other immediately available funds or, with respect to Revolving Advances deemed to have been requested by any Borrower, be disbursed to Agent to be applied to the outstanding Obligations giving rise to such deemed request.

2.4.    Reserved.

2.5.    Maximum Advances.    The aggregate balance of Revolving Advances outstanding hereunder together with the Revolving Advances outstanding under the Pre-Petition Credit

33

Agreement at any time shall not exceed the lesser of (a) the Maximum Revolving Advance Amount minus the outstanding Letters of Credit and the aggregate balance of outstanding Swing Loans, or (b) the Formula Amount minus the aggregate balance of the outstanding Swing Loans.

2.6.     Repayment of Advances.

(a)     The Advances shall be due and payable in full on the last day of the Term subject to earlier prepayment as herein provided.

(b)     Each Borrower recognizes that the amounts evidenced by checks, notes, drafts or any other items of payment relating to and/or proceeds of Collateral may not be collectible by Agent on the date deposited to any Collection Account or the Cash Concentration Account. For the purpose of calculating the aggregate Revolving Advances outstanding and the resulting Undrawn Availability, all such items of payment shall be credited to Borrowers on the Business Day on which Agent has received notice of the deposit of the proceeds of such Collateral into the Cash Concentration Account. For the purposes of calculating interest and other charges on the Obligations, and in consideration of Agent's agreement to conditionally credit Borrowers' Account as of the Business Day on which the Agent receives those items of payment, Borrowers agree that all items of payment shall be deemed applied by Agent on account of the Obligations one (1) Business Day after the Business Day Agent receives notice of the deposit of the proceeds of such Collateral into the Cash Concentration Account. Agent is not, however, required to credit Borrowers' Account for the amount of any item of payment which is unsatisfactory to Agent and Agent may charge Borrowers' Account for the amount of any item of payment which is returned to Agent unpaid.

(c)     All payments of principal, interest and other amounts payable hereunder, or under any of the Other Documents shall be made to Agent at the Payment Office not later than 1:00 P.M. (New York time) on the due date therefor in lawful money of the United States of America in federal funds or other funds immediately available to Agent. Agent shall have the right to effectuate payment on any and all Obligations due and owing hereunder by charging Borrowers' Account or by making Advances as provided in Section 2.2 hereof.

(d)     Borrowers shall pay principal, interest, and all other amounts payable hereunder, or under any related agreement, without any deduction whatsoever, including, but not limited to, any deduction for any setoff or counterclaim.

2.7.     Repayment of Excess Advances. The aggregate balance of Advances outstanding at any time in excess of the maximum amount of Advances permitted hereunder shall be immediately due and payable without the necessity of any demand, at the Payment Office, whether or not a Default or Event of Default has occurred.

2.8.     Statement of Account. Agent shall maintain, in accordance with its customary procedures, a loan account ("Borrowers' Account") in the name of Borrowers in which shall be recorded the date and amount of each Advance made by Agent and the date and amount of each payment in respect thereof; provided, however, the failure by Agent to record the date and amount of any Advance shall not adversely affect Agent or any Lender. Each month, Agent shall send to Borrowing Agent a statement showing the accounting for the Advances made,

payments made or credited in respect thereof, and other transactions between Agent and Borrowers during such month. The monthly statements shall be deemed correct and binding upon Borrowers in the absence of manifest error and shall constitute an account stated between Lenders and Borrowers unless Agent receives a written statement of Borrowers' specific exceptions thereto within thirty (30) days after such statement is received by Borrowing Agent. The records of Agent with respect to the loan account shall be conclusive evidence absent manifest error of the amounts of Advances and other charges thereto and of payments applicable thereto.

2.9.    Letters of Credit.  Subject to the terms and conditions hereof, Agent shall issue or cause the issuance of Standby Letters of Credit ("Letters of Credit") for the account of any Borrower; provided, however, that Agent will not be required to issue or cause to be issued any Letters of Credit to the extent that the issuance thereof would then cause the sum of (i) the outstanding Revolving Advances plus (ii) the outstanding Swing Loans, plus (iii) the Maximum Undrawn Amount Letters of Credit to exceed the lesser of (x) the Maximum Revolving Advance Amount or (y) the Formula Amount plus the outstanding Letters of Credit. The Maximum Undrawn Amount shall not exceed in the aggregate at any time the Letter of Credit Sublimit. All disbursements or payments related to Letters of Credit shall be deemed to be Revolving Advances and shall bear interest at the applicable Revolving Interest Rate; Letters of Credit that have not been drawn upon shall not bear interest.

2.10.   Issuance of Letters of Credit.

(a)     Borrowing Agent, on behalf of Borrowers, may request Agent to issue or cause the issuance of a Letter of Credit by delivering to Agent at the Payment Office, prior to 12:00 p.m. (New York time), at least five (5) Business Days' prior to the proposed date of issuance, Agent's form of Letter of Credit Application (the "Letter of Credit Application") completed to the satisfaction of Agent; and, such other certificates, documents and other papers and information as Agent may reasonably request. Borrowing Agent, on behalf of Borrowers, also has the right to give instructions and make agreements with respect to any application, any applicable letter of credit and security agreement, any applicable letter of credit reimbursement agreement and/or any other applicable agreement, any letter of credit and the disposition of documents, disposition of any unutilized funds, and to agree with Agent upon any amendment, extension or renewal of any Letter of Credit.

(b)     Each Letter of Credit shall, among other things, (i) provide for the payment of sight drafts, other written demands for payment, or acceptances of issuance drafts when presented for honor thereunder in accordance with the terms thereof and when accompanied by the documents described therein and (ii) have an expiry date not later than twelve (12) months after such Letter of Credit's date of issuance and in no event later than the last day of the Term. Each Letter of Credit shall be subject either to the Uniform Customs and Practice for Documentary Credits as most recently published by the International Chamber of Commerce at the time the Letter of Credit is issued ("UCP") or the International Standby Practices (ISP98-International Chamber of Commerce Publication Number 590) ("ISP98 Rules"), as determined by Agent, and each trade Letter of Credit shall be subject to the UCP.

(c)     Agent shall use its reasonable efforts to notify Lenders of the request by Borrowing Agent for a Letter of Credit hereunder.

2.11.   Requirements For Issuance of Letters of Credit.

(a)     Borrowing Agent shall authorize and direct any Issuer to name the applicable Borrower as the "Applicant" or "Account Party" of each Letter of Credit. If Agent is not the Issuer of any Letter of Credit, Borrowing Agent shall authorize and direct the Issuer to deliver to Agent all instruments, documents, and other writings and property received by the Issuer pursuant to the Letter of Credit and to accept and rely upon Agent's instructions and agreements with respect to all matters arising in connection with the Letter of Credit, the application therefor or any acceptance therefor.

(b)     In connection with all Letters of Credit issued or caused to be issued by Agent under this Agreement, each Borrower hereby appoints Agent, or its designee, as its attorney, with full power and authority if an Event of Default or Default shall have occurred: (i) to sign and/or endorse such Borrower's name upon any warehouse or other receipts, letter of credit applications and acceptances; (ii) to sign such Borrower's name on bills of lading; (iii) to clear Inventory through the United States of America Customs Department ("Customs") in the name of such Borrower or Agent or Agent's designee, and to sign and deliver to Customs officials powers of attorney in the name of Borrower for such purpose; and (iv) to complete in such Borrower's name or Agent's, or in the name of Agent's designee, any order, sale or transaction, obtain the necessary documents in connection therewith, and collect the proceeds thereof. Neither Agent nor its attorneys will be liable for any acts or omissions nor for any error of judgment or mistakes of fact or law, except for Agent's or its attorney's willful misconduct. This power, being coupled with an interest, is irrevocable as long as any Letters of Credit remain outstanding.

2.12.   Disbursements, Reimbursement.

(a)     Immediately upon the issuance of each Letter of Credit, each Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from Agent a participation in such Letter of Credit and each drawing thereunder in an amount equal to such Lender's Commitment Percentage of the Maximum Face Amount of such Letter of Credit and the amount of such drawing, respectively.

(b)     In the event of any request for a drawing under a Letter of Credit by the beneficiary or transferee thereof, Agent will promptly notify Borrowing Agent. Provided that Borrowing Agent shall have received such notice, the Borrowers shall reimburse (such obligation to reimburse Agent shall sometimes be referred to as a "Reimbursement Obligation") Agent prior to 12:00 Noon, New York time on each date that an amount is paid by Agent under any Letter of Credit (each such date, a "Drawing Date") in an amount equal to the amount so paid by Agent. In the event Borrowers fail to reimburse Agent for the full amount of any drawing under any Letter of Credit by 12:00 Noon, New York time, on the Drawing Date, Agent will promptly notify each Lender thereof, and Borrowers shall be deemed to have requested that a Revolving Advance be made by the Lenders to be disbursed on the Drawing Date under such Letter of Credit, subject to the amount of the unutilized portion of the lesser of the Maximum

36

Revolving Advance Amount or the Formula Amount and subject to Section 9.2 hereof. Any notice given by Agent pursuant to this Section 2.12(b) may be oral if immediately confirmed in writing; provided that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(c)     Each Lender shall upon any notice pursuant to Section 2.12(b) make available to Agent an amount in immediately available funds equal to its Commitment Percentage of the amount of the drawing, whereupon the participating Lenders shall (subject to Section 2.12(d)) each be deemed to have made a Revolving Advance to Borrowers in that amount. If any Lender so notified fails to make available to Agent the amount of such Lender's Commitment Percentage of such amount by no later than 2:00 p.m., New York time on the Drawing Date, then interest shall accrue on such Lender's obligation to make such payment, from the Drawing Date to the date on which such Lender makes such payment (i) at a rate per annum equal to the Federal Funds Rate during the first three days following the Drawing Date and (ii) at a rate per annum equal to the rate applicable to Revolving Advances on and after the fourth day following the Drawing Date. Agent will promptly give notice of the occurrence of the Drawing Date, but failure of Agent to give any such notice on the Drawing Date or in sufficient time to enable any Lender to effect such payment on such date shall not relieve such Lender from its obligation under this Section 2.12(c), provided that such Lender shall not be obligated to pay interest as provided in Section 2.12(c) (i) and (ii) until and commencing from the date of receipt of notice from Agent of a drawing.

