## V.   SUPERPRIORITY CLAIMS, COLLATERAL SECURITY, ETC.

5.1.   <u>Superpriority Claims and Collateral Security</u>.   Borrowers hereby represent, warrant and covenant that, upon the entry by the Bankruptcy Court of the Interim Order and/or the Final Order, as applicable:

(a)     for all Post-Petition Obligations (and upon entry of the Final Order, for Obligations, including without limitation, all Pre-Petition Obligations and the Post-Petition Obligations) now existing or hereafter arising and for diminution in value of any Pre-Petition Collateral used by the Borrowers pursuant to the Interim Order, this Agreement or otherwise, the Agent, for the benefit of itself and the other Lenders, is granted an allowed superpriority administrative claim in the Borrowers' estates pursuant to Section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of any of the Borrowers, whether now in existence or hereafter incurred by any of the Borrowers, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to the Bankruptcy Code, including without limitation, inter alia, Sections 105, 326, 328, 330, 331, 503(b), 506(c) (upon entry of the Final Order), 507, 364(c)(1), 546(c), 726 or 1114 of the Bankruptcy Code, subject as to priority only to the Carve-Out;

(b)     to secure the prompt payment and performance of any and all Post-Petition Obligations, (and upon entry of the Final Order, any and all Obligations, including without limitation, all Pre-Petition Obligations and the Post-Petition Obligations) of the Borrowers to the Agent and the Lenders of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, the Agent, for the benefit of itself and the other Lenders, shall have and is hereby granted, effective as of the Petition Date, valid and perfected first priority (subject to the Permitted Liens (as defined in the Interim Order) and the Carve-Out), security interests and liens in and upon all pre- and post- petition property of the Borrowers, whether existing on the Petition Date or thereafter acquired (i) pursuant to Section 364(c) (2), that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (collectively, the "Unencumbered Property"), (ii) pursuant to Section 364(d) and (c) of the Bankruptcy Code, all of the Pre-Petition Collateral, and (iii) pursuant to Section 364(c) and (d) of the Bankruptcy Code, all of the Collateral (as defined in this Agreement). Such security interests and liens shall be senior in all respects to interests of other parties arising out of security interests or liens, if any, in such assets and property existing immediately prior to the Petition Date.  The Liens securing the Obligations shall not be subject to Section 551 of the Bankruptcy Code;

(c)     Neither the incurrence of the Obligations, the granting of Liens on the Collateral under this Agreement or the transfer of any interest in property was incurred, granted or transferred, as applicable, with any intent to hinder, delay or defraud any of its respective creditors; and

(d)     The Interim Order and the Final Order, as applicable, has been entered by the Bankruptcy Court and is in full force and effect, and has not been amended or modified except to the extent consented to by Agent, or stayed, or reversed.

074658.01807/12123123v.11

5.2.     Borrowers hereby represent, warrant and covenant that, upon the entry by the Bankruptcy Court of the Interim Order and/or the Final Order, as applicable, all of the Obligations:

(a)     shall at all times constitute a Superpriority Claim having priority, pursuant to Section 364(c)(1) of the Bankruptcy Code, over any right of payment and any and all other obligations, liabilities and indebtedness of Borrowers and claims of any Person, whether now existing or hereafter arising, including without limitation any claims under Sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503, 506(c) (upon entry of the Final Order), 507, 546, 726, 1113 or 1114 of the Bankruptcy Code, subject, as to priority, only to the Carve-Out; and

(b)     pursuant to Section 364(c) and Section 364(d) of the Bankruptcy Code, this Agreement and the Other Documents, shall at all times be secured by a first priority perfected Lien, subject as to priority, only to the Permitted Liens (as defined in the Interim Order) and the Carve-Out, in all assets, whether now owned or hereafter acquired of Borrowers and their estates, such Liens shall be senior to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Bankruptcy Court or otherwise, including without limitation, liens or interests granted in favor of third parties in conjunction with Section 363, 364 or any other Section of the Bankruptcy Code or other applicable law. Such security interests and liens shall be senior in all respects to interests of other parties arising out of security interests or liens, if any, in such assets and property existing immediately prior to the Petition Date. The Liens securing the Obligations shall not be subject to Section 551 of the Bankruptcy Code.

The agreement of Agent and Lenders to provide post-petition financing to Borrowers will not prohibit Agent or Lenders from moving in the Bankruptcy Court for any other and further relief which Agent or Lenders believe in good faith to be reasonably and immediately necessary to protect their rights with respect to the Collateral (including a request for Borrowers to abandon any part of the Collateral) or otherwise.

5.3.     No Filings Required. The Liens securing the Obligations shall be deemed valid and perfected and duly recorded by entry of the Interim Order. Agent shall not be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Lien granted by or pursuant to the Interim Order, the Final Order, this Agreement or any Other Document.

5.4.     Grants, Rights and Remedies. The Lien and administrative priority granted by or pursuant to the Interim Order, the Final Order, this Agreement or any Other Document are independently granted. The Interim Order, the Final Order, this Agreement and the Other Documents supplement each other, and the grants, priorities, rights and remedies of Agent and Lenders hereunder and thereunder are cumulative.

5.5.     No Discharge; Survival of Claims. Each Borrower agrees that (a) the Obligations shall not be discharged by the entry of an order confirming a Reorganization Plan (and each Borrower, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge), (b) the Superpriority Claim granted to Agent and Lenders pursuant to the Interim

Order and the Final Order and the Liens granted to Agent, for the benefit of Agent and the Lenders pursuant to the Interim Order, the Final Order, this Agreement and the Other Documents, shall not be affected in any manner by the entry of an order confirming a Reorganization Plan, (c) Borrowers shall not propose or support any Reorganization Plan that is not conditioned upon termination of Agent's and Lenders' commitment to make Advances hereunder and indefeasible payment in full in cash of all Obligations and the release of Agent and Lenders in full from all claims of Borrowers and their estate, in each case, on or before the effective date of such Reorganization Plan, and (d) no Reorganization Plan shall be confirmed if it does not satisfy the foregoing requirements.

5.6.    Survival.  The Liens, lien priority, administrative priorities and other rights and remedies granted to Agent and Lenders pursuant to the Interim Order, the Final Order, this Agreement and the Other Documents (specifically including the existence, perfection and priority of the Liens provided herein and therein, and the superpriority administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by Borrowers (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Case, or by any other act or omission whatever.  Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(a)    except for the Carve-Out, no costs or expenses of administration which have been or may be incurred in the Case or any conversion of the same or in any other proceedings related thereto, and no priority claims, including claims and charges under Section 506(c) of the Bankruptcy Code, are or will be prior to or on a parity with any claim of Agent or any Lender against the Borrowers in respect of any Obligation;

(b)    the Liens securing the Obligations shall constitute valid and perfected Liens and subject only to the Carve-Out, shall be prior to all other Liens, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

(c)    the Liens securing the Obligations shall continue to be valid and perfected without the necessity that Agent file financing statements, mortgages or otherwise perfecting its Lien under applicable non-bankruptcy law.

5.7.    Disavowal and Waiver of Any Subsequent Relief Based on Changed Circumstances.  Borrowers, Agent and Lenders know and understand that there are rights and remedies provided under the Bankruptcy Code, the Federal Rules of Civil Procedure, and the Bankruptcy Rules, pursuant to which parties otherwise bound by a previously entered order can attempt to obtain relief from such an order by alleging circumstances that may warrant a change or modification in the order, or circumstances such as fraud, mistake, inadvertence, excusable neglect, newly discovered evidence, or similar matters that may justify vacating the order entirely, or otherwise changing or modifying it (collectively, "Changed Circumstances"). Rights and remedies based on Changed Circumstances include, but are not limited to, modification of a plan of reorganization after confirmation of the plan and before its substantial consummation, pursuant to Section 1127(b) of the Bankruptcy Code, relief from a final order or judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure and Bankruptcy Rule 9024, and the commencement and prosecution of a serial Chapter 11 case by a debtor which is in default of

obligations under a stipulation or plan of reorganization confirmed in an earlier case. With full knowledge and understanding of what are, or may be, its present or future rights and remedies based on allegations of Changed Circumstances, each Borrower: (i) expressly disavows that there are any matters which constitute any kind of Changed Circumstances as of the date of entry of the Interim Order and (ii) expressly disavows that it is aware of any matters whatsoever that it is assuming, contemplating, or expecting in proceeding with the Final Order and the transactions contemplated by this Agreement and having the Final Order entered that would serve as a basis to allege such Changed Circumstances. Each Borrower understands and agrees that Agent and Lenders are not willing to bear any of the risks involved in Borrowers' business enterprises and Agent and Lenders are not willing to modify any of the rights if such risks cause actual or alleged Changed Circumstances; and each Borrower expressly assumes all risks of any and all such matters, and the consequences that Agent and Lenders will enforce their legal, equitable, and contractual rights if Agent and Lenders are not paid and dealt with strictly in accordance with the terms and conditions of the Interim Order, the Final Order, this Agreement and the Other Documents. Without limiting the foregoing in any way, Borrowers' use of any cash collateral that is included in the Collateral will be governed exclusively by the terms and conditions of this Agreement, the Interim Order and the Final Order, and, until all Obligations are indefeasibly paid and satisfied in full either before or after a termination of this Agreement, no Borrower will seek authority from the Bankruptcy Court to otherwise use any cash collateral that is included in the Collateral for any purpose whatsoever.

5.8. <u>Exclusive Remedy For Any Alleged Post-Petition Claim.</u> If any Borrower asserts that it has any adverse claims against Agent or Lenders, with respect to this Agreement and the transactions contemplated hereby, each Borrower agrees that its sole and exclusive remedy for any and all such adverse claims will be an action for monetary damages (the "Damage Lawsuit"). Any such Damage Lawsuit, regardless of the procedural form in which it is alleged (e.g., by complaint, counterclaim, cross-claim, third-party claim, or otherwise) will be severed from any enforcement by Agent and Lenders of their legal, equitable, and contractual rights (including collection of the Obligations and foreclosure or other enforcement against the Collateral) pursuant to the Other Documents, and the Damage Lawsuit (including any and all adverse claims alleged against Agent or Lenders) cannot be asserted by any Borrower as a defense, setoff, recoupment, or grounds for delay, stay, or injunction against any enforcement by Agent or Lenders of their legal, equitable, and contractual rights under the Final Order, the Other Documents, and otherwise.

5.9. <u>Prohibition on Surcharge; Etc.</u> No Person will be permitted to surcharge the Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral, except for the Carve-Out. The prohibition on surcharging or priming of the Liens of Agent on the Collateral will survive the termination of this Agreement and the dismissal of the Case, such that no Person will be permitted to obtain a Lien or rights (through any means, at law or in equity) which in any case is equal or senior to the Liens of Agent on the Collateral. Upon the termination of this Agreement and the dismissal of the Case, the Bankruptcy Court will retain jurisdiction over the Collateral for the limited purpose of enforcing this Article 5.

5.10. <u>Marshalling Obligations.</u> The Agent shall not be subject to any equitable remedy of marshalling.

64

5.11.  Bankruptcy Notices.  The motions to approve the Interim Order and all other first day motions have been served on all secured creditors, all judgment creditors (if any), the twenty (20) largest unsecured creditors, and federal and state taxing authorities, any and all Governmental Bodies holding a claim, the PBGC, Environmental Protection Agency, union, and any other party claiming an interest in the Collateral in accordance with the Federal Rules of Bankruptcy Procedure.

VI.    REPRESENTATIONS AND WARRANTIES.

Each Borrower represents and warrants as follows:

6.1.    Authority.  Each Borrower has full power, authority and legal right to enter into this Agreement and the Other Documents and to perform all its respective Obligations hereunder and thereunder.  This Agreement and the Other Documents have been duly executed and delivered by each Borrower, and, subject to the entry by the Bankruptcy Court of the Interim Order, this Agreement and the Other Documents constitute the legal, valid and binding obligation of such Borrower enforceable in accordance with their terms.  Subject to the entry by the Bankruptcy Court of the Interim Order, the execution, delivery and performance of this Agreement and of the Other Documents (a) are within such Borrower's corporate or limited liability company powers, as applicable, have been duly authorized by all necessary corporate or company action, as applicable, are not in contravention of law or the terms of such Borrower's by-laws, certificate of incorporation, operating agreement, certificate of formation or other applicable documents relating to such Borrower's formation or to the conduct of such Borrower's business or of any material agreement or undertaking to which such Borrower is a party or by which such Borrower is bound, including the Subordinated Debt Documentation (b) will not conflict with or violate any law or regulation, or any judgment, order or decree of any Governmental Body, (c) will not require the Consent of any Governmental Body or any other Person, except those Consents set forth on Schedule 6.1 hereto, all of which will have been duly obtained, made or compiled prior to the Closing Date and which are in full force and effect and (d) will not conflict with, nor result in any breach in any of the provisions of or constitute a default under or result in the creation of any Lien except Permitted Encumbrances upon any asset of such Borrower under the provisions of any agreement, charter document, instrument, by-law, operating agreement, or other instrument to which such Borrower is a party or by which it or its property is a party or by which it may be bound, including the Subordinated Debt Documentation.

6.2.    Formation and Qualification.

(a)    Each Borrower is duly incorporated or formed, as applicable, and in good standing under the laws of the state listed on Schedule 6.2(a) and is qualified to do business and is in good standing in the states listed on Schedule 6.2(a) which constitute all states in which qualification and good standing are necessary for such Borrower to conduct its business and own its property and where the failure to so qualify could reasonably be expected to have a Material Adverse Effect on such Borrower.  Each Borrower has delivered to Agent true and complete copies of its certificate or articles of incorporation and by-laws or its certificate of formation and

operating agreement, as applicable, and will promptly notify Agent of any amendment or changes thereto.

(b)     The Borrower has no Subsidiaries.

6.3.    <u>Survival of Representations and Warranties</u>. All representations and warranties of such Borrower contained in this Agreement and the Other Documents shall be true at the time of such Borrower's execution of this Agreement and the Other Documents, and shall survive the execution, delivery and acceptance thereof by the parties thereto and the closing of the transactions described therein or related thereto, until the end of the Term, except as otherwise provided in Section 17.7.

6.4.    <u>Tax Returns</u>. Each Borrower's federal tax identification number is set forth on Schedule 6.4. Each Borrower has filed all federal, state and local tax returns and other reports each is required by law to file and, subject to any prohibition under the Bankruptcy Code with respect to pre-petition claims, but otherwise in accordance with Applicable Law, has paid all taxes, assessments, fees and other governmental charges that are due and payable. The provision for taxes on the books of each Borrower is adequate for all years not closed by applicable statutes, and for its current fiscal year, and no Borrower has any knowledge of any deficiency or additional assessment in connection therewith not provided for on its books.

6.5.    <u>Financial Statements</u>.

(a)     The Budget was prepared in good faith by the Chief Restructuring Officer of Hussey and based upon assumptions which provide a reasonable basis for the projections contained therein and reflect Borrowers' judgment based on present circumstances of the most likely set of conditions and course of action for the projected period.

(b)     The consolidated and consolidating balance sheets of Borrowers, their Subsidiaries and such other Persons described therein (including the accounts of all Subsidiaries for the respective periods during which a subsidiary relationship existed) as of December 31, 2010 and the related statements of income, changes in stockholder's equity, and changes in cash flow for the period ended on such date, in draft form.

6.6.    <u>Entity Names</u>. No Borrower has been known by any other corporate name in the past five years and does not sell Inventory under any other name, nor has any Borrower been the surviving corporation or company, as applicable, of a merger or consolidation or acquired all or substantially all of the assets of any Person during the preceding five (5) years.

6.7.    <u>O.S.H.A. and Environmental Compliance</u>.

