**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Hussey Copper Corp.,[1] | ) | Case No. 11-13010 (BLS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Hussey Copper Ltd., | ) | Case No. 11-13012 (BLS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| OAP Real Estate, LLC, | ) | Case No. 11-13013 (BLS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Cougar Metals, Inc., | ) | Case No. 11-13014 (BLS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Orbie Trading, L.P., | ) | Case No. 11-13015 (BLS) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Hussey Exports Ltd., | ) | Case No. 11-13016 (BLS) |
| | ) | |
| Debtor. | ) | Joint Administration Requested |
| | ) | |

---

[1]     The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Hussey Copper Corp. (9993); Hussey Copper Ltd. (9994); OAP Real Estate, LLC (1298); Cougar Metals, Inc. (1674); Orbie Trading, L.P. (4969); and Hussey Exports Ltd. (8997). The Debtors' address is 100 Washington Street, Leetsdale, Pennsylvania 15056.

**MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER (A) AUTHORIZING
THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, FREE AND
CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, (B) APPROVING
ASSET PURCHASE AGREEMENT AND (C) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by

and through their proposed undersigned counsel, hereby move the Court (the "Sale Motion") for

the entry of an order, pursuant to sections 105(a), 363, 365 and 1146(c) of title 11 of the United

States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"): (a) authorizing the sale (the

"Sale") of substantially all of the Debtors' assets, free and clear of all liens, claims,

encumbrances and interests to either (i) KHC Acquisition, LLC ("Kataman") or (ii) another

buyer (the "Purchaser"); and (b) approving either (i) the asset purchase agreement (the "Kataman

Agreement") attached hereto as **Exhibit "A,"** subject to higher and better offers, or (ii) the asset

purchase agreement with the Purchaser (the "Purchaser Agreement"), which is to be provided. In

support of this Motion, the Debtors rely on the Declaration of Dalton T. Edgecomb in Support of

First Day Motions for Relief, which is being filed contemporaneously herewith, and respectfully

state as follows:

## Jurisdiction

1.      This Court has jurisdiction over this Sale Motion under 28 U.S.C. §§ 157 and

1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is

proper in this judicial district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 105, 363, 365

and 1146(c) of the Bankruptcy Code and Rules 2002, 6004, 6006 and 9014 of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules").

2

## Background

3.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief with the Court under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases (the "Chapter 11 Cases") and, as of the date of the filing of this Sale Motion, no official committees have been appointed or designated.

4.      Together with its affiliated Debtors, Hussey Copper Ltd. ("Hussey") is one of the leading manufacturers of copper products in the United States. Among other things, it offers a wide range of value-added copper products and copper-nickel products including sheet, strip, plate and bar, certain alloys, architectural products, tape/fin (used in power cable and heat exchanger products), fabricated products and gaskets. Founded in 1848, Hussey has one manufacturing facility in Leetsdale, Pennsylvania (near Pittsburgh) and two facilities in Eminence, Kentucky. Hussey employs approximately 536 full-time employees.

5.      Since late 2008, the overall economic downturn has had an adverse impact on Hussey. As a result of this economic downturn, and due to related fluctuations in the price of copper, Hussey has faced significant economic challenges. Annual revenue for the Debtors, on a consolidated basis, was approximately $453.6 million in the year ending December 31, 2008, approximately $308.4 million in the year ending December 31, 2009 and approximately $381.9 million in the year ending December 31, 2010. Net income for the last three years was as follows:

| | |
|---|---|
| 2008 : | $3.1 million |
| 2009 : | $1.1 million |
| 2010 : | ($3.0 million) |

3

6. Hussey is a party to a Revolving Credit, Term Loan and Security Agreement dated as of January 20, 2006 (as amended, the "Credit Facility") with a group of lenders comprised of PNC Bank, National Association, successor to National City Bank and National City Business Credit, Inc. ("PNC"), Wells Fargo Capital Finance, LLC and Bank of America, N.A. (collectively with PNC, the "Bank Group"). In addition to being a member of the Bank Group, PNC serves as issuer and agent for the Bank Group with respect to the Credit Facility.

7. Hussey is the borrower under the Credit Facility. Debtors OAP Real Estate, LLC, Hussey Exports Ltd., Cougar Metals, Inc. and Orbie Trading, L.P. are guarantors (collectively, the "Guarantors").

8. The obligations to the Bank Group under the Credit Facility are secured by liens on substantially all of Hussey's assets.