(d)     With respect to any unreimbursed drawing that is not converted into a Revolving Advance Loan to Borrowers in whole or in part as contemplated by Section 2.12(b), because of Borrowers' failure to satisfy the conditions set forth in Section 9.2 (other than any notice requirements) or for any other reason, Borrowers shall be deemed to have incurred from Agent a borrowing (each a "Letter of Credit Borrowing") in the amount of such drawing. Such Letter of Credit Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the rate per annum applicable to a Revolving Advance. Each Lender's payment to Agent pursuant to Section 2.12(c) shall be deemed to be a payment in respect of its participation in such Letter of Credit Borrowing and shall constitute a "Participation Advance" from such Lender in satisfaction of its Participation Commitment under this Section 2.12.

(e)     Each Lender's Participation Commitment shall continue until the last to occur of any of the following events: (x) Agent ceases to be obligated to issue or cause to be issued Letters of Credit hereunder; (y) no Letter of Credit issued or created hereunder remains outstanding and uncancelled; and (z) all Persons (other than the Borrowers) have been fully reimbursed for all payments made under or relating to Letters of Credit.

2.13.   Repayment of Participation Advances.

(a)     Upon (and only upon) receipt by Agent for its account of immediately available funds from Borrowers (i) in reimbursement of any payment made by the Agent under the Letter of Credit with respect to which any Lender has made a Participation Advance to Agent, or (ii) in payment of interest on such a payment made by Agent under such a Letter of Credit, Agent will pay to each Lender, in the same funds as those received by Agent, the amount of such Lender's Commitment Percentage of such funds, except Agent shall retain the amount of

the Commitment Percentage of such funds of any Lender that did not make a Participation Advance in respect of such payment by Agent.

(b)     If Agent is required at any time to return to any Borrower, or to a trustee, receiver, liquidator, custodian, or any official in any insolvency proceeding, any portion of the payments made by Borrowers to Agent pursuant to Section 2.13(a) in reimbursement of a payment made under the Letter of Credit or interest or fee thereon, each Lender shall, on demand of Agent, forthwith return to Agent the amount of its Commitment Percentage of any amounts so returned by Agent plus interest at the Federal Funds Effective Rate.

2.14.    Documentation.  Each Borrower agrees to be bound by the terms of the Letter of Credit Application and by Agent's interpretations of any Letter of Credit issued on behalf of such Borrower and by Agent's written regulations and customary practices relating to letters of credit, though Agent's interpretations may be different from such Borrower's own.  In the event of a conflict between the Letter of Credit Application and this Agreement, this Agreement shall govern.  It is understood and agreed that, except in the case of gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment), Agent shall not be liable for any error, negligence and/or mistakes, whether of omission or commission, in following the Borrowing Agent's or any Borrower's instructions or those contained in the Letters of Credit or any modifications, amendments or supplements thereto.

2.15.    Determination to Honor Drawing Request.  The Issuer shall have absolute discretion whether to accept any draft. Without in any way limiting the Issuer's absolute discretion whether to accept any draft, no Borrower will not present for acceptance any draft, and the Issuer will generally not accept any drafts (i) that arise out of transactions involving the sale of goods by any Borrower not in the ordinary course of its business, (ii) that involve a sale to an Affiliate of a Borrower, (iii) that involve any purchase for which the Issuer has not received all related documents, instruments and forms requested by the Issuer, or (iv) that is not eligible for discounting with Federal Reserve Banks pursuant to paragraph 7 of Section 13 of the Federal Reserve Act, as amended.

2.16.    Nature of Participation and Reimbursement Obligations.  Each Lender's obligation in accordance with this Agreement to make the Revolving Advances or Participation Advances as a result of a drawing under a Letter of Credit, and the obligations of Borrowers to reimburse Agent upon a draw under a Letter of Credit, shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Section 2.16 under all circumstances, including the following circumstances:

(i)     any set-off, counterclaim, recoupment, defense or other right which such Lender may have against Agent, any Borrower or any other Person for any reason whatsoever;

(ii)     the failure of any Borrower or any other Person to comply, in connection with a Letter of Credit Borrowing, with the conditions set forth in this Agreement for the making of a Revolving Advance, it being acknowledged that such conditions are not required

38

for the making of a Letter of Credit Borrowing and the obligation of the Lenders to make Participation Advances under Section 2.12;

(iii)     any lack of validity or enforceability of any Letter of Credit;

(iv)     any claim of breach of warranty that might be made by Borrower or any Lender against the beneficiary of a Letter of Credit, or the existence of any claim, set-off, recoupment, counterclaim, crossclaim, defense or other right which any Borrower or any Lender may have at any time against a beneficiary, any successor beneficiary or any transferee of any Letter of Credit or the proceeds thereof (or any Persons for whom any such transferee may be acting), Agent or any Lender or any other Person, whether in connection with this Agreement, the transactions contemplated herein or any unrelated transaction (including any underlying transaction between any Borrower or any Subsidiaries of such Borrower and the beneficiary for which any Letter of Credit was procured);

(v)     the lack of power or authority of any signer of (or any defect in or forgery of any signature or endorsement on) or the form of or lack of validity, sufficiency, accuracy, enforceability or genuineness of any draft, demand, instrument, certificate or other document presented under or in connection with any Letter of Credit, or any fraud or alleged fraud in connection with any Letter of Credit, or the transport of any property or provisions of services relating to a Letter of Credit, in each case even if Agent or any of Agent's Affiliates has been notified thereof;

(vi)     payment by Agent under any Letter of Credit against presentation of a demand, draft or certificate or other document which does not comply with the terms of such Letter of Credit;

(vii)     the solvency of, or any acts or omissions by, any beneficiary of any Letter of Credit, or any other Person having a role in any transaction or obligation relating to a Letter of Credit, or the existence, nature, quality, quantity, condition, value or other characteristic of any property or services relating to a Letter of Credit;

(viii)     any failure by the Agent or any of Agent's Affiliates to issue any Letter of Credit in the form requested by Borrowing Agent, unless the Agent has received written notice from Borrowing Agent of such failure within three (3) Business Days after the Agent shall have furnished Borrowing Agent a copy of such Letter of Credit and such error is material and no drawing has been made thereon prior to receipt of such notice;

(ix)     any Material Adverse Effect on any Borrower or any Guarantor;

(x)     any breach of this Agreement or any Other Document by any party thereto;

(xi)     the occurrence or continuance of an insolvency proceeding with respect to any Borrower or any Guarantor;

(xii)     the fact that a Default or Event of Default shall have occurred and be continuing;

39

(xiii)   the fact that the Term shall have expired or this Agreement or the Obligations hereunder shall have been terminated; and

(xiv)   any other circumstance or happening whatsoever, whether or not similar to any of the foregoing.

2.17.   Indemnity.   In addition to amounts payable as provided in Section 17.5, each Borrower hereby agrees to protect, indemnify, pay and save harmless Agent, Lenders, the Issuer and any of Agent's or Lenders' Affiliates that have issued a Letter of Credit from and against any and all claims, demands, liabilities, damages, taxes, penalties, interest, judgments, losses, costs, charges and expenses (including reasonable fees, expenses and disbursements of counsel and allocated costs of internal counsel) which the Agent, Lender, the Issuer or any of Agent's or Lenders' Affiliates may incur or be subject to as a consequence, direct or indirect, of the issuance of any Letter of Credit, other than as a result of (a) the gross negligence or willful misconduct of the Agent or Lenders as determined by a final and non-appealable judgment of a court of competent jurisdiction or (b) the wrongful dishonor by the Agent, Lenders or any of Agent's or Lenders' Affiliates of a proper demand for payment made under any Letter of Credit, except if such dishonor resulted from any act or omission, whether rightful or wrongful, of any present or future de jure or de facto Governmental Body (all such acts or omissions herein called "Governmental Acts").

2.18.   Liability for Acts and Omissions.   As between Borrowers and Agent and Lenders, each Borrower assumes all risks of the acts and omissions of, or misuse of the Letters of Credit by, the respective beneficiaries of such Letters of Credit.  In furtherance and not in limitation of the respective foregoing, Agent shall not be responsible for: (i) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for an issuance of any such Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged (even if Agent shall have been notified thereof); (ii) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (iii) the failure of the beneficiary of any such Letter of Credit, or any other party to which such Letter of Credit may be transferred, to comply fully with any conditions required in order to draw upon such Letter of Credit or any other claim of any Borrower against any beneficiary of such Letter of Credit, or any such transferee, or any dispute between or among any Borrower and any beneficiary of any Letter of Credit or any such transferee; (iv) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex or otherwise, whether or not they be in cipher; (v) errors in interpretation of technical terms; (vi) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Letter of Credit or of the proceeds thereof; (vii) the misapplication by the beneficiary of any such Letter of Credit of the proceeds of any drawing under such Letter of Credit; or (viii) any consequences arising from causes beyond the control of Agent, including any governmental acts, and none of the above shall affect or impair, or prevent the vesting of, any of Agent's rights or powers hereunder. Nothing in the preceding sentence shall relieve Agent from liability for Agent's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment) in connection with actions or omissions described in such clauses (i) through (viii) of such

40

sentence. In no event shall Agent or Agent's Affiliates be liable to any Borrower for any indirect, consequential, incidental, punitive, exemplary or special damages or expenses (including without limitation attorneys' fees), or for any damages resulting from any change in the value of any property relating to a Letter of Credit.