(a)     Except as set forth on Schedule 6.7(a), each Borrower has duly complied with, and its facilities, business, assets, property, leaseholds, Real Property and Equipment are in compliance in all material respects with, the provisions of the Federal Occupational Safety and Health Act, the Environmental Protection Act, RCRA and all other Environmental Laws and there are no outstanding citations, notices or orders of non-compliance issued to any Borrower or relating to its business, assets, property, leaseholds or Equipment under any such laws, rules or regulations.

(b)     Except as set forth on Schedule 6.7(b), each Borrower has been issued all required federal, state and local licenses, certificates or permits relating to all applicable Environmental Laws.

(c)     Except as set forth on Schedule 6.7(c), to the best of Borrowers' knowledge: (i) there are no signs of releases, spills, discharges, leaks or disposal (collectively referred to as "Releases") of Hazardous Substances at, upon, under or within any Real Property including any premises leased by any Borrower; (ii) there are no underground storage tanks or polychlorinated biphenyls on the Real Property including any premises leased by any Borrower; (iii) the Real Property including any premises leased by any Borrower has never been used as a treatment, storage or disposal facility of Hazardous Waste; and (iv) no Hazardous Substances are present on the Real Property including any premises leased by any Borrower, except in such amounts that do not constitute a violation of Environmental Laws.

6.8.     <u>No Litigation, Violation, Indebtedness or Default</u>.

(a)     <u>Intentionally Omitted</u>.

(b)     Except as disclosed in Schedule 6.8(b), no Borrower has (i) any pending or, threatened litigation, arbitration, actions or proceedings which involve the possibility of having a Material Adverse Effect, and (ii) any liabilities or indebtedness for borrowed money other than the Obligations.

(c)     No Borrower is in violation of any applicable statute, law, rule, regulation or ordinance in any respect which could reasonably be expected to have a Material Adverse Effect, nor is any Borrower in violation of any order of any court, Governmental Body or arbitration board or tribunal.

(d)     No Borrower nor any member of the Controlled Group maintains or contributes to any Plan other than those listed on Schedule 6.8(d) hereto. Except as set forth on Schedule 6.8(d): (i) No Plan has incurred any "accumulated funding deficiency," as defined in Section 302(a)(2) of ERISA and Section 412(a) of the Code, whether or not waived, and each Borrower and each member of the Controlled Group has met all applicable minimum funding requirements under Section 302 of ERISA in respect of each Plan; (ii) each Plan which is intended to be a qualified plan under Section 401(a) of the Code as currently in effect has been determined by the Internal Revenue Service to be qualified under Section 401(a) of the Code and the trust related thereto is exempt from federal income tax under Section 501(a) of the Code; (iii) neither any Borrower nor any member of the Controlled Group has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due which are unpaid; (iv) no Plan has been terminated by the plan administrator thereof nor by the PBGC, and there is no occurrence which would cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Plan; (v) at the time of issuance of the most recent actuarial report and based upon the law then in effect, the current value of the assets of each Plan exceeds the present value of the accrued benefits and other liabilities of such Plan (on an on-going basis) and neither any Borrower nor any member of the Controlled Group knows of any facts or circumstances which would materially change the value of such assets and accrued benefits and other liabilities; (vi) neither any Borrower nor any member of the

67

Controlled Group has breached any of the responsibilities, obligations or duties imposed on it by ERISA with respect to any Plan; (vii) neither any Borrower nor any member of a Controlled Group has incurred any liability for any excise tax arising under Section 4972 or 4980B of the Code, and no fact exists which could give rise to any such liability; (viii) neither any Borrower nor any member of the Controlled Group nor any fiduciary of, nor any trustee to, any Plan, has engaged in a "prohibited transaction" described in Section 406 of the ERISA or Section 4975 of the Code nor taken any action which would constitute or result in a Termination Event with respect to any such Plan which is subject to ERISA; (ix) each Borrower and each member of the Controlled Group has made all contributions due and payable with respect to each Plan; (x) there exists no event described in Section 4043(b) of ERISA, for which the thirty (30) day notice period has not been waived; (xi) neither any Borrower nor any member of the Controlled Group has any fiduciary responsibility for investments with respect to any plan existing for the benefit of persons other than employees or former employees of any Borrower and any member of the Controlled Group; (xii) neither any Borrower nor any member of the Controlled Group maintains or contributes to any Plan which provides health, accident or life insurance benefits to former employees, their spouses or dependents, other than in accordance with Section 4980B of the Code; (xiii) neither any Borrower nor any member of the Controlled Group has withdrawn, completely or partially, from any Multiemployer Plan so as to incur liability under the Multiemployer Pension Plan Amendments Act of 1980 and there exists no fact which would reasonably be expected to result in any such liability; and (xiv) no Plan fiduciary (as defined in Section 3(21) of ERISA) has any liability for breach of fiduciary duty or for any failure in connection with the administration or investment of the assets of a Plan.

6.9.    <u>Patents, Trademarks, Copyrights and Licenses</u>.  All patents, patent applications, trademarks, trademark applications, service marks, service mark applications, copyrights, copyright applications, design rights, tradenames, assumed names, trade secrets and licenses owned or utilized by Borrower are set forth on Schedule 6.9, are valid and have been duly registered or filed with all appropriate Governmental Bodies and constitute all of the intellectual property rights which are necessary for the operation of its business; except as set forth in Schedule 6.9 hereto, there is no objection to or pending challenge to the validity of any such patent, trademark, copyright, design rights, tradenames, trade secret or license and no claims are pending, or to the best of each Borrower's knowledge following diligent inquiry, threatened that any Borrower is infringing or otherwise adversely affecting the rights of any Person with respect to such rights.  Each patent, patent application, patent license, trademark, trademark application, trademark license, service mark, service mark application, service mark license, design rights, copyright, copyright application and copyright license owned or held by any Borrower and all trade secrets used by any Borrower consist of original material or property developed by such Borrower or was lawfully acquired by such Borrower from the proper and lawful owner thereof; each of such items has been maintained so as to preserve the value thereof from the date of creation or acquisition thereof; with respect to all customized software used by any Borrower, such Borrower is in possession of all source and object codes related to each piece of software or is the beneficiary of a valid license or source code escrow agreement, and each such source code escrow agreement is listed on Schedule 6.9 hereto.

6.10.    <u>Licenses and Permits</u>.  Except as set forth in Schedule 6.10, each Borrower (a) is in compliance with and (b) has procured and is now in possession of, all material licenses or permits required by any applicable federal, state, provincial or local law, rule or regulation for

the operation of its business in each jurisdiction wherein it is now conducting or proposes to conduct business and where the failure to comply with or procure such licenses or permits would reasonably be expected to have a Material Adverse Effect.

6.11. <u>Reserved.</u>

6.12. <u>No Default</u>. No Borrower is in default in the payment or performance of any of its post-petition contractual obligations required to be performed by an order of the Bankruptcy Court or the Bankruptcy Code.

6.13. <u>No Burdensome Restrictions</u>. No Borrower is party to any contract or agreement the performance of which could reasonably be expected to have a Material Adverse Effect. Each Borrower has heretofore delivered to Agent true and complete copies of all material contracts to which it is a party or to which it or any of its properties is subject. No Borrower has agreed or consented to cause or permit in the future (upon the happening of a contingency or otherwise) any of its property, whether now owned or hereafter acquired, to be subject to a Lien which is not a Permitted Encumbrance.

6.14. <u>No Labor Disputes</u>. No Borrower is involved in any labor dispute; there are no strikes or walkouts or union organization of any Borrower's employees threatened or in existence and no labor contract is scheduled to expire during the Term other than as set forth on Schedule 5.14 hereto.

6.15. <u>Margin Regulations</u>. No Borrower is engaged, nor will it engage, principally or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U of the Board of Governors of the Federal Reserve System as now and from time to time hereafter in effect. No part of the proceeds of any Advance will be used for "purchasing" or "carrying" "margin stock" as defined in Regulation U of such Board of Governors.

6.16. <u>Investment Company Act</u>. No Borrower is an "investment company" registered or required to be registered under the Investment Company Act of 1940, as amended, nor is it controlled by such a company.

6.17. <u>Disclosure</u>. No representation or warranty made by any Borrower in this Agreement or in any financial statement, report, certificate or any other document furnished in connection herewith or therewith contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements herein or therein not misleading. There is no fact known to any Borrower or which reasonably should be known to such Borrower which such Borrower has not disclosed to Agent in writing with respect to the transactions contemplated or evidenced by this Agreement which could reasonably be expected to have a Material Adverse Effect.

6.18. <u>Swaps</u>. No Borrower is a party to, nor will it be a party to, any swap agreement whereby such Borrower has agreed or will agree to swap interest rates or currencies unless same provides that damages upon termination following an event of default thereunder are payable on an unlimited "two-way basis" without regard to fault on the part of either party.

69

6.19.  <u>Conflicting Agreements</u>.  No provision of any mortgage, indenture, contract, agreement, judgment, decree or order binding on any Borrower or affecting the Collateral conflicts with the terms of this Agreement or the Other Documents, or requires any Consent to be obtained, which has not already been authorized pursuant to an order of the Bankruptcy Court or been obtained, prior to the execution, delivery or performance of the terms of this Agreement and the Other Documents.

6.20.  <u>Application of Certain Laws and Regulations</u>.  Neither any Borrower nor any Affiliate of any Borrower is subject to any law, statute, rule or regulation which regulates the incurrence of any Indebtedness, including laws, statutes, rules or regulations relative to common or interstate carriers or to the sale of electricity, gas, steam, water, telephone, telegraph or other public utility services.

6.21.  <u>Business and Property of Borrowers</u>.  Upon and after the Closing Date, Borrowers do not propose to engage in any business other than as set forth on Schedule 6.21 hereto and activities necessary to conduct the foregoing.  On the Closing Date, each Borrower will own all the property and possess all of the rights and Consents necessary for the conduct of the business of such Borrower.

6.22.  <u>Section 20 Subsidiaries</u>.  Borrowers do not intend to use and shall not use any portion of the proceeds of the Advances, directly or indirectly, to purchase during the underwriting period, or for 30 days thereafter, Ineligible Securities being underwritten by a Section 20 Subsidiary.

6.23.  <u>Anti-Terrorism Laws</u>.

(a)  <u>General</u>.  Neither any Borrower nor any Affiliate of any Borrower is in violation of any Anti-Terrorism Law or engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

(b)  <u>Executive Order No. 13224</u>.  Neither any Borrower nor any Affiliate of any Borrower or their respective agents acting or benefiting in any capacity in connection with the Advances or other transactions hereunder, is any of the following (each a "Blocked Person"):

(i)  a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224;

(ii)  a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order No. 13224;

(iii)  a Person or entity with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)  a Person or entity that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order No. 13224;

70

(v)     a Person or entity that is named as a "specially designated national" on the most current list published by the U.S. Treasury Department Office of Foreign Asset Control at its official website or any replacement website or other replacement official publication of such list, or

(vi)     a Person or entity who is affiliated or associated with a Person or entity listed above.

Neither any Borrower nor to the knowledge of any Borrower, any of its agents acting or benefitting in any capacity in connection with the Advances or other transactions hereunder (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order No. 13224.

6.24.   Trading with the Enemy.  No Borrower has engaged, nor does it intend to engage, in any business or activity prohibited by the Trading with the Enemy Act.

6.25.   Federal Securities Laws.  Neither any Borrower nor any of its Subsidiaries (i) is required to file periodic reports under the Exchange Act, (ii) has any securities registered under the Exchange Act or (iii) has filed a registration statement that has not yet become effective under the Securities Act.

6.26.   Equity Interests.   The authorized and outstanding Equity Interests of each Borrower is as shown on Schedule 6.26 hereto.  All of the Equity Interests of each Borrower has been duly and validly authorized and issued and is fully paid and non-assessable and has been sold and delivered to the holders hereof in compliance with, or under valid exemption from, all federal and state laws and the rules and regulations of each Governmental Body governing the sale and delivery of securities.  Except for the rights and obligations shown on Schedule 6.26, there are no subscriptions, warrants, options, calls, commitments, rights or agreements by which any Borrower or any of the shareholders of any Borrower is bound relating to the issuance, transfer, voting or redemption of shares of its Equity Interests or any pre-emptive rights held by any Person with respect to the Equity Interests of Borrowers.  Except as shown on Schedule 6.26, Borrowers have not issued any securities convertible into or exchangeable for shares of its Equity Interests or any options, warrants or other rights to acquire such shares or securities convertible into or exchangeable for such shares.

VII.   AFFIRMATIVE COVENANTS.

Each Borrower shall, until payment in full of the Obligations and termination of this Agreement:

7.1.   Payment of Fees.  Pay to Agent on demand all usual and customary fees and expenses which Agent incurs in connection with (a) the forwarding of Advance proceeds and (b) the establishment and maintenance of the Collection Account, the Cash Concentration Account and any deposit accounts related to a Blocked Account Agreement or Lockbox Agreement. Agent may, without making demand, charge Borrowers' Account for all such fees and expenses.

71

7.2.    Conduct of Business and Maintenance of Existence and Assets.  Subject to any prohibition under the Bankruptcy Code with respect to pre-petition claims, but otherwise in accordance with Applicable Law: (a) conduct continuously and operate actively its business according to good business practices and maintain all of its properties useful or necessary in its business in good working order and condition (reasonable wear and tear excepted and except as may be disposed of in accordance with the terms of this Agreement), including all licenses, patents, copyrights, design rights, tradenames, trade secrets and trademarks and take all actions necessary to enforce and protect the validity of any such intellectual property right or other right included in the Collateral; (b) keep in full force and effect its existence and comply in all material respects with the laws and regulations governing the conduct of its business where the failure to do so could reasonably be expected to have a Material Adverse Effect; (c) make all such reports and pay all such franchise and other taxes and license fees and do all such other acts and things as may be lawfully required to maintain its rights, licenses, leases, powers and franchises under the laws of the United States or any political subdivision thereof; and (d) otherwise operate the business consistent with the requirements of the Asset Purchase Agreement.

7.3.    Violations.  Promptly notify Agent in writing of any violation of any law, statute, regulation or ordinance of any Governmental Body, or of any agency thereof, applicable to any Borrower or the Collateral which could reasonably be expected to have a Material Adverse Effect.

7.4.    Government Receivables.  To the extent Borrowers desire such Receivables to constitute Eligible Receivables, take all reasonable steps necessary to protect Agent's interest in the Collateral under the Federal Assignment of Claims Act, the Uniform Commercial Code and all other applicable state or local statutes or ordinances and deliver to Agent appropriately endorsed, any instrument or chattel paper connected with any Receivable arising out of contracts between any Borrower and the United States, any state or any department, agency or instrumentality of any of them.

7.5.    Financial Covenants.

(a)    Minimum Cash Receipts.  As of the end of each week, commencing the fourth week after the Petition Date, for the Cumulative Period, the actual cash receipts received by the Borrowers shall not be less than eighty percent (80%) of the cash receipts for the corresponding period in the Budget.

(b)    Maximum Disbursements.  As of the end of each week, commencing the fourth week after the Petition Date, for the Cumulative Period, the actual cash disbursements of the Borrowers shall be no more than fifteen percent (15%) more than the cash disbursements in the aggregate for the corresponding period in the Budget.

Notwithstanding anything contained in Section 7.5(a) and (b) above, Borrowers may carry forward any position variances and balances for a period and reallocate such variances and balances between other line items and other periods in the Budget.

7.6. <u>Execution of Supplemental Instruments</u>. Execute and deliver to Agent from time to time, upon demand, such supplemental agreements, statements, assignments and transfers, or instructions or documents relating to the Collateral, and such other instruments as Agent may request, in order that the full intent of this Agreement may be carried into effect.