9. As a result of the occurrence of certain events of default under the Credit Facility related to Hussey's failure to repay the amounts due thereunder as of the maturity date (extended through March 31, 2011), on April 13, 2011 the parties entered into a forbearance agreement, and thereafter a series of amendments to such forbearance agreement. The most recent forbearance agreement amendment, dated September 26, 2011, expired on September 26, 2011. Under the terms of the forbearance agreement, the Bank Group agreed to forbear from exercising its rights and remedies with respect to existing defaults under the Credit Facility, pursuant to certain terms and conditions, including a reduction of the amount of maximum borrowing available and the requirement that Hussey engage an investment banker to market substantially all of its assets for sale. To that end, Hussey engaged SSG Capital Advisors, LLC ("SSG") as its exclusive investment banker.

4

10.    In the months leading up to the filing of the Debtors' bankruptcy petitions, the Debtors concurrently pursued two alternative tracks: (a) a sale of substantially all of their assets, with the assistance of SSG, and (b) the satisfaction of the amounts due under the Credit Facility (which, as of the Petition Date, are approximately $38,170,958.24 principal, plus accrued interest) through a refinancing, with the assistance of Huron Consulting Services, LLC. Although the Debtors diligently sought to effectuate a refinancing, it could not be achieved. As a result, the Debtors concluded that the sale of substantially all of their assets, subject to a competitive bidding process, was the best option to maximize value for all creditor constituencies. The Debtors accordingly entered into an Asset Purchase Agreement with KHC Acquisition, LLC prior to the filing of the petitions, which, subject to Court approval, will serve as the stalking horse bidder in a competitive bidding process before this Court.

11.    In addition to the above-referenced amount owed under the Credit Facility, Hussey is a party to a certain subordinated loan agreement dated as of February 3, 2003 with Schneider Electric USA, Inc., formerly known as Square D Company (as amended on January 20, 2006, the "Schneider Loan Agreement") in the original principal amount of $5,000,000. The Schneider Loan Agreement is secured by a second lien on Hussey's senior assets, subordinate to the Bank Group, and is subject to an Intercreditor Agreement with the Bank Group. The obligations owing under the Schneider Loan Agreement are guaranteed (subject to certain limitations) by OAP Real Estate, LLC. As of the Petition Date, the amount owing under the Schneider Loan Agreement was approximately $2,400,000. The Debtors also have approximately $29 million of trade debt, which is owed primarily to suppliers of copper and other metals to Hussey.

12.     Additional information regarding Hussey and its affiliated Debtors, and the background to the Debtors' bankruptcy filing, is set forth in the Declaration of Dalton T. Edgecomb in Support of First Day Motions for Relief filed substantially contemporaneously herewith and incorporated herein.

## Marketing Efforts

13.     Since its retention in late May 2011, SSG has been diligently marketing the Debtors' assets for sale.  In mid-May 2011, SSG began reaching out to international investors and domestic investors (including financial buyers), contacting 134 parties in total.  SSG further compiled a confidential informational memorandum containing detailed information about the Debtors and their business operations and sent such memorandum to 43 of the 134 parties contacted.  Of those parties receiving the confidential memorandum, five submitted letters of intent. Further, a data room was created to allow potential purchasers to conduct due diligence.

14.     SSG, along with the Debtors, their counsel and financial advisors, and in conjunction with the Bank Group, have carefully evaluated and compared offers to identify the highest and best bids.  These efforts culminated in the execution of a letter of intent with Kataman, dated August 5, 2011, under which Kataman agreed to pay $84,700,000, subject to certain adjustments (the "Purchase Price"), for substantially all of the Debtors' assets.

15.     Subsequent to the execution of the letter of intent, Kataman and the Debtors engaged in several weeks of arm's length, good faith negotiations that resulted in a comprehensive agreement for Kataman to purchase substantially all of the Debtors' assets.

16.     Prior to the filing of the petitions, the Debtors and Kataman executed the Kataman Agreement, a copy of which is attached hereto as **Exhibit "A."**  Pursuant to the Kataman Agreement, the Acquired Assets (as defined below) are to be sold free and clear of all liens, claims, encumbrances and other interests.

6

17.     In addition to the proposed provisions of the Kataman Agreement set forth below, the Kataman Agreement also includes a provision that allows Kataman to terminate the Kataman Agreement and thereby no longer serve as the stalking horse bidder prior to the entry of an order approving the Bid Procedures Motion (as defined below) if certain conditions are not met (the "Termination Rights").  As such, in the event that Kataman exercises its Termination Rights, the Debtors will seek the Court's approval of the Purchaser Agreement, subject to higher and better offers.