Without limiting the generality of the foregoing, Agent and each of its Affiliates: (i) may rely on any oral or other communication believed in good faith by Agent or such Affiliate to have been authorized or given by or on behalf of the applicant for a Letter of Credit; (ii) may honor any presentation if the documents presented appear on their face substantially to comply with the terms and conditions of the relevant Letter of Credit; (iii) may honor a previously dishonored presentation under a Letter of Credit, whether such dishonor was pursuant to a court order, to settle or compromise any claim of wrongful dishonor, or otherwise, and shall be entitled to reimbursement to the same extent as if such presentation had initially been honored, together with any interest paid by Agent or its Affiliates; (iv) may honor any drawing that is payable upon presentation of a statement advising negotiation or payment, upon receipt of such statement (even if such statement indicates that a draft or other document is being delivered separately), and shall not be liable for any failure of any such draft or other document to arrive, or to conform in any way with the relevant Letter of Credit; (v) may pay any paying or negotiating bank claiming that it rightfully honored under the laws or practices of the place where such bank is located; and (vi) may settle or adjust any claim or demand made on Agent or its Affiliate in any way related to any order issued at the applicant's request to an air carrier, a letter of guarantee or of indemnity issued to a carrier or any similar document (each an "Order") and honor any drawing in connection with any Letter of Credit that is the subject of such Order, notwithstanding that any drafts or other documents presented in connection with such Letter of Credit fail to conform in any way with such Letter of Credit.

In furtherance and extension and not in limitation of the specific provisions set forth above, any action taken or omitted by Agent under or in connection with the Letters of Credit issued by it or any documents and certificates delivered thereunder, if taken or omitted in good faith and without gross negligence (as determined by a court of competent jurisdiction in a final non-appealable judgment), shall not put Agent under any resulting liability to any Borrower or any Lender.

2.19. <u>Additional Payments</u>. Any sums expended by Agent or any Lender due to any Borrower's failure to perform or comply with its obligations under this Agreement or any Other Document including any Borrower's obligations under Sections 4.2, 4.4, 4.12, 4.13, 4.14 and 7.1 hereof, may be charged to Borrowers' Account as a Revolving Advance and added to the Obligations.

2.20. <u>Manner of Borrowing and Payment</u>.

(a) Each borrowing of Revolving Advances shall be advanced according to the applicable Commitment Percentages of Lenders. Agent may, at its option, exercisable at any time for any reason whatsoever, demand repayment of the Swing Loans, and each Lender shall make a Revolving Advance in an amount equal to such Lender's Commitment Percentage of the aggregate principal amount of the outstanding Swing Loans, plus, if the Agent so requests, accrued interest thereon, provided that no Lender shall be obligated in any event to make

Revolving Advances in excess of its Commitment Percentage of the Maximum Revolving Advance Amount. Revolving Advances made pursuant to the preceding sentence shall be deemed to have been properly requested in accordance with Section 2.2 without regard to any of the requirements of that provision. Agent shall provide notice to the Lenders (which may be telephonic or written notice by letter, facsimile or telex) that such Revolving Advances are to be made under this Section 2.20 and of the apportionment among the Lenders, and the Lenders shall be unconditionally obligated to fund such Revolving Advances (whether or not the conditions specified in Section 2.2 are then satisfied) by the time Agent so requests, which shall not be earlier than 12:00 P.M. (New York time) on the Settlement Date next after the date the Lenders receive such notice from Agent.

(b)      Each payment (including each prepayment) by any Borrower on account of the principal of and interest on the Revolving Advances, shall be applied to the Revolving Advances pro rata according to the applicable Commitment Percentages of Lenders. Except as expressly provided herein, all payments (including prepayments) to be made by any Borrower on account of principal, interest and fees shall be made without set off or counterclaim and shall be made to Agent on behalf of the Lenders to the Payment Office, in each case on or prior to 1:00 P.M., New York time, in Dollars and in immediately available funds.

(c)      (i)      Notwithstanding anything to the contrary contained in Sections 2.20(a) and (b) hereof, commencing with the first Business Day following the Closing Date, each borrowing of Revolving Advances shall be advanced by Agent and each payment by any Borrower on account of Revolving Advances shall be applied first to those Revolving Advances advanced by Agent.  On or before 1:00 P.M., New York time, on each Settlement Date commencing with the first Settlement Date following the Closing Date, Agent and Lenders shall make certain payments as follows: (I) if the aggregate amount of new Revolving Advances made by Agent during the preceding Week (if any) exceeds the aggregate amount of repayments applied to outstanding Revolving Advances during such preceding Week, then each Lender shall provide Agent with funds in an amount equal to its applicable Commitment Percentage of the difference between (w) such Revolving Advances and (x) such repayments and (II) if the aggregate amount of repayments applied to outstanding Revolving Advances during such Week exceeds the aggregate amount of new Revolving Advances made during such Week, then Agent shall provide each Lender with funds in an amount equal to its applicable Commitment Percentage of the difference between (y) such repayments and (z) such Revolving Advances.

(ii)      Each Lender shall be entitled to earn interest at the Revolving Interest Rate on outstanding Advances which it has funded.

(iii)      Promptly following each Settlement Date, Agent shall submit to each Lender a certificate with respect to payments received and Advances made during the Week immediately preceding such Settlement Date.  Such certificate of Agent shall be conclusive in the absence of manifest error.

(d)      If any Lender or Participant (a "Benefited Lender") shall at any time receive any payment of all or part of its Advances, or interest thereon, or receive any Collateral in respect thereof (whether voluntarily or involuntarily or by set-off) in a greater proportion than any such payment to and Collateral received by any other Lender, if any, in respect of such other

Lender's Advances, or interest thereon, and such greater proportionate payment or receipt of Collateral is not expressly permitted hereunder, such Benefited Lender shall purchase for cash from the other Lenders a participation in such portion of each such other Lender's Advances, or shall provide such other Lender with the benefits of any such Collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such Collateral or proceeds ratably with each of the other Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest. Each Lender so purchasing a portion of another Lender's Advances may exercise all rights of payment (including rights of set-off) with respect to such portion as fully as if such Lender were the direct holder of such portion.

(e)     Unless Agent shall have been notified by telephone, confirmed in writing, by any Lender that such Lender will not make the amount which would constitute its applicable Commitment Percentage of the Advances available to Agent, Agent may (but shall not be obligated to) assume that such Lender shall make such amount available to Agent on the next Settlement Date and, in reliance upon such assumption, make available to Borrowers a corresponding amount. Agent will promptly notify Borrowing Agent of its receipt of any such notice from a Lender. If such amount is made available to Agent on a date after such next Settlement Date, such Lender shall pay to Agent on demand an amount equal to the product of (i) the daily average Federal Funds Rate (computed on the basis of a year of 360 days) during such period as quoted by Agent, times (ii) such amount, times (iii) the number of days from and including such Settlement Date to the date on which such amount becomes immediately available to Agent. A certificate of Agent submitted to any Lender with respect to any amounts owing under this paragraph (e) shall be conclusive, in the absence of manifest error. If such amount is not in fact made available to Agent by such Lender within three (3) Business Days after such Settlement Date, Agent shall be entitled to recover such an amount, with interest thereon at the rate per annum then applicable to such Revolving Advances hereunder, on demand from Borrowers; provided, however, that Agent's right to such recovery shall not prejudice or otherwise adversely affect Borrowers' rights (if any) against such Lender.

2.21.   Mandatory Prepayments.  When any Borrower sells or otherwise disposes of any Collateral, Borrowers shall repay the Obligations in an amount equal to the net proceeds of such sale (i.e., gross proceeds less the reasonable costs of such sales or other dispositions), such repayments to be made promptly but in no event more than one (1) Business Day following receipt of such net proceeds, and until the date of payment, such proceeds shall be held in trust for Agent. The foregoing shall not be deemed to be implied consent to any such sale otherwise prohibited by the terms and conditions hereof. Such repayments shall be applied to either the Pre-Petition Obligations or the Post-Petition Obligations as Agent may determine in its sole and absolute discretion, subject to Borrowers' ability to reborrow Revolving Advances in accordance with the terms hereof.

2.22.   Use of Proceeds.

(a)     Borrowers shall use the proceeds of Advances to (i) to refinance, in whole or in part at Agent's option, the Pre-Petition Obligations, (ii) pay fees and expenses owed to Agent and Lenders, (iii) provide for its working capital needs in accordance with the Budget, (iv)

to reimburse drawings under Letters of Credit, (v) to fund the Carve-Out strictly in accordance with the Budget and, (vi) to pay for Allowed Professional Fees and Statutory Fees allocated to the Borrowers during the Case in accordance with the Budget.

(b)     Without limiting the generality of Section 2.22(a) above, neither the Borrowers, the Guarantors nor any other Person which may in the future become party to this Agreement or the Other Documents as a Borrower or Guarantor, intends to use nor shall they use any portion of the proceeds of the Advances, directly or indirectly, for any purpose in violation of the Trading with the Enemy Act.

2.23.   Defaulting Lender.

(a)     Notwithstanding anything to the contrary contained herein, in the event any Lender (x) has refused (which refusal constitutes a breach by such Lender of its obligations under this Agreement) to make available its portion of any Advance or (y) notifies either Agent or Borrowing Agent that it does not intend to make available its portion of any Advance (if the actual refusal would constitute a breach by such Lender of its obligations under this Agreement) (each, a "Lender Default"), all rights and obligations hereunder of such Lender (a "Defaulting Lender") as to which a Lender Default is in effect and of the other parties hereto shall be modified to the extent of the express provisions of this Section 2.23 while such Lender Default remains in effect.