7.7. <u>Payment of Indebtedness</u>. Subject to any prohibition under the Bankruptcy Code with respect to pre-petition claims, but otherwise in accordance with Applicable Law, pay, discharge or otherwise satisfy at or before maturity (subject, where applicable, to specified grace periods and, in the case of the trade payables, to normal payment practices) all its obligations and liabilities of whatever nature, except when the failure to do so could not reasonably be expected to have a Material Adverse Effect or when the amount or validity thereof is currently being contested in good faith by appropriate proceedings and each Borrower shall have provided for such reserves as Agent may reasonably deem proper and necessary, subject at all times to any applicable subordination arrangement in favor of Lenders.

7.8. <u>Standards of Financial Statements</u>. Cause all financial statements referred to in Sections 10.7, 10.8, 10.9, 10.10, 10.11, 10.12, and 10.13 as to which GAAP is applicable to be complete and correct in all material respects (subject, in the case of interim financial statements, to normal year-end audit adjustments) and to be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein (except as concurred in by such reporting accountants or officer, as the case may be, and disclosed therein).

7.9. <u>Federal Securities Laws</u>. Promptly notify Agent in writing if any Borrower or any of its Subsidiaries is required to file periodic reports under the Exchange Act; or if any Borrower or any of any Borrower's Subsidiaries (i) registers any securities under the Exchange Act or (ii) files a registration statement under the Securities Act.

7.10. <u>Bankruptcy Schedules</u>.

(a) File with the Bankruptcy Court and deliver to Agent, within thirty (30) days of the Closing Date, all Schedules of the Borrowers.

(b) Serve all secured creditors, all judgment creditors (if any), the twenty (20) largest unsecured creditors, the federal and state taxing authorities, any and all Governmental Bodies holding a claim, the PBGC, the union, Environmental Protection Agency and any other party claiming an interest in the Collateral in accordance with the Federal Rules of Bankruptcy Procedure a copy of the Motion and Interim Order as approved by the Bankruptcy Court in accordance with the Federal Rules of Bankruptcy Procedure.

7.11. <u>Inventory Hedge Contracts</u>. At the request of Agent, or with the consent of Agent at the request of Borrowers, maintain, purchase, sell, terminate or modify hedge contract(s) or any portion thereof relating to Borrowers' Inventory at times and on terms and conditions deemed acceptable to, Agent and Lenders in their sole discretion.

7.12. <u>Carve-Out Reserve Account</u>. Maintain at all times the Carve-Out Reserve Account and fund the escrowed amounts for the Professionals as contemplated in accordance with the Budget and this Agreement.

7.13. <u>Chief Restructuring Officer</u>. Retain Dalton Edgecomb as the chief restructuring officer of Borrowers and Guarantors at all times.

## VIII. NEGATIVE COVENANTS.

No Borrower shall, until satisfaction in full of the Obligations and termination of this Agreement:

8.1. <u>Merger, Consolidation, Acquisition and Sale of Assets</u>.

(a) Enter into any merger, consolidation or other reorganization with or into any other Person or acquire all or a substantial portion of the assets or Equity Interests of any Person or permit any other Person to consolidate with or merge with it.

(b) Sell, lease, transfer or otherwise dispose of any of its properties or assets, except (i) dispositions of Inventory expressly permitted by Section 4.3 and (ii) any other sales or dispositions expressly permitted by this Agreement or the Interim Order or Final Order.

8.2. <u>Creation of Liens</u>. Create or suffer to exist any Lien or transfer upon or against any of its property or assets now owned or hereafter acquired, except Permitted Encumbrances.

8.3. <u>Guaranties</u>. Become liable upon the obligations or liabilities of any Person by assumption, endorsement or guaranty thereof or otherwise (other than to Lenders) except (a) as disclosed on Schedule 8.3, (b) the endorsement of checks in the Ordinary Course of Business and (c) guarantees made by Borrowers with regard to the obligations of another Borrower.

8.4. <u>Investments</u>. Purchase or acquire obligations or Equity Interests of, or any other interest in, any Person, except: (a) investments existing on the Closing Date and set forth on Schedule 8.4, (b) obligations issued or guaranteed by the United States of America or any agency thereof; (c) commercial paper with maturities of not more than 180 days and a published rating of not less than A-1 or P-1 (or the equivalent rating); (d) certificates of time deposit and bankers' acceptances having maturities of not more than 180 days and repurchase agreements backed by United States government securities of a commercial bank if (i) such bank has a combined capital and surplus of at least $500,000,000, or (ii) its debt obligations, or those of a holding company of which it is a Subsidiary, are rated not less than A (or the equivalent rating) by a nationally recognized investment rating agency; (e) U.S. money market funds (i) rated AAA by Standard & Poors, Inc. or with an equivalent rating from Moody's Investors Service, Inc. or (ii) that invest solely in obligations issued or guaranteed by the United States of America or an agency thereof or (f) investments by a Borrower in another Borrower.

8.5. <u>Loans</u>. Make advances, loans or extensions of credit to any Person, including any Parent, Subsidiary or Affiliate except with respect to the extension of commercial trade credit in connection with the sale of Inventory in the Ordinary Course of Business.

8.6. <u>Capital Expenditures</u>. Contract for, purchase or make any expenditure or commitments for Capital Expenditures during the Term in an amount in excess of the amount set forth in the Budget.

74

8.7. <u>Dividends / Distributions</u>. Declare, pay or make any dividend or distribution on any Equity Interests of any Borrower (other than dividends or distributions payable in its stock, or split-ups or reclassifications of its stock) or apply any of its funds, property or assets to the purchase, redemption or other retirement of any Equity Interest, or of any options to purchase or acquire any Equity Interest of any Borrower.

8.8. <u>Indebtedness</u>. Create, incur, assume or suffer to exist any Indebtedness (exclusive of trade debt) except in respect of: (i) Indebtedness to Lenders; (ii) Indebtedness existing on the Closing Date and set forth on Schedule 8.8 (including any extensions, renewals or refinancings thereof), provided that the principal amount of such Indebtedness shall not be increased without the prior written consent of the Required Lenders; (iii) Indebtedness incurred for Capital Expenditures permitted under Section 8.6 hereof; (iv) Indebtedness as permitted under Section 8.3 hereof; and (vi) Indebtedness arising from Hedge Liabilities incurred in the ordinary course of business consisting of bona fide hedging transactions.

8.9. <u>Nature of Business</u>. Substantially change the nature of the business in which it is presently engaged, nor except as specifically permitted hereby purchase or invest, directly or indirectly, in any assets or property other than in the Ordinary Course of Business for assets or property which are useful in, necessary for and are to be used in its business as presently conducted.

8.10. <u>Transactions with Affiliates</u>. Directly or indirectly, purchase, acquire or lease any property or services from, or sell, transfer or lease any property or services to, or otherwise enter into any transaction or deal with, any Affiliate; provided, however, Borrowers may enter into (i) lease transactions with Affiliates which are in the Ordinary Course of Business and on an arm's-length basis on terms and conditions no less favorable than terms and conditions which would have been obtainable from a Person other than an Affiliate and (ii) sales transactions with Affiliates which are in the Ordinary Course of Business, on an arm's-length basis on terms and conditions no less favorable than terms and conditions which would have been obtainable from a Person other than an Affiliate in the ordinary course of business so long as the terms of such transactions are C.O.D. or C.I.A.

8.11. <u>Leases</u>. Enter as lessee into any lease arrangement for real or personal property (unless capitalized and permitted under Section 8.6 hereof) if after giving effect thereto, aggregate annual rental payments for all leased property would exceed $2,000,000 in any one fiscal year in the aggregate for all Borrowers.

8.12. <u>Subsidiaries</u>.

(a)     Form any Subsidiary.

(b)     Enter into any partnership, joint venture or similar arrangement.

8.13. <u>Fiscal Year and Accounting Changes</u>. Change its fiscal year from December 31 or make any change (i) in accounting treatment (including, without limitation, any change from last in, first out (LIFO) treatment with respect to the Inventory of Borrowers) and reporting practices except as required by GAAP and (ii) in tax reporting treatment except as required by law.

8.14.  Pledge of Credit.  Now or hereafter pledge Agent's or any Lender's credit on any purchases or for any purpose whatsoever or use any portion of any Advance in or for any business other than such Borrower's business as conducted on the date of this Agreement.

8.15.  Amendment of Articles of Incorporation, By-Laws, Certificate of Formation or Operating Agreement.  Amend, modify or waive any term or material provision of its Articles or Certificate of Incorporation or By-Laws or its Certificate of Formation or Operating Agreement, as applicable, unless required by law.

8.16.  Compliance with ERISA.  (i) (x) Maintain, or permit any member of the Controlled Group to maintain, or (y) become obligated to contribute, or permit any member of the Controlled Group to become obligated to contribute, to any Plan, other than those Plans disclosed on Schedule 6.8(d), (ii) engage, or permit any member of the Controlled Group to engage, in any non-exempt "prohibited transaction", as that term is defined in section 406 of ERISA and Section 4975 of the Code, (iii) incur, or permit any member of the Controlled Group to incur, any "accumulated funding deficiency", as that term is defined in Section 302 of ERISA or Section 412 of the Code, (iv) terminate, or permit any member of the Controlled Group to terminate, any Plan where such event could result in any liability of any Borrower or any member of the Controlled Group or the imposition of a lien on the property of any Borrower or any member of the Controlled Group pursuant to Section 4068 of ERISA, (v) assume, or permit any member of the Controlled Group to assume, any obligation to contribute to any Multiemployer Plan not disclosed on Schedule 6.8(d), (vi) incur, or permit any member of the Controlled Group to incur, any withdrawal liability to any Multiemployer Plan; (vii) fail promptly to notify Agent of the occurrence of any Termination Event, (viii) fail to comply, or permit a member of the Controlled Group to fail to comply, with the requirements of ERISA or the Code or other Applicable Laws in respect of any Plan, (ix) fail to meet, or permit any member of the Controlled Group to fail to meet, all minimum funding requirements under ERISA or the Code or postpone or delay or allow any member of the Controlled Group to postpone or delay any funding requirement with respect of any Plan.

8.17.  Prepayment of Indebtedness.  At any time, directly or indirectly, prepay any Indebtedness (other than to Lenders), or repurchase, redeem, retire or otherwise acquire any Indebtedness of any Borrower.

8.18.  Anti-Terrorism Laws.  No Borrower shall, until satisfaction in full of the Obligations and termination of this Agreement, nor shall it permit any Affiliate or agent to:

(a)  Conduct any business or engage in any transaction or dealing with any Blocked Person, including the making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person.

(b)  Deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order No. 13224.

(c)  Engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in the Executive Order No. 13224, the USA PATRIOT Act or any other Anti-Terrorism Law.

76

Borrower shall deliver to Lenders any certification or other evidence requested from time to time by any Lender in its sole discretion, confirming Borrower's compliance with this Section.

8.19. <u>Trading with the Enemy Act</u>. Engage in any business or activity in violation of the Trading with the Enemy Act.

8.20. <u>Bankruptcy Matters</u>.

(a)     Directly or indirectly, seek, consent or suffer to exist: (i) any modification, stay, vacation or amendment to the Interim Order or Final Order, unless the Agent has consented to such modification, stay, vacation or amendment in writing; (ii) entry of any order that is not reasonably satisfactory to Agent in form and substance; (iii) a priority claim for any administrative expense or unsecured claim (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expenses of the kind specified in the Bankruptcy Code, including without limitation Sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503, 506(c) (upon entry of the Final Order), 507, 546, 726, 1113 or 1114 of the Bankruptcy Code) equal or superior to the Superpriority Claim of the Agent and the Lenders in respect of the Obligations, except for the Carve-Out; or (iv) any Lien on any Collateral, having a priority equal or superior to the Lien in favor of the Agent in respect of the Obligations (subject to the Permitted Liens (as defined in the Interim Order) and the Carve-Out).

(b)     Prior to the date on which the Obligations have been indefeasibly paid in full in cash and Agent and Lenders' commitment to make Advances has been terminated, Borrowers shall not pay any administrative expense claims not provided for in the Budget; provided however that Borrowers may pay administrative expense claims with respect to (i) Ineligible Professional Expenses in an amount not to exceed $25,000 in the aggregate to pay Allowed Professional Fees of the Creditors' Committee to investigate (but not prosecute) claims against and objections with respect to the Pre-Petition Obligations and pre-petition Liens and security interests of the Agent and the Lenders (including, without limitation, issues regarding validity, perfection, priority, or enforceability of the secured claims of the Agent and the Lenders), (ii) the Carve-Out, (iii) Obligations due and payable hereunder and (iii) Allowed Professional Fees and Statutory Fees as set forth in the Budget allocated to the Borrowers during the Case.

(c)     Make any material expenditure except of the type and for the purposes provided for in the Budget.

8.21. <u>Executive Compensation</u>. Permit its executive compensation payable to Roy Allen, James Goldberg and David Allen to be in excess of the levels in place as of July 1, 2011.

8.22. <u>Amendments to Bidding Procedures and Asset Purchase Agreement</u>. Amend, modify or supplement the Bidding Procedures or the Asset Purchase Agreement without the prior written consent of Agent.

IX.     CONDITIONS PRECEDENT.

9.1. <u>Conditions to Initial Advances</u>. The agreement of Lenders to make the initial Advances requested to be made on the Closing Date is subject to the satisfaction, or waiver by

Agent, immediately prior to or concurrently with the making of such Advances, of the following conditions precedent:

(a)     Note. Agent shall have received the Notes duly executed and delivered by an authorized officer of each Borrower;

(b)     Hedge Contracts. Borrowers shall have terminated the existing hedge contract with Wells Fargo Bank, N.A. bearing trade ID No. 23556985 and purchased a put option for not less than 6,500,000 lbs. of copper through November 30, 2011 with a strike price agreed to among Agent and Borrower based on the prevailing market price of copper and instructed Wells Fargo Bank, N.A. to remit the balance of any proceeds received from the termination of trade ID No. 23556985 to Borrower's collection account maintained with Agent;

(c)     Filings, Registrations and Recordings. Each document (including any Uniform Commercial Code financing statement) required by this Agreement, any related agreement or under law or reasonably requested by the Agent to be filed, registered or recorded in order to create, in favor of Agent, a perfected security interest in or lien upon the Collateral shall have been properly filed, registered or recorded in each jurisdiction in which the filing, registration or recordation thereof is so required or requested, and Agent shall have received an acknowledgment copy, or other evidence satisfactory to it, of each such filing, registration or recordation and satisfactory evidence of the payment of any necessary fee, tax or expense relating thereto;

(d)     Proceedings of Borrowers. Agent shall have received a copy of the resolutions in form and substance reasonably satisfactory to Agent, of the Board of Directors, of each Borrower authorizing (i) the execution, delivery and performance of this Agreement, the Notes, and any related agreements (collectively the "Documents") and (ii) the granting by each Borrower of the security interests in and liens upon the Collateral in each case certified by the Secretary of each Borrower, as applicable, as of the Closing Date; and, such certificate shall state that the resolutions thereby certified have not been amended, modified, revoked or rescinded as of the date of such certificate;

(e)     Incumbency Certificates of Borrowers. Agent shall have received a certificate of the Secretary of the general partner of Hussey and the Secretary of O-A-P, dated the Closing Date, as to the incumbency and signature of the officers of the general partner of Hussey and O-A-P executing this Agreement, the Other Documents, any certificate or other documents to be delivered by it pursuant hereto, together with evidence of the incumbency of such Secretary;

(f)     Bankruptcy Case. The Case shall have been commenced in the Bankruptcy Court and all of the first day orders entered at the time of commencement of the Case shall be reasonably satisfactory in form and substance to Agent and no trustee or examiner shall have been appointed with respect to Borrowers, or any of them, or any property of or any estate of any Borrower;

(g)     Interim Order. Agent shall have received satisfactory evidence of the entry of the Interim Order, which Interim Order (i) shall have been entered upon an application or

78

motion of Borrowers reasonably satisfactory in form and substance to Agent and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by Agent; and (ii) shall be in full force and effect and shall not have been amended, modified or stayed, or reversed; and, if the Interim Order is the subject of a pending objection, appeal or motion for reconsideration in any respect, neither the Interim Order, nor the making of the Advances, the issuance, extension or renewal of any Letters of Credit, or the performance by the Borrowers of any of the Obligations shall be the subject of a presently effective stay. Borrowers, Agent and Lenders shall be entitled to rely in good faith upon the Interim Order notwithstanding any such objection, appeal or motion for reconsideration. Agent may, however, in its sole discretion, defer any obligations of Agent and Lenders to make Advances or to issue or to support the issuance of any Letters of Credit until such time as no such objection, appeal or motion for reconsideration is pending and the period for lodging any such objection, appeal or motion for reconsideration has expired;

(h) <u>Cash Management Order</u>. Agent shall have received satisfactory evidence of the entry of a cash management order adopting and implementing cash management arrangements reasonably acceptable to Agent (the "Cash Management Order");

(i) <u>Bidding Procedures and Sale Motion</u>. The Borrowers shall have filed a motion to establish bidding procedures and authorizing a sale of Borrowers' assets, such motions to be satisfactory to Agent in form and substance, within one (1) Business Day of the Petition Date.