**Proposed Sale**

18.     The following briefly summarizes certain provisions of the Kataman Agreement:"[2]

| Assets Sold / Excluded Assets (§§ 2.1, 2.2) | The assets to be sold are all assets of Hussey, OAP Real Estate, LLC and Cougar Metals, Inc. (collectively, the "Sellers") other than Excluded Assets.  Excluded Assets include: <ul><li>Inventory sold, and supplies consumed or otherwise exhausted, prior to the Closing Date in the ordinary course of the Sellers' businesses;</li><li>any action of any Seller that arises under chapter 5 of the Bankruptcy Code and all claims relating to Excluded Liabilities;</li><li>any Contract (other than a Hedge Contract) not listed on the schedule of Assumed Contracts;</li><li>certain designated Hedge Contracts;</li><li>all claims and causes of action of any Seller that arise under chapter 5 of the Bankruptcy Code;</li><li>all cash other than petty cash;</li><li>certain accounts receivable (specifically,</li></ul> |
|---|---|

---

[2]     The description of the Kataman Agreement is intended as a summary only.  Any conflict between the description of the Kataman Agreement in this Sale Motion and the Kataman Agreement should be resolved in favor of the Kataman Agreement.  Capitalized terms used in the summary of the Kataman Agreement that are not defined herein shall have the meaning given in the Kataman Agreement.

| | |
|---|---|
| | the "Challenger A/R", the "Cougar A/R" and the "HM A/R");<br><br>• certain life insurance contracts; and<br><br>• all claims and causes of action not set forth in Section 2.1(k). |
| **Purchase Price**<br>**(Section 2.5)** | The Purchase Price consists of (i) the assumption of the Assumed Liabilities; and (ii) $84,700,000, subject to adjustment.<br><br>The Purchase Price is subject to adjustment based on:<br><br>• accounts receivable and inventory levels, as compared to the level of such items as reflected on a Borrowing Base Certificate dated as of July 5, 2011; and<br><br>• the amount of any Assumed Liabilities, with the amount of Assumed Liabilities not to exceed $5.0 million; provided, however, that if the Purchase Price is less than the amount needed to repay the amounts due under the Pre-Petition Facility and the DIP Financing Facility, Hussey may require the Buyer to reduce its credit for Assumed Liabilities.<br><br>Assumed Liabilities are to be listed on Schedule 2.3(b) and shall be limited to: (a) specified environmental liabilities; (b) specified employee-related liabilities; and (c) returns and allowances. |
| **Adjustment Mechanics**<br>**(Section 2.5)** | The Kataman Agreement contains detailed provisions regarding the manner in which the Purchase Price adjustment described above is calculated and contains, among other things, provision for a $3.0 million Working Capital Holdback and Court resolution of any disputes regarding the adjustment. |
| **Deposit**<br>**(Section 5.1(d))** | $6,500,000, payable as follows:<br><br>• $3,250,000, upon execution of the Kataman Agreement, and |

1335057.5 9/27/11

| | |
|---|---|
| | • $3,250,000, upon entry of the Bid Procedures Order. |
| **Auction**<br>**(Section 5.1(a))** | The Kataman Agreement contemplates an Auction to be conducted in accordance with the Bid Procedures Order. |
| **Excluded Liabilities**<br>**(Section 2.4)** | The Buyer is not to be obligated to pay for any of the Excluded Liabilities, which are listed in Section 2.4 of the Agreement. |
| **Contracts**<br>**(Section 5.13)** | Subject to Court approval, certain contracts will be assumed by Sellers and assigned to Buyer on the Closing Date in accordance with section 365 of the Bankruptcy Code. All Assumed Contracts will be assigned to and assumed by Buyer (or Buyer's designee) at Closing or such later date as agreed by Buyer and Sellers.<br><br>Cure costs with respect to Assumed Contracts are to be paid by the Sellers. |
| **Representations and Warranties**<br>**(Sections 3 and 4)** | The Kataman Agreement contains certain representations and warranties by the Sellers and Buyers. |
| **Covenants and Agreements of the Parties**<br>**(Section 5)** | Covenants and agreements of the parties to the Kataman Agreement include, but are not limited to, the following:<br><br>(i)(a) Within 24 hours of the execution and delivery of the Kataman Agreement, the Sellers are to file chapter 11 petitions, and (b) within two Business Days after the execution and delivery of the Kataman Agreement, Sellers must file motions seeking approval of the Kataman Agreement as the "stalking horse bid," and the approval of the proposed Breakup Fee and reimbursement of Expenses;<br><br>(ii) The Sellers are required to provide the schedules to the Kataman Agreement by the date of the hearing on the Bid Procedures Motion;<br><br>(iii) Until the Closing Date, the Sellers must |