(b)     Advances shall be incurred pro rata from Lenders (the "Non-Defaulting Lenders") which are not Defaulting Lenders based on their respective Commitment Percentages, and no Commitment Percentage of any Lender or any pro rata share of any Advances required to be incurred by any Lender shall be increased as a result of such Lender Default. Amounts received in respect of principal of any type of Advances shall be applied to reduce the applicable Advances of each Lender (other than any Defaulting Lender) pro rata based on the aggregate of the outstanding Advances of that type of all Lenders at the time of such application; provided, that, Agent shall not be obligated to transfer to a Defaulting Lender any payments received by Agent for the Defaulting Lender's benefit, nor shall a Defaulting Lender be entitled to the sharing of any payments hereunder (including any principal, interest or fees). Amounts payable to a Defaulting Lender shall instead be paid to or retained by Agent. Agent may hold and, in its discretion, re-lend to a Borrower the amount of such payments received or retained by it for the account of such Defaulting Lender.

(c)     A Defaulting Lender shall not be entitled to give instructions to Agent or to approve, disapprove, consent to or vote on any matters relating to this Agreement and the Other Documents. All amendments, waivers and other modifications of this Agreement and the Other Documents may be made without regard to a Defaulting Lender and, for purposes of the definition of "Required Lenders", a Defaulting Lender shall be deemed not to be a Lender and not to have Advances outstanding.

(d)     Other than as expressly set forth in this Section 2.23, the rights and obligations of a Defaulting Lender (including the obligation to indemnify Agent) and the other parties hereto shall remain unchanged. Nothing in this Section 2.23 shall be deemed to release any Defaulting Lender from its obligations under this Agreement and the Other Documents, shall

alter such obligations, shall operate as a waiver of any default by such Defaulting Lender hereunder, or shall prejudice any rights which any Borrower, Agent or any Lender may have against any Defaulting Lender as a result of any default by such Defaulting Lender hereunder.

(e)      In the event a Defaulting Lender retroactively cures to the satisfaction of Agent the breach which caused a Lender to become a Defaulting Lender, such Defaulting Lender shall no longer be a Defaulting Lender and shall be treated as a Lender under this Agreement.

## III.    INTEREST AND FEES.

3.1.    <u>Interest</u>.  Interest charges shall be computed on the actual principal amount of Advances outstanding hereunder during the month (the "Monthly Advances") at a rate per annum equal to the Revolving Interest Rate, and shall be payable on all Advances hereunder in cash in arrears on the first (1st) day of each calendar month.  Whenever, subsequent to the date of this Agreement, the Alternate Base Rate is increased or decreased, the Revolving Interest Rate shall be similarly changed without notice or demand of any kind by an amount equal to the amount of such change in the Alternate Base Rate during the time such change or changes remain in effect.  Upon and after the occurrence of an Event of Default, and during the continuation thereof, the Obligations shall bear interest at the applicable Revolving Interest Rate plus two (2%) percent per annum (as applicable, the "Default Rate").

3.2.    <u>Letter of Credit Fees</u>.

(a)      Borrowers shall pay (x) to Agent, for the ratable benefit of Lenders, fees for each Letter of Credit for the period from and excluding the date of issuance of same to and including the date of expiration or termination, equal to the average daily face amount of each outstanding Letter of Credit multiplied by five percent (5.00%) per annum, such fees to be calculated on the basis of a 360-day year for the actual number of days elapsed and to be payable monthly in arrears on the first day of each calendar month and on the last day of the Term, and (y) to the Issuer, for its own account, fees for each Letter of Credit for the period from and excluding the date of issuance of same to and including the date of expiration or termination, equal to the average daily face amount of each outstanding Letter of Credit multiplied by one-quarter of one percent (0.25%) per annum, such fees to be calculated on the basis of a three hundred sixty (360) day year for the actual number of days elapsed and to be payable monthly in arrears on the first day of each calendar month and on the last day of the Term and (z) to the Issuer, for its own account, any and all fees and expenses as agreed upon by the Issuer and Borrowers in connection with any Letter of Credit, including, without limitation, in connection with the opening, amendment or renewal of any such Letter of Credit and any acceptances created thereunder and shall reimburse Agent for any and all fees and expenses, if any, paid by Agent to the Issuer (all of the foregoing fees, the "Letter of Credit Fees").  All such charges shall be deemed earned in full on the date when the same are due and payable hereunder and shall not be subject to rebate or pro-ration upon the termination of this Agreement for any reason.  Any such charge in effect at the time of a particular transaction shall be the charge for that transaction, notwithstanding any subsequent change in the Issuer's prevailing charges for that type of transaction.  All Letter of Credit Fees payable hereunder shall be deemed earned in full on the date when the same are due and payable hereunder and shall not be subject to rebate or pro-ration upon the termination of this Agreement for any reason.

(b)     At any time following the occurrence of an Event of Default or upon the expiration of the Term, Borrowers will immediately cause cash to be deposited and maintained in an account with Agent, as cash collateral, in an amount equal to one hundred and five percent (105%) of the Maximum Undrawn Amount of all outstanding Letters of Credit, and each Borrower hereby irrevocably authorizes Agent, in its discretion, on such Borrower's behalf and in such Borrower's name, to open such an account and to make and maintain deposits therein, or in an account opened by such Borrower, in the amounts required to be made by such Borrower, out of the proceeds of Receivables or other Collateral or out of any other funds of such Borrower coming into any Lender's possession at any time.  Agent will invest such cash collateral (less applicable reserves) in such short-term money-market items as to which Agent and such Borrower mutually agree and the net return on such investments shall be credited to such account and constitute additional cash collateral.  No Borrower may withdraw amounts credited to any such account except upon the occurrence of all of the following: (x) payment and performance in full of all Obligations; (y) expiration of all Letters of Credit; and (z) termination of this Agreement.

3.3.     Commitment Fee, Facility Fee and Termination Fee.

(a)     Upon the Maturity Date, Borrowers shall pay to Agent a commitment fee $1,000,000, which fee is fully earned upon entry of the Interim Order and payable as follows: (i) $500,000 upon entry of the Interim Order; and (ii) $500,000 on the Maturity Date.

(b)     If, for any calendar month during the Term, the average daily unpaid balance of the Revolving Advances and undrawn amount of any outstanding Letters of Credit for each day of such calendar month does not equal the Maximum Revolving Advance Amount, then Borrowers shall pay to Agent for the ratable benefit of Lenders a fee at a rate equal to one-half of one percent (0.50%) per annum multiplied by the amount by which the Maximum Revolving Advance Amount exceeds such average daily unpaid balance.  Such fee shall be payable to Agent in arrears on the first day of each calendar month with respect to the previous calendar month after the date hereof until the termination hereof and on the earlier of (i) such termination date or (ii) the last day of the Term.

3.4.     Collateral Evaluation Fee, Collateral Monitoring Fee and Appraisals.

(a)     Borrowers shall pay Agent a collateral monitoring fee equal to $2,000 per month commencing on the first day of the month following the Closing Date and on the first day of each month thereafter during the Term.  The collateral monitoring fee shall be deemed earned in full on the date when same is due and payable hereunder and shall not be subject to rebate or proration upon termination of this Agreement for any reason.

(b)     Borrowers shall pay to Agent on demand, after Agent performs any collateral evaluation - namely any field examination, collateral analysis or other business analysis, the need for which is to be determined by Agent and which evaluation is undertaken by Agent or for Agent's benefit - a collateral evaluation fee in an amount equal to $850 per day for each person employed to perform such evaluation, plus all costs and disbursements incurred by Agent in the performance of such examination or analysis.

(c)    Agent may, in its sole discretion, exercised in a commercially reasonable manner, engage the services of an independent appraisal firm or firms of reputable standing, satisfactory to Agent, for the purpose of appraising the then current values of Borrowers' assets. Absent the occurrence and continuance of an Event of Default at such time, Agent shall consult with Borrowers as to the identity of any such firm. All of the fees and out-of-pocket costs and expense of any such firm (collectively, "appraisal amounts") shall be paid for when due, in full and without off-set, by Borrowers. In the event the value of Borrowers' Inventory, as so determined pursuant to such appraisal, is less than the value reflected for such Inventory on the most recent Borrowing Base Certificate, such that the Revolving Advances against Eligible Inventory, are in fact in excess of such Advances permitted hereunder, then, promptly upon Agent's demand for same, Borrowers shall make mandatory prepayments of the then outstanding Revolving Advances made against such Eligible Inventory so as to eliminate the excess Advances.

3.5.    Computation of Interest and Fees. Interest and fees hereunder shall be computed on the basis of a year of 360 days and for the actual number of days elapsed. If any payment to be made hereunder becomes due and payable on a day other than a Business Day, the due date thereof shall be extended to the next succeeding Business Day and interest thereon shall be payable at the Revolving Interest Rate during such extension.

3.6.    Maximum Charges. In no event whatsoever shall interest and other charges charged hereunder exceed the highest rate permissible under law. In the event interest and other charges as computed hereunder would otherwise exceed the highest rate permitted under law, such excess amount shall be first applied to any unpaid principal balance owed by Borrowers, and if the then remaining excess amount is greater than the previously unpaid principal balance, Lenders shall promptly refund such excess amount to Borrowers and the provisions hereof shall be deemed amended to provide for such permissible rate.