(j) <u>Certificates</u>. Agent shall have received a copy of the Articles or Certificate of Incorporation of each Borrower and each Guarantor, and all amendments thereto, certified by the Secretary of State or other appropriate official of its jurisdiction of incorporation with copies of the By-Laws of each Borrower and each Guarantor and all agreements of each Borrower's and Guarantor's shareholders or members certified as accurate and complete by the Secretary, Officer, General Partner or Manager, as the case may be, of each Borrower and Guarantor;

(k) <u>Reserved</u>;

(l) <u>No Litigation</u>. Other than in connection with the Case, (i) No litigation, investigation or proceeding before or by any arbitrator or Governmental Body shall be continuing, or threatened, against any Borrower or against the officers or directors of any Borrower (A) in connection with this Agreement the Other Documents and which, in the reasonable opinion of Agent, is deemed material or (B) which could, in the reasonable opinion of Agent, have a Material Adverse Effect; and (ii) no injunction, writ, restraining order or other order of any nature materially adverse to any Borrower or the conduct of its business or inconsistent with the due consummation of the Transactions shall have been issued by any Governmental Body;

(m) <u>Reserved</u>;

(n) <u>Fees</u>. Agent shall have received all fees payable to Agent and Lenders on or prior to the Closing Date hereunder, including pursuant to Article III hereof;

(o)     Insurance.  Agent shall have received in form and substance reasonably satisfactory to Agent, certified copies of Borrowers' casualty insurance policies, together with loss payable endorsements on Agent's standard form of loss payee endorsement naming Agent as loss payee, and certified copies of Borrowers' liability insurance policies, together with endorsements naming Agent as a co-insured;

(p)     Payment Instructions.  Agent shall have received written instructions from Borrowing Agent directing the application of proceeds of the initial Advances made pursuant to this Agreement;

(q)     Collection/Concentration Accounts.  Agent shall have received duly executed agreements establishing the Collection Account and Cash Concentration Accounts with financial institutions acceptable to Agent for the collection or servicing of the Receivables and proceeds of the Collateral and evidence satisfactory to the Agent Borrowers have directed all Customers to remit payment to the Collection Accounts;

(r)     Budget.  Agent shall have received a copy of the initial Budget which shall be satisfactory in all respects to Lenders;

(s)     Consents.  Agent shall have received any and all Consents necessary to permit the effectuation of the transactions contemplated by this Agreement and the Other Documents; and, Agent shall have received such Consents and waivers of such third parties as might assert claims with respect to the Collateral, as Agent and its counsel shall deem necessary;

(t)     Reserved;

(u)     Leasehold Agreements.  Agent shall have received landlord, mortgagee, warehouseman, consignments, processing or similar agreements satisfactory to Agent with respect to all premises leased by Borrowers at which Inventory and books and records are located;

(v)     Other Documents.  The executed Other Documents, all in form and substance satisfactory to Agent;

(w)     Contract Review.  Agent shall have reviewed all material contracts of Borrowers including leases, union contracts, labor contracts, vendor supply contracts, license agreements and distributorship agreements and such contracts and agreements shall be satisfactory in all respects to Agent;

(x)     Closing Certificate.  Agent shall have received a closing certificate signed by the President or Chief Executive Officer of each Borrower dated as of the date hereof, stating that: (i) all representations and warranties set forth in this Agreement and the Other Documents are true and correct in all material respects on and as of such date; (ii) Borrowers are on such date in compliance with all the terms and provisions set forth in this Agreement and the Other Documents; and (iii) on such date no Default or Event of Default has occurred or is continuing;

80

(y) <u>Borrowing Base</u>. Agent shall have received evidence from Borrowers that the aggregate amount of Eligible Receivables and Eligible Inventory is sufficient in value and amount to support Advances in the amount requested by Borrowers on the Closing Date;

(z) <u>Compliance with Laws</u>. Agent shall be reasonably satisfied that each Borrower is in compliance with all materially applicable federal, state, local or territorial regulations, including those with respect to the Federal Occupational Safety and Health Act, the Environmental Protection Act, ERISA and the Trading with the Enemy Act;

(aa) <u>Collateral Assignment of Insurance Policies</u>. Agent shall have received the fully executed Collateral Assignment of Insurance Policies; and

(bb) <u>Other</u>. All corporate and other proceedings, and all documents, instruments and other legal matters in connection with the Transactions shall be satisfactory in form and substance to Agent and its counsel.

9.2. <u>Conditions to Each Advance</u>. The agreement of Lenders to make any Advance requested to be made on any date (including the initial Advance), is subject to the satisfaction of the following conditions precedent as of the date such Advance is made:

(a) <u>Representations and Warranties</u>. Each of the representations and warranties made by any Borrower in or pursuant to this Agreement, the Other Documents and any related agreements to which it is a party, and each of the representations and warranties contained in any certificate, document or financial or other statement furnished at any time under or in connection with this Agreement, the Other Documents or any related agreement shall be true and correct in all material respects on and as of such date as if made on and as of such date;

(b) <u>No Default</u>. No Event of Default or Default shall have occurred and be continuing on such date, or would exist after giving effect to the Advances requested to be made, on such date; provided, however that Agent, in its sole discretion, may continue to make Advances notwithstanding the existence of an Event of Default or Default and that any Advances so made shall not be deemed a waiver of any such Event of Default or Default;

(c) <u>Maximum Advances</u>. In the case of any type of Advance requested to be made, after giving effect thereto, the aggregate amount of such type of Advance shall not exceed the maximum amount of such type of Advance permitted under this Agreement;

(d) <u>Budget</u>. In connection with each request of an Advance pursuant to Section 2.2 hereof, Borrowers shall deliver to agent a written notice identifying the line-items on the applicable Budget that Borrowers intend to pay with the proceeds of such Advance;

(e) <u>Interim Order</u>. The Interim Order shall be in full force and effect and shall not be the subject of any appeal, stay, order of reversal or modification; and

(f) <u>Final Order</u>. On or before October 18, 2011, the Bankruptcy Court shall have entered the Final Order which Final Order (i) shall have been entered upon an application or motion of Borrowers reasonably satisfactory in form and substance to Agent and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably

81

requested by Agent; and (ii) shall be in full force and effect and shall not have been amended, modified or stayed, or reversed; and, if the Final Order is the subject of a pending objection, appeal or motion for reconsideration in any respect, neither the Final Order, nor the making of the Advances, the issuance, extension or renewal of any Letters of Credit, or the performance by the Borrowers of any of the Obligations shall be the subject of a presently effective stay. Borrowers, Agent and Lenders shall be entitled to rely in good faith upon the Final Order notwithstanding any such objection, appeal or motion for reconsideration. Agent may, however, in its sole discretion, defer any obligations of Agent and Lenders to make Advances or to issue or to support the issuance of any Letters of Credit until such time as no such objection, appeal or motion for reconsideration is pending and the period for lodging any such objection, appeal or motion for reconsideration has expired.

Each request for an Advance by any Borrower hereunder shall constitute a representation and warranty by each Borrower as of the date of such Advance that the conditions contained in this subsection shall have been satisfied.

X.    INFORMATION AS TO BORROWERS.

Each Borrower shall, or shall cause Borrowing Agent on its behalf to, until satisfaction in full of the Obligations and the termination of this Agreement:

10.1.    Disclosure of Material Matters.  Immediately upon learning thereof, report to Agent all matters materially affecting the value, enforceability or collectibility of any portion of the Collateral, including any Borrower's reclamation or repossession of, or the return to any Borrower of, a material amount of goods or claims or disputes asserted by any Customer or other obligor.

10.2.    Schedules.  Deliver to Agent on or before the fifteenth (15th) day of each month as and for the prior month, and if the fifteenth (15th) day of the month falls on a day that is not a Business Day, then it shall be delivered the following Business Day: (a) accounts receivable ageings inclusive of reconciliations to the general ledger; (b) accounts payable schedules inclusive of reconciliations to the general ledger; (c) Inventory reports; (d) a report detailing all Receivables collected by Borrowers, and (e) a Borrowing Base Certificate in form and substance satisfactory to Agent (which shall be calculated as of the last day of the prior month and which shall not be binding upon Agent or restrictive of Agent's rights under this Agreement).   In addition, Borrowers shall deliver to the Agent on or before the first day of each Week as and for the prior Week (i) an interim Borrowing Base Certificate (which shall be calculated as of the last day of the prior Week and which shall not be binding upon the Agent or restrictive of the Agent's rights under this Agreement) reflecting all activity (sales, collections, credits, etc ) impacting the accounts of the Borrowers for all Business Days of the immediately preceding Week and (ii) and accounts payable aging report segregated by metal vendors. The amount derived as being excluded from Eligible Accounts used on such interim Borrowing Base Certificate shall be the amount that is calculated and updated monthly pursuant to this Section 10.2 and which is satisfactory to the Agent, the amount of Eligible Inventory to be included on such interim Borrowing Base Certificate shall be calculated and updated monthly pursuant to this Section 10.2 and which is satisfactory to the Agent.  In addition, each Borrower will deliver to Agent at such intervals as Agent may reasonably require: (i) confirmatory assignment schedules; (ii) copies of

Customer's invoices; (iii) evidence of shipment or delivery; and (iv) such further schedules, documents and/or information regarding the Collateral as Agent may require including, without limitation, trial balances and test verifications. Agent shall have the right to confirm and verify all Receivables by any manner and through any medium it considers advisable and do whatever it may deem reasonably necessary to protect its interests hereunder. The items to be provided under this Section are to be in form satisfactory to Agent and executed by each Borrower and delivered to Agent from time to time solely for Agent's convenience in maintaining records of the Collateral, and any Borrower's failure to deliver any of such items to Agent shall not affect, terminate, modify or otherwise limit Agent's Lien with respect to the Collateral.

10.3. <u>Environmental Reports</u>. Furnish Agent, concurrently with the delivery of the financial statements referred to in Sections 10.7 and 10.8, with a certificate signed by the President of Borrowing Agent stating, to the best of his knowledge, that each Borrower is in compliance in all material respects with all federal, state and local Environmental Laws. To the extent any Borrower is not in compliance with the foregoing laws, the certificate shall set forth with specificity all areas of non-compliance and the proposed action such Borrower will implement in order to achieve full compliance.

10.4. <u>Litigation</u>. Promptly notify Agent in writing of any claim, litigation, suit or administrative proceeding affecting any Borrower or any Guarantor, whether or not the claim is covered by insurance, and of any litigation, suit or administrative proceeding, which in any such case affects the Collateral or which could reasonably be expected to have a Material Adverse Effect.

10.5. <u>Material Occurrences</u>. Promptly notify Agent in writing upon the occurrence of (a) any Event of Default or Default; (b) any event of default under any subordinated loan documentation; (c) any event which with the giving of notice or lapse of time, or both, would constitute an event of default under any subordinated loan documentation; (d) any event, development or circumstance whereby any financial statements or other reports furnished to Agent fail in any material respect to present fairly, in accordance with GAAP consistently applied, the financial condition or operating results of any Borrower as of the date of such statements; (e) any accumulated retirement plan funding deficiency which, if such deficiency continued for two plan years and was not corrected as provided in Section 4971 of the Code, could subject any Borrower to a tax imposed by Section 4971 of the Code; (f) each and every default by any Borrower which would reasonably be expected to result in the acceleration of the maturity of any Indebtedness, including the names and addresses of the holders of such Indebtedness with respect to which there is a default existing or with respect to which the maturity has been or could be accelerated, and the amount of such Indebtedness; and (g) any other development in the business or affairs of any Borrower, Holdings or any Guarantor, which could reasonably be expected to have a Material Adverse Effect; in each case describing the nature thereof and the action Borrowers propose to take with respect thereto.

10.6. <u>Government Receivables</u>. Notify Agent immediately if any of its Receivables arise out of contracts between any Borrower and the United States, any state, or any department, agency or instrumentality of any of them.

10.7. <u>Reserved</u>.

10.8.    Quarterly Financial Statements.  Furnish Agent and Lenders within forty five (45) days after the end of each fiscal quarter, an unaudited balance sheet of Borrowers on a consolidated and consolidating basis and unaudited statements of income and stockholders' equity and cash flow of Borrowers on a consolidated and consolidating basis reflecting results of operations from the beginning of the fiscal year to the end of such quarter and for such quarter, prepared on a basis consistent with prior practices and complete and correct in all material respects, subject to normal and recurring yearend adjustments that individually and in the aggregate are not material to Borrowers' business.  The reports shall be accompanied by a Compliance Certificate.

10.9.    Monthly Financial Statements.  Furnish Agent and Lenders within thirty (30) days after the end of each month (other than for the months of March, June, September and December which shall be delivered in accordance with Sections 10.7 and 10.8 as applicable), an unaudited balance sheet of Borrowers on a consolidated and consolidating basis and unaudited statements of income and stockholders' equity and cash flow of Borrowers on a consolidated and consolidating basis reflecting results of operations from the beginning of the fiscal year to the end of such month and for such month, prepared on a basis consistent with prior practices and complete and correct in all material respects, subject to normal and recurring year end adjustments that individually and in the aggregate are not material to Borrowers' business.  In addition, the reports shall be accompanied by a certificate of Borrowers signed by the Borrowers' Chief Financial Officer which shall state that, based on an examination sufficient to permit him to make an informed statement, no Default or Event of Default exists, or, if such is not the case, specifying such Default or Event of Default, its nature, when it occurred, whether it is continuing and the steps being taken by the Borrowers with respect to such event.  The reports shall be accompanied by a Compliance Certificate.

10.10.    Other Reports.  Furnish Agent as soon as available, but in any event within ten (10) days after the issuance thereof, with copies of such financial statements, reports and returns as each Borrower shall send to its stockholders or members, as applicable.

10.11.    Additional Information.  Furnish Agent with such additional information as Agent shall reasonably request in order to enable Agent to determine whether the terms, covenants, provisions and conditions of this Agreement and the Notes have been complied with by Borrowers including, without the necessity of any request by Agent, (a) copies of all existing environmental audits and reviews, (b) at least thirty (30) days prior thereto, notice of any Borrower's opening of any new office or place of business or any Borrower's closing of any existing office or place of business, and (c) promptly upon any Borrower's learning thereof, notice of any labor dispute to which any Borrower may become a party, any strikes or walkouts relating to any of its plants or other facilities, and the expiration of any labor contract to which any Borrower is a party or by which any Borrower is bound.

10.12.    Budget.  Furnish Agent and Lenders, no later than the first day of each four week commencing October 24, 2011, an updated Budget of Borrowers on a consolidated and consolidating basis for the next thirteen week (13) period such Budget, each to be accompanied by a certificate signed by the President of each Borrower to the effect that such Budget has been prepared on the basis of sound financial planning practice consistent with past budgets and

84

financial statements and that such officer has no reason to question the reasonableness of any material assumptions on which such projections were prepared.