| | |
|---|---|
| | operate in the ordinary course of business and carry on their businesses in substantially the same manner as they have prior to the execution of the Kataman Agreement; and |
| | (iv) The Sellers must use Best Efforts to obtain the entry of the Bidding Procedures Order on or after twenty-one (21) days after the Execution Date and the entry of the Sale Order on or before forty-five (45) days after the Execution Date. |
| **Record Retention (Section 5.6)** | The Kataman Agreement requires each party to preserve and maintain all books and records in the possession or control of such party until the expiration of any applicable statute of limitations. |
| **Conditions Precedent to Obligations of Sellers and Buyer (Sections 6 and 7)** | Sellers' Conditions: The Kataman Agreement contains various conditions which must be satisfied or waived by the Sellers before they are obligated under the agreement: (i) the Buyer's representations and warranties must be true and correct, (ii) no Governmental Authority shall have taken any action or made any request of Sellers or Buyer as a result of which Sellers reasonably deem it inadvisable to proceed with the transaction, and (iii) the Sale Order must have been entered and not stayed or reversed.<br><br>Buyers' Conditions: Conditions precedent to the obligation of the Buyer include (i) that the Seller's representations and warranties be true and correct in all material respects, (ii) that the Sale Order, Executory Contract Assumption and Assignment Order and the Bidding Procedures Order have been become Final Orders, (iii) that the Buyer obtain certain consents; (iv) that there has been no Material Adverse Effect; and (v) that Sellers have paid, or pay concurrently with Closing, all salary and hourly wges for employees through Closing, unless the Buyer waives such requirements. |
| **Termination Events (Section 9.1)** | There are several circumstances in which the Kataman Agreement may be terminated: |

1335057.5 9/27/11

(a)   by the mutual consent of Buyer and Sellers;

(b)   by Buyer, if there is a material breach by any Seller, or a material inaccuracy of any representation or warranty of any Seller that is not cured within a certain period of time;

(c)   by Sellers if there is a material breach of the Kataman Agreement by Buyer, or a material inaccuracy of any representation or warranty of Buyer, that is not cured within a designated period of time;

(d)   by either party if the Sale transaction has not been consummated on or before seventy-five (75) days after the Execution Date;

(e)   upon Court aproval of an Alternative Transaction;

(f) by Buyer, upon confirmation of a Plan of Reorganization that is not an Alternative Transaction;

(g)   by Buyer, upon the dismissal or conversion of the Debtors' bankruptcy cases to chapter 7, and the Seller's breach of any covenants contained in the Kataman Agreement;

(h) by Buyer, upon appointment of a trustee or examiner with enlarged powers under Section 1106(b) of the Bankruptcy Code;

(i) by Buyer, if certain deadlines are not met regarding the proposed transaction, including: (A) if the Bidding Procedures Order is not entered within 25 days of the Execution Date; (B) if the Bidding Procedures Order is reversed, vacated or modified; or (C) if the Sale Order is not entered within 60 days after the Execution Date;

(j) by Buyer, if prior to the later of (A) the entry of the Bidding Procedures Order and (B) 21 days after the Execution Date the Buyer is not satisfied with

11

| | |
|---|---|
| | • any matter disclosed by its environmental due diligence, the existence and magnitude of which was not known with specificity to Buyer on the Execution Date; <br><br> • the form or substance of the Schedules to the Kataman Agreement, or <br><br> • (iii) any matter regarding Buyer's discussions with the United Steelworkers of America regarding modifications to the CBAs; <br><br> (l) by Buyer, if on the date that otherwise would be Closing, the Sellers' inventory of copper does not meet certain benchmarks; and <br><br> (m) by Buyer, if the Sellers fail to satisfy certain shipping requirements in the time period prior to the Auction. |
| **Effect of Termination (Section 9.2)** | The Kataman Agreement provides certain circumstances in which the Buyer is entitled to either the Breakup Fee or reimbursement of the Buyer's Expenses, in the event of termination. |
| **Supply Arrangment (Section 5.19)** | The Kataman Agreement provides that if Kataman is High Bidder at the Auction, from the period from the Auction until Closing (or until the earlier termination of the agreement) Sellers are to purchase all of their requirements of copper scrap and copper cathode from Kataman Metals LLC, subject to certain terms, conditions and expections. |

## The Bid Procedures

19.     On the Petition Date, the Debtors sought to establish procedures for the Sale of

the Acquired Assets by filing the Motion of the Debtors for Entry of an Order (A) Approving

Bid Procedures Relating to the Sale of Substantially All of Debtors' Assets; (B) Scheduling

Hearing to Consider Sale and Approving the Form and Matter of Notices; (C) Approving

Expense Reimbursement Provision and Break-Up Fee, If Applicable; and (D) Granting Related Relief (the "Bid Procedures Motion").