3.7.    Increased Costs. In the event that any Applicable Law, treaty or governmental regulation, or any change therein or in the interpretation or application thereof, or compliance by any Lender (for purposes of this Section 3.7, the term "Lender" shall include Agent or any Lender and any corporation or bank controlling Agent or any Lender) with any request or directive (whether or not having the force of law) from any central bank or other financial, monetary or other authority, shall:

(a)    subject Agent or any Lender to any tax of any kind whatsoever with respect to this Agreement or any Other Document or change the basis of taxation of payments to Agent or any Lender of principal, fees, interest or any other amount payable hereunder or under any Other Documents (except for changes in the rate of tax on the overall net income of Agent or any Lender by the jurisdiction in which it maintains its principal office);

(b)    impose, modify or hold applicable any reserve, special deposit, assessment or similar requirement against assets held by, or deposits in or for the account of, advances or loans by, or other credit extended by, any office of Agent or any Lender, including pursuant to Regulation D of the Board of Governors of the Federal Reserve System; or

47

(c)     impose on Agent or any Lender any other condition with respect to this Agreement or any Other Document;

and the result of any of the foregoing is to increase the cost to Agent or any Lender of making, renewing or maintaining its Advances hereunder by an amount that Agent or such Lender deems to be material or to reduce the amount of any payment (whether of principal, interest or otherwise) in respect of any of the Advances by an amount that Agent or such Lender deems to be material, then, in any case Borrowers shall promptly pay Agent or such Lender, upon its demand, such additional amount as will compensate Agent or such Lender for such additional cost or such reduction, as the case may be.  Agent or such Lender shall certify the amount of such additional cost or reduced amount to Borrowing Agent including a reasonably detailed calculation of such additional cost or reduced amount, and such certification shall be conclusive absent manifest error.

3.8.     Reserved.

3.9.     Capital Adequacy.

(a)     In the event that Agent or any Lender shall have determined that any Applicable Law, rule, regulation or guideline regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any Governmental Body, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by Agent or any Lender (for purposes of this Section 3.9, the term "Lender" shall include Agent or any Lender and any corporation or bank controlling Agent or any Lender) with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on Agent or any Lender's capital as a consequence of its obligations hereunder to a level below that which Agent or such Lender could have achieved but for such adoption, change or compliance (taking into consideration Agent's and each Lender's policies with respect to capital adequacy) by an amount deemed by Agent or any Lender to be material, then, from time to time, Borrowers shall pay upon demand to Agent or such Lender such additional amount or amounts as will compensate Agent or such Lender for such reduction.  In determining such amount or amounts, Agent or such Lender may use any reasonable averaging or attribution methods.  The protection of this Section 3.9 shall be available to Agent and each Lender regardless of any possible contention of invalidity or inapplicability with respect to the Applicable Law, regulation or condition.

(b)     A certificate of Agent or such Lender setting forth such amount or amounts as shall be necessary to compensate Agent or such Lender with respect to Section 3.9(a) hereof and including a reasonably detailed calculation of such additional amounts due when delivered to Borrowing Agent shall be conclusive absent manifest error.

3.10.    Gross Up for Taxes.  If any Borrower shall be required by Applicable Law to withhold or deduct any taxes from or in respect of any sum payable under this Agreement or any of the Other Documents to Agent, or any Lender, assignee of any Lender, or Participant (each, individually, a "Payee" and collectively, the "Payees"), (a) the sum payable to such Payee or Payees, as the case may be, shall be increased as may be necessary so that, after making all

48

required withholding or deductions, the applicable Payee or Payees receives an amount equal to the sum it would have received had no such withholding or deductions been made (the "Gross-Up Payment"), (b) such Borrower shall make such withholding or deductions, and (c) such Borrower shall pay the full amount withheld or deducted to the relevant taxation authority or other authority in accordance with Applicable Law. Notwithstanding the foregoing, no Borrower shall be obligated to make any portion of the Gross-Up Payment that is attributable to any withholding or deductions that would not have been paid or claimed had the applicable Payee or Payees properly claimed a complete exemption with respect thereto pursuant to Section 3.11 hereof.

3.11. <u>Withholding Tax Exemption</u>.

(a)     Each Payee that is not incorporated under the Laws of the United States of America or a state thereof (and, upon the written request of Agent, each other Payee) agrees that it will deliver to Borrowing Agent and Agent two (2) duly completed appropriate valid Withholding Certificates (as defined under §1.1441-1(c)(16) of the Income Tax Regulations ("Regulations")) certifying its status (i.e., U.S. or foreign person) and making a claim of exemption from U.S. withholding tax on the basis of an income tax treaty or an exemption provided by the Code. The term "Withholding Certificate" means a Form W-9; a Form W-8BEN; a Form W-8ECI; a Form W-8IMY and the related statements and certifications as required under §1.1441-1(e)(2) and/or (3) of the Regulations; a statement described in §1.871-14(c)(2)(v) of the Regulations; or any other certificates under the Code or Regulations that certify or establish the status of a payee or beneficial owner as a U.S. or foreign person.

(b)     Each Payee required to deliver to Borrowing Agent and Agent a valid Withholding Certificate pursuant to Section 3.11(a) hereof shall deliver such valid Withholding Certificate as follows: (i) each Payee which is a party hereto on the Closing Date shall deliver such valid Withholding Certificate at least five (5) Business Days prior to the first date on which any interest or fees are payable by any Borrower hereunder for the account of such Payee; (ii) each Payee shall deliver such valid Withholding Certificate at least five (5) Business Days before the effective date of such assignment or participation (unless Agent in its sole discretion shall permit such Payee to deliver such Withholding Certificate less than five (5) Business Days before such date in which case it shall be due on the date specified by Agent). Each Payee which so delivers a valid Withholding Certificate further undertakes to deliver to Borrowing Agent and Agent two (2) additional copies of such Withholding Certificate (or a successor form) on or before the date that such Withholding Certificate expires or becomes obsolete or after the occurrence of any event requiring a change in the most recent Withholding Certificate so delivered by it, and such amendments thereto or extensions or renewals thereof as may be reasonably requested by Borrowing Agent or Agent.

(c)     Notwithstanding the submission of a Withholding Certificate claiming a reduced rate of or exemption from U.S. withholding tax required under Section 3.11(b) hereof, Agent shall be entitled to withhold United States federal income taxes at the full 30% withholding rate if in its reasonable judgment it is required to do so under the due diligence requirements imposed upon a withholding agent under §1.1441-7(b) of the Regulations. Further, Agent is indemnified under §1.1461-1(e) of the Regulations against any claims and demands of

49

any Payee for the amount of any tax it deducts and withholds in accordance with regulations under §1441 of the Code.

## IV.   COLLATERAL:  GENERAL TERMS

4.1.   <u>Security Interest in the Collateral</u>.   To secure the prompt payment and performance of any and all Post-Petition Obligations, (and upon entry of the Final Order, any and all Obligations, including without limitation, all Pre-Petition Obligations and Post-Petition Obligations) of the Borrowers to the Agent and the Lenders of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, the Agent, for the benefit of itself and the other Lenders, shall have and is hereby granted, effective as of the Petition Date, valid and perfected first priority (subject to the Permitted Liens (as defined in the Interim Order) and the Carve-Out), security interests and liens in and upon all pre- and post- petition property of the Borrowers, whether existing on the Petition Date or thereafter acquired including a continuing security interest in and to and Lien on all of its Collateral, whether now owned or existing or hereafter acquired or arising and located wheresoever.   As consideration to Pre-Petition Lenders for their agreement to the terms hereof and as replacement collateral for the Pre-Petition Collateral used, consumed or sold by the Borrowers in the Case, the Collateral shall secure the Pre-Petition Obligations.  Each Borrower shall mark its books and records as may be necessary or appropriate to evidence, protect and perfect Agent's security interest and shall cause its financial statements to reflect such security interest.  Each Borrower shall promptly provide Agent with written notice of all commercial tort claims, such notice to contain the case title together with the applicable court and a brief description of the claim(s).  Upon delivery of each such notice, such Borrower shall be deemed to hereby grant to Agent a security interest and lien in and to such commercial tort claims and all proceeds thereof.

4.2.   <u>Perfection of Security Interest</u>.   Without any further order of the Bankruptcy Court, each Borrower shall take all action that may be necessary or desirable, or that Agent may reasonably request, so as at all times to maintain the validity, perfection, enforceability and priority of Agent's security interest in and Lien on the Collateral or to enable Agent to protect, exercise or enforce its rights hereunder and in the Collateral, including, but not limited to: (i) immediately discharging all Liens other than Permitted Encumbrances; (ii) obtaining Lien Waiver Agreements; (iii) delivering to Agent, endorsed or accompanied by such instruments of assignment as Agent may specify, and stamping or marking, in such manner as Agent may specify, any and all chattel paper, instruments, letters of credits and advices thereof and documents evidencing or forming a part of the Collateral; (iv) entering into warehousing, lockbox and other custodial arrangements satisfactory to Agent; and (v) executing and delivering financing statements, control agreements, instruments of pledge, mortgages, notices and assignments, in each case in form and substance satisfactory to Agent, relating to the creation, validity, perfection, maintenance or continuation of Agent's security interest and Lien under the Uniform Commercial Code or other Applicable Law.  By its signature hereto, each Borrower hereby authorizes Agent to file against such Borrower, one or more financing, continuation or amendment statements pursuant to the Uniform Commercial Code in form and substance satisfactory to Agent, including, without limitation, "all assets" financing statements.   All charges, expenses and fees Agent may incur in doing any of the foregoing, and any local taxes relating thereto, shall be charged to Borrowers' Account as a Revolving Advance and added to

50

the Obligations, or, at Agent's option, shall be paid to Agent for its benefit and for the ratable benefit of Lenders immediately upon demand.

4.3.    Disposition of Collateral.  Each Borrower will safeguard and protect all Collateral for Agent's general account and make no disposition thereof whether by sale, lease or otherwise except the sale of Inventory in the Ordinary Course of Business.