10.13. Variances From Operating Budget. Furnish Agent on or before Tuesday of each week, in connection with the delivery of the Budget required in Section 10.12 hereof, a written report for the immediately preceding week and for the Cumulative Period, setting forth a comparison of the actual cash receipts, cash disbursements, loan balance and availability of Borrowers to the amounts projected in the applicable Budget.

10.14. Notice of Suits, Adverse Events. Furnish Agent with prompt written notice of (i) any lapse or other termination of any Consent issued to any Borrower by any Governmental Body or any other Person that is material to the operation of any Borrower's business, (ii) any refusal by any Governmental Body or any other Person to renew or extend any such Consent; and (iii) copies of any periodic or special reports filed by any Borrower or any Guarantor with any Governmental Body or Person, if such reports indicate any material change in the business, operations, affairs or condition of any Borrower or any Guarantor, or if copies thereof are requested by Lender, and (iv) copies of any material notices and other communications from any Governmental Body or Person which specifically relate to any Borrower or any Guarantor.

10.15. ERISA Notices and Requests. Furnish Agent with immediate written notice in the event that (i) any Borrower or any member of the Controlled Group knows or has reason to know that a Termination Event has occurred, together with a written statement describing such Termination Event and the action, if any, which such Borrower or any member of the Controlled Group has taken, is taking, or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, Department of Labor or PBGC with respect thereto, (ii) any Borrower or any member of the Controlled Group knows or has reason to know that a prohibited transaction (as defined in Sections 406 of ERISA and 4975 of the Code) has occurred together with a written statement describing such transaction and the action which such Borrower or any member of the Controlled Group has taken, is taking or proposes to take with respect thereto, (iii) a funding waiver request has been filed with respect to any Plan together with all communications received by any Borrower or any member of the Controlled Group with respect to such request, (iv) any increase in the benefits of any existing Plan or the establishment of any new Plan or the commencement of contributions to any Plan to which any Borrower or any member of the Controlled Group was not previously contributing shall occur, (v) any Borrower or any member of the Controlled Group shall receive from the PBGC a notice of intention to terminate a Plan or to have a trustee appointed to administer a Plan, together with copies of each such notice, (vi) any Borrower or any member of the Controlled Group shall receive any favorable or unfavorable determination letter from the Internal Revenue Service regarding the qualification of a Plan under Section 401(a) of the Code, together with copies of each such letter, (vii) any Borrower or any member of the Controlled Group shall receive a notice regarding the imposition of withdrawal liability, together with copies of each such notice, (viii) any Borrower or any member of the Controlled Group shall fail to make a required installment or any other required payment under Section 412 of the Code on or before the due date for such installment or payment, and (ix) any Borrower or any member of the Controlled Group knows that (a) a Multiemployer Plan has been terminated; (b) the administrator or plan sponsor of a Multiemployer Plan intends to terminate a Multiemployer Plan; or (c) the PBGC has

instituted or will institute proceedings under Section 4042 of ERISA to terminate a Multiemployer Plan.

10.16. Other Bankruptcy Documents. Borrowers will deliver to Agent: (a) contemporaneous with the filing thereof, copies of all pleadings, motions, applications, financial information and other papers and documents filed by Borrowers in the Case, with copies of such papers and documents also provided to or served on Agent's counsel; (b) contemporaneously with delivery thereof to the Creditors' Committee or any other official or unofficial creditors' committee in the Case, copies of all material written reports and all term sheets for a Reorganization Plan or any sale under Section 363 of the Bankruptcy Code given by Borrowers to the Creditors' Committee or any other official or unofficial creditors' committee in the Case, with copies of such reports and term sheets also provided to or served on Agent's counsel; and (c) projections, operating plans and other financial information and information, reports or statements regarding Borrowers, their business and the Collateral as Agent may from time to time reasonably request.

10.17. Additional Documents. Execute and deliver to Agent, upon request, such documents and agreements as Agent may, from time to time, reasonably request to carry out the purposes, terms or conditions of this Agreement.

XI.    EVENTS OF DEFAULT.

The occurrence of any one or more of the following events shall constitute an "Event of Default":

11.1. Nonpayment. Failure by any Borrower to pay any principal or interest on the Obligations when due, whether at maturity or by reason of acceleration pursuant to the terms of this Agreement or by notice of intention to prepay, or by required prepayment or failure to pay any other liabilities or make any other payment, fee or charge provided for herein when due or in any Other Document;

11.2. Breach of Representation. Any representation or warranty made or deemed made by any Borrower or any Guarantor in this Agreement, any Other Document or any related agreement or in any certificate, document or financial or other statement furnished at any time in connection herewith or therewith shall prove to have been misleading in any material respect on the date when made or deemed to have been made;

11.3. Financial Information. Failure by any Borrower to (i) furnish financial information when due hereunder, (ii) furnish other financial information promptly following any request by Agent or (iii) permit the inspection of its books or records in accordance with the terms of this Agreement;

11.4. Judicial Actions. Issuance of a notice of Lien, levy, assessment, injunction or attachment against any Borrower's or any Guarantor's Inventory or Receivables or against a material portion of any Borrower's other property which is not stayed or lifted within thirty (30) days;

11.5. <u>Noncompliance</u>. Except as otherwise provided for in Sections 11.1, 11.3 and 11.5(ii), (i) failure or neglect of any Borrower or any Guarantor to perform, keep or observe any term, provision, condition, covenant herein contained, or contained in any Other Document or any other agreement or arrangement, now or hereafter entered into between any Borrower, any Guarantor or any other Person and Agent or any Lender or the Issuer, or (ii) failure or neglect of any Borrower to perform, keep or observe any term, provision, condition or covenant, contained in Sections 4.6, 4.7, 4.9 or, 7.3 hereof which is not cured within thirty (30) days from the occurrence of such failure or neglect;

11.6. <u>Judgments</u>. Any judgment or judgments are rendered against any Borrower or Guarantor for an aggregate amount in excess of $250,000 or against all Borrowers and Guarantors for an aggregate amount in excess of $250,000 which judgment is not covered by insurance undisputed by the applicable insurance company or which within thirty (30) days of such rendering or filing of such judgment is not either appealed, satisfied, stayed or discharged of record;

11.7. <u>Material Adverse Effect</u>. The occurrence of any Material Adverse Effect;

11.8. <u>Lien Priority</u>. Any Lien created hereunder or provided for hereby or under any related agreement for any reason ceases to be or is not a valid and perfected Lien having a first priority interest (subject to the Permitted Liens (as defined in the Interim Order) and the Carve-Out);

11.9. <u>Default of Material Agreements</u>. A default of the obligations of any Borrower or Guarantor under any material agreement to which it is a party shall occur which may reasonably be expected to cause a Material Adverse Effect which default is not cured within any applicable grace period;

11.10. <u>Cross-Default</u>. Any Borrower or Guarantor shall (a) default in any payment of principal of or interest on any Indebtedness in excess of $250,000 beyond any period of grace with respect to such payment or (b) default in the observance of any other covenant, term or condition contained in any agreement or instrument pursuant to which such Indebtedness is created, secured or evidenced, if the effect of such default is to cause the acceleration of any such Indebtedness (whether or not such right shall have been waived);

11.11. <u>Change of Control</u>. Any Change of Control shall occur;

11.12. <u>Breach of Guaranty or Pledge</u>. Termination or breach of any Guaranty, Guaranty Security Agreement or any Pledge or similar agreement executed and delivered to Agent in connection with the Obligations of any Borrower, or if any Guarantor or Pledgor attempts to terminate, challenges the validity of, or its liability under, any such Guaranty, Guaranty Security Agreement, Pledge or similar agreement;

11.13. <u>Invalidity</u>. Any material provision of this Agreement, or any Other Document shall, for any reason, cease to be valid and binding on any Borrower or any Guarantor, or any Borrower or any Guarantor shall so claim in writing to Agent or any Lender;

11.14. <u>Licenses</u>. (i) Any Governmental Body shall (A) revoke, terminate, suspend or adversely modify any license, permit, patent trademark or tradename of any Borrower or any Guarantor, or (B) commence proceedings to suspend, revoke, terminate or adversely modify any such license, permit, trademark, tradename or patent and such proceedings shall not be dismissed or discharged within sixty (60) days, or (c) schedule or conduct a hearing on the renewal of any license, permit, trademark, tradename or patent necessary for the continuation of any Borrower's or any Guarantor's business and the staff of such Governmental Body issues a report recommending the termination, revocation, suspension or material, adverse modification of such license, permit, trademark, tradename or patent; (ii) any agreement which is necessary or material to the operation of any Borrower's or any Guarantor's business shall be revoked or terminated and not replaced by a substitute acceptable to Agent within thirty (30) days after the date of such revocation or termination, and such revocation or termination and non-replacement would reasonably be expected to have a Material Adverse Effect;

11.15. <u>Seizures</u>. Any portion of the Collateral shall be seized or taken by a Governmental Body, or any Borrower or any Guarantor or the title and rights of any Borrower, any Guarantor shall have become the subject matter of claim, litigation, suit or other proceeding which might, in the opinion of Agent, upon final determination, result in impairment or loss of the security provided by this Agreement or the Other Documents;

11.16. <u>Operations</u>. The operations of Borrowers', or any Borrower's, manufacturing facility are interrupted at any time for more than seven (7) consecutive Business Days, which interruption would reasonably be expected to have a Material Adverse Effect;

11.17. <u>Pension Plans</u>. An event or condition specified in Sections 8.16 or 10.15 hereof shall occur or exist with respect to any Plan and, as a result of such event or condition, together with all other such events or conditions, any Borrower or any member of the Controlled Group shall incur, or in the opinion of Agent be reasonably likely to incur, a liability to a Plan or the PBGC (or both) which, in the reasonable judgment of Agent, would have a Material Adverse Effect; or

11.18. <u>Bankruptcy Defaults and Events of Default</u>.

(a) the Bankruptcy Court shall enter any order (i) revoking, reversing, staying, vacating, rescinding, modifying, supplementing or amending the Interim Order, the Final Order, the Cash Management Order, the Bidding Procedures Order, the Sale Order, any "first day" orders, this Agreement, the Pre-Petition Loan Documents or any Other Document or (ii) permitting any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to any Borrower equal or superior to the priority of the Agent and Lenders in respect of the Obligations, except for the Carve-Out Reserve Account up to the amount of the Carve-Out, or there shall arise any such Superpriority Claim, or (iii) to grant or permit the grant of a Lien on the Collateral superior to, or pari passu with, the Liens of Agent on the Pre-Petition Collateral or the Collateral (other than the Permitted Liens (as defined in the Interim Order), the Carve-Out);

(b) the Bankruptcy Court shall enter any order (i) appointing a Chapter 11 trustee under Section 1104 of the Bankruptcy Code in the Case, (ii) appointing an examiner with

enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code in the Case, (iii) appointing a fiduciary or representative of the estate with decision-making or other management authority over some or all of any Borrower's or Guarantor's senior management, (iv) substantively consolidating the estate of Borrowers and/or any Guarantor with the estate of any other Person, (v) dismissing the Case or converting the Case to a Chapter 7 case; or (vi) approving a sale of any Borrower's or Guarantor's assets which order does not provide that upon consummation of such sale, all of the Obligations shall be indefeasibly paid and satisfied in full and which shall otherwise be satisfactory to Agent, and in connection with such sale order, Secured Parties shall not have received a release of Secured Parties in full from all claims of Borrowers and their estates on or before the entry of such sale order;

(c)        this Agreement, any of the Other Documents, the Interim Order or the Final Order for any reason ceases to be in full force and effect or is declared to be null and void by a court of competent jurisdiction, or any of the Borrowers, Guarantors or any third party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of such Borrower, Guarantor or such third party) any other Person's motion to, disallow in whole or in part the Secured Parties' claim in respect of the Obligations or to challenge the validity and enforceability of the Liens in favor of any Secured Party;

(d)        any Borrower or Guarantor files a motion with the Bankruptcy Court or supports a motion filed with the Bankruptcy Court which fails to provide that Agent and/or Lenders have the right to credit bid for any assets of the Borrowers or Guarantors in connection with any sale pursuant to Section 363(k) of the Bankruptcy Code;

(e)        the Bankruptcy Court shall enter any order granting relief from the automatic stay to any creditor holding or asserting a Lien or reclamation claim on the assets of any Borrower or any Guarantor;

(f)        any application for any of the orders described in clauses (a), (b) or (d) above shall be made and, if made by a Person other than a Borrower or a Guarantor, such application is not being diligently contested by such Borrower or Guarantors in good faith;

(g)        except as permitted by the Interim Order or Final Order and set forth in the Budget or as otherwise agreed to by Agent in writing, no Borrower or Guarantor shall make any Pre-petition Payment (including, without limitation, related to any reclamation claims) following the Closing Date;

(h)        any Borrower or Guarantor shall be unable to pay its postpetition debts as they mature, shall fail to comply with any order of the Bankruptcy Court in any material respect, or shall fail to make, as and when such payments become due or otherwise;

(i)        any Borrower or Guarantor shall file a motion in the Case (i) to use cash Collateral under Section 363(c) of the Bankruptcy Code without Agent's prior written consent except to the extent expressly permitted in the Interim Order, (ii) to sell a material portion of the assets of any Borrower or any Guarantor, or the sale of any business unit of any Borrower or any

Guarantor without Agent's prior written consent, (iii) to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or to cut off rights in the Collateral under Section 552(b) of the Bankruptcy Code, (iv) to obtain additional financing under Sections 364(c) or (d) of the Bankruptcy Code not otherwise permitted under this Agreement, or (v) to take any other action or actions adverse to Secured Parties or their rights and remedies hereunder or under any of the Other Documents or Secured Parties interest in any of the Collateral;

(j) a Reorganization Plan is filed in the Case which does not contain provisions for termination of Agent's and Lenders' commitment to make Advances hereunder and indefeasible payment in full in cash of all Obligations and the release of Agent and Lenders in full from all claims of Borrowers, Guarantors and their Estates, in each case, on or before, and the continuation of the Liens and security interests granted to Agent until, the effective date of such Reorganization Plan, or (ii) an order shall be entered by the Bankruptcy Court confirming a Reorganization Plan in the Case which does not contain provisions for termination of Agent's and Lenders commitment to make Advances hereunder and indefeasible payment in full in cash of all Obligations and the release of the Secured Parties in full from all claims of Borrowers, Guarantors and their Estates on or before, and the continuation of the Liens and security interests granted to Agent until, the effective date of such Reorganization Plan upon entry thereof;

(k) the expiration of the "exclusive period" of Borrowers under Section 1121 of the Bankruptcy Code for the filing of a plan of reorganization;

(l) Any Borrower or Guarantor engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of the credit facility provided hereunder or the Pre-Petition Loan Documents or the liens on or security interest in the assets of the Borrowers and Guarantors securing the Obligations or (ii) any Borrower or Guarantor engages in or supports any investigation or asserts any claims or causes of action (or directly or indirectly support assertion of the same) against Secured Parties; provided, however, that it shall not constitute an Event of Default if any Borrower or Guarantor provides information with respect to the Pre-Petition Loan Documents to a party in interest or is compelled to provide information by an Order of the Bankruptcy Court and provides prior written notice to the Agent and the Lenders of any intention or requirement to do so;

(m) Any Person shall obtain a judgment under Section 506(a) Bankruptcy Code or similar determination with respect to the Pre-Petition Obligations that is unacceptable to Agent and Lenders;

(n) the termination or rejection of any material contract of any Borrower which could reasonably be expected to result in a Material Adverse Effect;

(o) a breach or default occurs under the Asset Purchase Agreement or the Asset Purchase Agreement is terminated for any reason;

(p) Borrowers and Guarantors shall fail to file a motion under section 363 of the Bankruptcy Code seeking authority to sell all or substantially all of the Borrowers' and Guarantors' assets to the Buyer under the Asset Purchase Agreement, subject to the receipt of

"higher and better" bids (the "Approved Sale"), together with bidding procedures (the "Bidding Procedures"), in each case, in form and substance satisfactory to the Agent, on the Petition Date;

(q)     Borrowers and/or Guarantors fail to obtain the Bidding Procedures Order on or before the 21st day following the Petition Date, such Bidding Procedures Order to be in form and substance acceptable to Agent;

(r)     Borrowers fail to conduct an auction in accordance with the Bidding Procedures (the "Auction") on or before the 45th day following the Petition Date;

(s)     Borrowers fail to obtain a court order of the Approved Sale (the "Sale Order") to the successful bidder on or before the 2nd Business Day following the completion of the Auction, such Sale Order to be in form and substance satisfactory to Agent;

(t)     the Approved Sale is not consummated on or before 62 days after the Petition Date;

(u)     the Final Order is not entered immediately following the expiration of the Interim Order, and in any case, not later than October 18, 2011; and

(v)     a breach of the terms or provisions of the Interim Order or Final Order.