20.     Pursuant to the Kataman bid procedures attached to the Bid Procedures Motion (the "Kataman Bid Procedures"), parties interested in bidding on the Acquired Assets must submit a Qualified Bid (as defined in the Bid Procedures Motion) in accordance with the Kataman Bid Procedures.  Prior to the Auction (as defined in the Bid Procedures Motion), the Debtors shall evaluate each Qualified Bid that they have received, including Kataman's bid, and shall select the bid that the Debtors determine to be the highest and best offer.

21.     In accordance with the Kataman Bid Procedures, bidders who have made a Qualified Bid, including Kataman, will be invited to the Auction to compete to make the highest and best offer for the Acquired Assets.  The bid that the Debtors select as the highest and best offer will constitute the Baseline Bid (as defined in the Bid Procedures Motion) for the Acquired Assets and will serve as the opening bid at the Auction.  The Auction will thereafter commence and attendees will be invited to offer a bid that is higher and better than the Baseline Bid.  If no Qualified Bids are submitted other than Kataman's bid, the Auction will be cancelled and Kataman's bid as set forth in the Kataman Agreement will be the Successful Bid (as defined below).

22.     In the event that Kataman exercises its Termination Rights, parties interested in bidding on the Acquired Assets must submit a Qualified Bid (as defined in the Bid Procedures Motion) in accordance with the Form Bid Procedures.

23.     Following the Auction, the bid for the Acquired Assets that the Debtors determine, in their sole discretion, to be the highest and best offer (the "Successful Bid") will be

13

submitted to the Court for approval at the hearing to consider the Sale Motion (the "Sale Hearing").

## Applicable Authority

**I.     The Proposed Sale is Proper and Should Be Approved**

24.     The Debtors submit that ample authority exists for approval of the proposed Sale of the Acquired Assets pursuant to either the (i) Kataman Agreement or (ii) Purchaser Agreement. Section 363(b)(1) of the Bankruptcy Code, which authorizes a debtor to sell assets of the estate other than in the ordinary course of business free and clear of liens, claims and encumbrances, provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1); *see also* Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction.").

25.     Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets if the sale is based upon the sound business judgment of the debtor. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 39 (3rd Cir. 1996); *In re Trans World Airlines, Inc.*, No. 01-00056, 2001 Bankr. LEXIS 980, at *29 (Bankr. D. Del. April 2, 2001); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991).

26.     Courts typically consider the following factors in determing whether a proposed sale satisfies this standard: (i) whether a sound business justification exists for the sale; (ii) whether adequate and reasonable notice of the sale was given to interested parties; (iii) whether the sale will produce a fair and reasonable price for the property; and (iv) whether the parties have acted in good faith. See *In re Del. & Hudson Ry.*, 124 B.R. at 176; *In re*

14

*Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987); *In re United Healthcare Sys.,*

*Inc.*, No. 97-1159, 1997 U.S. Dist. LEXIS 5090, at *13-14 and n.2 (D.N.J. March 26, 1997).

The *Delaware & Hudson Railway* court further held that:

> Once a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the purchaser [or proposed purchaser] is proceeding in good faith.

*In re Delaware & Hudson Ry.*, 124 B.R. at 176.

27. In accordance with *Delaware & Hudson Railway*, a sound business purpose dictates the relief requested herein, which is also supported by adequate and reasonable notice, a fair and reasonable sale price and a sale negotiated in good faith.

### A. A "Sound Business Purpose" Supports the Sale

28. Before the Petition Date, the Debtors' operations were not generating sufficient revenue to maintain the Debtors' businesses as a going concern, and thus the Debtors concluded that the best way to maximize value of the Debtors' estates and to the Debtors' creditors is through a sale of substantially all of the Debtors' assets. In addition to the thorough marketing efforts that were conducted prepetition by SSG, the Bid Procedures have provided the Debtors with a mechanism to seek out potential purchasers of the Acquired Assets that will compete to purchase such assets at the Auction. This enables the Debtors to test the market value for the Acquired Assets and ensure that the Sale will maximize the value of such assets.

### B. Ample Notice of the Proposed Sale Will Be Provided to Interested Parties

29. The Debtors will employ various methods of notification to ensure that all interested parties will be informed of the Sale and to maximize exposure to interested parties. In