4.4.    Preservation of Collateral.  Following the occurrence and during the continuance of a Default or Event of Default in addition to the rights and remedies set forth in Section 12.1 hereof, Agent: (a) may at any time take such steps as Agent deems necessary to protect Agent's interest in and to preserve the Collateral, including the hiring of such security guards or the placing of other security protection measures as Agent may deem appropriate; (b) may employ and maintain at any of any Borrower's premises a custodian who shall have full authority to do all acts necessary to protect Agent's interests in the Collateral; (c) may lease warehouse facilities to which Agent may move all or part of the Collateral; (d) may use any Borrower's owned or leased lifts, hoists, trucks and other facilities or equipment for handling or removing the Collateral; and (e) shall have, and is hereby granted, a right of ingress and egress to the places where the Collateral is located, and may proceed over and through any of Borrowers' owned or leased property.  Each Borrower shall cooperate fully with all of Agent's efforts to preserve the Collateral and will take such actions to preserve the Collateral as Agent may direct.  All of Agent's expenses of preserving the Collateral, including any expenses relating to the bonding of a custodian, shall be charged to Borrowers' Account as a Revolving Advance and added to the Obligations.

4.5.    Ownership of Collateral.

(a)    With respect to the Collateral, at the time the Collateral becomes subject to Agent's security interest: (i) each Borrower shall be the sole owner of and fully authorized and able to sell, transfer, pledge and/or grant a first priority security interest in each and every item of its respective Collateral to Agent; and, except for Permitted Encumbrances the Collateral shall be free and clear of all Liens and encumbrances whatsoever; (ii) each document and agreement executed by each Borrower or delivered to Agent or any Lender in connection with this Agreement shall be true and correct in all material respects; (iii) all signatures and endorsements of each Borrower that appear on such documents and agreements shall be genuine and each Borrower shall have full capacity to execute same; and (iv) each Borrower's Equipment and Inventory shall be located as set forth on Schedule 4.5 and shall not be removed from such location(s) without the prior written consent of Agent except with respect to the sale of Inventory in the Ordinary Course of Business.

(b)    (i) There is no location at which any Borrower has any Inventory (except for Inventory in transit) other than those locations listed on Schedule 4.5; (ii) Schedule 4.5 hereto contains a correct and complete list, as of the Closing Date, of the legal names and addresses of each warehouse at which Inventory of any Borrower is stored; none of the receipts received by any Borrower from any warehouse states that the goods covered thereby are to be delivered to bearer or to the order of a named Person or to a named Person and such named Person's assigns; (iii) Schedule 4.5 hereto sets forth a correct and complete list as of the Closing Date of (A) each place of business of each Borrower and (B) the chief executive officer of each Borrower; and (iv)

51

Schedule 4.5 hereto sets forth a correct and complete list as of the Closing Date of the location, by state and street address, of all Real Property owned or leased by each Borrower, together with the names and addresses of any landlords.

4.6.    Defense of Agent's and Lenders' Interests.  Until (a) payment and performance in full of all of the Obligations and (b) termination of this Agreement, Agent's interests in the Collateral shall continue in full force and effect.  During such period no Borrower shall, without Agent's prior written consent, pledge, sell (except Inventory in the Ordinary Course of Business), assign, transfer, create or suffer to exist a Lien upon or encumber or allow or suffer to be encumbered in any way except for Permitted Encumbrances, any part of the Collateral.  Each Borrower shall defend Agent's interests in the Collateral against any and all Persons whatsoever. At any time following demand by Agent for payment of all Obligations, Agent shall have the right to take possession of the indicia of the Collateral and the Collateral in whatever physical form contained, including, without limitation:  labels, stationery, documents, instruments and advertising materials.   If Agent exercises this right to take possession of the Collateral, Borrowers shall, upon demand, assemble it in the best manner possible and make it available to Agent at a place reasonably convenient to Agent.  In addition, with respect to all Collateral, Agent and Lenders shall be entitled to all of the rights and remedies set forth herein and further provided by the Uniform Commercial Code or other Applicable Law.  Each Borrower shall, and Agent may, at its option, instruct all suppliers, carriers, forwarders, warehousers or others receiving or holding cash, checks, Inventory, documents or instruments in which Agent holds a security interest to deliver same to Agent and/or subject to Agent's order and if they shall come into any Borrower's possession, they, and each of them, shall be held by such Borrower in trust as Agent's trustee, and such Borrower will immediately deliver them to Agent in their original form together with any necessary endorsement.

4.7.    Books and Records.  Each Borrower shall: (a) keep proper books of record and account in which full, true and correct entries will be made of all dealings or transactions of or in relation to its business and affairs; (b) set up on its books accruals with respect to all taxes, assessments, charges, levies and claims; and (c) on a reasonably current basis set up on its books, from its earnings, allowances against doubtful Receivables, advances and investments and all other proper accruals (including, without limitation, by reason of enumeration, accruals for premiums, if any, due on required payments and accruals for depreciation, obsolescence, or amortization of properties), which should be set aside from such earnings in connection with its business. All determinations pursuant to this subsection shall be made in all material respects in accordance with, or as required by, GAAP consistently applied in the opinion of such independent public accountant as shall then be regularly engaged by Borrowers.

4.8.    Financial Disclosure.  Each Borrower hereby irrevocably authorizes and directs all accountants and auditors employed by such Borrower at any time during the Term and promptly after the request of Agent to exhibit and deliver to Agent and each Lender upon request copies of any of such Borrower's financial statements, trial balances or other accounting records of any sort in the accountant's or auditor's possession, and to disclose to Agent and each Lender any information such accountants may have concerning such Borrower's financial status and business operations.  Each Borrower hereby authorizes all Governmental Bodies to furnish to Agent and each Lender copies of reports or examinations relating to such Borrower, whether made by such Borrower or otherwise; however, Agent and each Lender will attempt to obtain

52

such information or materials directly from such Borrower prior to obtaining such information or materials from such accountants or Governmental Bodies.

4.9. Compliance with Laws. Each Borrower shall comply with all Applicable Laws with respect to the Collateral or any part thereof or to the operation of such Borrower's business the non-compliance with which could reasonably be expected to have a Material Adverse Effect. Each Borrower may, however, contest or dispute any Applicable Laws in any reasonable manner, provided that any related Lien is inchoate or stayed and sufficient reserves are established to the reasonable satisfaction of Agent to protect Agent's Lien on or security interest in the Collateral. The assets of Borrowers at all times shall be maintained in accordance with the requirements of all insurance carriers which provide insurance with respect to the assets of Borrowers so that such insurance shall remain in full force and effect.

4.10. Inspection of Premises. Agent shall have full access to and the right to audit, check, inspect and make abstracts and copies from each Borrower's books, records, audits, correspondence and all other papers relating to the Collateral and the operation of each Borrower's business. Agent and its agents may enter upon any premises of any Borrower at any time during business hours and at any other reasonable time, and from time to time, for the purpose of inspecting the Collateral and any and all records pertaining thereto and the operation of such Borrower's business.

4.11. Insurance. The assets and properties of each Borrower at all times shall be maintained in accordance with the requirements of all insurance carriers which provide insurance with respect to the assets and properties of such Borrower so that such insurance shall remain in full force and effect. Borrowers shall bear the full risk of any loss of any nature whatsoever with respect to the Collateral. At Borrowers' own cost and expense in amounts and with carriers acceptable to Agent, Borrowers shall (a) keep all its insurable properties and properties in which Borrowers, or any of them, have an interest insured against the hazards of fire, flood, sprinkler leakage, those hazards covered by extended coverage insurance and such other hazards, and for such amounts, as is customary in the case of companies engaged in businesses similar to Borrowers' including, without limitation, business interruption insurance; (b) maintain a bond in such amounts as is customary in the case of companies engaged in businesses similar to Borrowers insuring against larceny, embezzlement or other criminal misappropriation of insured's officers and employees who may either singly or jointly with others at any time have access to the assets or funds of Borrowers either directly or through authority to draw upon such funds or to direct generally the disposition of such assets; (c) maintain public and product liability insurance against claims for personal injury, death or property damage suffered by others; (d) maintain all such worker's compensation or similar insurance as may be required under the laws of any state or jurisdiction in which Borrowers, or any of them, is engaged in business; (e) furnish Agent with (i) a status report with respect to the renewal of all such insurance no later than ten (10) days before the expiration date thereof, (ii) evidence of the maintenance of all such insurance by the renewal thereof no later than the expiration date thereof, and (iii) appropriate loss payable endorsements in form and substance satisfactory to Agent, naming Agent as a co-insured and lender loss payee as its interests may appear but only with respect to all insurance coverage covering damage, loss or destruction of Collateral, and providing (A) that all proceeds thereunder covering a loss of or damage to Collateral shall be payable to Agent, (B) no such insurance shall be affected by any act or neglect of the insured or

53

owner of the property described in such policy, and (C) that such policy and lender loss payable clauses may not be cancelled, amended or terminated unless at least thirty (30) days' prior written notice is given to Agent. Borrowers shall provide copies of all such insurance policies (including the appropriate lender loss payee and additional insured endorsements) within thirty (30) days after Agent's request, however, only certificates of such insurance shall be required at Closing. In the event of any loss under any insurance covering Collateral, the carriers named in such insurance policies covering Collateral hereby are directed by Agent and Borrowers to make payment for such loss to Agent and not to Borrower and Agent jointly. If any insurance losses with respect to Collateral are paid by check, draft or other instrument payable to Borrowers, or any of them, and Agent jointly, Agent may endorse such Borrower's name thereon and do such other things as Agent may deem advisable to reduce the same to cash. Agent is hereby authorized to adjust and compromise claims under insurance coverage with respect to Collateral. All loss recoveries with respect to Collateral received by Agent upon any such insurance may be applied to the Obligations, in such order as Agent in its sole discretion shall determine. Any surplus with respect to Collateral shall be paid by Agent to Borrowers, or any of them, or applied as may be otherwise required by law. Any deficiency thereon shall be paid by Borrowers to Agent, on demand. Any loss recoveries not relating to items of Collateral shall be payable directly to Borrowers and, if received by Agent, Agent shall promptly deliver same to the Borrower.