11.19. <u>Intercreditor Default</u>.    The occurrence of an event of default under the Intercreditor Agreement.

XII.    LENDERS' RIGHTS AND REMEDIES AFTER DEFAULT.

12.1.   <u>Rights and Remedies</u>.

(a)     Upon the occurrence of an Event of Default and at any time thereafter and without any further order of the Bankruptcy Court, at the option of Required Lenders (i) all Obligations (including all Pre-Petition Obligations) shall be immediately due and payable, (ii) Agent may terminate the Borrowers' right to use Cash Collateral by written notice thereof to counsel for the Borrowers and Guarantors, counsel for any official committee of unsecured creditors ("Committee"), and the U.S. Trustee, without further notice, application or order of the Bankruptcy Court and (iii) Lenders shall have the right to terminate the obligation of Lenders to make Advances.  Upon the occurrence of any Event of Default and without any further order of the Bankruptcy Court, Agent shall have the right to exercise any and all rights and remedies provided for herein, under the Other Documents, under the Uniform Commercial Code, under the Interim Order, and upon entry of the Final Order, the Final Order and at law or equity generally, including the right to foreclose the security interests granted herein and to realize upon any Collateral by any available judicial procedure and/or to take possession of and sell any or all of the Collateral; provided however that prior to exercising any foreclosure on any of the Collateral or otherwise to exercise remedies against the Collateral, the Agent shall provide three (3) Business Days' written notice to counsel for the Borrowers, Borrowing Agent, counsel for the Creditors Committee (if appointed) and the U.S. trustee (such notice shall not relieve any Borrower of any obligation hereunder); provided further that the only issue that may be raised by any such party in opposition to the actions proposed or available to Agent shall be whether an

Event of Default has actually occurred and is existing. In furtherance of exercising its remedies, Agent may enter any of any Borrower's premises or other premises without legal process and without incurring liability to any Borrower therefor, and Agent may thereupon, or at any time thereafter, in its discretion without notice or demand, take the Collateral and remove the same to such place as Agent may deem advisable and Agent may require Borrowers to make the Collateral available to Agent at a convenient place. With or without having the Collateral at the time or place of sale, Agent may sell the Collateral, or any part thereof, at public or private sale, at any time or place, in one or more sales, at such price or prices, and upon such terms, either for cash, credit or future delivery, as Agent may elect. Except as to that part of the Collateral which is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Agent shall give Borrowers reasonable notification of such sale or sales, it being agreed that in all events written notice mailed to Borrowing Agent at least ten (10) days prior to such sale or sales is reasonable notification. At any public sale Agent or any Lender may bid for and become the purchaser, and Agent, any Lender or any other purchaser at any such sale thereafter shall hold the Collateral sold absolutely free from any claim or right of whatsoever kind, including any equity of redemption and all such claims, rights and equities are hereby expressly waived and released by each Borrower. In connection with the exercise of the foregoing remedies, including the sale of Inventory, Agent is granted a perpetual nonrevocable, royalty free, nonexclusive license and Agent is granted permission to use all of each Borrower's (a) trademarks, trade styles, trade names, patents, patent applications, copyrights, service marks, licenses, franchises and other proprietary rights which are used or useful in connection with Inventory for the purpose of marketing, advertising for sale and selling or otherwise disposing of such Inventory and (b) Equipment for the purpose of completing the manufacture of unfinished goods. The cash proceeds realized from the sale of any Collateral shall be applied to the Obligations in the order set forth in Section 12.5 hereof. Noncash proceeds will only be applied to the Obligations as they are converted into cash. If any deficiency shall arise, Borrowers shall remain liable to Agent and Lenders therefor.

(b)     To the extent that Applicable Law imposes duties on the Agent to exercise remedies in a commercially reasonable manner, each Borrower acknowledges and agrees that it is not commercially unreasonable for the Agent (i) to fail to incur expenses reasonably deemed significant by the Agent to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (iii) to fail to exercise collection remedies against Customers or other Persons obligated on Collateral or to remove Liens on or any adverse claims against Collateral, (iv) to exercise collection remedies against Customers and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (v) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (vi) to contact other Persons, whether or not in the same business as any Borrower, for expressions of interest in acquiring all or any portion of such Collateral, (vii) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature, (viii) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets, (ix) to dispose of assets in wholesale rather than retail

markets, (x) to disclaim disposition warranties, such as title, possession or quiet enjoyment, (xi) to purchase insurance or credit enhancements to insure the Agent against risks of loss, collection or disposition of Collateral or to provide to the Agent a guaranteed return from the collection or disposition of Collateral, or (xii) to the extent deemed appropriate by the Agent, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Agent in the collection or disposition of any of the Collateral. Each Borrower acknowledges that the purpose of this Section 12.1(b) is to provide non-exhaustive indications of what actions or omissions by the Agent would not be commercially unreasonable in the Agent's exercise of remedies against the Collateral and that other actions or omissions by the Agent shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 12.1(b). Without limitation upon the foregoing, nothing contained in this Section 12.1(b) shall be construed to grant any rights to any Borrower or to impose any duties on Agent that would not have been granted or imposed by this Agreement or by Applicable Law in the absence of this Section 12.1(b).

12.2. <u>Agent's Discretion</u>. Agent shall have the right in its sole discretion to determine which rights, Liens, security interests or remedies Agent may at any time pursue, relinquish, subordinate, or modify or to take any other action with respect thereto and such determination will not in any way modify or affect any of Agent's or Lenders' rights hereunder.

12.3. <u>Setoff</u>. Subject to Section 15.12, in addition to any other rights which Agent or any Lender may have under Applicable Law, upon the occurrence of an Event of Default hereunder, Agent and such Lender shall have a right, immediately and without notice of any kind, to apply any Borrower's property held by Agent and such Lender to reduce the Obligations.

12.4. <u>Rights and Remedies not Exclusive</u>. The enumeration of the foregoing rights and remedies is not intended to be exhaustive and the exercise of any rights or remedy shall not preclude the exercise of any other right or remedies provided for herein or otherwise provided by law, all of which shall be cumulative and not alternative.

12.5. <u>Allocation of Payments After Event of Default</u>. Notwithstanding any other provisions of this Agreement to the contrary, after the occurrence and during the continuance of an Event of Default, all amounts collected or received by the Agent on account of the Obligations or any other amounts outstanding under any of the Other Documents or in respect of the Collateral may, at Agent's discretion, be applied to the outstanding Pre-Petition Obligations or the Post-Petition Obligations at Agent's sole discretion.

XIII.    WAIVERS AND JUDICIAL PROCEEDINGS.

13.1. <u>Waiver of Notice</u>. Each Borrower hereby waives notice of non-payment of any of the Receivables, demand, presentment, protest and notice thereof with respect to any and all instruments, notice of acceptance hereof, notice of loans or advances made, credit extended, Collateral received or delivered, or any other action taken in reliance hereon, and all other demands and notices of any description, except such as are expressly provided for herein.

13.2.  Delay.  No delay or omission on Agent's or any Lender's part in exercising any right, remedy or option shall operate as a waiver of such or any other right, remedy or option or of any Default or Event of Default.

13.3.  Jury Waiver. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE AND EACH PARTY HEREBY CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENTS OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

XIV.  EFFECTIVE DATE AND TERMINATION.

14.1.  Term.  This Agreement, which shall inure to the benefit of and shall be binding upon the respective successors and permitted assigns of each Borrower, Agent, each Lender and the Issuer, shall become effective on the date hereof and shall continue in full force and effect until the Maturity Date (the "Term") unless sooner terminated as herein provided.

14.2.  Termination.  The termination of the Agreement shall not affect any Borrower's, Agent's, any Lender's or the Issuer's rights, or any of the Obligations having their inception prior to the effective date of such termination, and the provisions hereof shall continue to be fully operative until all transactions entered into, rights or interests created or Obligations have been fully and indefeasibly paid, disposed of, concluded or liquidated.  The security interests, Liens and rights granted to Agent, Lenders and the Issuer hereunder and the financing statements filed hereunder shall continue in full force and effect, notwithstanding the termination of this Agreement or the fact that Borrowers' Account may from time to time be temporarily in a zero or credit position, until all of the Obligations of each Borrower have been indefeasibly paid and performed in full after the termination of this Agreement and Agent and Lenders have received a full release from Borrowers and Guarantors from all claims of Borrowers and Guarantors and their estates for any matters arising out of, relating to or in connection, with the Pre-Petition Loan Documents, this Agreement or each Borrower has furnished Agent, Lenders and the Issuer with an indemnification satisfactory to Agent, Lenders and the Issuer with respect thereto. Accordingly, each Borrower waives any rights which it may have under the Uniform Commercial Code to demand the filing of termination statements with respect to the Collateral, and Agent shall not be required to send such termination statements to each Borrower, or to file them with any filing office, unless and until this Agreement shall have been terminated in accordance with its terms, all Obligations have been indefeasibly paid in full in immediately

94

available funds and Agent and Lenders have received a full release from Borrowers and Guarantors from all claims of Borrowers and Guarantors and their estates for any matters arising out of, relating to or in connection, with the Pre-Petition Loan Documents, this Agreement. All representations, warranties, covenants, waivers and agreements contained herein shall survive termination hereof until all Obligations are indefeasibly paid and performed in full.

## XV. REGARDING AGENT.

15.1. <u>Appointment</u>. Each Lender hereby designates PNC to act as Agent for such Lender and the Issuer under this Agreement and the Other Documents. Each Lender and the Issuer hereby irrevocably authorizes Agent to take such action on its behalf under the provisions of this Agreement and the Other Documents and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto and Agent shall hold all Collateral, payments of principal and interest, fees (except the fees set forth in Sections 3.3 and 3.4), charges and collections (without giving effect to any collection days) received pursuant to this Agreement, for the ratable benefit of Lenders and the Issuer. Agent may perform any of its duties hereunder by or through its agents or employees. As to any matters not expressly provided for by this Agreement (including collection of the Note) Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions shall be binding; provided, however, that Agent shall not be required to take any action which exposes Agent to liability or which is contrary to this Agreement or the Other Documents or Applicable Law unless Agent is furnished with an indemnification reasonably satisfactory to Agent with respect thereto.

15.2. <u>Nature of Duties</u>. Agent shall have no duties or responsibilities except those expressly set forth in this Agreement and the Other Documents. Neither Agent nor any of its officers, directors, employees or agents shall be (i) liable for any action taken or omitted by them as such hereunder or in connection herewith, unless caused by their gross (not mere) negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment), or (ii) responsible in any manner for any recitals, statements, representations or warranties made by any Borrower or any officer thereof contained in this Agreement, or in any of the Other Documents or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with, this Agreement or any of the Other Documents or for the value, validity, effectiveness, genuineness, due execution, enforceability or sufficiency of this Agreement, or any of the Other Documents or for any failure of any Borrower to perform its obligations hereunder. Agent shall not be under any obligation to any Lender or the Issuer to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any of the Other Documents, or to inspect the properties, books or records of any Borrower. The duties of Agent as respects the Advances to Borrowers shall be mechanical and administrative in nature; Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any Lender or the Issuer; and nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon Agent any obligations in respect of this Agreement except as expressly set forth herein.

074658.01807/12123123v.11

15.3.    Lack of Reliance on Agent and Resignation. Independently and without reliance upon Agent, any other Lender or the Issuer, each Lender and the Issuer has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of each Borrower and each Guarantor in connection with the making and the continuance of the Advances hereunder and the taking or not taking of any action in connection herewith, and (ii) its own appraisal of the creditworthiness of each Borrower and each Guarantor. Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender or the Issuer with any credit or other information with respect thereto, whether coming into its possession before making of the Advances or at any time or times thereafter except as shall be provided by any Borrower pursuant to the terms hereof. Agent shall not be responsible to any Lender or the Issuer for any recitals, statements, information, representations or warranties herein or in any agreement, document, certificate or a statement delivered in connection with or for the execution, effectiveness, genuineness, validity, enforceability, collectibility or sufficiency of this Agreement or any Other Document, or of the financial condition of any Borrower or any Guarantor, or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement, the Note, the Other Documents or the financial condition of any Borrower, or the existence of any Event of Default or any Default.

Agent may resign on sixty (60) days' written notice to each of Lenders, the Issuer and Borrowing Agent and upon such resignation, the Required Lenders will promptly designate a successor Agent reasonably satisfactory to Borrowers.

Any such successor Agent shall succeed to the rights, powers and duties of Agent, and the term "Agent" shall mean such successor agent effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent. After any Agent's resignation as Agent, the provisions of this Article XV shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

15.4.    Certain Rights of Agent. If Agent shall request instructions from Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any Other Document, Agent shall be entitled to refrain from such act or taking such action unless and until Agent shall have received instructions from the Required Lenders; and Agent shall not incur liability to any Person by reason of so refraining. Without limiting the foregoing, Lenders and the Issuer shall not have any right of action whatsoever against Agent as a result of its acting or refraining from acting hereunder in accordance with the instructions of the Required Lenders.

15.5.    Reliance. Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, order or other document or telephone message believed by it to be genuine and correct and to have been signed, sent or made by the proper person or entity, and, with respect to all legal matters pertaining to this Agreement and the Other Documents and its duties hereunder, upon advice of counsel selected by it. Agent may employ agents and attorneys-in-fact and shall not be liable for the default or misconduct of any such agents or attorneys-in-fact selected by Agent with reasonable care.

96

15.6. <u>Notice of Default</u>. Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder or under the Other Documents, unless Agent has received notice from a Lender, the Issuer or Borrowing Agent referring to this Agreement or the Other Documents, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that Agent receives such a notice, Agent shall give notice thereof to Lenders and the Issuer. Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; provided, that, unless and until Agent shall have received such directions, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of Lenders and the Issuer.

15.7. <u>Indemnification</u>. To the extent Agent is not reimbursed and indemnified by Borrowers, each Lender will reimburse and indemnify Agent and the Issuer in proportion to its respective portion of the Advances (or, if no Advances are outstanding, according to its Commitment Percentage), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Agent or the Issuer in performing its duties hereunder, or in any way relating to or arising out of this Agreement or any Other Document; provided that, Lenders shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from Agent's gross (not mere) negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment).

15.8. <u>Agent in its Individual Capacity</u>. With respect to the obligation of Agent to lend under this Agreement, the Advances made by it shall have the same rights and powers hereunder as any other Lender and as if it were not performing the duties as Agent specified herein; and the term "Lender" or any similar term shall, unless the context clearly otherwise indicates, include Agent in its individual capacity as a Lender. Agent may engage in business with any Borrower as if it were not performing the duties specified herein, and may accept fees and other consideration from any Borrower for services in connection with this Agreement or otherwise without having to account for the same to Lenders.