order to generate the greatest number of bidders possible for the Acquired Assets and to satisfy the requirements of Bankruptcy Rule 2002, the Debtors propose to serve by first class mail, no later than three days after the entry of the Order approving the Bid Procedures Motion (the "Bid Procedures Order"), notice of the Auction and the Sale Notice (as defined in the Bid Procedures Motion) upon: (a) the Office of the United States Trustee for the District of Delaware; (b) the Office of the United States Attorney for the District of Delaware; (c) the Offices of the United States Attorney for the Commonwealth of Pennsylvania; (d) the Offices of the United States Attorney for the Commonwealth of Kentucky; (e) the Office of the Attorney General for the State of Delaware; (f) the Office of the Attorney General for the Commonwealth of Pennsylvania; (g) the Office of the Attorney General for the Commonwealth of Kentucky; (h) the State of Delaware Department of Labor and Industry; (i) the Commonwealth of Pennsylvania Department of Labor and Industry; (j) the Commonwealth of Kentucky Department of Labor and Industry; (k) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed by the Debtors pursuant to Bankruptcy Rule 1007(d); (l) counsel to PNC Bank, National Association, as lender, issuer and agent for the Debtors' pre-petition and post-petition secured lenders; (m) counsel to Schneider Electric USA, Inc.; (n) the Internal Revenue Service; (o) counsel to the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (United Steelworkers, AFL-CIO); (p) the Pension Benefit Guaranty Corporation; (q) counsel to KHC Acquisition, LLC; (r) the United States Environmental Protection Agency; (s) the Commonwealth of Pennsylvania Department of Environmental Protection; (t) the Commonwealth of Kentucky Department of Environmental Protection; (u) all applicable state and local taxing authorities; (v) all parties asserting liens against the Debtors' assets; (w) all counter-parties to executory contracts with the

Debtors; (x) all parties that have expressed an interest in purchasing the assets of the Debtors; (y) all parties entering an appearance in these cases pursuant to Rule 2002.; (z) all creditors listed on the matrix of creditors filed by the Debtors; and (aa) counsel to the Official Committee of Unsecured Creditors (collectively, the "Notice Parties").

30.     In addition, as soon as practicable after the date on which the Court enters the Bid Procedures Order, the Debtors propose to cause notice to be published in one daily edition of the *New York Times* or *The Wall Street Journal*, national editions, or such other national publication selected by the Debtors.

## C.     The Proposed Sale is for a Fair and Reasonable Price

31.     The Debtors, with the assistance of SSG (i) conducted a comprehensive marketing process with respect to the sale of the Debtors' businesses in order to maximize value, (ii) solicited the interest of various potential strategic and financial buyers and (iii) entertained offers for the purchase of the Debtors' assets and the satisfaction of the outstanding obligations under the Credit Facility.  Numerous potential buyers conducted due diligence with respect to a potential transaction and certain potential buyers provided letters of intent with respect to potential transactions.  In addition, the Debtors have established the Bid Procedures in order to further market the Acquired Assets.

32.     Because the purchase price of the Acquired Assets will be determined by the Auction, it will be fair and reasonable as contemplated by section 363 of the Bankruptcy Code. *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149 (3d. Cir. 1986) (finding that "[g]enerally speaking, an auction may be sufficient to establish that one has paid 'value' for the assets of a bankrupt"); *In re Nat'l Health & Safety Corp.*, No. 99-18339DWS, 1999 WL 703208, at *2 (Bankr. E.D. Pa. Sept. 02, 1999) (citing *Abbotts Dairies* for the proposition that an auction

17

may be sufficient to establish that one has paid value for the assets of a debtor, and relying upon auction results to verify that the purchase price represented value).

### D. The Proposed Sale Will Be Negotiated in Good Faith

33.     Section 363(m) of the Bankruptcy Code provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

34.     Although the Bankruptcy Code does not define "good faith purchaser," courts construing section 363(m) of the Bankruptcy Code have stated that "the phrase encompasses one who purchases in 'good faith' and for 'value.'" *Abbotts Dairies*, 788 F.2d at 147. To constitute lack of good faith, a court must find fraud or collusion between a purchaser and a debtor in possession, trustee or other bidders in order to demonstrate a lack of good faith. *See Kabro Associates of West Islip v. Colony Hill Associates (In re Colony Hill Associates)*, 111 F.3d 269, 276 (2d Cir. 1997) ("Typically, the misconduct that would destroy a [purchaser]'s good faith status at a judicial sale involves fraud, collusion between the [purchaser] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *see also 255 Park Plaza Associates. Ltd. P'shp. v. Conn. Gen. Life Ins.*, 100 F.3d 1214 (6th Cir. 1996) (citing *In re Onouli-Kona Land Co.*, 846 F.2d 1170, 1173 (9th Cir. 1988)); *Miami Ctr. Ltd. P'ship v. Bank of New York*, 838 F.2d 1547 (11th Cir. 1988); *Hoese Corp. v. Vetter Corp. (In re Vetter Corp.)*, 724 F.2d 52, 56 (7th Cir. 1983); *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978); *In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *Matter of Perona*

*Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995). Due to the absence of a bright-line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting *Rock Indus. Mach.*, 572 F.2d at 1198).