4.12. <u>Failure to Pay Insurance</u>. If any Borrower fails to obtain insurance as hereinabove provided, or to keep the same in force, Agent, if Agent so elects, may obtain such insurance and pay the premium therefor on behalf of such Borrower, and charge Borrowers' Account therefor as a Revolving Advance and such expenses so paid shall be part of the Obligations.

4.13. <u>Payment of Taxes</u>. Subject to any prohibition under the Bankruptcy Code with respect to pre-petition claims, but otherwise in accordance with Applicable Law, each Borrower will pay, when due, all taxes, assessments and other Charges lawfully levied or assessed upon such Borrower or any of the Collateral including real and personal property taxes, assessments and charges and all franchise, income, employment, social security benefits, withholding, and sales taxes, except those taxes, assessments or Charges to the extent that Borrowers have contested or disputed those taxes, assessments or Charges in good faith, by expeditious protest, administrative or judicial appeal or similar proceeding provided that any related tax Lien is stayed and sufficient reserves are established to the reasonable satisfaction of Agent to protect Agent's security interest in or Lien on the Collateral. If any tax by any Governmental Body is or may be imposed on or as a result of any transaction between any Borrower and Agent or any Lender which Agent or any Lender may be required to withhold or pay or if any taxes, assessments, or other Charges remain unpaid after the date fixed for their payment, or if any claim shall be made which, in Agent's or any Lender's opinion, may possibly create a valid Lien on the Collateral, Agent may without notice to Borrowers pay the taxes, assessments or other Charges and each Borrower hereby indemnifies and holds Agent and each Lender harmless in respect thereof. Agent will not pay any taxes, assessments or Charges to the extent that any applicable Borrower has contested or disputed those taxes, assessments or Charges in good faith, by expeditious protest, administrative or judicial appeal or similar proceeding provided that any related tax lien is stayed and sufficient reserves are established to the reasonable satisfaction of Agent to protect Agent's security interest in or Lien on the Collateral. The amount of any

54

payment by Agent under this Section 4.13 shall be charged to Borrowers' Account as a Revolving Advance and added to the Obligations and, until Borrowers shall furnish Agent with an indemnity therefore (or supply Agent with evidence satisfactory to Agent that due provision for the payment thereof has been made), Agent may hold without interest any balance standing to Borrowers' credit and Agent shall retain its security interest in and Lien on any and all Collateral held by Agent.

4.14. <u>Payment of Leasehold Obligations.</u>  Subject to any prohibition under the Bankruptcy Code with respect to pre-petition claims, but otherwise in accordance with Applicable Law, each Borrower shall at all times pay, when and as due, its rental obligations under all leases under which it is a tenant, and shall otherwise comply, in all material respects, with all other terms of such leases and keep them in full force and effect and, at Agent's request will provide evidence of having done so.

4.15. <u>Receivables.</u>

(a) <u>Nature of Receivables.</u>  Each of the Receivables shall be a bona fide and valid account representing a bona fide indebtedness incurred by the Customer therein named, for a fixed sum as set forth in the invoice relating thereto (provided immaterial or unintentional invoice errors shall not be deemed to be a breach hereof) with respect to an absolute sale or lease and delivery of goods upon stated terms of a Borrower, or work, labor or services theretofore rendered by a Borrower as of the date each Receivable is created.  Same shall be due and owing in accordance with the applicable Borrower's standard terms of sale without dispute, set off or counterclaim except as may be stated on the accounts receivable schedules delivered by Borrowers to Agent.

(b) <u>Solvency of Customers.</u>  Each Customer, to the best of each Borrower's knowledge, as of the date each Receivable is created, is and will be solvent and able to pay all Receivables on which the Customer is obligated in full when due or with respect to such Customers of any Borrower who are not solvent such Borrower has set up on its books and in its financial records bad debt reserves adequate to cover such Receivables.

(c) <u>Location of Borrowers.</u>  Each Borrower's chief executive office is located at the addresses set forth on Schedule 4.15(c) hereto.  Until written notice is given to Agent by Borrowing Agent of any other office at which any Borrower keeps its records pertaining to Receivables, all such records shall be kept at such executive office.

(d) <u>Notification of Assignment of Receivables.</u>  At any time following the occurrence of an Event of Default or a Default or when Agent in its reasonable discretion believes it is necessary to do so, Agent shall have the right to send notice of the assignment of, and Agent's security interest in and Lien on, the Receivables to any and all Customers or any third party holding or otherwise concerned with any of the Collateral.  Thereafter, Agent shall have the sole right to collect the Receivables, take possession of the Collateral, or both.  Agent's actual collection expenses, including, but not limited to, stationery and postage, telephone and telegraph, secretarial and clerical expenses and the salaries of any collection personnel used for collection, may be charged to Borrowers' Account and be added to the Obligations.

55

(e)     Power of Agent to Act on Borrowers' Behalf. Agent shall have the right to receive, endorse, assign and/or deliver in the name of Agent or any Borrower any and all checks, drafts and other instruments for the payment of money relating to the Receivables, and each Borrower hereby waives notice of presentment, protest and non-payment of any instrument so endorsed. Each Borrower hereby constitutes Agent or Agent's designee as such Borrower's attorney with power (i) at any time (A) to endorse such Borrower's name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment or Collateral; (B) to sign such Borrower's name on any invoice or bill of lading relating to any of the Receivables, drafts against Customers, assignments and verifications of Receivables; (C) to send verifications of Receivables to any Customer; (D) to sign such Borrower's name on all financing statements or any other documents or instruments deemed necessary or appropriate by Agent to preserve, protect, or perfect Agent's interest in the Collateral and to file same; and (ii) at any time following the occurrence of a Default or Event of Default (A) to demand payment of the Receivables; (B) to enforce payment of the Receivables by legal proceedings or otherwise; (C) to exercise all of such Borrower's rights and remedies with respect to the collection of the Receivables and any other Collateral; (D) to settle, adjust, compromise, extend or renew the Receivables; (E) to settle, adjust or compromise any legal proceedings brought to collect Receivables; (F) to prepare, file and sign such Borrower's name on a proof of claim in bankruptcy or similar document against any Customer; (G) to prepare, file and sign such Borrower's name on any notice of Lien, assignment or satisfaction of Lien or similar document in connection with the Receivables; and (H) to do all other acts and things necessary to carry out this Agreement. All acts of said attorney or designee are hereby ratified and approved, and said attorney or designee shall not be liable for any acts of omission or commission nor for any error of judgment or mistake of fact or of law, unless done with gross (not mere) negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment); this power being coupled with an interest is irrevocable while any of the Obligations remain unpaid. Agent shall have the right at any time following the occurrence and during the continuance of an Event of Default or Default, to change the address for delivery of mail addressed to any Borrower to such address as Agent may designate and to receive, open and dispose of all mail addressed to any Borrower.

(f)     No Liability.   Neither Agent nor any Lender shall, under any circumstances or in any event whatsoever, have any liability for any error or omission or delay of any kind occurring in the settlement, collection or payment of any of the Receivables or any instrument received in payment thereof, or for any damage resulting therefrom unless such liability arises from Agent's, the Issuer's or any Lender's willful misconduct or gross negligence as determined by a court of competent jurisdiction in a final non-appealable judgment. Following the occurrence and during the continuance of an Event of Default or Default, Agent may, without notice to or consent from any Borrower, sue upon or otherwise collect, extend the time of payment of, compromise or settle for cash, credit or upon any terms any of the Receivables or any other securities, instruments or insurance applicable thereto and/or release any obligor thereof. Agent is authorized and empowered to accept following the occurrence of an Event of Default or Default the return of the goods represented by any of the Receivables, without notice to or consent by any Borrower, all without discharging or in any way affecting any Borrower's liability hereunder.

56

(g)     Establishment of Lockboxes, Collection Account. Borrowers have established and shall maintain one or more Lockboxes with the Lockbox Bank in the name of Borrowers. Borrowers have established and will maintain a deposit account (each a "Collection Account") with the Lockbox Bank in the name of Borrowers for each Lockbox. The Lockbox Bank and Borrowers have entered into agreements establishing the Lockboxes maintained by the Lockbox Bank (each a "Lockbox Agreement") and agreements with respect to the Collection Account maintained at the Lockbox Bank (each a "Deposit Account Agreement"), each such Lockbox Agreement and Deposit Account Agreement to be in form and substance satisfactory to Agent. Borrowers and Agent shall have entered, or will enter upon request of Agent, into a Blocked Account Agreement with the Lockbox Bank relating to rights of Agent with respect to the Lockboxes and the Collection Accounts maintained at the Lockbox Bank. Borrowers shall notify all of its Customers to forward all collections of every kind due any Borrower to a Lockbox (such notices to be in such form and substance as Agent may reasonably require to from time to time). In addition, Borrowers shall deposit all proceeds of any Collateral in the Collection Account. Schedule 4.15(g) hereto lists the following information with respect to Borrowers: (i) all present Lockboxes, all Collection Accounts and the Cash Concentration Account, (ii) the name and address of each Lockbox, (iii) the account number of each Collection Account and the Cash Concentration Account, (iv) a contact Person at the Lockbox Bank, and (v) a list describing all Lockbox Agreements, Deposit Account Agreements and Blocked Account Agreements, and all other agreements establishing each Lockbox and Collection Account.