15.9. <u>Delivery of Documents</u>. To the extent Agent receives financial statements required under Sections 10.7, 10.8, 10.9, 10.12 and 10.13 or Borrowing Base Certificates from any Borrower pursuant to the terms of this Agreement which any Borrower is not obligated to deliver to each Lender, Agent will promptly furnish such documents and information to Lenders and the Issuer.

15.10. <u>Borrowers' Undertaking to Agent</u>. Without prejudice to their respective obligations to Lenders and/or the Issuer under the other provisions of this Agreement, each Borrower hereby undertakes with Agent to pay to Agent from time to time on demand all amounts from time to time due and payable by it for the account of Agent, Lenders or the Issuer or any of them pursuant to this Agreement to the extent not already paid. Any payment made pursuant to any such demand shall pro tanto satisfy the relevant Borrower's obligations to make payments for the account of Lenders and the Issuer or the relevant one or more of them pursuant to this Agreement.

15.11. No Reliance on Agent's Customer Identification Program. Each Lender and the Issuer acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on the Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the USA PATRIOT Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended or replaced, the "CIP Regulations"), or any other Anti-Terrorism Law, including any programs involving any of the following items relating to or in connection with any Borrower, its Affiliates or its agents, this Agreement, the Other Documents or the transactions hereunder or contemplated hereby: (1) any identity verification procedures; (2) any record-keeping; (3) comparisons with government lists; (4) customer notices; or (5) other procedures required under the CIP Regulations or such other laws.

15.12. Other Agreements. Each of the Lenders agrees that it shall not, without the express consent of Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the request of Agent, set off against the Obligations, any amounts owing by such Lender to any Borrower or any deposit accounts of any Borrower now or hereafter maintained with such Lender. Anything in this Agreement to the contrary notwithstanding, each of the Lenders further agrees that it shall not, unless specifically requested to do so by Agent, take any action to protect or enforce its rights arising out of this Agreement or the Other Documents, it being the intent of Lenders that any such action to protect or enforce rights under this Agreement and the Other Documents shall be taken in concert and at the direction or with the consent of Agent or Required Lenders.

XVI. BORROWING AGENCY.

16.1. Borrowing Agency Provisions.

(a)    Each Borrower hereby irrevocably designates Borrowing Agent to be its attorney and agent and in such capacity to borrow, sign and endorse notes, and execute and deliver all instruments, documents, writings and further assurances now or hereafter required hereunder, on behalf of such Borrower or Borrowers, and hereby authorizes Agent to pay over or credit all loan proceeds hereunder in accordance with the request of Borrowing Agent.

(b)    The handling of this credit facility as a co-borrowing facility with a borrowing agent in the manner set forth in this Agreement is solely as an accommodation to Borrowers and at their request. Neither Agent nor any Lender shall incur liability to Borrowers as a result thereof. To induce Agent and Lenders to do so and in consideration thereof, each Borrower hereby indemnifies Agent and each Lender and holds Agent and each Lender harmless from and against any and all liabilities, expenses, losses, damages and claims of damage or injury asserted against Agent or any Lender by any Person arising from or incurred by reason of the handling of the financing arrangements of Borrowers as provided herein, reliance by Agent or any Lender on any request or instruction from Borrowing Agent or any other action taken by Agent or any Lender with respect to this Section 16.1 except due to willful misconduct or gross (not mere) negligence by the indemnified party (as determined by a court of competent jurisdiction in a final and non-appealable judgment).

98

(c)     All Obligations shall be joint and several, and each Borrower shall make payment upon the maturity of the Obligations by acceleration or otherwise, and such obligation and liability on the part of each Borrower shall in no way be affected by any extensions, renewals and forbearance granted to Agent or any Lender to any Borrower, failure of Agent or any Lender to give any Borrower notice of borrowing or any other notice, any failure of Agent or any Lender to pursue or preserve its rights against any Borrower, the release by Agent or any Lender of any Collateral now or thereafter acquired from any Borrower, and such agreement by each Borrower to pay upon any notice issued pursuant thereto is unconditional and unaffected by prior recourse by Agent or any Lender to the other Borrowers or any Collateral for such Borrower's Obligations or the lack thereof. Each Borrower waives all suretyship defenses.

16.2.    Waiver of Subrogation.  Each Borrower expressly waives any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution of any other claim which such Borrower may now or hereafter have against the other Borrowers or other Person directly or contingently liable for the Obligations hereunder, or against or with respect to the other Borrowers' property (including, without limitation, any property which is Collateral for the Obligations), arising from the existence or performance of this Agreement, until termination of this Agreement, repayment in full of the Obligations and the release of Agent and Lenders in full from all claims of Borrowers and their estates for any matters arising out of, relating to or in connection, with this Agreement.

## XVII.  MISCELLANEOUS.

17.1.    Governing Law.

(a)     This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania applied to contracts to be performed wholly within the Commonwealth of Pennsylvania except to the extent that the application of the Bankruptcy Code is mandatory.

(b)     IF (I) THE CASE IS DISMISSED, (II) THE BANKRUPTCY COURT ABSTAINS FROM HEARING ANY ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER DOCUMENTS (OR IN ANY WAY CONNECTED WITH OR RELATED TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO) OR (III) THE BANKRUPTCY COURT REFUSES TO EXERCISE JURISDICTION OVER ANY ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER DOCUMENTS (OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO), THEN ALL ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT, ARISING OUT OF OR FROM, RELATED TO OR IN CONNECTION WITH THIS AGREEMENT, THE OTHER DOCUMENTS OR THE COLLATERAL SHALL BE LITIGATED IN COURTS HAVING SITUS WITHIN THE CITY OF PHILADELPHIA, COMMONWEALTH OF PENNSYLVANIA. EACH OF THE BORROWERS HEREBY CONSENTS AND SUBMITS

074658.01807/12123123v.11

TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURTS LOCATED WITHIN SAID CITY AND STATE. EACH OF THE BORROWERS HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST ANY BORROWER BY THE AGENT OR LENDERS IN ACCORDANCE WITH THIS SECTION.

(c)     Each Borrower hereby waives personal service of any and all process upon it and consents that all such service of process may be made by registered mail (return receipt requested) directed to Borrowing Agent at its address set forth in Section 17.6 and service so made shall be deemed completed five (5) days after the same shall have been so deposited in the mails of the United States of America, or, at the Agent's option, by service upon Borrowing Agent which each Borrower irrevocably appoints as such Borrower's Agent for the purpose of accepting service within the Commonwealth of Pennsylvania. Nothing herein shall affect the right to serve process in any manner permitted by law or shall limit the right of Agent, any Lender or the Issuer to bring proceedings against any Borrower in the courts of any other jurisdiction. Each Borrower waives any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon forum non conveniens. Any judicial proceeding by Borrowers or any of them against Agent, any Lender or the Issuer involving, directly or indirectly, any matter or claim in any way arising out of, related to or connected with this Agreement or any related agreement, shall be brought only in a federal or state court located in the Philadelphia, Pennsylvania.

17.2.  Entire Understanding.

(a)     This Agreement and the documents executed concurrently herewith contain the entire understanding between each Borrower, Agent, each Lender and the Issuer and supersedes all prior agreements and understandings, if any, relating to the subject matter hereof. Any promises, representations, warranties or guarantees not herein contained and hereinafter made shall have no force and effect unless in writing, signed by each Borrower's, Agent's, each Lender's and the Issuer's respective officers. Neither this Agreement nor any portion or provisions hereof may be changed, modified, amended, waived, supplemented, discharged, cancelled or terminated orally or by any course of dealing, or in any manner other than by an agreement in writing, signed by the Agent, Lenders and Borrowers and such parties shall be permitted to amend this Agreement and the Other Documents without further approval or order of the Court so long as such Amendment is not material (for purposes hereof, a "material" Amendment shall mean, any Amendment that operates to increase the interest rate other than as currently provided in this Agreement, increase the Maximum Revolving Advance Amount, add specific new events of default or enlarge the nature and extent of default remedies available to the Agent and the Lenders following an Event of Default) and is undertaken in good faith by the Borrowers, the Agent and the Lenders. Each Borrower acknowledges that it has been advised by counsel in connection with the execution of this Agreement and Other Documents and is not relying upon oral representations or statements inconsistent with the terms and provisions of this Agreement.

(b)     The Required Lenders, Agent with the consent in writing of the Required Lenders, and Borrowers may, subject to the provisions of this Section 17.2(b), from time to time enter into written supplemental agreements to this Agreement or the Other Documents executed

by Borrowers, for the purpose of adding or deleting any provisions or otherwise changing, varying or waiving in any manner the rights of Lenders, the Issuer, Agent or Borrowers thereunder or the conditions, provisions or terms thereof or waiving any Event of Default thereunder, but only to the extent specified in such written agreements; provided, however, the consent of the Issuer must be obtained with respect to any amendment, waiver or consent with respect to Sections 2.8, 2.9, 2.10 or any other provisions, the amendment or waivers of which would adversely affect the Issuer; provided, further however, that no such supplemental agreement shall, without the consent of all Lenders:

(i)    increase the Commitment Percentage, the maximum dollar commitment of any Lender or the Maximum Revolving Advance Amount;

(ii)    extend the maturity of any Note or the due date for any amount payable hereunder, or decrease the rate of interest or reduce any fee payable by Borrowers to Lenders and/or the Issuer pursuant to this Agreement;

(iii)    alter the definition of the term Required Lenders or alter, amend or modify this Section 17.2(b);

(iv)    release any Collateral during any calendar year (other than in accordance with the provisions of this Agreement) having an aggregate value in excess of $1,000,000;

(v)    change the rights and duties of Agent;

(vi)    permit any Revolving Advance to be made if after giving effect thereto the total of Revolving Advances outstanding and the amount of Letters of Credit Outstanding hereunder would exceed (x) the Maximum Revolving Advance Amount or (y) the Formula Amount for more than sixty (30) consecutive Business Days or exceed one hundred and five percent (105%) of the Formula Amount;

(vii)    increase the Advance Rates above the Advance Rates in effect on the Closing Date;

(viii)    release any Guarantor, or

(ix)    alter, amend or modify Section 12.5 thereof.

Any such supplemental agreement shall apply equally to each Lender and shall be binding upon Borrowers, Lenders, the Issuer and Agent and all future holders of the Obligations. In the case of any waiver, Borrowers, Agent, Lenders and the Issuer shall be restored to their former positions and rights, and any Event of Default waived shall be deemed to be cured and not continuing, but no waiver of a specific Event of Default shall extend to any subsequent Event of Default (whether or not the subsequent Event of Default is the same as the Event of Default which was waived), or impair any right consequent thereon.

Notwithstanding (a) the existence of a Default or an Event of Default, (b) that any of the other applicable conditions precedent set forth in Section 9.2 hereof have not been satisfied or (c)

101

any other provision of this Agreement, Agent may at its discretion and without the consent of the Required Lenders, voluntarily permit the outstanding Revolving Advances and the amount of Letters of Credit outstanding at any time to exceed one hundred five percent (105%) of the Formula Amount for up to thirty (30) consecutive Business Days provided that such Advances do not exceed the Maximum Revolving Advance Amount (the "Out-of-Formula Loans"). If Agent is willing in its sole and absolute discretion to make such Out-of-Formula Loans, such Out-of-Formula Loans shall be payable on demand and shall bear interest at the Default Rate for Revolving Advances; provided that, if Lenders do make Out-of-Formula Loans, neither Agent nor Lenders shall be deemed thereby to have changed the limits of Section 2.1(a). For purposes of this paragraph, the discretion granted to Agent hereunder shall not preclude involuntary overadvances that may result from time to time due to the fact that the Formula Amount was unintentionally exceeded for any reason, including, but not limited to, Collateral previously deemed to be either "Eligible Receivables", Eligible Inventory" or "Eligible In-Transit Inventory", as applicable, becomes ineligible, collections of Receivables applied to reduce outstanding Revolving Advances are thereafter returned for insufficient funds or overadvances are made to protect or preserve the Collateral. In the event Agent involuntarily permits the outstanding Revolving Advances to exceed the Formula Amount by more than five percent (5%), Agent shall use its efforts to have Borrowers decrease such excess in as expeditious a manner as is practicable under the circumstances and not inconsistent with the reason for such excess. Revolving Advances made after Agent has determined the existence of involuntary overadvances shall be deemed to be involuntary overadvances and shall be decreased in accordance with the preceding sentence.

In addition to (and not in substitution of) the discretionary Revolving Advances permitted above in this Section 17.2, the Agent is hereby authorized by Borrowers, Lenders and the Issuer, from time to time in the Agent's sole discretion, (A) after the occurrence and during the continuation of a Default or an Event of Default, or (B) at any time that any of the other applicable conditions precedent set forth in Section 9.2 hereof have not been satisfied, to make Revolving Advances to Borrowers on behalf of the Lenders which the Agent, in its reasonable business judgment, deems necessary or desirable (a) to preserve or protect the Collateral, or any portion thereof, (b) to enhance the likelihood of, or maximize the amount of, repayment of the Advances and other Obligations, or (c) to pay any other amount chargeable to Borrowers pursuant to the terms of this Agreement; provided, that at any time after giving effect to any such Revolving Advances the outstanding Revolving Advances and the amount of Letters of Credit outstanding do not exceed one hundred and five percent (105%) of the Formula Amount or the Maximum Revolving Advance Amount.

17.3.  Successors and Assigns; Participations; New Lenders.

(a)  Successors and Assigns. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that Borrowers may not assign or otherwise transfer any of their rights or obligations hereunder without the prior written consent of each Lender. No Lender may assign or otherwise transfer any of its rights or obligations hereunder except: (i) to an Eligible Assignee in accordance with the provisions of Section 17.3(b), (ii) by way of participation in accordance with the provisions of Section 17.3(d) or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 17.3(e) (and any other attempted

assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby Participants to the extent provided in Section 17.3(d) and, to the extent expressly contemplated hereby, the Affiliates of each of the Agent, the Lenders and the respective directors, officers, employees, agents and advisors of such Affiliates of each of the Agent, the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Transfer of Commitments. Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its commitment to make Advances hereunder and the Advances at the time owing to such Lender); provided that (i) except in the case of (A) an assignment of the entire remaining amount of the assigning Lender's commitment to make Advances hereunder and the Advances at the time owing to such Lender or (B) in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender or (C) in the case of an assignment by a Lender upon the merger, consolidation, sale, transfer, or other disposition of all or substantially all of such Lender's business, loan portfolio, or other assets, the aggregate amount of the commitment to make Advances hereunder (which for this purpose includes Advances outstanding thereunder) or, if the applicable commitment to make Advances hereunder is not then in effect, the principal outstanding balance of the Advances of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Agent, or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than Five Million Dollars ($5,000,000), in the case of any assignment in respect of Revolving Advances, unless Agent otherwise consents (such consent not to be unreasonably withheld, delayed or conditioned); (ii) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Advances or the commitment to make Advances hereunder assigned, except that this clause (ii) shall not prohibit any Lender from assigning all or a portion of its rights and obligations in Revolving Advances on a non-pro rata basis; (iii) any assignment of a commitment to make Advances hereunder must be approved by Agent and the Issuer unless the Person that is the proposed assignee is itself a Lender with a commitment to make Advances hereunder (whether or not the proposed assignee would otherwise qualify as an Eligible Assignee); and (iv) the parties to each assignment shall execute and deliver to Agent an Assignment and Assumption, together with a processing and recordation fee of Three Thousand Five Hundred Dollars ($3,500), and the Eligible Assignee, if it shall not be a Lender, shall deliver to Agent an Administrative Questionnaire. Subject to acceptance and recording thereof by Agent pursuant to Section 17.3(c), from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Section 17.5 with respect to facts and circumstances occurring prior to the effective date of such assignment. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for

103

purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 17.3(d).