35.     As required by section 363(m) of the Bankruptcy Code, the Debtors and Kataman, or another Purchaser, have engaged in intense, arm's length negotiations. There is no evidence of fraud or collusion. Furthermore, the Bid Procedures establish a process whereby interested parties compete to establish the value of the Acquired Assets. As such, the Auction will result in a bid for the Acquired Assets that represents substantial value to the Debtors' estates because it will provide favorable terms for the disposition of such assets for a price that represents the market value of the assets. *See Abbotts Dairies*, 788 F.2d at 149. Thus, for the foregoing reasons, the Debtors respectfully request that the Court find that Kataman, or another Purchaser, is entitled to the protections of section 363(m) of the Bankruptcy Code.

**II.     Sale of the Acquired Assets Free and Clear of Liens, Claims, Encumbrances and Interests**

36.     The Debtors propose to sell the Acquired Assets pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, which, among other things, authorize a debtor to sell property outside the ordinary course of business, free and clear of any interest, lien, claim, encumbrance or security interest of any other party, including, but not limited to, any administrative expense or priority claim asserted in these Chapter 11 Cases (collectively, "Liens"). Specifically, section 363(f) of the Bankruptcy Code states that a trustee may sell property free and clear of any interest in such property of an entity other than the estate, only if:

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)     such entity consents;

19

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (stating that section 363(f) is written in the disjunctive and explaining that a court may approve a sale "free and clear" so long as one of the statutory subsections is met); *In re Shary*, 152 B.R. 724, 725 (Bankr. N.D. Ohio 1993).

37.    The Sale satisfies the criteria set forth in section 363(f) of the Bankruptcy Code. The Debtors will provide notice of the Sale to all creditors, including all parties who could potentially assert Liens against the Acquired Assets. Moreover, any holder of an alleged Lien against the Acquired Assets could be compelled, in a legal or equitable proceeding, to accept a monetary satisfaction equal to the amount of their claim or interests in such assets. Additionally, as set forth in the Declaration of Dalton T. Edgecomb in Support of First Day Motions for Relief, in accordance with the arrangement with Kataman, or another Purchaser, Kataman or such other Purchaser shall consent to sale of the Acquired Assets free and clear of any Liens, subject to the terms of debtor in possession financing (the "DIP Facility") and the Bid Procedures.

38.    Accordingly, the Debtors submit that the Sale of the Acquired Assets free and clear of any Liens satisfies the statutory prerequisites of section 363(f) of the Bankruptcy Code.

## III.    Exemption from Transfer Taxes

39.    Pursuant to section 1146 of the Bankruptcy Code, the "transfer . . . or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp or similar tax." 11 U.S.C. § 1146(a). In

*Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33 (2008), the United States Supreme Court held that the Bankruptcy Code's stamp-tax exemption does not apply to transfers made before a plan is confirmed under chapter 11. Notwithstanding this ruling, however, the court in *In re New 118th Inc.*, 398 B.R. 791, 797 (Bankr. S.D.N.Y. 2009,) found that the *Piccadilly* decision "did not address whether the exemption could apply to a pre-confirmation sale that closed post-confirmation." *See New 118th*, 398 B.R. at 797 (finding that "the post-confirmation delivery of the deed, and hence, the transfer, satisfied *Piccadilly's* "simple, bright-line rule").

40.     The Debtors will file a chapter 11 plan of liquidation shortly after the Petition Date. It is anticipated that the Debtors will confirm the plan either contemporaneously with or shortly after the closing of the Sale. Further, the Kataman Agreement or the Purchaser Agreement, and the funding of the DIP Facility are all part of an integrated restructuring plan that includes the Debtors' formulation, confirmation and consummation of a plan of liquidation. As such, the plan will go effective only upon closing of the Sale. Finally, the Sale is a critical component of an overall restructuring that will ultimately result in a confirmed plan. Thus, for the foregoing reasons, the Sale should be exempt from transfer taxes under section 1146(c) of the Bankruptcy Code.

## IV.     The Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized

41.     Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that a trustee may assign an executory contract or unexpired lease of a debtor only if:

> (A)     the trustee assumes such contract or lease in accordance with the provisions of this section; and

1335057.5 9/27/11

(B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

42.    Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Moreover, section 365(b) of the Bankruptcy Code codifies the requirements for assuming an executory contract of a debtor. This provision provides that:

> (b) (1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> > (A)    cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
> >
> > (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> >
> > (C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

43.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each such case, but should be given "practical pragmatic construction." *EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe World-Wide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992), aff'd, 993 F.2d 300 (2d Cir. 1993). Typically, "the assurance of future performance is adequate if performance is likely (i.e. more probable than not)," which notably "falls considerably short of an absolute guarantee of performance." *See In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).