(h)     Processing Collections; Cash Concentration Account. In accordance with the terms of the applicable Blocked Account Agreement, the Lockbox Bank shall be instructed to deposit on a daily basis all collections from Customers of Borrowers sent to the Lockbox maintained by the Lockbox Bank directly into the applicable Collection Account in the identical form in which such collections were made (except for any necessary endorsements) whether by cash or check. In accordance with the terms of the applicable Blocked Account Agreement, the Lockbox Bank shall be instructed to deposit on a daily basis all funds from collections deposited into such Collection Account to the Cash Concentration Account. The Cash Concentration Account shall not be subject to any deduction, set off, banker's lien or any other right in favor of any Person. All funds deposited into the Cash Concentration Account shall be the exclusive property of Agent on behalf of the Lenders and shall be subject to the sole and exclusive control of Agent and only to such signing authority designated from time to time by Agent and to be applied either to the Pre-Petition Obligations or the Post-Petition Obligations as determined by Agent in its sole and absolute discretion. No Borrower shall have control over or any interest in such funds. Any collections received directly by any Borrower shall be deemed held by such Borrower in trust and as fiduciary for the Lenders. Borrowers agree not to commingle any such collections with any of Borrowers' other funds or property, but to hold such funds separate and apart in trust and as fiduciary for the Lenders until deposit is made into the applicable Collection Account or the Cash Concentration Account. Borrowers hereby agree to deposit immediately such directly received collections into any Collection Account maintained by or on behalf of Borrowers or directly into the Cash Concentration Account.

(i)     Adjustments. No Borrower will, without Agent's consent, compromise or adjust any Receivables (or extend the time for payment thereof) or accept any returns of

57

merchandise or grant any additional discounts, allowances or credits thereon except for those compromises, adjustments, returns, discounts, credits and allowances as have been heretofore (A) customary in the business of such Borrower and (B) done in the ordinary course of Borrowers' business.

4.16. <u>Inventory</u>. To the extent Inventory held for sale or lease has been produced by any Borrower, it has been and will be produced by such Borrower in accordance with the Federal Fair Labor Standards Act of 1938, as amended, and all rules, regulations and orders thereunder.

4.17. <u>Maintenance of Equipment</u>. The Equipment shall be maintained in good operating condition and repair (reasonable wear and tear excepted) and all necessary replacements of and repairs thereto shall be made so that the value and operating efficiency of the Equipment shall be maintained and preserved. No Borrower shall use or operate the Equipment in violation of any law, statute, ordinance, code, rule or regulation.

4.18. <u>Exculpation of Liability</u>. Nothing herein contained shall be construed to constitute Agent, the Issuer or any Lender as any Borrower's agent for any purpose whatsoever, nor shall Agent or any Lender be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless of the cause thereof, except to the extent caused by the gross negligence or willful misconduct of Agent, the Issuer or any Lender as finally determined by a court of competent jurisdiction. Neither Agent, the Issuer nor any Lender, whether by anything herein or in any assignment or otherwise, assume any of any Borrower's obligations under any contract or agreement assigned to Agent, the Issuer or such Lender, and neither Agent, the Issuer, nor any Lender shall be responsible in any way for the performance by any Borrower of any of the terms and conditions thereof.

4.19. <u>Environmental Matters</u>.

(a) Borrowers shall ensure that the Real Property and all operations and businesses conducted thereon remain in compliance with all Environmental Laws and they shall not place or permit to be placed any Hazardous Substances on any Real Property except as permitted by Applicable Law, permits, licenses, or appropriate governmental authorities.

(b) Borrowers shall establish and maintain a system to assure and monitor continued compliance with all applicable Environmental Laws, which system shall include periodic reviews of such compliance.

(c) Borrowers shall (i) employ in connection with the use of the Real Property appropriate technology necessary to maintain compliance with any applicable Environmental Laws and (ii) dispose of any and all Hazardous Waste generated at the Real Property only at facilities and with carriers that maintain valid permits under RCRA and any other applicable Environmental Laws. Borrowers shall use their best efforts to obtain certificates of disposal, such as hazardous waste manifest receipts, from all treatment, transport, storage or disposal facilities or operators employed by Borrowers in connection with the transport or disposal of any Hazardous Waste generated at the Real Property.

(d)     In the event any Borrower obtains, gives or receives notice of any Release or threat of Release of a reportable quantity of any Hazardous Substances at the Real Property (any such event being hereinafter referred to as a "Hazardous Discharge") or receives any notice of violation, request for information or notification that it is potentially responsible for investigation or cleanup of environmental conditions at the Real Property, demand letter or complaint, order, citation, or other written notice with regard to any Hazardous Discharge or violation of Environmental Laws affecting the Real Property or any Borrower's interest therein (any of the foregoing is referred to herein as an "Environmental Complaint") from any Person, including any state agency responsible in whole or in part for environmental matters in the state in which the Real Property is located or the United States Environmental Protection Agency (any such person or entity hereinafter the "Authority"), then Borrowing Agent shall, within five (5) Business Days, give written notice of same to Agent detailing facts and circumstances of which any Borrower is aware giving rise to the Hazardous Discharge or Environmental Complaint. Such information is to be provided to allow Agent to protect its security interest in and Lien on the Real Property and the Collateral and is not intended to create nor shall it create any obligation upon Agent or any Lender with respect thereto.

(e)     Borrowing Agent shall promptly forward to Agent copies of any request for information, notification of potential liability, demand letter relating to potential responsibility with respect to the investigation or cleanup of Hazardous Substances at any other site owned, operated or used by any Borrower to dispose of Hazardous Substances and shall continue to forward copies of correspondence between any Borrower and the Authority regarding such claims to Agent until the claim is settled. Borrowing Agent shall promptly forward to Agent copies of all documents and reports concerning a Hazardous Discharge at the Real Property that any Borrower is required to file under any Environmental Laws. Such information is to be provided solely to allow Agent to protect Agent's security interest in and Lien on the Real Property and the Collateral.

(f)     Borrowers shall respond promptly to any Hazardous Discharge or Environmental Complaint and take all necessary action in order to safeguard the health of any Person and to avoid subjecting the Collateral or Real Property to any Lien. If any Borrower shall fail to respond promptly to any Hazardous Discharge or Environmental Complaint or any Borrower shall fail to comply with any of the requirements of any Environmental Laws, Agent on behalf of Lenders may, but without the obligation to do so, for the sole purpose of protecting Agent's interest in the Collateral: (i) give such notices or (ii) enter onto the Real Property (or authorize third parties to enter onto the Real Property) and take such actions as Agent (or such third parties as directed by Agent) deem reasonably necessary or advisable, to clean up, remove, mitigate or otherwise deal with any such Hazardous Discharge or Environmental Complaint. All reasonable costs and expenses incurred by Agent, the Issuer and Lenders (or such third parties) in the exercise of any such rights, including any sums paid in connection with any judicial or administrative investigation or proceedings, fines and penalties, together with interest thereon from the date expended at the Default Rate for Revolving Advances shall be paid upon demand by Borrowers, and until paid shall be added to and become a part of the Obligations secured by the Liens created by the terms of this Agreement or any other agreement between Agent, the Issuer, any Lender and any Borrower.

(g)     Promptly upon the written request of Agent from time to time, Borrowers shall provide Agent, at Borrowers' expense, with an environmental site assessment or environmental audit report prepared by an environmental engineering firm acceptable in the reasonable opinion of Agent, to assess with a reasonable degree of certainty the existence of a Hazardous Discharge and the potential costs in connection with abatement, cleanup and removal of any Hazardous Substances found on, under, at or within the Real Property. Any report or investigation of such Hazardous Discharge proposed and acceptable to an appropriate Authority that is charged to oversee the clean-up of such Hazardous Discharge shall be acceptable to Agent. If such estimates, individually or in the aggregate, exceed $250,000, Agent shall have the right to require Borrowers to post a bond, letter of credit or other security reasonably satisfactory to Agent to secure payment of these costs and expenses.

(h)     Borrowers shall defend and indemnify Agent, the Issuer and Lenders and hold Agent, Lenders and their respective employees, agents, directors and officers harmless from and against all loss, liability, damage and expense, claims, costs, fines and penalties, including attorney's fees, suffered or incurred by Agent, the Issuer or Lenders under or on account of any Environmental Laws, including the assertion of any Lien thereunder, with respect to any Hazardous Discharge, the presence of any Hazardous Substances affecting the Real Property, whether or not the same originates or emerges from the Real Property or any contiguous real estate, including any loss of value of the Real Property as a result of the foregoing except to the extent such loss, liability, damage and expense is attributable to any Hazardous Discharge resulting from actions on the part of Agent, the Issuer or any Lender. Borrowers' obligations under this Section 4.19 shall arise upon the discovery of the presence of any Hazardous Substances at the Real Property in violation of Environmental Laws, whether or not any federal, state, or local environmental agency has taken or threatened any action in connection with the presence of any Hazardous Substances. Borrowers' obligation and the indemnifications hereunder shall survive the termination of this Agreement.

(i)     For purposes of Section 4.19 and 6.7, all references to Real Property shall be deemed to include all of each Borrower's right, title and interest in and to its owned and leased premises.

4.20.   Financing Statements. Except as respects the financing statements filed by Agent and the financing statements described on Schedule 1.2(a), no financing statement covering any of the Collateral or any proceeds thereof is on file in any public office.

4.21.   Tolling and Bailment Arrangements. Borrowers may from time to time enter into tolling and/or bailment arrangements with suppliers of Inventory whereby such parties shall place raw materials on Borrowers' premises from time to time subject to title retention by such third party so long as such transactions are on terms and conditions, and subject to documentation in form and substance, acceptable to the Agent and Lenders in their sole discretion.

60