(c)     Maintenance of Register. Agent, acting solely for this purpose as an agent of the Borrowers, shall maintain at its office in Pittsburgh, Pennsylvania, a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of Lenders, and the commitments to make Advances hereunder of, and principal amounts of the Advances owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, and Borrowers, the Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all_purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by any Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)     Participations, Any Lender may at any time, without the consent of, or notice to, Borrowers or Agent, sell participations to any Person (other than a natural person or Borrowers or any of the Borrowers' Affiliates or Subsidiaries) (each, a "Participant") all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its commitment to make Advances hereunder and/or the Advances owing to it);provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) Borrowers, Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in Section17.2(b)(i) through (ix) that affects such Participant. Borrowers agree that each Participant shall be entitled to the benefits of Sections 2.6(d), 3.7, 3.9, 3.11 and 17.5 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 17.3(b). To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 12.3 as though it were a Lender, provided such Participant agrees to be subject to Section 2.12(d) as though it were a Lender. A Participant shall not be entitled to receive any greater payment under Section 17.5 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrowers' prior written consent. A Participant that is not incorporated under the Laws of the United States of America or a state thereof shall not be entitled to the benefits of Section 12.3 unless Borrowers are notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrowers, to comply with Section 17.16 as though it were a Lender.

(e)     Pledge of Interests. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation, any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender

from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(f)     Revolving Credit Notes. Borrowers shall execute and deliver: (i) to the Agent, the transferor and the transferee, any consent or release (of all or a portion of the obligations of the transferor) to be delivered in connection with each Assignment and Assumption, (ii) if a Lender's entire interest in its commitments to make Advances hereunder and in all of its Advances have been transferred to the transferee, appropriate replacement notes against return of the Revolving Credit Notes (each marked "replaced") held by the transferor and (iii) if only a portion of a Lender's interest in its commitments to make advances hereunder and Advances has been transferred, replacement notes to each of the transferor and the transferee against return of the original such Revolving Credit Notes of the transferor (each marked "replaced") held by the transferor; provided, that, simultaneously with Borrowers' delivery of new Revolving Credit Notes pursuant to this Section 17.3(f), the transferor Lender will deliver to Borrowers any note being replaced in whole or in part, and each such note delivered by the transferor Lender shall be conspicuously marked "replaced" when so delivered.

(g)     Replacement of Certain Lenders. If any Lender is a Defaulting Lender hereunder, then, Borrowers may, at their sole expense and effort, upon notice to such Lender and Agent, require such Lender to assign and delegate, without recourse (in accordance with the restrictions contained in Section 17.3(b)), all of its interests, rights and obligations under this Agreement to an Eligible Assignee that shall assume such obligations; provided that: (i) Borrowers shall have received the prior written consent of Agent, which consent shall not be unreasonably withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Advances, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or Borrowers (in the case of all other amounts). None of the Lenders shall be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling Borrowers to require such assignment and delegation cease to apply.

(h)     Replacement of Non-consenting Lenders. If, in connection with any proposed amendment, waiver or consent hereunder pursuant to Section 17.2(b) hereof: (i) requiring the consent of all Lenders, the consent of Required Lenders is obtained but the consent of all Lenders whose consent is required is not obtained or (ii) requiring the consent of Required Lenders, the consent of Lenders holding fifty-one percent (51%) or more is obtained but the consent of Required Lenders is not obtained (any Lender withholding consent as described in clause (i) and (ii) hereof being referred to as a "Non-Consenting Lender"), then, so long as Agent is not a Non-Consenting Lender, Agent may, at the sole expense of Borrowers, upon notice to such Non-Consenting Lender and Borrowers, require such Non-Consenting Lender to assign and delegate, without recourse (in accordance with the restrictions contained in Section 17.3(b)), all of its interests, rights and obligations under this Agreement to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that such Lender shall have received payment of an amount equal to the outstanding principal of its Advances, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or Borrowers (in the case of all other amounts).

105

17.4. <u>Application of Payments</u>. Agent shall have the continuing and exclusive right to apply or reverse and re-apply any payment and any and all proceeds of Collateral to any portion of the Obligations. To the extent that any Borrower makes a payment or Agent, any Lender or the Issuer receives any payment or proceeds of the Collateral for any Borrower's benefit, which are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other party under any bankruptcy law, common law or equitable cause, then, to such extent, the Obligations or part thereof intended to be satisfied shall be revived and continue as if such payment or proceeds had not been received by Agent, such Lender or the Issuer.

17.5. <u>Indemnity</u>. Each Borrower shall indemnify Agent, each Lender, the Issuer and each of their respective officers, directors, Affiliates, attorneys, employees and agents from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including fees and disbursements of counsel) which may be imposed on, incurred by, or asserted against Agent, any Lender or the Issuer in any claim, litigation, proceeding or investigation instituted or conducted by any Governmental Body or instrumentality or any other Person with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, arising out of or in connection with this Agreement or the Other Documents, whether or not Agent, any Lender or the Issuer is a party thereto, except to the extent that any of the foregoing arises out of the willful misconduct of the party being indemnified (as determined by a court of competent jurisdiction in a final and non-appealable judgment). Without limiting the generality of the foregoing, this indemnity shall extend to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses and disbursements of any kind or nature whatsoever (including fees and disbursements of counsel) asserted against or incurred by any of the indemnitees described above in this Section 17.5 by any Person under any Environmental Laws or similar laws by reason of any Borrower's or any other Person's failure to comply with laws applicable to solid or hazardous waste materials, including Hazardous Substances and Hazardous Waste, or other Toxic Substances. Additionally, if any taxes (excluding taxes imposed upon or measured solely by the net income of Agent and Lenders, but including any intangibles taxes, stamp tax, recording tax or franchise tax) shall be payable by Agent, Lenders or Borrowers on account of the execution or delivery of this Agreement, or the execution, delivery, issuance or recording of any of the Other Documents, or the creation or repayment of any of the Obligations hereunder, by reason of any Applicable Law now or hereafter in effect, Borrowers will pay (or will promptly reimburse Agent and Lenders for payment of) all such taxes, including interest and penalties thereon, and will indemnify and hold the indemnitees described above in this Section 17.5 harmless from and against all liability in connection therewith.

17.6. <u>Notice</u>. Any notice or request hereunder may be given to Borrowing Agent or any Borrower or to Agent, any Lender or the Issuer at their respective addresses set forth below or at such other address as may hereafter be specified in a notice designated as a notice of change of address under this Section. Any notice, request, demand, direction or other communication (for purposes of this Section 17.6 only, a "Notice") to be given to or made upon any party hereto under any provision of this Agreement shall be given or made by telephone or in writing (which includes by means of electronic transmission (i.e., "e-mail") or facsimile transmission or by setting forth such Notice on a site on the World Wide Web (a "Website Posting") if Notice of such Website Posting (including the information necessary to access such site) has previously

been delivered to the applicable parties hereto by another means set forth in this Section 17.6) in accordance with this Section 17.6. Any such Notice must be delivered to the applicable parties hereto at the addresses and numbers set forth under their respective names on Section 17.6 hereof or in accordance with any subsequent unrevoked Notice from any such party that is given in accordance with this Section 17.6. Any Notice shall be effective:

(a) In the case of hand-delivery, when delivered;

(b) If given by mail, four days after such Notice is deposited with the United States Postal Service, with first-class postage prepaid, return receipt requested;

(c) In the case of a telephonic Notice, when a party is contacted by telephone, if delivery of such telephonic Notice is confirmed no later than the next Business Day by hand delivery, a facsimile or electronic transmission, a Website Posting or an overnight courier delivery of a confirmatory Notice (received at or before noon on such next Business Day);

(d) In the case of a facsimile transmission, when sent to the applicable party's facsimile machine's telephone number, if the party sending such Notice receives confirmation of the delivery thereof from its own facsimile machine;

(e) In the case of electronic transmission, when actually received;

(f) In the case of a Website Posting, upon delivery of a Notice of such posting (including the information necessary to access such site) by another means set forth in this Section 16.6; and

(g) If given by any other means (including by overnight courier), when actually received.

Any Lender or the Issuer giving a Notice to Borrowing Agent or any Borrower shall concurrently send a copy thereof to the Agent, and the Agent shall promptly notify the other Lenders and the Issuer of its receipt of such Notice.

(A) If to Agent or PNC at:

PNC Bank, National Association
Three PNC Plaza
225 Fifth Avenue
Pittsburgh, PA 15222
Attention: Michael Etienne, Vice President
Telephone: (412) 768-8135
Facsimile: (412) 768- 4369

with an additional copy to:

Blank Rome LLP
One Logan Square
130 N. 18th Street

074658.01807/12123123v.11

Philadelphia, Pennsylvania 19103
Attention: Lawrence F. Flick, II, Esq.
Telephone: (215) 569-5556
Facsimile: (215) 832-5556

with an additional copy to:

Blank Rome LLP
1201 Market Street, Suite 800
Wilmington, DE 19801
Attention: Regina Stango Kelbon, Esq.
Telephone: (302) 425-6424
Facsimile: (302) 428-5133

(B)    If to a Lender other than Agent, as specified on the signature pages hereof

(C)    If to Borrowing Agent or any Borrower:

Hussey Copper Ltd.
100 Washington Street
Leetsdale, PA 15056-1099
Attention: Dalton Edgecomb
Attention: Roy D. Allen
Telephone: (724) 251-4238
Facsimilie: (724) 251-4497

With a copy to:

Saul Ewing
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Attention: Jeffrey C. Hampton, Esq.
Attention: Adam H. Isenberg, Esq.
Telephone: (215) 972-7118
Facsimilie: (215) 972-1848

17.7.   Survival. The obligations of Borrowers under Sections 3.7, 3.9, 4.19(h), and 17.5 and the obligations of Lenders under Section 15.7, shall survive termination of this Agreement and the Other Documents and payment in full of the Obligations.

17.8.   Severability. If any part of this Agreement is contrary to, prohibited by, or deemed invalid under Applicable Laws or regulations, such provision shall be inapplicable and deemed omitted to the extent so contrary, prohibited or invalid, but the remainder hereof shall not be invalidated thereby and shall be given effect so far as possible.

074658.01807/12123123v.11

17.9.  <u>Expenses</u>.  All costs and expenses including, without limitation, reasonable attorneys' fees (including the allocated costs of in house counsel), fees of RAS Management Advisors, LLC and disbursements incurred by Agent on its behalf or on behalf of Lenders and/or the Issuer (a) in all efforts made to enforce payment of any Obligation or effect collection of any Collateral, or (b) in connection with the entering into, modification, amendment, administration and enforcement of this Agreement, or any consents or waivers hereunder and all related agreements, documents and instruments, or (c) in instituting, maintaining, preserving, enforcing and foreclosing on Agent's security interest in or Lien on any of the Collateral, or maintaining, preserving or enforcing any of Agent's or any Lender's rights hereunder, and under all related agreements, documents and instruments, whether through judicial proceedings or otherwise, or (d) in defending or prosecuting any actions or proceedings arising out of or relating to Agent's, any Lender's or the Issuer's transactions with any Borrowers, any Guarantor or (e) in connection with any advice given to Agent, any Lender or the Issuer with respect to its rights and obligations under this Agreement, and all related agreements, documents and instruments, may be charged to Borrowers' Account and shall be part of the Obligations, or (f) in connection with the Case, including without limitation, (i) costs and expenses incurred in connection with review of pleadings and other filings made with the Bankruptcy Court, (ii) attendance at all hearings in respect of the Case, and (iii) defending and prosecuting any actions or proceedings arising out of or relating to the Pre-Petition Obligations, the Obligations, the Liens securing the Pre-Petition Obligations and the Obligations or any transactions related to arising in connection with the Pre-Petition Loan Documents or the Other Documents. Each Borrower agrees that in the event that any actions or proceedings are in effect or are threatened by or Agent reasonably believes any actions or proceedings may be brought by the Official Committee of Unsecured Creditors appointed pursuant to Section 1102 of the Bankruptcy Code or any other party in interest attacking the legality, validity, enforceability of the Pre-Petition Obligations, the Liens arising under the Pre-Petition Credit Agreement or any other matters relating to the Pre-Petition Loan Documents at the time of the consummation of any sale of the assets of Borrowers or at the time that Borrowers propose to pay and satisfy the Obligations in full, Agent may hold a reserve following the date of payment in full of the Obligations as cash collateral for the expenses expected to be incurred in connection with such actions or proceedings until the earlier of (I) Agent's receipt of a general release satisfactory in form and substance to Agent, and (II) the entry of a final non-appealable order determining the outcome of such litigation.

17.10.  <u>Injunctive Relief</u>.  Each Borrower recognizes that, in the event any Borrower fails to perform, observe or discharge any of its obligations or liabilities under this Agreement, or threatens to fail to perform, observe or discharge such obligations or liabilities, any remedy at law may prove to be inadequate relief to Lenders and/or the Issuer; therefore, Agent, if Agent so requests, shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving that actual damages are not an adequate remedy.

17.11.  <u>Consequential Damages</u>.  No party hereto shall be liable to any other party hereto (or any Affiliate of any such Person) for indirect, punitive, exemplary or consequential damages arising from any breach of contract, tort or other wrong as a result of any transaction contemplated under this Agreement or any Other Document.

17.12.  <u>Captions</u>.  The captions at various places in this Agreement are intended for convenience only and do not constitute and shall not be interpreted as part of this Agreement.

17.13. <u>Counterparts; Facsimile Signatures</u>.  This Agreement may be executed in any number of and by different parties hereto on separate counterparts, all of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement.  Any signature delivered by a party by facsimile or electronic transmission shall be deemed to be an original signature hereto.

17.14. <u>Construction</u>.  The parties acknowledge that each party and its counsel have reviewed this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments, schedules or exhibits thereto.

17.15. <u>Publicity</u>.  Each Borrower, each Lender and the Issuer hereby authorizes Agent to make appropriate announcements of the financial arrangement entered into among Borrowers, Agent, Lenders and the Issuer, including announcements which are commonly known as tombstones, in such publications and to such selected parties as Agent shall in its sole and absolute discretion deem appropriate.

17.16. <u>Certifications From Banks and Participants; USA PATRIOT Act</u>.  Each Lender, the Issuer or assignee or participant of a Lender or the Issuer that is not incorporated under the Laws of the United States of America or a state thereof (and is not excepted from the certification requirement contained in Section 313 of the USA PATRIOT Act and the applicable regulations because it is both (i) an affiliate of a depository institution or foreign bank that maintains a physical presence in the United States or foreign country, and (ii) subject to supervision by a banking authority regulating such affiliated depository institution or foreign bank) shall deliver to the Agent the certification, or, if applicable, recertification, certifying that such Lender or the Issuer is not a "shell" and certifying to other matters as required by Section 313 of the USA PATRIOT Act and the applicable regulations: (1) within 10 days after the Closing Date, and (2) as such other times as are required under the USA PATRIOT Act.

074658.01807/12123123v.11

Each of the parties has signed this Agreement as of the day and year first above written.

BORROWERS:

HUSSEY COPPER LTD.

By:    Hussey Copper Corp., its general partner

By:   _____

Name:  _____

Title:  _____

AGENT:

PNC BANK, NATIONAL ASSOCIATION,
as Agent

By: _____
Name: _____
Title: _____

LENDERS:

PNC BANK, NATIONAL ASSOCIATION,
as Lender

By: _____
Name: _____
Title: _____

Commitment Percentage: _____%

PNC BANK, NATIONAL ASSOCIATION,
as Issuer

By: _____
Name: _____
Title: _____

WELLS FARGO CAPITAL FINANCE, LLC

By: _____

Name: _____

Title: _____

Commitment Percentage: _____%

BANK OF AMERICA, N.A.

By: _____

Name: _____

Title: _____

Commitment Percentage: _____%

**EXHIBIT A**

**BUDGET**