1335057.5 9/27/11

44.     Moreover, adequate assurance, among other things, may be provided by demonstrating the assignee's financial health and resources and experience in the industry. Adequate assurance may also be shown when the assignee has expressed a willingness to devote sufficient resources to fund the business. *In re Bygraph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986).

45.     As set forth in the Kataman Agreement and the Purchaser Agreement, to the extent any defaults exist under any executory contracts or unexpired leases sought to be assumed by the Debtors and assigned to either Kataman or the Purchaser (the "Assumed Contracts"), such defaults are required to be cured as required under section 365(b)(1) of the Bankruptcy Code.

46.     Based on information received from Kataman, or another Purchaser, the Debtors believe that Kataman, or such other Purchaser, has the financial capability to satisfy any and all obligations it will incur in connection with the Assumed Contracts. Facts will be further adduced at the Sale Hearing to show the financial credibility of Kataman, or the other Purchaser, its experience in the industry and its willingness and ability to perform under the Assumed Contracts. Because the Sale Hearing will provide the Court with an opportunity to evaluate the ability of Kataman, or the other Purchaser, to provide adequate assurance of future performance under the Assumed Contracts, as required by section 365(b)(1)(C) of the Bankruptcy Code, the Debtors submit that the Court should authorize the assumption and assignment of the Assumed Contracts by the Debtors, effective upon the closing of the proposed Sale.

47.     The Debtors' proposed Bid Procedures provide that all of the counterparties to contracts and leases with the Debtors will be given notice of this Sale Motion, informed whether or not their contracts or leases are Assumed Contracts and provided with the Debtors' proposed cure amounts with respect to their contracts and leases. The Debtors accordingly believe that

their proposed procedures with respect to contracts and leases comply with all requirements of Bankruptcy Rule 6006(c).

48. Based on the foregoing, the Debtors respectfully submit that their assumption and assignment of the Assumed Contracts satisfies the requirements under Bankruptcy Code sections 365(f)(2)(A) and (B).

## V.    The Court Should Waive or Reduce the Fourteen-Day Stay Periods Required by Bankruptcy Rules 6004(h) and 6006(d)

49. Pursuant to Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of the order. *See* Fed. R. Bankr. P. 6004(h). The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. Pro. 6004(g).

50. Similarly, Bankruptcy Rule 6006(d) stays all orders authorizing a debtor to assign an executory contract or unexpired lease pursuant to section 365(f) of the Bankruptcy Code for 14 days, unless the court orders otherwise.

51. To preserve the value of the Acquired Assets and limit the costs of administering and preserving such assets, it is critical that the Debtors close the Sale of the Acquired Assets as soon as possible after all closing conditions have been met or waived. In particular, in light of the limited funding provided by the DIP Facility, it is in the best interest of the Debtors' bankruptcy estates to consummate a sale in accordance with the either the Kataman Agreement or the Purchaser Agreement so that the affirmative funding arrangement under the DIP Facility does not terminate as a result of timing defaults or excess costs that might be incurred in connection with a prolonged process. Accordingly, the Debtors hereby request that the Court

24

waive the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the Sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal to allow the Sale to close as provided under either the Kataman Agreement or the Purchaser Agreement.

52. Based upon the foregoing, the Debtors submit that the relief requested herein is necessary and appropriate, is in the best interests of the Debtors and their estates, and should be granted in all respects.

## Notice

53. Notice of this Motion has been given to the Notice Parties, which includes all creditors.

## No Prior Request

54. No previous motion for the relief requested herein has been made to this or any other court.

1335057.5 9/27/11

WHEREFORE the Debtors respectfully request that the Court enter an order: (i) authorizing the Debtors' Sale of the Acquired Assets, free and clear of liens, claims, encumbrances and interests to either: (a) KHC Acquisition, LLC or (b) another Purchaser; (ii) approving either the: (a) Kataman Agreement or (b) Purchaser Agreement; and (iii) granting such other and further relief as the Court deems just and proper.

Dated: September 27, 2011

SAUL EWING LLP

Mark Minuti (DE Bar No. 2659)
Teresa K.D. Currier (DE Bar No. 3080)
222 Delaware Avenue, Suite 1200
P.O. Box 1266
Wilmington, DE 19899
Telephone: (302) 421-6840
Facsimile: (302) 421-5873

-and-

Jeffrey C. Hampton
Adam H. Isenberg
Robyn F. Pollack
Monique A. Bair
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-7777
Facsimile: (215) 972-7725

*Proposed Counsel for Debtors
and Debtors-in-Possession*