# EXHIBIT 1

**Kataman Asset Purchase Agreement**

ASSET PURCHASE AGREEMENT

by and among

**HUSSEY COPPER LTD.,**

**COUGAR METALS, INC.,**

**and**

**OAP REAL ESTATE, LLC,** as Sellers

and

**KHC ACQUISITION LLC,** as Buyer

Dated as of September 27, 2011

# TABLE OF CONTENTS

1.  DEFINITIONS AND REFERENCES ...................................................................................1

    1.1     Definitions. ...................................................................................................1
    1.2     Certain References.......................................................................................10

2.  SALE OF ASSETS AND RELATED MATTERS...............................................................10

    2.1     Sale of Assets..............................................................................................10
    2.2     Excluded Assets...........................................................................................12
    2.3     Assumed Liabilities. ....................................................................................13
    2.4     Excluded Liabilities......................................................................................13
    2.5     Consideration...............................................................................................14
    2.6     Manner of Payment. ....................................................................................17
    2.7     Modification of Schedules............................................................................17
    2.8     Risk of Loss. ...............................................................................................17
    2.9     Allocation. ..................................................................................................17

3.  REPRESENTATIONS AND WARRANTIES OF SELLER .................................................17

    3.1     Organization. ..............................................................................................17
    3.2     Power and Authority.....................................................................................18
    3.3     Binding Agreement.......................................................................................18
    3.4     Investments and Third Party Rights. .............................................................18
    3.5     Recent Activities..........................................................................................18
    3.6     Assets..........................................................................................................18
    3.7     Title to Personal Property. ............................................................................18
    3.8     Real Property. ..............................................................................................19
    3.9     Environmental Matters. ................................................................................20
    3.10    Intellectual Properties; Computer Software. ..................................................20
    3.11    Insurance......................................................................................................21
    3.12    Permits and Licenses. ...................................................................................21
    3.13    Agreements and Commitments. ....................................................................21
    3.14    The Contracts...............................................................................................22
    3.15    Employees and Employee Relations. .............................................................23
    3.16    Employee Benefit Plans................................................................................23
    3.17    Brokers and Finders......................................................................................23
    3.18    Payments......................................................................................................23
    3.19    Compliance with Legal Requirements. ..........................................................23
    3.20    Accounts Receivable. ...................................................................................23
    3.21    Inventories...................................................................................................24
    3.22    DIP Financing Facility..................................................................................24

4.  REPRESENTATIONS AND WARRANTIES OF BUYER .................................................24

    4.1     Organization. ..............................................................................................24
    4.2     Powers; Consents; Absence of Conflicts.......................................................24
    4.3     Binding Agreement.......................................................................................25
    4.4     Brokers and Finders......................................................................................25

# TABLE OF CONTENTS

|  |  |  |
|---|---|---|
| 4.5 | Adequate Assurance. | 25 |
| **5.** | **COVENANTS AND AGREEMENTS OF THE PARTIES** | **25** |
| 5.1 | Filing of Petition; Bidding Procedures Order; Deposit. | 25 |
| 5.2 | Operations. | 27 |
| 5.3 | Certain Actions. | 27 |
| 5.4 | Employee Matters. | 28 |
| 5.5 | Access to and Provision of Additional Information. | 28 |
| 5.6 | Post-Closing Maintenance of and Access to Information. | 29 |
| 5.7 | Governmental Authority Approvals; Consents to Assignment. | 30 |
| 5.8 | Allocation of Purchase Price for Tax Purposes. | 31 |
| 5.9 | Further Acts and Assurances. | 31 |
| 5.10 | Costs and Expenses. | 31 |
| 5.11 | Insurance Ratings. | 31 |
| 5.12 | Fulfillment of Conditions. | 32 |
| 5.13 | Assumed and Assigned Contracts; Rejected Contracts; Excess Cure Amounts. | 32 |
| 5.14 | Bankruptcy Court Approval. | 32 |
| 5.15 | Transfer Taxes and Recording Fees; Real Estate Taxes. | 33 |
| 5.16 | Name Change. | 33 |
| 5.17 | Adequate Assurances. | 33 |
| 5.18 | Inventory/Shipping Notice. | 33 |
| 5.19 | Supply Arrangement. | 34 |
| **6.** | **CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS** | **34** |
| 6.1 | Representations and Warranties; Covenants. | 34 |
| 6.2 | Adverse Actions or Proceedings. | 34 |
| 6.3 | Sale Order. | 34 |
| **7.** | **CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER** | **34** |
| 7.1 | Representations and Warranties; Covenants. | 34 |
| 7.2 | Pre-Closing Confirmations and Contractual Consents. | 35 |
| 7.3 | Adverse Actions or Proceedings. | 35 |
| 7.4 | Deliveries at Closing. | 35 |
| 7.5 | Title Insurance. | 35 |
| 7.6 | No Material Adverse Effect. | 35 |
| 7.7 | Cure Costs. | 36 |
| 7.8 | Employee Compensation. | 36 |
| **8.** | **CLOSING** | **36** |
| 8.1 | Closing. | 36 |
| 8.2 | Action of Sellers at Closing. | 36 |
| 8.3 | Action of Buyer at Closing. | 37 |
| **9.** | **TERMINATION OF AGREEMENT** | **38** |
| 9.1 | Termination Prior to Closing. | 38 |

# TABLE OF CONTENTS

|  | 9.2 | Effect of Termination. | 40 |
| 10. |  | SURVIVAL | 41 |
| 11. |  | GENERAL | 42 |
|  | 11.1 | Schedules. | 42 |
|  | 11.2 | Reproduction of Documents. | 42 |
|  | 11.3 | Choice of Law; Submission to Jurisdiction. | 42 |
|  | 11.4 | Benefit; Assignment. | 42 |
|  | 11.5 | No Third Party Beneficiary. | 42 |
|  | 11.6 | Waiver of Breach, Right or Remedy. | 43 |
|  | 11.7 | Notices. | 43 |
|  | 11.8 | Misdirected Payments; Offset Rights. | 44 |
|  | 11.9 | Severability. | 44 |
|  | 11.10 | Entire Agreement; Counterparts; Amendment. | 45 |
|  | 11.11 | Drafting. | 45 |

# LIST OF SCHEDULES AND EXHIBITS

## Exhibits

| | |
|---|---|
| Exhibit A | Bidding Procedures Order |
| Exhibit B | Escrow Agreement |
| Exhibit C | Sales Order |

## Schedules

| | |
|---|---|
| Schedule 2.1(a) | Real Property |
| Schedule 2.1(c) | Machinery and Equipment |
| Schedule 2.1(f) | Assumed Contracts |
| Schedule 2.1(h) | Permits |
| Schedule 2.1(i) | Intellectual Property |
| Schedule 2.1(r) | Other Assets |
| Schedule 2.1(i) | Excluded Accounts Receivable |
| Schedule 2.2(k) | Other Excluded Assets |
| Schedule 2.3(b) | Other Assumed Liabilities |
| Schedule 2.5(b) | Agreed Principles |
| Schedule 2.5(c) | Inventory Audit Procedure |
| Schedule 3.4 | Investments |
| Schedule 3.5 | Recent Activities |
| Schedule 3.6 | Exceptions to Title to Assets |
| Schedule 3.7 | Encumbrances on Personal Property |
| Schedule 3.8 | Real Property |
| Schedule 3.9 | Environmental Matters |
| Schedule 3.10 | Intellectual Property Exceptions |
| Schedule 3.11 | Insurance |
| Schedule 3.13 | Agreements & Commitments |
| Schedule 3.14 | Contract Exceptions |
| Schedule 3.16(a) | Employee Benefit Plans |
| Schedule 3.17 | Brokers |
| Schedule 3.18 | Payments |
| Schedule 3.19 | Legal Requirements |
| Schedule 3.20 | Accounts Receivable |
| Schedule 3.21 | Inventories and Off-Site Locations |
| Schedule 3.22 | DIP Financing Facility |
| Schedule 4.2(b) | Powers; Consents; Absence of Conflicts |
| Schedule 5.3 | Certain Actions |
| Schedule 7.2(b) | Required Consents and Approvals |

693680.13

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT ("Agreement") is made and entered into as of the 27th day of September, 2011 (the "Execution Date"), by and among KHC ACQUISITION LLC, a Delaware limited liability company ("Buyer"), and HUSSEY COPPER LTD., a Pennsylvania limited partnership ("Hussey"), COUGAR METALS, INC., a Delaware corporation ("Cougar"), and OAP REAL ESTATE, LLC, a Pennsylvania limited liability company ("OAP" and together with Hussey and Cougar, collectively, "Sellers" and, individually, a "Seller").

## WITNESSETH

WHEREAS, as set forth below following the execution and delivery of this Agreement, Sellers shall commence cases (collectively, the "Bankruptcy Case") under chapter 11 of the Bankruptcy Code in the Bankruptcy Court;

WHEREAS, Sellers desire to sell, convey, assign and transfer the Assets to Buyer, and Buyer desires to purchase the Assets from Sellers, on the terms and subject to the conditions set forth in this Agreement and in accordance with sections 105, 363, 365 and all other applicable provisions of the Bankruptcy Code;

WHEREAS, this Agreement shall serve as the "stalking horse bid" in the Bankruptcy Case and be subject to higher and better offers pursuant to the bidding procedures under the Bidding Procedures Order; and

WHEREAS, capitalized terms used, but not otherwise defined herein, shall have the respective meanings given to such terms in Section 1.

NOW, THEREFORE, for and in consideration of the foregoing premises, and the agreements, covenants, representations and warranties hereinafter set forth, and other good and valuable consideration, the receipt and adequacy of which are acknowledged and accepted, the parties, intending to be legally bound hereby, agree as follows:

## 1. DEFINITIONS AND REFERENCES

1.1     Definitions. As used in this Agreement, the following terms have the meanings given:

Accounts Receivable: all accounts, accounts receivable and other rights to payments of the Sellers of whatever kind or nature, including all current or deferred rights to payment for goods, by-products or services rendered on or prior to the Closing Date.

Affiliate: any Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with another Person, including the power to direct or cause the direction of the management and policies of a Person, whether through the beneficial ownership of more than fifty (50%) percent of the equity securities of such Person, election or appointment of directors, by contract or otherwise.

Agreed Principles: as defined in Section 2.5(b).

Agreed Rules: those certain terms and conditions set forth in Section 5.1(e).

Agreement: this Asset Purchase Agreement and all Exhibits and Schedules attached hereto, as amended, consolidated, supplemented, novated or replaced by the Parties from time to time.

Alternative Transaction: as defined in Section 9.1(f).

Ancillary Agreement: any agreement, instrument, certificate, deed, bill of sale, or similar document delivered in connection with the transactions contemplated by this Agreement.

Assets: collectively, all of Sellers' assets, other than the Excluded Assets, whether real, personal or mixed, tangible or intangible, including but not limited the assets listed in Section 2.1 or any Schedule referenced in Section 2.1.

Assumed Contracts: as defined in Section 2.1(f).

Assumed Employee Liabilities: as defined in Section 2.3.

Assumed Liabilities: as defined in Section 2.3.

Auction: the auction contemplated by the Bid Procedures.

Bankruptcy Case: as defined in the Preamble.

Bankruptcy Code: 11 U.S.C. § 101 *et seq.* and applicable federal rules of bankruptcy procedure thereunder.

Bankruptcy Court: (a) the United States Bankruptcy Court for the District of Delaware, (b) to the extent of any reference under §157 of Title 28 of the United States Code, the unit of such District Court constituted under §151, Title 28 of the United States Code, or (c) such other court to which the Bankruptcy Case may be transferred.

BBR: as defined in Section 2.5(b).

Best Efforts: means the efforts that a prudent person wanting to achieve the result in question would take and that are commercially reasonable under similar circumstances to achieve that result as expeditiously as reasonably possible but without requiring the payment of money to third parties, resort to litigation or other extraordinary efforts.

Bidding Procedures Order: an Order of the Bankruptcy Court that authorizes and directs Sellers to conduct an auction for sale of their Assets, in the form attached as Exhibit A with such changes as may be satisfactory to Buyer in its sole and absolute discretion.

Breakup Fee: Breakup Fee shall mean the greater of $3 Million or 3% of the Purchase Price.

2

<u>Business</u>: the businesses managed or otherwise operated or conducted by the Sellers.

<u>Business Day</u>: any day other than a Saturday, Sunday, or legal holiday on which banks in the City of Wilmington, Delaware are permitted to be closed.

<u>Buyer</u>: as defined in the Preamble.

<u>CBAs</u>: the Sellers' existing collective bargaining agreements with the United Steelworkers of America, as may be modified prior to Closing.

<u>Cash Consideration</u>: as defined in <u>Section 2.5</u>.

<u>Certified BBR</u>: as defined in <u>Section 2.5(b)</u>.

<u>Challenger A/R</u>: means the Accounts Receivable of Sellers from Challenger Brass and Copper, LLC ("<u>Challenger</u>").

<u>Closing</u>: as defined in <u>Section 8.1</u>.

<u>Closing Date</u>: the date on or as of which the Closing occurs.

<u>Closing Working Capital</u>: as defined in <u>Section 2.5(c)</u>.

<u>COBRA</u>: continuation coverage under any Employee Benefit Plan pursuant to the requirements of section 4980 of the Code and Part 6 of Subtitle B of Title I of ERISA.

<u>Code</u>: the Internal Revenue Code of 1986, as amended.

<u>Confidentiality Agreement</u>: any Contract entered into by or on behalf of any Seller with any potential purchaser, investor or lender, governing such Person's use of Sellers' confidential information.

<u>Conflicting Transaction</u>: as defined in <u>Section 5.1(a)</u>.

<u>Contracts</u>: all commitments, contracts, leases, licenses, instruments, indentures, agreements and understandings, written or oral, relating to the Assets or the operation of the Business to which any Seller is a party or by which it or any of its Assets are bound.

<u>Controlled Group</u>: with respect to any Seller, a group consisting of each trade or business (whether or not incorporated) that, together with Hussey, would be deemed a "single employer" within the meaning of §4001(b) (1) of ERISA or subsections (b), (c), (m) or (o) of § 414 of the Code.

<u>Cougar</u>: as defined in the Preamble.

<u>Cougar A/R</u>: means the Accounts Receivable of Hussey from Cougar.

<u>Deposit</u>: as defined in <u>Section 5.1(a)</u>.

3

DIP Budget: as defined in the DIP Financing Facility.

DIP Financing Facility: as defined in Section 3.22.

DIP Financing Order: any interim order or Final Order of the Bankruptcy Court in the Bankruptcy Case approving the DIP Financing Facility.

Employee Benefit Plan: any (a) nonqualified deferred compensation or retirement plan or arrangement that is an Employee Pension Benefit Plan, (b) qualified defined contribution retirement plan or arrangement that is an Employee Pension Benefit Plan (including any Multiemployer Plan), (c) qualified defined benefit retirement plan or arrangement that is an Employee Pension Benefit Plan (including any Multiemployer Plan), or (d) Employee Welfare Benefit Plan or material fringe benefit plan or program.

Employee Pension Benefit Plan: as defined in § 3(2) of ERISA.

Employee Welfare Benefit Plan: as defined in § 3(1) of ERISA.

Encumbrances: liabilities, levies, claims, charges, assessments, mortgages, security interests, liens, pledges, conditional sales agreements, title retention contracts, leases, subleases, rights of first refusal, options to purchase, restrictions, easements, covenants and other encumbrances, and agreements or commitments to create or suffer any of the foregoing.

Environmental Claim: any oral or written notice by a Person alleging liability (including liability for investigatory costs, cleanup costs, Governmental Authority response costs, natural resource damages, property damages, personal injuries, or penalties) arising out of, based on or resulting from (a) the presence, or release into the environment, of any Materials of Environmental Concern at any location, whether or not owned by a Seller or (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Laws; or (c) circumstances in which a Seller has or may have retained or assumed either contractually or by operation of law any liability for any presence or release of any Materials of Environmental concern at any location or any violation, or alleged violation, of any Environmental Laws alleged or asserted against any third party.

Environmental Laws: any and all Legal Requirements relating to pollution, or to protection of human health or the environment (including ground water, land surface or subsurface strata) from pollution, including Legal Requirements relating to emissions, discharges, releases or threatened releases of Materials of Environmental Concern, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, recycling, reporting or handling of Materials of Environmental Concern.

ERISA: the Employee Retirement Income Security Act of 1974, as amended;

Escrow Agent: as defined in Section 5.1(a).

Escrow Agreement: an agreement in the form of Exhibit B, with such changes as Buyer and Sellers may agree.

4

Estimated Closing Working Capital: as defined in Section 2.5(b).

Excluded Assets: as defined in Section 2.2.

Excluded Liabilities: any and all liabilities or obligations of Sellers of any kind or nature, other than the Assumed Liabilities, whether known or unknown, fixed or contingent, recorded or unrecorded, and whether arising before or after the Closing, including all of the liabilities and obligations listed in Section 2.4.

Execution Date: as defined in the Preamble.

Executory Contract Assumption and Assignment Order: an Order of the Bankruptcy Court, which may be the Sale Order, in form and substance acceptable to Buyer, that (a) authorizes and directs the Seller, pursuant to § 365 of the Bankruptcy Code, to assume and to assign to Buyer or its assignee(s) the Assumed Contracts, and (b) determines that Buyer has provided adequate assurance of future performance relative to the Assumed Contracts.

Existing Mortgages: the mortgages on the Real Property set forth on Schedule 3.6 or 3.8.

Expenses: means an amount equal to all reasonable expenses (including the reasonable fees and expenses of legal counsel, accounts, investment bankers, environmental consultants, brokers and other representatives or consultants) which are incurred by Buyer or its Affiliates in connection with the transactions contemplated by this Agreement (whether or not consummated), but not to exceed $2 Million in the aggregate.

Final Closing Working Capital: as defined in Section 2.5(e).

Final Order: an order, ruling, judgment or the operation or effect of a judgment or other decree issued and entered by the Bankruptcy Court which has not been reversed, vacated, stayed, modified or amended and as to which: (a) the time to appeal or petition for review, rehearing, certiorari, reargument or retrial has expired and as to which no appeal or petition for review, rehearing, certiorari, reargument or retrial is pending, or (b) any appeal or petition for review, rehearing, certiorari, reargument or retrial has been finally decided and no further appeal or petition for review, rehearing, certiorari, reargument or retrial can be taken or granted.

Force Majeure Event: any of the following events or conditions, provided that such event or condition did not exist as of the date of execution of this Agreement, was not reasonably foreseeable as of such date and is not reasonably within the control of either party and prevents as a whole or in material part, the performance by a party of its obligations hereunder: acts of state or governmental action; orders, legislation or regulations; governmental restrictions, priorities or rationing; riots, disturbance or war (declared or undeclared); strikes, lockouts or delay of subcontractors or vendors; embargo, fire, earthquake, flood, hurricane, typhoon, explosion and accident.

Governmental Authorities: all agencies, authorities, bodies, boards, commissions, courts (including the Bankruptcy Court), instrumentalities, legislatures and offices of any nature whatsoever of any federal, state, county, district, municipal, city, foreign or other government or quasi-government unit or political subdivision.

5

Hedge Contract: any exchange traded or over-the-counter Contract (including any swap, put, call, straddle or future) hedging the price of any metal used in the Business, including the associated initial and variation margin deposits.

HM A/R: means the Accounts Receivable of Sellers from Hussey Copper S de RL de CV and Hussey Fab Prod S de RL de CV (collectively "Hussey Mexico").

HSR Act: The Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

Hussey: as defined in the Preamble.

Intellectual Properties: all of Sellers' marks, names, and all variations of the foregoing, all trademarks, service marks, assumed names, logos, including all goodwill associated therewith, patents, patent rights, copyrights, trade secrets, confidential business information (including research and development, manufacturing and production processes and techniques and pricing and cost information) and similar intangibles (including all foreign equivalents or counterpart rights having similar effect in any jurisdiction throughout the world thereof, variants thereof, registrations and applications for registration thereof, and renewals or extensions thereof); provided, however, that Intellectual Properties shall not include any right, title or interest in or to any items set forth on Schedule 2.2(k).

Inventory: as defined in Section 2.1(d).

Investments: shares of capital stock of any corporation, interests in partnerships or limited liability companies, or other equity or debt instruments issued by any Person, and proceeds from the sale thereof.

Knowledge of Sellers: with reference to this Agreement means the actual knowledge of Dalton Edgecomb, Roy Allen, David Allen, Howard Snyder and Joe Scripko.

Leased Real Property: all of Sellers' right, title and interest as tenant in and to the real property leases set forth on Schedule 2.1(a), including any security deposits or other prepaid rent, together with the right to use and occupy the space demised under such leases in accordance with the lease terms.

Legal Requirements: with respect to any Person, all statutes, ordinances, bylaws, codes, rules, regulations, restrictions, judgments, orders, writs, injunctions, decrees, determinations or awards of any Governmental Authority having jurisdiction over such Person or any of such Person's assets or businesses.

Life Insurance Contracts: means those certain life insurance contracts with respect to Roy D. Allen, David M. Allen and Frederick Drango.

Material Adverse Effect: means (a) any change or effect that is or would reasonably be expected to be materially adverse to the Business of Sellers (including, without limitation, changes in relationships with customers, employees and suppliers), assets, operations, financial condition or results of operations of the Business, taken as a whole with respect to Sellers, except for any such changes or effects resulting directly from (i) the transactions contemplated by this

6

Agreement, (ii) the filing of the Bankruptcy Case; (iii) the announcement or other disclosure of the transactions contemplated by this Agreement, (iv) any failure of Kataman Metals LLC to perform its obligations under the supply arrangement contemplated by Section 5.19; or (b) the occurrence of a Force Majeure Event that has had a material adverse effect on the business, assets, operations, financial condition or results of operations of the Business.

Materials of Environmental Concern: (a) any chemicals, pollutants, contaminants, medical waste or specimens, toxic substances chemicals, petroleum or petroleum products, including hazardous wastes under the Resource Conservation and Recovery Act, as amended, 42 U.S.C. § 6901 et seq., hazardous substances under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601 et seq., asbestos, polychlorinated biphenyls and urea formaldehyde, and low-level nuclear materials, special nuclear materials or nuclear-byproduct materials, all within the meaning of the Atomic Energy Act of 1954 as amended, and any rules, regulations or policies promulgated thereunder, and all other materials regulated under Environmental Laws.

Multiemployer Plan: as defined in §§ 3(37) or 4001(a) (3) of ERISA.

Multiple Employer Plan: an Employee Pension Benefit Plan that is not a Multiemployer Plan and for which a Person who is not a member of a Controlled Group that includes Sellers is or has been a contributing sponsor.

OAP: as defined in the Preamble.

Occupancy Leases: means all of Sellers' right, title and interest as landlord in and to any lease, license or other similar agreement for the use or occupancy of any portion of the Owned Real Property by any third party, together with any security deposits or other prepaid rent.

Off-Site Locations: the locations set forth on Schedule 3.21.

Other Plan: means any bonus, pension, profit sharing deferred compensation, incentive, equity compensation, stock performance, retirement, stock appreciation, phantom-stock, performance, savings, stock bonus, option, cafeteria, paid time off, fringe benefit, vacation, employment contract, independent contractor agreement, consulting agreement, collective bargaining agreement, unemployment insurance or pay, severance, change in control termination, retention, disability, death benefit, hospitalization, medical or welfare benefit or any other Contract, program or arrangement that provides cash or noncash benefits or perquisites to current or former employees of Sellers, but that is not an Employee Benefit Plan.

Owned Real Property: means the real property specified as "Owned Real Property" on Schedule 2.1(a), together with all easements and other rights appurtenant thereto, and all buildings, utility facilities, parking and access facilities, fixtures, trade fixtures, and all other improvements and facilities located thereon, other than the building and related improvements located at 1180 Mulberry Pike, Eminence, Kentucky owned by Mulberry Lane Associates, LLC.

Party: any party to this Agreement, or its successors and assigns.

7

Permits: all material licenses, permits, consents, approvals and other authorizations of or from all Governmental Authorities that are necessary to the ownership of the Assets or in the conduct of the Business.

Permitted Encumbrances: those Encumbrances set forth on Schedule 3.8; utility easements and other customary easements, covenants and restrictions of record (not set forth on Schedule 3.8) that do not materially adversely affect the ownership or leasing of the Real Property or the conduct of the Business; Encumbrances related to Assumed Liabilities; the standard or printed exceptions contained in the form of owner's policy issued by the Title Company, which will not be removed by a customary owner's affidavit to be delivered by Sellers to the Title Company, any exception for any state of facts or other matters which would be shown by a survey of the Real Property; any and all present and future laws, ordinances, restrictions, requirements, resolutions, orders, rules and regulations of any governmental authority, as now or hereafter existing or enforced (including, without limitation, those related to zoning and land use); interests and rights of third parties under Occupancy Leases; interests and rights of third parties in the real property which is the subject of any Seller's lease of Leased Real Property; all Assumed Contracts affecting any Real Property; all Permits affecting any Real Property; liens for real estate taxes, assessments, water and sewer rents and other lienable services that are apportioned as provided in this Agreement; and any exceptions caused by Buyer or any of its Affiliates.

Person: any individual, company, body corporate, association, partnership, firm, joint venture, trust, trustee, unincorporated organization or Governmental Authority.

Plan of Reorganization: any plan of reorganization or plan of liquidation that has been confirmed by an order entered by the Bankruptcy Court in the Bankruptcy Case.

Purchase Price: the sum of the Cash Consideration plus the Assumed Liabilities.

Qualified Bid: as defined in Section 5.1.

Qualified Bidder: as defined in Section 5.1.

Real Property: all Owned Real Property, all Leased Real Property, or all other real property, including easements, buildings, improvements and fixtures thereon and all appurtenances and rights thereto used by Sellers in connection with the Business.

Reference Working Capital: $107,789,979.

Related Party A/R: the Challenger A/R, the Cougar A/R and the HM A/R.

Related Person: with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, attorneys, accountants, lenders, investment bankers or representatives of any such Person.

Required Cure Costs: cure amounts necessary to be paid to permit the assumption and assignment of Assumed Contracts, pursuant to Section 365 of the Bankruptcy Code.

8

Retained A/R Adjustment: an amount calculated as follows: the sum of (a) the amount of Challenger A/R and the HM A/R, as of September 2, 2011 or as of the Closing Date, whichever is less, multiplied by the lesser of (i) 0.20 or (ii) one (1) minus a fraction, the numerator of which is the Purchase Price and the denominator of which is the sum of the Inventory valued as provided in clause 2.5(b)(i) and the Accounts Receivable valued as provided in clause 2.5(b)(ii), provided that if clause (a)(ii) results in a negative number, then the adjustment by reason of this clause (a) is $0; plus (b) the amount of ordinary course third party accounts receivable of Cougar acquired by Buyer at the Closing, but not in excess of the amount of ordinary course third party accounts receivable of Cougar on September 2, 2011.

Sale Motion: the motion or motions, in form and substance reasonably acceptable to Buyer in its sole and absolute discretion, filed by Sellers, pursuant to the provisions of §§ 363 and 365 of the Bankruptcy Code in the Bankruptcy Case, among other things, to obtain the Sale Order, approve the Transaction, and authorize the assumption and assignment of the Assumed Contracts to Buyer.

Sale Order: an Order of the Bankruptcy Court, which may also be the Executory Contract Assumption and Assignment Order, in form and substance acceptable to Buyer in its sole and absolute discretion, that, among other things, grants the Sale Motion, approves, authorizes and directs Sellers to assume this Agreement and consummate the Transaction, and shall contain substantially the same terms as those set forth in the form of Sale Order attached hereto as Exhibit C.

Section: sections of the Agreement, unless the context indicates otherwise.

Sellers: as defined in the Preamble.

Tax or Taxes: any income, unrelated business income, gross receipts, commercial activity, license, payroll, employment, excise, workmen's compensation, severance, stamp, occupation, privilege, premium, windfall profits, environmental (including taxes under § 59A of the Code), customs duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, stamp, sales, use, transfer, registration, unclaimed property, value added, alternative or add-on minimum, estimated or other tax, assessment, charge, levy or fee of any kind whatsoever, including payments or services in lieu of Taxes, interest or penalties on and additions to all of the foregoing, that are due or alleged to be due to any Governmental Authority, whether disputed or not, whether payable by reason of contract, assumption, transferee liability, operation of law or Treasury Regulation section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under state, local or foreign law), whether arising before, on or after the Closing Date.

Tax Return: any return, declaration, report, claim for refund, information return or statement, filing or other information, including schedules, exhibits and attachments thereto and amendments to any of the foregoing, required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

Title Company: Chicago Title Insurance Company.

Transaction: the sale and purchase of the Assets contemplated in this Agreement, together with any and all related transactions designed to implement, facilitate or expedite such sale and purchase of the Assets.

WARN Act: the Worker Adjustment and Retraining Notification Act of 1988, as amended, 29 U.S.C. §§ 2101-2109.

Working Capital Holdback: $3,000,000.

1.2    Certain References. As used in this Agreement, and unless the context requires otherwise:

(a)    references to "include" or "including" mean including without limitation;

(b)    references to "hereof, "herein" and derivative or similar words refer to this Agreement;

(c)    references to any document are references to that document as amended, consolidated, supplemented, novated or replaced by the parties thereto from time to time;

(d)    references to any law are references to that law as amended, consolidated, supplemented or replaced from time to time and all rules and regulations promulgated thereunder;

(e)    unless otherwise specified herein, references to time are references to Wilmington, Delaware time;

(f)    the gender of all words includes the masculine, feminine and neuter, and the number of all words includes the singular and plural; and

(g)    the Table of Contents, the divisions of this Agreement into articles, sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

## 2.    SALE OF ASSETS AND RELATED MATTERS

2.1    Sale of Assets. Subject to the terms and conditions of this Agreement, at the Closing, Sellers shall sell, assign, convey, transfer and deliver to Buyer, and Buyer shall purchase from Sellers, the Assets, wherever located, free and clear of all Encumbrances other than the Permitted Encumbrances, including the following:

(a)    Sellers' interests in Real Property, including, without limitation, those set forth on Schedule 2.1(a);

(b)    all notes and Accounts Receivable, except as set forth in Section 2.2(i);

10

(c)     all owned equipment, vehicles, tools, tooling, dies, furniture, fixtures and furnishings and other tangible personal property of Sellers wherever located, including the items set forth on Schedule 2.1(c);

(d)     all inventory wherever located, including all raw materials, work-in-progress, and finished goods and inventory to be delivered (the "Inventory");

(e)     all financial, project-related, personnel and other records of the Business, in whatever format held, including equipment records, project plans, documents, catalogs, books, records, files and operating manuals;

(f)     the Contracts listed on Schedule 2.1(f) and all Hedge Contracts not listed on Schedule 2.2(d) (the "Assumed Contracts");

(g)     the CBAs;

(h)     to the extent transferable, all Permits and other approvals (including pending approvals) of Governmental Authorities relating to the ownership, development and operations of the Business or the Assets, including the Permits described on Schedule 2.1(h);

(i)     all interests of Sellers in and to all Intellectual Properties and all computer software, programs and similar systems (including data and related documentation), and internet domain names, owned or licensed by any Seller, including but not limited to those set forth on Schedule 2.1(i), but excluding the computer software, programs and similar systems (including data and related documentation) set forth on Schedule 2.2(k);

(j)     general intangibles of the Business, including goodwill and the rights to the name "Hussey Copper" and all other trade names used by any Seller;

(k)     any and all claims and causes of action, including privileges related thereto, of any Seller against counterparties relating to the Assumed Liabilities or the Assumed Contracts, other than actions that arise under Chapter 5 of the Bankruptcy Code;

(l)     all corporate office furniture and equipment, spare parts, hardware, equipment and other assets of each Seller wherever located;

(m)     any supplies, prepaid expenses and deposits, wherever located;

(n)     all customer, vendor and supplier lists, other distribution lists, files and documents, products drawings, blueprints, schematics and sales invoices of the Business, whether generated by, or used by, any Seller;

(o)     all proceeds of the foregoing and all other property of Sellers of every kind, character or description, tangible and intangible, known or unknown, wherever located;

(p)     all advertising materials and all distributor, supplier and marketing materials, rights and privileges, and all endorsements;

(q)    [intentionally omitted];

(r)    any Seller's interests in any Confidentiality Agreements, and in the assets listed on Schedule 2.1(r); and

(s)    all life insurance policies, except for the Life Insurance Contracts.

2.2    Excluded Assets.  Notwithstanding the generality of Section 2.1, the following assets are not a part of the sale and purchase contemplated by this Agreement and are excluded from the Assets (collectively, the "Excluded Assets"):

(a)    Inventory sold, and supplies consumed or otherwise exhausted, prior to the Closing Date in the ordinary course of the Business and consistent with the terms of this Agreement;

(b)    any action of any Seller that arises under Chapter 5 of the Bankruptcy Code and all claims relating to Excluded Liabilities;

(c)    any Contract (other than a Hedge Contract) not listed on Schedule 2.1(f);

(d)    the Hedge Contracts listed on Schedule 2.2(d);

(e)    the Purchase Price;

(f)    all cash, other than petty cash in hand at any plant;

(g)    any interest in any Seller Employee Benefit Plan;

(h)    any escrows or sub-escrows established after the filing of the Bankruptcy Case;

(i)    the Challenger A/R, the Cougar A/R and the HM A/R;

(j)    any Real Property not listed on Schedule 2.1(a);

(k)    those other assets of the Sellers set forth on Schedule 2.2(k);

(l)    the Life Insurance Contracts;

(m)    Sellers' interest in any insurance policies, except as provided in Section 2.8.;

(n)    all claims and cause of action of any Seller that arise under Chapter 5 of the Bankruptcy Code; and

(o)    all claims and causes of action of any Seller other than those set forth in Section 2.1(k) herein.

12

2.3     Assumed Liabilities. At the Closing, Buyer shall assume only the following liabilities (the "Assumed Liabilities"):

(a)     liabilities and obligations under the Assumed Contracts first arising after the Closing; provided, that Sellers shall pay, and Buyer shall have no obligation to pay, the Required Cure Costs for such Assumed Contracts; and

(b)     subject to Section 2.5(i), those liabilities, calculated in a manner agreed to by the Buyer and Sellers, listed on Schedule 2.3(b), which shall be limited to (i) specified environmental liabilities not in excess of the amount listed on the schedule, (ii) specified employee-related liabilities not in excess of the amount listed on the schedule, and (iii) returns and allowances not in excess of the amount listed on the schedule, all of which in the aggregate will not exceed $5,000,000. Subject to Section 2.5(i), Buyer may (subject to the $5,000,000 cap herein) amend Schedule 2.3(b) at any time up to three (3) days prior to the Auction provided that Buyer may not thereby assume any liabilities not in the categories specified in Section 2.3(b) and such liabilities shall be calculated in a manner agreed to by the Buyer and the Sellers.

2.4     Excluded Liabilities. Under no circumstance shall Buyer assume or be obligated to pay, and none of the Assets shall be or become liable for or subject to, any of the Excluded Liabilities, including, but not limited to, the following liabilities, which shall be and remain liabilities of Sellers:

(a)     liabilities accrued on any financial statements of Sellers other than the Assumed Liabilities;

(b)     liabilities or obligations associated with any Excluded Assets;

(c)     liabilities or obligations associated with any and all indebtedness of Sellers for borrowed money not included in the Assumed Liabilities;

(d)     liabilities or obligations arising under any Contracts that are not Assumed Contracts;

(e)     liabilities or obligations arising out of or in connection with claims, litigation and proceedings (whether instituted prior to or after Closing) for acts or omissions by Sellers and their respective Affiliates that occurred, or arise from events that occurred, prior to the Closing Date;

(f)     except as set forth on Schedule 2.3(b) liabilities or obligations to Sellers' current employees or their dependents and beneficiaries;

(g)     except as set forth on Schedule 2.3(b) liabilities with respect to any of Sellers' Employee Benefit Plans and Other Plans;

(h)     liabilities of Sellers to the Internal Revenue Service or any other Governmental Authority relating to Sellers' employees (whether or not triggered by the Transaction or the announcement thereof);

13

(i)     penalties, fines, settlements, interest, costs and expenses arising out of or incurred, as a result of any presence or release of any Materials of Environmental Concern at any location or any actual or alleged violation by Sellers of any Legal Requirement and/or Environmental Law prior to the Closing Date;

(j)     liabilities to any Person arising out of any act or omission, under any Law, including any Environmental Law incurred in whole or in part, prior to the Closing Date;

(k)     liabilities or obligations under the WARN Act, if any, arising out of or resulting from layoffs or termination of employees by any of Sellers prior to Closing and/or the consummation of the Transaction that requires notice under the WARN Act;

(l)     any liabilities or obligations arising out of or relating to products of Sellers to the extent manufactured or sold prior to the Closing Date for damages to Persons or property including liabilities and obligations to repair or replace, or to refund the sales price or any other related expenses relating to alleged defects in goods sold or services provided by Sellers or arising from any warranties or other product and service guarantees issued by Sellers;

(m)     all liabilities for expenses (i) of the negotiation and preparation of this Agreement and (ii) relating to the Transaction, in each case to the extent incurred by Sellers and including those related to legal counsel, accounting, brokerage and investment advisors fees and disbursements;

(n)     liabilities or obligations for Taxes, except for any realty transfer taxes, real property taxes and assessments or other taxes allocable to Buyer in accordance with Section 5.15; and

(o)     any and all other liabilities or obligations not assumed pursuant to Section 2.3.

2.5     Consideration.

(a)     Subject to the terms and conditions hereof, at the Closing Buyer shall (i) assume the Assumed Liabilities; and (ii) tender as cash consideration the sum of EIGHTY-FOUR MILLION SEVEN HUNDRED THOUSAND DOLLARS ($84,700,000), subject to (i) adjustment upwards or downwards in accordance with the prorations contemplated by Section 5.15 and (ii) subject to further adjustment as provided in this Section 2.5 (as so adjusted, the "Cash Consideration"). The Cash Consideration shall be paid in the manner provided in Section 2.6.

(b)     Not later than 4:00 p.m. on the Business Day immediately prior to the Closing Date, the chief restructuring officer of Hussey shall deliver to Buyer the Borrowing Base Report of Sellers (the "BBR") for such date, together with all supporting documentation therefore, and shall personally certify that such report (the "Certified BBR") (A) is identical to that provided to Sellers' lenders and (B) has been prepared in accordance with all of the terms and conditions of the DIP Financing Facility. Immediately thereafter, Buyer shall calculate the "Estimated Closing Working Capital," which shall be the sum of: (i) the amount of Inventory

shown on line 19, Combined Column, of the Certified BBR (which shall include in-transit inventory, if any, that has been paid cash in advance, as contemplated by Section 5.3(b)), plus (ii) the amount of Accounts Receivable shown on line 10, Combined Column, of the Certified BBR, but excluding the Related Party A/R, plus (iii) Buyer's good faith estimate of the Retained A/R Adjustment; minus (iv) Buyer's good faith estimate of the Assumed Liabilities, calculated in the manner set forth on Schedule 2.5(b) (the "Agreed Principles") as of the Closing Date; provided, however that in no event shall the amount of the Assumed Liabilities taken into account in such calculation exceed $5,000,000. At the Closing, the Cash Consideration shall be increased by the amount that the Estimated Closing Working Capital exceeds the Reference Working Capital, or decreased by the amount by which the Reference Working Capital exceeds Estimated Closing Working Capital, as the case may be.

(c) As promptly as practicable, but not later than three (3) Business Days after the Closing Date, Buyer shall prepare and deliver to Sellers a calculation of the final "Closing Working Capital," which shall be the sum of (i) the value of Sellers' Inventory as of the Closing (and reflecting the results of the physical count and audit of the Inventory), calculated as provided in the DIP Financing Facility for purposes of line 19, Combined Column, of the BBR (which shall include in-transit inventory, if any, that has been paid cash in advance, as contemplated by Section 5.3(b)), plus (ii) the value of Sellers' Accounts Receivable as of the Closing, calculated as provided in the DIP Financing Facility for purposes of line 10, Combined Column, of the BBR, but excluding the Related Party A/R, plus (iii) the Retained A/R Adjustment, minus (iv) the Assumed Liabilities, calculated using the Agreed Principles, with appropriate supporting documentation; provided, however that in no event shall the amount of the Assumed Liabilities taken into account in such calculation exceed $5,000,000. In furtherance of such calculation and the estimates to be made as provided in Section 2.5(b), Buyer and Sellers shall cause a physical count and audit of the Inventory of Sellers to be taken at the end of October, shall work together to verify the validity of accounts receivable as promptly as possible after the Auction (or the date on which it is determined that no Auction will be held), and shall use Best Efforts to make it possible to accurately calculate Closing Working Capital as soon as possible following the Closing, pursuant to the procedures set forth on Schedule 2.5(c).

(d) If Sellers disagree with Buyer's calculation of final Closing Working Capital, Sellers may, within two (2) Business Days after receipt of Buyer's calculation of final Closing Working Capital, deliver a notice to Buyer disagreeing with such calculation and setting forth Sellers' calculation of such amount. Any such notice of disagreement shall specify those items or amounts as to which Sellers disagree and the reasons for Sellers' disagreements, and Sellers shall be deemed to have agreed with all other items and amounts contained in the calculation of final Closing Working Capital delivered by Buyer.

(e) If a notice of disagreement is duly delivered, Buyer and Sellers shall, during the two (2) Business Day following receipt of such notice by Buyer, use their Best Efforts to reach agreement on the disputed items or amounts in order to determine, as may be required, the amount of final Closing Working Capital, which amount shall not be more than the amount thereof shown in Sellers' calculation nor less than the amount thereof shown in Buyer's calculation. If during such period, Buyer and Sellers are unable to reach such agreement, they shall immediately bring all disputed items to the Bankruptcy Court for

15

resolution by it, provided that Buyer and Sellers shall be responsible for bearing any and all of their respective costs incurred in connection with the foregoing resolution of disputed items.. The amount of the final Closing Working Capital as of the Closing Date, as determined pursuant to this Section 2.5, shall be referred to as the "Final Closing Working Capital."

(f) Buyer and Sellers shall, and shall cause their respective representatives and agents to, cooperate and assist in the calculation of Final Closing Working Capital and in the conduct of the reviews referred to in this Section 2.5, including making available to the extent necessary of books, records, work papers and personnel.

(g) If Final Closing Working Capital exceeds Estimated Closing Working Capital, (i) Buyer shall pay Sellers an amount equal to such excess by wire transfer of immediately available funds within two (2) Business Days of the final determination of Final Closing Working Capital, and (ii) Buyer and Sellers shall jointly instruct the Escrow Agent to distribute the balance of the Working Capital Holdback to Sellers.

(h) If Estimated Closing Working Capital exceeds Final Closing Working Capital, Buyer and Sellers shall within two (2) Business Days of the final determination of Final Working Capital jointly instruct the Escrow Agent to (i) pay Buyer from the Working Capital Holdback an amount equal to such excess (but not in excess of the full amount of the Working Capital Holdback), (ii) if there remains any amount after the payment described in clause (i), distribute such remaining amount to Sellers.

(i) Notwithstanding anything in this Section 2.5 to the contrary, if Hussey certifies to Buyer that the Cash Consideration (net of closing costs and exclusive of the Working Capital Holdback) will be less than the sum necessary to repay all Obligations due under the DIP Financing Facility and/or the Pre-Petition Facility (the "Pay-Off Amount"), and provides reasonable documentation of the calculation supporting such certification, then Hussey shall have the right (but not the obligation) to require Buyer to reduce the amount (with Buyer designating, in its sole discretion, the specific Assumed Liabilities to be reduced) of Assumed Liabilities listed on Schedule 2.3(b) to such lower number (not less than $0) as would result in the Cash Consideration (exclusive of the Working Capital Holdback and net of closing costs) being equal to the Pay-Off Amount. In the event that pursuant to Section 2.5(g) or Section 2.5(h), any amount is to be paid to Sellers (either from Working Capital Holdback or by Buyer directly) Buyer shall have the right, in its discretion, to satisfy such payment obligation by assumption of any liability removed from Schedule 2.3(b) pursuant to this Section 2.5(i).

16

2.6     Manner of Payment.  At the Closing the Cash Consideration shall be paid as follows:  (a) Buyer and Sellers shall direct the Escrow Agent to (i) retain an amount of the Deposit equal to the Working Capital Holdback, to be held and distributed as herein provided; (ii) disburse, via wire transfer, the remainder of the Deposit to Sellers, and (b) Buyer shall disburse, via wire transfer, to Sellers an amount equal to the Cash Consideration, minus the amount of the Deposit, to an account designated by Sellers in writing, not less than three (3) Business Days prior to the Closing.

2.7     Modification of Schedules.  At any time up to three (3) days prior to the Auction, Buyer may modify Schedule 2.1(f) to remove any Contract therefrom, or to add any Contract thereto; provided that Buyer will be responsible for the payment of any Cure Costs for any Contract listed on Schedule 3.13 that is added to Schedule 2.1(f) after three (3) days prior to the Auction.  Any Contract removed from Schedule 2.1(f) shall become an Excluded Asset.  At any time prior to Closing, Buyer may modify Schedule 2.2(k) to add any Asset (including any account receivable) thereto, and thereafter such Asset shall be an Excluded Asset.   Removal of any Contract or other asset from the Assets shall not reduce the Cash Consideration.

2.8     Risk of Loss.  If between the Execution Date and the Closing there is any damage or other loss to any item(s) of property, plant or equipment which is covered by insurance, then at the Closing, Buyer shall receive the insurance proceeds which Sellers shall have received (or be entitled to receive), or in the event the proceeds have not been received by any Seller at the time of Closing, an assignment by such Seller of all of its rights in and to adjust and receive the insurance proceeds, Sellers shall credit to Buyer the amount of any insurance deductible at Closing, and Sellers shall not have the right to participate in any insurance adjustment, settlement or claim or condemnation proceeding, but will, at all times, reasonably cooperate with Buyer in pursuing any claim settlement, adjustment or prosecution, and any and all insurance proceeds shall be the sole property of Buyer.   The rights of Buyer in this Section 2.8 are in addition to Buyer's other rights in this Agreement including those contained in Section 7.6.

2.9     Allocation.  The Cash Consideration (adjusted as provided in Section 2.5) shall be allocated among the Sellers as provided on Schedule 2.9.

## 3.     REPRESENTATIONS AND WARRANTIES OF SELLER

Sellers hereby represent and warrant to Buyer that the statements contained in this Section 3 are correct and complete as of the Execution Date and, except where limited to a specific date, shall be correct and complete as of the Closing Date:

3.1     Organization.  Each of Hussey and OAP are duly formed, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania and Cougar is duly formed, validly existing and in good standing under the laws of the State of Delaware.   Each Seller is licensed, registered, qualified or admitted to do business in each jurisdiction in which the ownership, use or leasing of that Seller's assets or properties (including the Assets), or the conduct or nature of the Business, makes such licensing, qualification or admission necessary, except where such failure would not individually or in the aggregate have a Material Adverse Effect.

17

3.2     Power and Authority. Subject to the entry of the Sale Order and approval of this Agreement by the Bankruptcy Court, each Seller has the requisite power and authority to conduct its businesses (including the Business) as now being conducted, to enter into this Agreement and to perform its obligations hereunder, and the execution, delivery and performance by Sellers of this Agreement and the consummation of the Transaction are within each Seller's corporate powers, limited liability company powers, or limited partnership powers, as applicable, are not in contravention of the terms of each Seller's certificate of incorporation or formation, or bylaws or limited liability company agreement, each as amended to date, and have been duly authorized by all necessary action of the board of directors or limited liability company and member action.

3.3     Binding Agreement. Subject to the entry of the Sale Order and approval of this Agreement by the Bankruptcy Court, this Agreement and all instruments and agreements hereunder to which Sellers are or become a party are (or upon execution will be) valid and legally binding obligations of Sellers, enforceable against each Seller in accordance with the respective terms hereof or thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally.

3.4     Investments and Third Party Rights. Except as set forth on Schedule 3.4, no Seller holds any Investments. There are no agreements with, or options, commitments or rights in favor of, any Person to directly or indirectly acquire any of the Assets, or any interest therein.

3.5     Recent Activities. Except as set forth on Schedule 3.5, since May 1, 2011:

        (a)     no material damage, destruction or loss (whether or not covered by insurance) has occurred;

        (b)     Sellers have not sold, assigned, transferred, distributed or otherwise disposed of any of the Assets, except for sales of Inventory for in the ordinary course of the Business or as permitted by Order of the Bankruptcy Court;

        (c)     There has not been any change to the manner in which Accounts Receivable are calculated for purposes of line 10, Combined Column, of the BBR or of the manner in which Inventory is calculated for purposes of line 19, Combined Column, of the BBR, since July 5, 2011; and

        (d)     Sellers have not canceled or waived any rights in respect of the Assets, except in the ordinary course of the Business or as permitted by Final Order of the Bankruptcy Court.

3.6     Assets. Except as set forth on Schedule 3.6, no Person other than Sellers owns, holds title to or has any other direct, indirect or beneficial interest in any of the Assets. The Assets constitute all of the assets, rights and properties used by Sellers in the operation of the Business as presently operated.

3.7     Title to Personal Property. Except as described on Schedule 3.7, Sellers own and hold good, marketable and valid title or leasehold title, as the case may be, to all the Assets, other than the Owned Real Property, free and clear of any Encumbrances. Subject to the Bankruptcy

18

Court's entry of the Sale Order, at Closing Sellers will convey to Buyer good and valid title to all the Assets, other than the Owned Real Property, free and clear of any Encumbrances.

3.8    Real Property.

(a)    Except for those Encumbrances set forth on Schedule 3.8, Sellers own or hold good and marketable fee simple title to the Owned Real Property, together with all buildings, improvements and fixtures thereon and all appurtenances and rights thereto, free and clear of any Encumbrances.

(b)    At the Closing, subject to the Bankruptcy Court's entry of the Sale Order, Sellers will convey to Buyer good and marketable fee simple title to the Owned Real Property and leasehold title to the Leased Real Property, all free and clear of any Encumbrances other than the Permitted Encumbrances.

(c)    The Real Property comprises all of the real property owned or leased by Sellers that is used by Sellers in the operation of the Business.

(d)    There are no pending or, to the Knowledge of Sellers, threatened condemnation or similar proceedings or special assessments relating to the Real Property or any part thereof.

(e)    Other than the Occupancy Leases and the Permitted Encumbrances, there are no leases, subleases, licenses, tenancies or other agreements, written or to Sellers' Knowledge, oral, granting to any third party the right of use or occupancy of any portion of the Owned Real Property. Seller has previously delivered to Buyer true, complete and correct copies of all Occupancy Leases. No Seller is a tenant, subtenant or licensee under any lease, sublease or other occupancy agreement pertaining to the Business other than the leases demising the Leased Real Property, and no Seller has subleased or licensed any Leased Real Property to any third party. Sellers have previously delivered to Buyer true, complete and correct copies of all leases demising the Leased Real Property.

(f)    Except as described on Schedule 3.8, there are no Occupancy Leases or outstanding options to purchase or rights of first refusal to purchase any Real Property.

(g)    Subject to payment of any cure amounts and the Bankruptcy Court's entry of the Executory Contract Assumption and Assignment Order, with respect to Real Property leased or subleased by Sellers in connection with the Business:

(i)    to the Knowledge of Sellers, the lease or sublease is legal, valid, binding, enforceable and in full force and effect;

(ii)    to the Knowledge of Sellers, the lease or sublease shall continue to be legal, valid, binding, enforceable and in full force and effect on identical terms following the consummation of the Transaction;

(iii)    Sellers are not, and to the Knowledge of Sellers no other party to the lease or sublease is, in breach or default, and no event has occurred, other than

19

or resulting from the filing of the Bankruptcy Case which, with notice or lapse of time, would constitute a breach or default or permit termination, modification or acceleration thereunder by Sellers or to the Knowledge of Sellers any other party;

(iv)     Sellers have not, and to the Knowledge of Sellers no other party to the lease or sublease has, repudiated any provision thereof;

(v)     there are no disputes, oral agreements, or forbearance programs in effect as to the lease or sublease; and

(vi)     Sellers have not assigned, transferred, conveyed, mortgaged, deeded in trust, or encumbered any interest in the lease or sublease.

(h)     Schedule 3.8 sets forth all and any unpaid assessments for governmental improvements affecting any of the Owned Real Property.

3.9     Environmental Matters.  Except as set forth on Schedule 3.9 and to the Knowledge of Sellers:

(a)     The Business is, and has been, in compliance with all applicable Environmental Laws.

(b)     Sellers have not received any Environmental Claim with respect to the Business or Real Property.

(c)     True, complete and correct copies of the written reports, and all parts thereof, of all environmental audits or assessments relating to the Assets that have been conducted either by Sellers or any environmental consultant or engineer engaged for such purpose and which are in the possession or control of Sellers, have been made available to Buyer, and a list of all such reports, audits and assessments and any other similar report, audit or assessment is included on Schedule 3.9.

(d)     Each Seller has and holds in good standing all Permits required under applicable Environmental Laws to own or lease its properties (including the Assets) and to conduct the Business thereon.  All Permits currently held by any Seller pursuant to the Environmental Laws are identified on Schedule 2.1(h).

(e)     (i) all Materials of Environmental Concern are handled and disposed of in compliance with all applicable Environmental Laws, (ii) there are no underground storage tanks located on the Real Property, (iii) there is no exposed friable asbestos contained in or forming part of any building, building component, structure or office space owned or leased by any Seller and used in the conduct of the Business, and (iv) no polychlorinated biphenyls are used or stored at any Real Property owned or leased by any Seller.

3.10     Intellectual Properties; Computer Software.     Except as described on Schedule 3.10, to the Knowledge of Sellers (a) the Intellectual Properties, computer software, programs and similar systems set forth on Schedule 2.1(i) are all of the Intellectual Properties, computer software, programs and similar systems used by Sellers in the conduct of the Business

20

as currently conducted and (b) Sellers own or have the right to use pursuant to license, sublicense or other agreement free and clear of any liens, royalty or other payment obligations, the Intellectual Properties and all computer software, programs or similar systems (including data and related documentation) owned, leased or licensed by Sellers necessary to the ownership or use of the Assets. Sellers have taken all necessary action to maintain and protect the Intellectual Properties. All Intellectual Properties used or needed by Sellers in the conduct of the Business, and all computer software, programs and similar systems owned, licensed or used by Sellers in the conduct of the Business, to the Knowledge of Sellers, are not in violation or infringement of, nor have Sellers received any written notice alleging any conflict with or violation or infringement of, any rights of any other Person with respect to any such Intellectual Properties or computer software, programs or similar systems.

3.11    Insurance.    Schedule 3.11 describes all insurance arrangements, including self-insurance, in place for the benefit of the Assets and the conduct of the Business at the Execution Date. True and correct copies of all such policies and any endorsements thereto have been made available to Buyer.

3.12    Permits and Licenses.    Schedule 2.1(h) contains a complete and accurate list of all Permits and franchises (including applications therefor) owned or held by Sellers relating to the ownership, development or operations of the Business or the Assets. To the Knowledge of Sellers, each such Permit and franchise has been duly obtained, is valid and in full force and effect, and is not subject to any pending Government Authority proceeding to revoke, cancel, suspend or declare such Permit or franchise invalid in any respect, and, to the Knowledge of Sellers, none of the operations of the Business are being conducted in a manner that violates in any material way any of the terms or conditions under which any Permit or franchise was granted.

3.13    Agreements and Commitments.

(a)    Schedule 3.13 sets forth for all Contracts, together with Seller's calculation of Required Cure Costs therefore, to which any Seller is a party and which fall into any of the following categories:

(i)    Contracts involving payments by or to any Seller in excess of One Hundred Thousand Dollars ($100,000) or not made in the ordinary course of business;

(ii)    any employee agreement or other Contract with any labor union covering employees of any Seller;

(iii)    any option or other Contract to purchase or otherwise acquire or sell or otherwise dispose of any interest in any real property (including the Real Property);

(iv)    any Hedge Contract;

21

(v)     any Contract to make a capital expenditure or to purchase a capital asset in excess of One Hundred Thousand Dollars ($100,000) by or on behalf of any Seller in connection with the Assets or the operation of the Business;

(vi)     any Contract limiting or restricting in any material manner the operation of the Business;

(vii)     any lease or similar Contract under which (i) Seller is the lessee of, or holds or uses, any machinery, equipment, vehicle or other tangible personal property owned by any third Person for an annual rent in excess of Fifty Thousand Dollars ($50,000) or (ii) any Seller is the lessor of, or makes available for use by any third Person, any tangible personal property or real property owned by Hussey for an annual rent in excess of Fifty Thousand Dollars ($50,000);

(viii)     employment and severance Contracts, including Contracts (i) to employ or terminate executive officers or other personnel and other Contracts with present or former officers, directors or members of any Seller or (ii) that will or could result in the payment by or the creation of any commitment or obligation (absolute or contingent) to pay on behalf of Buyer or any Seller any severance, termination, "golden parachute," or other similar payments to any present or former personnel following termination of employment or otherwise as a result of the consummation of the Transaction;

(ix)     any joint venture or partnership Contracts; and

(x)     any agreement (or group of related agreements) for the purchase or sale of raw materials, commodities, supplies, products or other personal property, or for the furnishing or receipt of services, the performance of which shall extend over a period of more than one year, or involve consideration in excess of One Hundred Thousand Dollars ($100,000).

(b)     Sellers have made available to Buyer copies of any Contracts (including purchase orders) in their possession required to be listed on Schedule 3.13 or involving the obligation of Sellers to purchase products or services pursuant to which the aggregate of payments to become due from Sellers after the Execution Date is equal to or exceeds One Hundred Thousand Dollars ($100,000).

3.14     The Contracts.     Subject to the payment of Required Cure Costs and the Bankruptcy Court's entry of the Executory Contract Assumption and Assignment Order, except as set forth on Schedule 3.14, the Sellers will be permitted to assume and assign to Buyer or its assignee, the Assumed Contracts without the consent of any other Person.

3.15 <u>Employees and Employee Relations</u>. Sellers have made available to Buyer a list (as of August 31, 2011) complete in all material respects of the names, positions, current annual salaries or wage rates, and bonus and other compensation arrangements of all full-time and part-time employees of Seller, who work in the Business (indicating in such list whether each employee is full-time or part-time, whether such employee is employed under written contract, and, if such an employee is not actively at work, the reason thereof).

3.16 <u>Employee Benefit Plans</u>.

(a) <u>Schedule 3.16(a)</u> lists each Employee Benefit Plan and Other Plan that any Seller or any member of any Controlled Group that includes any Seller sponsors or maintains or has within the last five (5) years sponsored or maintained or to which it contributes (including employee elective deferrals) or has within the last five (5) years contributed or been required to contribute.

(b) No Seller, and no member of a Controlled Group that includes a Seller, contributes to, ever has contributed to, or ever has been required to contribute to any Multiple Employer Plan or any Multiemployer Plan or has any liability (including withdrawal liability) under any Multiple Employer Plan or any Multiemployer Plan. No Seller, and no member of a Controlled Group that includes a Seller, maintains or contributes, ever has maintained or contributed, or ever has been required to maintain or contribute to any Employee Welfare Benefit Plan providing medical, health or life insurance or other welfare-type benefits for current or future retired or terminated employees, their spouses or their dependents (other than in accordance with § 4980B of the Code).

3.17 <u>Brokers and Finders</u>. Except as set forth on <u>Schedule 3.17</u>, none of the Sellers nor any member, officer, director, employee or agent of Sellers, have engaged any finder or broker in connection with the Transaction.

3.18 <u>Payments</u>. Except as set forth on <u>Schedule 3.18</u>, and to the Knowledge of the Sellers, the Sellers have not, directly or indirectly, paid or delivered or agreed to pay or deliver any fee, commission or other sum of money or item of property, however characterized, to any Person that is in any manner related to the Assets or the Business in violation of any Legal Requirement. To the Knowledge of the Sellers, none of the Sellers, nor any member, officer, director or employee of Sellers have received or, as a result of the consummation of the Transaction contemplated by this Agreement, will receive any rebate, kickback or other improper or illegal payment from any Person with whom Sellers conduct or have conducted business.

3.19 <u>Compliance with Legal Requirements</u>. Except as set forth on <u>Schedule 3.19</u> or as reflected in the schedules filed in or in connection with the Bankruptcy Case, (i) Sellers are in material compliance with all applicable Legal Requirements and (ii) there are no claims, actions, suits, litigation, arbitration, mediations, investigations or other proceedings (including qui tam actions) pending or, to the Knowledge of Sellers, threatened in writing against Sellers or the Assets.

3.20 <u>Accounts Receivable</u>. Except as set forth on <u>Schedule 3.20</u>, all of Sellers' accounts receivable are valid accounts receivable arising from the provision of goods and

23

services in the ordinary course of business and are collectible in the ordinary course of business subject to any accrual, allowance, or reserve for doubtful accounts consistent with Sellers' past practices.

3.21 Inventories. Except as set forth in Schedule 3.21, all of Sellers' existing Inventory (i) is of such quality and quantity as to be usable and, with respect to finished goods, saleable by Sellers in the ordinary course of business, subject to an allowance or reserve for defects consistent with Sellers' past practices and (ii) has not been revalued by Sellers since July 31, 2011, except in accordance with such revaluation of copper and nickel Inventory in the ordinary course of business. All Inventory not on the Real Property is located at a location listed on Schedule 3.21 (the "Off-Site Locations").

3.22 DIP Financing Facility.

(a) Sellers have, prior to the execution of this Agreement, provided to Buyer a correct and complete copy of the debtor-in-possession financing facility to be provided by PNC Bank, National Association, as agent, and the other lenders as therein provided, to Sellers (the "DIP Financing Facility").

(b) The terms and conditions pursuant to which the BBR will be prepared pursuant to the DIP Financing Facility are identified the same as in the Sellers' existing credit facility.

## 4. REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Sellers that the statements contained in this Section 4 are correct and complete as of the Execution Date and, except where expressly limited to a specific date, shall be correct and complete as of the Closing Date:

4.1 Organization. Buyer is a limited liability company duly organized and validly existing in good standing under the laws of the State of Delaware.

4.2 Powers; Consents; Absence of Conflicts. Buyer has the requisite power and authority to enter into this Agreement, and to perform its obligations hereunder. The execution, delivery and performance by Buyer of this Agreement and the consummation of the Transaction by Buyer:

(a) are within Buyer's entity powers and are not in contravention of the terms of its certificate of formation or Bylaws, each as amended to date, and have been duly authorized by all necessary corporate action;

(b) except as otherwise expressly provided in this Agreement or as set forth on Schedule 4.2(b), do not require any approval or consent of, or filing with, any Governmental Authority; and

(c) do not violate any Legal Requirement to which Buyer may be subject.

24

4.3     Binding Agreement. Subject to the entry of the Sale Order and approval of the Bankruptcy Court, this Agreement and all instruments and agreements hereunder to which Buyer is or becomes a party are (or upon execution will be) valid and legally binding obligations of Buyer enforceable against Buyer in accordance with the respective terms hereof and thereof, except as enforceability against Buyer may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

4.4     Brokers and Finders. Except for the fees and expenses of Harris Williams & Co., all of which will be paid by Buyer, neither Buyer, nor any Affiliate of Buyer, nor any officer, director, employee or agent thereof, has engaged any finder or broker in connection with the transactions contemplated hereunder.

4.5     Adequate Assurance. Buyer is capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assumed Contracts to be assigned to Buyer and is capable of producing/providing any and all information required by the Bankruptcy Code and the Bankruptcy Court in connection therewith. In addition, Buyer will at Closing have available to it all amounts necessary to allow Buyer to pay the Purchase Price and otherwise perform all of Buyer's obligations under this Agreement.

## 5.     COVENANTS AND AGREEMENTS OF THE PARTIES

### 5.1     Filing of Petition; Bidding Procedures Order; Deposit.

(a)     (i) Within 24 hours of the execution and delivery of this Agreement, Sellers will file petitions with the Bankruptcy Court seeking relief from their creditors under chapter 11 of the Bankruptcy Code; (ii) within two (2) Business Days of the execution and delivery of this Agreement, Sellers will file with the Bankruptcy Court a motion seeking (A) the approval of the Agreement as the "stalking horse bid", (B) the approval of the transactions contemplated thereby, including bidding procedures for the Auction and otherwise in form and substance acceptable to Buyer in its sole discretion (the "Bidding Procedures"), and (C) the approval of the proposed Breakup Fee and reimbursement of Expenses to be paid to Buyer under the terms and provisions of this Agreement; (iii) file with the Bankruptcy Court a motion seeking the DIP Financing Order and the Agreed Rules; and (iv) a motion seeking authority to pay certain pre-petition wages, salaries, compensation, reimbursable employee business expenses and benefits liabilities.

(b)     Sellers shall file all pleadings with the Bankruptcy Court as are necessary or appropriate to secure entry of the Sale Order, shall serve all parties entitled to notice of such pleadings under applicable provisions of the Bankruptcy Code and all related rules and orders of the Bankruptcy Court and shall diligently pursue the issuance of such Sale Order (including by presenting all evidence reasonably necessary, as determined by Sellers in their business judgment to support the Sale Motion, responding to objections and discovery request made by any party in interest and taking all such other actions as may be necessary to obtain the issuance of the Sale Order). If commercially reasonable, Sellers shall oppose and seek the dismissal of any appeal (including a petition for certiorari, motion for rehearing, reargument, reconsideration or revocation) of the Bidding Procedures Order or the Sale Order

25

that is filed. As soon as practicable, and in any event not later than two (2) calendar days prior to the date any Seller files the Sale Motion or the Bid Procedures Motion with the Bankruptcy Court, Sellers shall provide Buyer a draft of any such motions, orders, amendments or supplements. Sellers shall reasonably cooperate with Buyer with respect to all such filings and incorporate any reasonable comments of Buyer and its counsel into such order, amendment, supplement, motion or pleading. Each Party hereto shall promptly notify the other Parties if at any time before the Closing Date such Party becomes aware that any information provided to the Bankruptcy Court contains any untrue statement of a material fact or omits to state a material fact required to be stated herein or necessary to make the statements contained therein, in light of the circumstances under which they were made, not misleading.

(c)     Subject to Section 5.1(e), Sellers shall offer the Assets for sale in accordance with the Bidding Procedures reflected in the Bidding Procedures Order and shall solicit qualified bids only in accordance with the terms of the Bidding Procedures (each, a "Qualified Bid") and only from bidders who comply with all the requirements of the Bidding Procedures Order (each, a "Qualified Bidder"). If one or more Qualified Bids is timely received by Sellers, Sellers shall conduct the Auction. Consummation of the sale is subject to the determination by the Bankruptcy Court that this Agreement is the highest or otherwise best offer from a Qualified Bidder for the Assets and the Assumed Liabilities. Buyer is a Qualified Bidder and this Agreement constitutes a Qualified Bid.

(d)     Buyer shall make an aggregate deposit to U.S. Bank, as escrow agent (the "Escrow Agent") in the sum of Six Million Five Hundred Thousand Dollars ($6,500,000) (the "Deposit"), payable in the following manner: (i) upon execution of this Agreement, Buyer shall make a deposit equal to Three Million Two Hundred Fifty Thousand Dollars ($3,250,000), and (ii) upon entry of the Bidding Procedures Order by the Bankruptcy Court, Buyer shall make an additional deposit equal to Three Million Two Hundred Fifty Thousand Dollars ($3,250,000). The Deposit shall be held and disbursed by the Escrow Agent in accordance with this Agreement and the Escrow Agreement.

(e)     Between the Execution Date and the date on which the Bidding Procedures Order is entered, the Sellers may, and they may cause their Affiliates and Related Persons to, solicit and discuss with any party any transaction for the purchase and sale of Sellers' assets on terms and conditions contemplated by the Bidding Procedures, and provide diligence information to any such person; provided, however, between the Execution Date and the date on which the Bidding Procedures are approved by the Bankruptcy Court, Sellers shall not enter into any agreement with any person (whether or not a Qualified Bidder) regarding a sale, merger, consolidation, restructuring, financing or other transaction (whether or not contemplated by the Bidding Procedures) that would conflict with the transactions contemplated by this Agreement (a "Conflicting Transaction"). Sellers will support Buyer as the "stalking horse" bidder and use their Best Efforts to obtain entry of the Bidding Procedures.

(f)     Between the Execution Date and the date on of the Bankruptcy Court's hearing on the Bidding Procedures, Sellers shall provide the schedules to this Agreement, other than Schedule 4.2 which shall be provided by Buyer.

5.2     Operations. From the Execution Date until the Closing Date, except as otherwise expressly provided in this Agreement (including Section 5.3) and subject to the obligations of Sellers to comply with applicable law or any order of the Bankruptcy Court (including the DIP Financing Order and budget), and the provisions of the Bankruptcy Code, Sellers will:

(a)     operate in the ordinary course of business and carry on the Business in substantially the same manner as they have prior to the Execution Date;

(b)     maintain the Assets in the same condition as the Assets were maintained as of the Execution Date, ordinary wear and tear excepted;

(c)     take all actions reasonably necessary and appropriate to deliver to Buyer title to the Assets free and clear of all Encumbrances (other than Permitted Encumbrances) pursuant to the Sale Order and cooperate with Buyer to obtain appropriate releases, consents, estoppels, certificates and other instruments as Buyer may reasonably request;

(d)     keep in full force and effect present insurance policies or other comparable insurance benefiting the Assets and the conduct of the Business;

(e)     maintain and preserve their respective status as a corporation, limited liability company or limited partnership, as applicable;

(f)     between the date of the Auction and the Closing, obtain, and use consistent with past practice, funding from the Sellers' lenders consistent with the DIP Budget; and

(g)     provide Buyer with reasonable access to Sellers' senior management to the same extent as provided to other buyers of the Assets.

5.3     Certain Actions. From the Execution Date until the Closing Date, except as otherwise expressly provided in this Agreement, as set forth on Schedule 5.3 or as required by the Bankruptcy Court (including the DIP Financing Orders and the budget) and the provisions of the Bankruptcy Code, Sellers, except in the ordinary course of business consistent with past practice, shall not take any of the following actions without first obtaining the written consent of Buyer:

(a)     amend or terminate any Assumed Contract;

(b)     other than the inclusion of in-transit inventory which has been paid for cash in advance as contemplated by the DIP Budget, permit any change in the manner in which Inventory is calculated for purposes of line 19, Combined Column, of the BBR or of the manner in which Accounts Receivable are calculated for purposes of line 10, Combined Column, of the BBR, from the manner of calculation used on July 5, 2011;

(c)     sell, assign, transfer, distribute or otherwise transfer or dispose of any property, plant, equipment account receivable, supply or other assets or property, other than sales of Inventory in the ordinary course of business;

27

(d)     take, cause or permit to occur any action or event that would result in any representation or warranty of Sellers being materially inaccurate as of the Closing Date;

(e)     make any changes in cash management practices, pricing policies, credit or allowance policies, monetary policies, or accounting policies;

(f)     make any payment to, or undertake any transaction with, any Affiliate, officer, director, member or manager of any Seller other than sales of Inventory at market price; or

(g)     (1) change materially the compensation, or (2) terminate without cause or change the position of any non-union employee whose annual base salary exceeds $60,000;

5.4     Employee Matters.

(a)     Nothing contained in this Agreement shall confer upon any employee of Sellers any right with respect to continued employment by Buyer.

(b)     Sellers shall cooperate with Buyer in facilitating meetings between Buyer and the respective collective bargaining agents for each of the unions; provided however, that such meetings shall include a representative of Sellers.

(c)     Except as set forth on Schedule 2.3, Buyer shall not assume any responsibility for or have any liability or obligation of Sellers with respect to or in favor of any employees or former employees of Sellers or with respect to any of Sellers' Employee Benefit or Other Plans.

(d)     Sellers shall pay all post-petition employee salaries and wages when due.

5.5     Access to and Provision of Additional Information.

(a)     From the Execution Date until the Closing Date, Sellers shall cooperate fully with Buyer and Buyer's representatives in connection with Buyer's investigation of the business, Assets, Contracts, rights, liabilities and obligations of Sellers and the Business, and shall provide to Buyer and Buyer's representatives reasonable access to and the right to inspect the Business, any facilities associated with or used in the Business, the Assets, books and records of Sellers relating to Sellers, updated DIP Budgets, the Assets and the Business, and will furnish to Buyer and its representatives all material information concerning the Assets and the Business not otherwise disclosed pursuant to this Agreement all financial, operating and other data and information regarding the Business as Buyer may from time to time reasonably request, without regard to where such information may be located. In addition, Sellers shall use their Best Efforts to cause Sellers' agents, representatives, remaining employees, officers, directors, vendors, and suppliers to cooperate with Buyer and Buyer's representatives in connection with Buyer's due diligence review as it reasonably relates to any Contracts between any such vendors and suppliers and Sellers. Between the date of the hearing on the Bidding Procedures and the date of the Auction, the Buyer shall not initiate any contact with any of Sellers' customers regarding this Agreement or the transactions contemplated hereby. Sellers

28

acknowledge that some of Sellers' existing customers are also customers of Buyer with whom Buyer has a legitimate need to have conversations regarding Buyer's business dealings with such existing customers, and that the fact that Buyer is the stalking horse bidder for the Business will be a matter of public record about which Buyer and its employees are likely to be asked questions, and that Buyer will have a legitimate business need to be able to confirm its interest in, owning and operating the Business should Buyer be the acquirer. Sellers will impose restrictions on customer contacts by all other bidders at least as strict as those imposed on Buyer.

(b)     From the Execution Date until the Closing Date, Sellers shall use their respective Best Efforts to cause its officers and employees to confer with one or more representatives of Buyer and to answer Buyer's questions regarding matters relating to the conduct of the Business and the status of the Transaction.

(c)     Buyer agrees that it will not, in the exercise by Buyer of any right of access granted herein, unreasonably interfere with the business operations of Sellers.

(d)     Except for information received or derived by Sellers in connection with or through the License Agreement between Hussey, OAP and Buyer, dated August 17, 2011, Sellers shall not disclose any diligence information (i) received from Buyer or its Related Persons, or (ii) derived from materials provided to Sellers by Buyer or its Related Persons, to any Person that is or is seeking to become a Qualified Bidder, or that is or is seeking to evaluate, negotiate or consummate a Conflicting Transaction.

(e)     Each Party shall be responsible for its own costs and expenses incurred pursuant to this Section 5.5.

5.6     Post-Closing Maintenance of and Access to Information.

(a)     The parties acknowledge that after Closing each party may need access to information or documents in the control or possession of the other party for the purposes of concluding the transactions herein contemplated, Tax Returns or audits, the Assumed Contracts and other Legal Requirements, and the prosecution or defense of third party claims. Accordingly, each party shall keep, preserve and maintain in the ordinary course of business, and as required by Legal Requirements and relevant insurance carriers, all books, records, documents and other information in the possession or control of such party and relevant to the foregoing purposes until the expiration of any applicable statute of limitations. Notwithstanding the foregoing, neither party shall destroy or otherwise dispose of any of the items referenced in this Section 5.6(a) unless the party seeking to destroy or dispose of such items provides sixty (60) days' prior written notice to the other party of the intent to seek or destroy such items and affords such other party an opportunity to copy or otherwise remove such items.

(b)     Each party shall cooperate fully with, and make available for inspection and copying by, the other party, its employees, agents, counsel and accountants and/or Governmental Authorities, upon written request and at the expense of the requesting party, such books, records, documents and other information in its possession or control to the extent

reasonably necessary to facilitate the foregoing purposes. Such cooperation shall include the on-site and off-site inspection of any equipment or components by experts, engineers, attorneys and other agents of the parties during normal business hours and upon reasonable prior notice. In addition, each party shall cooperate with, and shall permit and use its Best Efforts to cause, at the expense of the requesting party, its respective former and present general or limited partners, members, directors, officers and employees, as applicable, to cooperate with the other party on and after Closing in furnishing information, evidence, testimony and other assistance in connection with any action, proceeding, arrangement or dispute of any nature with respect to the subject matters of this Agreement and pertaining to periods prior to the Closing Date.

(c)     For a period of twelve (12) months following the Closing Date, or for such shorter period of time as Sellers may request, at any time, in writing upon ten (10) days prior notice to Buyer, Buyer shall provide to Sellers sufficient space to permit up to three (3) individuals to engage in all activities related to the Bankruptcy Case, and at no cost to Sellers, at the Leetsdale, Pennsylvania facility; provided, however, that Buyer shall be permitted to structure such arrangement in a manner that will not materially affect Buyer's ability to operate the Business or the Assets following the Closing.

(d)     Following the execution of this Agreement Buyer and Sellers will negotiate in good faith the terms and conditions of a transition services agreement pursuant to which Buyer shall, at Sellers' sole cost and expense, provide certain transition services to Sellers. Such agreement will provide, among other things, that such services shall not interfere with Buyer's conduct of its business or require Buyer to assist in any way in any course of action that involves bringing suit against any customer or supplier.

(e)     The exercise by either party of any right of access granted herein shall not materially interfere with the business operations of the other party.

### 5.7    Governmental Authority Approvals; Consents to Assignment.

(a)     From the Execution Date until the Closing Date, Sellers and Buyer shall (i) promptly apply for and use their respective Best Efforts to obtain prior to Closing all consents, approvals, authorizations and clearances of Governmental Authorities (including under the HSR Act, which HSR filing, if required, shall be made by the parties within fifteen (15) days following the entry of the Bidding Procedures Order) and third parties required of it to consummate the Transaction (including the assignment of the Assumed Contracts), (ii) provide such information and communications to Governmental Authorities as the other party or such Persons may reasonably request, and (iii) assist and cooperate with other party to obtain all Permits and clearances of Governmental Authorities (including pre-merger clearance as required under the HSR Act) that the other party reasonably deems necessary or appropriate, and to prepare any document or other information reasonably required of it by any such Persons to consummate the Transaction; provided, however, that, notwithstanding the foregoing, no party shall have any obligation under such provisions (x) to pay any cash amounts to Governmental Authorities other than filing fees, or (y) to agree to divest assets or limit the operations of its businesses. Buyer will pay 100% of the filing fees required to be paid to the government in connection with the filings required under the HSR Act.

(b)     Sellers, with Buyer's cooperation, shall use their Best Efforts to obtain Bankruptcy Court approval of the assumption by and assignment to Buyer of the Assumed Contracts and Sellers and Buyer shall use their respective efforts to obtain all other consents and approvals, if any, required to assign the Assumed Contracts to Buyer.

(c)     After the Closing, Sellers shall use their Best Efforts to assist Buyer to obtain any Permits and other approvals of Governmental Authorities relating to the ownership, development and operations of the Business or the Assets.

5.8     Allocation of Purchase Price for Tax Purposes.  For income tax purposes, the Purchase Price shall be allocated among the Assets as mutually agreed to by Buyer and Sellers, in accordance with their fair market values consistent with §1060 of the Code, and such allocation shall be binding upon the parties for all applicable federal, state, local and foreign Tax purposes. Sellers and Buyer covenant to report gain or loss or cost basis, as the case may be, in a manner consistent with such allocation on all Tax Returns filed by any of them after Closing and not to voluntarily take any inconsistent position therewith in any administrative or judicial proceeding relating to such returns. Sellers and Buyer shall exchange mutually acceptable and completed IRS Forms 8594 (including supplemental forms, if required), which they shall use to report the transaction contemplated hereunder to the Internal Revenue Service in accordance with such allocation.  Notwithstanding anything to the contrary, no allocation hereunder shall supersede or otherwise usurp the jurisdiction of the Bankruptcy Court to value the assets for purposes of distribution to the respective Debtors' estates under the Bankruptcy Code.

5.9     Further Acts and Assurances.  At any time, and from time to time, at and after the Closing, upon request of Buyer, Sellers shall do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, such further acts, deeds, assignments, transfers, conveyances, powers of attorney, confirmations and assurances as Buyer may reasonably request to more effectively convey, assign and transfer to and vest in Buyer, its successors and assigns, full legal right, title and interest in and actual possession of the Assets and the Business and to generally carry out the purposes and intent of this Agreement.  Sellers shall also furnish Buyer with such information and documents in its possession or under its control, or that such Seller can execute or cause to be executed, as will enable Buyer to prosecute any and all petitions, applications, claims and demands relating to or constituting a part of the Assets and the Business. Sellers shall, to the extent permitted by Governmental Authorities, allow Buyer to operate under any Permit of Sellers that cannot be assigned to Buyer until such time as Buyer obtains a substitute or replacement permit for such Permit.

5.10     Costs and Expenses.  Except as otherwise expressly set forth in this Agreement, all expenses of the negotiation and preparation of this Agreement and related to the Transaction, including legal counsel, accounting, brokerage and investment advisor fees and disbursements, shall be borne by the respective Party incurring such expense, whether or not the Transaction is consummated.

5.11     Insurance Ratings.  From the Execution Date until the Closing Date, Sellers will use their Best Efforts to enable Buyer to succeed to the Workers' Compensation and Unemployment Insurance ratings, insurance policies and other interests of Hussey and the

Business for insurance or other purposes. Buyer shall not be obligated to succeed to any such rating, insurance policy, deposit or other interest, except as it may elect to do so.

5.12    Fulfillment of Conditions.    Each party will execute and deliver at Closing each agreement, instrument or other document that such party is required by this Agreement to execute and deliver as a condition to Closing, and will take all commercially reasonable steps necessary or desirable and proceed diligently and in good faith to satisfy each other condition to the obligations of the parties contained in this Agreement, to the extent that satisfaction of such condition is within the control of such party.

5.13    Assumed and Assigned Contracts; Rejected Contracts; Excess Cure Amounts.

(a)    Assumed Contracts.    Subject to the approval of the Bankruptcy Court and pursuant to the Executory Contract Assumption and Assignment Order, the Assumed Contracts will be assumed by Sellers and assigned to Buyer or Buyer's designee on the Closing Date under §365 of the Bankruptcy Code.  In the Sale Motion, or in such additional or subsequent motions as may be appropriate, Sellers will seek authority to assume and assign the Assumed Contracts to Buyer (or Buyer's Designee) in accordance with §365 of the Bankruptcy Code.  All Assumed Contracts shall be assigned to and assumed by Buyer (or Buyer's designee) at Closing or such later date as agreed by Buyer and Sellers.  Subject to Section 2.3 and the following right of Sellers to reject any Contract, the final determination of which Contracts Sellers will assume and assign to Buyer shall be within the sole discretion of Buyer.  Seller shall be responsible for the Required Cure Amounts and curing all non-monetary defaults with respect to any Assumed Contracts.

(b)    Required Cure Amounts.    At or prior to the Closing, Sellers will pay in full all Required Cure Costs for all Assumed Contracts; provided, however, that in the event that any Required Cure Costs remain the subject of a dispute at the time of Closing, then Sellers shall pay the such disputed Required Cure Costs upon the entry of an order of the Bankruptcy Court settling such dispute.

(c)    Notice of Rejection.    Prior to the Closing Sellers will give Buyer ten (10) days' prior notice before rejecting any Contract (which requirement may be satisfied by providing a copy of any motion seeking authority to reject such Contract).  In addition to the rights of Buyer in Section 2.7, Buyer may at any time prior to rejection of a Contract designate any Contract for assumption and assignment to Buyer and Sellers shall assume and assign such Contract to Buyer, provided that in case of assignment of any Contract listed on Schedule 3.13, or not required to be listed on Schedule 3.13, Buyer shall pay any Required Cure Costs.

5.14    Bankruptcy Court Approval.

(a)    Sellers shall use Sellers' Best Efforts to obtain Bankruptcy Court entry of the Bidding Procedures Order on or after twenty-one (21) days after the Execution Date.

(b)    Sellers shall use Sellers' Best Efforts to obtain Bankruptcy Court entry of the Sale Order on or before forty-five (45) days after the Execution Date, which Sale Order shall be in substantially the form attached hereto as Exhibit C.

32

(c) Sellers shall use Sellers' Best Efforts to obtain Bankruptcy Court entry of the Executory Contract Assumption and Assignment Order.

(d) Sellers shall promptly make any filings, take all reasonable actions, and use Sellers' Best Efforts to obtain any and all other approvals and orders necessary or appropriate for consummation of the Transaction, subject to Sellers' obligations to comply with any order of the Bankruptcy Court.

(e) In the event an appeal is taken, or a stay pending appeal is requested, from the Sale Order, the Executory Contract Assumption and Assignment Order or the Bidding Procedures Order, Sellers shall immediately notify Buyer of such appeal or stay request and shall provide to Buyer within one (1) Business Day a copy of the related notice of appeal or order of stay. Sellers shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such orders.

5.15 Transfer Taxes and Recording Fees; Real Estate Taxes.

(a) Buyer and Sellers shall each pay one half share of any recording fees to file any instruments of transfer of record. In the event real estate or deed transfer Taxes or conveyance fees are required to be paid in order to record any deeds to be delivered to Buyer in accordance herewith, or in the event any such Taxes are assessed at any time thereafter, such real estate or deed transfer Taxes or conveyance fees incurred as a result of the transactions contemplated hereby shall be paid equally by Buyer and Sellers. Prior to the Closing Date, the Buyer and Sellers shall cooperate in good faith to determine that portion of the Purchase Price attributable to the Owned Real Property for purposes of computing any such transfer Tax or conveyance fee.

(b) Real estate taxes and assessments, both general and special, shall be conclusively prorated between the parties as of the Closing Date based upon the rate and millage shown in the latest available real estate tax bill for the Owned Real Property, such that all amounts attributable to periods ending on or before the Closing Date are allocated to Sellers, and all amounts attributable to periods ending after the Closing Date are allocated to Buyer. Notwithstanding the foregoing, Buyer shall be responsible for any unpaid assessments for governmental improvements affecting any of the Owned Real Property.

5.16 Name Change. Immediately following the Closing, Hussey shall change its name to a name that does not use the words "Hussey" or "Copper."

5.17 Adequate Assurances. Buyer (or any affiliate of Buyer designated or to be designated pursuant to Section 8.1(b) herein) shall provide in a timely fashion any and all information required by the Bankruptcy Code and the Bankruptcy Court to evidence Buyer's (or any affiliate of Buyer designated or to be designated pursuant to Section 8.1(b) herein) capability of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assumed Contracts to be assigned to Buyer.

5.18 Inventory/Shipping Notice. Sellers shall provide written notice to Buyer within twenty-four (24) hours of the occurrence of any failure by Sellers to meet the minimum shipping threshold set forth in Section 9.1(o).

33

5.19    Supply Arrangement.  If Buyer is determined to be the High Bidder (as defined in the Bidding Procedures Order) at the Auction, then from and after the date of the Auction until (a) the sale of the Assets to Buyer at the Closing, or (b) the earlier termination of this Agreement, Sellers shall purchase all of their requirements of copper scrap and copper cathode from Kataman Metals LLC cash in advance, at an arm's length price; provided, however, that if Kataman Metals LLC is unable, or fails to supply Sellers' needs Kataman Metals LLC shall not be obligated to do so, and Buyers shall not in such case be obligated to purchase from Kataman Metals LLC.  Buyer waives any right to set off or recoup any obligation it may have to any of the Sellers under this Section 5.19 against any obligation any Seller may have to Buyer under this Agreement or otherwise.

## 6.    CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS

The obligations of Sellers hereunder are subject to the satisfaction on or prior to the Closing Date of the following conditions unless waived in writing by Sellers:

### 6.1    Representations and Warranties; Covenants.

(a)    Each of the representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects on and as of the Execution Date and, except where expressly limited to a specific date, on and as of the Closing Date.

(b)    Each and all of the terms, covenants and agreements to be complied with or performed by Buyer on or before the Closing Date shall have been complied with and performed in all material respects, including the obligations of Buyer in Section 8.3.

6.2    Adverse Actions or Proceedings.  No Governmental Authority shall have taken any action or made any request of Sellers or Buyer as a result of which Sellers reasonably and in good faith deems it inadvisable to proceed with the Transaction, and there shall not be in effect any order restraining, enjoining or otherwise preventing consummation of the Transaction; provided that the parties shall have used their respective Best Efforts to cause any such order to be vacated or lifted.  All applicable waiting periods under the HSR Act shall have expired or been earlier terminated.

### 6.3    Sale Order.

The Sale Order shall have been entered, which order shall not have been stayed or reversed.

## 7.    CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER

The obligations of Buyer hereunder are subject to the satisfaction on or prior to the Closing Date of each of the following conditions, unless waived in writing by Buyer:

### 7.1    Representations and Warranties; Covenants.

(a)    Each of the representations and warranties of Sellers contained in this Agreement shall be true, complete and correct in all material respects on and as of the

34

Execution Date and, except where expressly limited to a specific date, on and as of the Closing Date.

(b) Each and all of the terms, covenants and agreements to be complied with or performed by Sellers on or before the Closing Date shall have been complied with or performed in all material respects, including the obligations of Sellers in Section 8.2.

7.2 Pre-Closing Confirmations and Contractual Consents. Buyer shall have obtained or received from Sellers documentation or other evidence reasonably satisfactory to Buyer that:

(a) the Sale Order, Executory Contract Assumption and Assignment Order and the Bidding Procedures Order have been entered by the Bankruptcy Court and have become Final Orders, unless Buyer, in its sole discretion, waives the requirement that one or more of these orders be a Final Order – in such case, no notice of such waiver need be given except to Sellers, it being the intention of the Parties that Buyer shall be entitled to, and is not waiving, the protections of Section 363(m) of the Bankruptcy Code, the mootness doctrine and any similar statute or body of law if the Closing occurs in the absence of the above orders being each a Final Order; and

(b) Buyer has obtained the consents, permits, approvals, authorizations and clearances of Governmental Authorities listed on Schedule 7.2(b).

7.3 Adverse Actions or Proceedings. No Governmental Authority shall have taken any action or made any request of Sellers or Buyer as a result of which Buyer reasonably and in good faith deems it inadvisable to proceed with the Transaction; and there shall not be in effect any order restraining, enjoining or otherwise preventing consummation of the Transaction; provided that the parties shall have used their respective Best Efforts to cause any such order to be vacated or lifted. All applicable waiting periods under the HSR Act shall have expired or been earlier terminated.

7.4 Deliveries at Closing. Sellers shall have delivered to Buyer, in form reasonably acceptable to Buyer and approved by Buyer's counsel, deeds, bills of sale, assignments or other instruments of transfer, and estoppels, consents and waivers by others, necessary or appropriate to transfer to and effectively vest in Buyer the Assets and all agreements, instruments, certificates or other documents contemplated or required to be executed by Sellers pursuant to this Agreement.

7.5 Title Insurance. The Title Company shall have issued a commitment to issue to Buyer, upon Buyer's payment of the cost therefor and all fees and expenses of the Title Company and Buyer's delivery of all customary documents, certificates and instruments required by the Title Company, an ALTA owners coverage policy of title insurance for each of the parcels of Owned Real Property identified on Schedule 2.1(a) insuring the interest to be acquired by Buyer in each such each property, subject only to Permitted Encumbrances.

7.6 No Material Adverse Effect. There shall not have been any Material Adverse Effect since the date of this Agreement.

693680.13

7.7    Cure Costs. Sellers shall have paid, or made arrangements satisfactory to Buyer for the payment of, all Required Cure Costs required to be paid for the assignment and assumption of the Acquired Contracts.

7.8    Employee Compensation. Sellers shall have paid, or shall pay concurrently with Closing, all salary and hourly salary and wages for all employees through and including the date of the Closing.

## 8.    CLOSING

### 8.1    Closing.

(a)    Consummation of the sale and purchase of the Assets and the Business and the other transactions contemplated by and described in this Agreement (the "Closing") shall take place at such time or place as the parties may mutually agree, or at such time or place as the parties may mutually agree. Unless otherwise agreed in writing by the parties at Closing, the Closing shall be effective for accounting purposes as of 12:01 A.M. on the day of the Closing Date.

(b)    No later than three (3) days prior to the hearing on the Sale Order, Buyer, with the prior written consent of Sellers, which consent shall not be unreasonably withheld, may designate one or more Affiliates to take title to the Assets, and references to instruments or agreements to be executed and delivered to or by Buyer in this Agreement at Closing shall apply to each such designee with respect to the Assets acquired by it. Sellers shall be deemed to have provided consent as to any designated affiliate of Buyer that has satisfied the adequate assurance requirements of Section 5.17 herein. Buyer shall notify Sellers prior to Closing of the names of such approved designees and, from and after Closing, the rights, privileges and benefits of this Agreement applicable to Buyer shall benefit each such designee, subject to the terms, covenants and conditions of this Agreement, with respect to the Assets acquired by it.

8.2    Action of Sellers at Closing. At the Closing unless otherwise waived in writing by Buyer, Sellers shall deliver:

(a)    to Buyer deeds containing special warranties of title and where applicable assignments of lease, in form and substance reasonably acceptable to Buyer and Sellers, fully executed by Sellers in recordable form (if applicable), conveying to Buyer good and marketable, fee simple title to the Owned Real Property, and valid leasehold title to the Leased Real Property, and assignments of any Occupancy Lease, as set forth on Schedule 3.8, free and clear of all Encumbrances on Sellers' interest in each such property other than the Permitted Encumbrances;

(b)    to Buyer bills of sale and assignment, including patent and trademark assignments, if any, fully executed by Sellers, in form and substance reasonably acceptable to Buyer, conveying to Buyer good and valid title to all Assets other than the Real Property, free and clear of all Encumbrances;

36

(c)     to Buyer assignments, fully executed by Sellers, in form and substance reasonably acceptable to Buyer, conveying Sellers' interests in the Assumed Contracts to Buyer;

(d)     to Buyer copies of resolutions or equivalent instruments duly adopted by each Seller, authorizing and approving the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, certified as true and in full force and effect as of the Closing Date by the appropriate officers or members of each Seller;

(e)     to the Title Company, all such documents, certificates and instruments as are customarily provided to by a seller to the buyer's title company, in form and substance reasonably satisfactory to the Title Company and the Sellers, including, without limitation, a customary owner's affidavit to delete some of the standard title exceptions;

(f)     to Buyer certificates of the duly authorized person or officer of each Seller certifying that, except where expressly limited to a specific date, each of the representations and warranties of Sellers contained in this Agreement is true and correct on and as of the Closing Date in all material respects, and that each and all of the terms, covenant and agreements to be complied with or performed by Sellers on or before the Closing Date have been complied with and performed in all material respects;

(g)     to Buyer a written certification from Sellers, in form reasonably acceptable to Buyer and Sellers, certifying that Sellers are not persons subject to withholding under Section 1445 of the Internal Revenue Code and regulations promulgated thereunder;

(h)     to the extent obtainable using good faith efforts, Buyer estoppel certificates executed on behalf of each of the lessors of the Real Property leased or subleased by Sellers (except to the extent the lessor is a Seller), in form and substance reasonably satisfactory to Buyer;

(i)     to Buyer a customary no-change survey affidavit with respect to the 2003 surveys of the Owned Real Property; and

(j)     to Buyer such other instruments, agreements, certificates and documents as Buyer reasonably deems necessary to effect the Transaction.

8.3     Action of Buyer at Closing.  At the Closing and unless otherwise waived in writing by Sellers, Buyer shall deliver:

(a)     to Sellers, the Cash Consideration in accordance with Section 2.5;

(b)     to Sellers an assumption agreement, fully executed by Buyer, in form and substance reasonably acceptable to Sellers, pursuant to which Buyer shall assume the future payment and performance of the Assumed Liabilities;

(c)     to Sellers copies of resolutions duly adopted by the governing body of Buyer authorizing and approving Buyer's execution and delivery of this Agreement and the

37

Transaction, certified as true and in full force and effect as of the Closing Date by an appropriate officer of Buyer;

(d)     to Sellers certificates of the duly authorized President, Vice President, or other authorized officer of Buyer certifying that, except as expressly limited to a specific date, each of the representations and warranties of Buyer contained in this Agreement is true and correct on and as of the Closing Date in all material respects, and that each and all of the terms, covenants and agreements to be complied with or performed by Buyer on or before the Closing Date have been complied with and performed in all material respects;

(e)     to Sellers certificates of incumbency for the officers of Buyer executing this Agreement and other Closing documents, dated as of the Closing Date; and

(f)     to Sellers such other agreements, instruments and documents as Sellers reasonably deems necessary to effect the Transaction.

## 9.     **TERMINATION OF AGREEMENT**

9.1     Termination Prior to Closing.  Notwithstanding anything herein to the contrary, this Agreement may be terminated, and the transactions contemplated by this Agreement abandoned, only as provided in this Section 9.1, upon notice by the terminating party to the other parties:

(a)     At any time before the Closing, by the mutual consent of Buyer and Sellers.

(b)     At any time before the Closing, by Buyer if there is a material breach of this Agreement by any Seller, or a material inaccuracy of any representation or warranty of any Seller, in either case, that is not cured within five (5) Business Days after notice thereof by the Buyer.

(c)     At any time before the Closing, by Sellers if there is a material breach of this Agreement by Buyer, or a material inaccuracy of any representation or warranty of Buyer, that is not cured within five (5) Business Days after notice thereof by the Sellers.

(d)     [Intentionally Omitted].

(e)     At any time after seventy-five (75) days after the Execution Date, by either party if the Transaction has not been consummated on or before such date; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(e) shall not be available to a party if such party's failure to fulfill any obligation under this Agreement shall have been the proximate cause of the failure of the Closing Date to have occurred on or prior to such date.

(f)     Automatically, upon Bankruptcy Court approval of (i) any refinancing of Sellers, excluding the financing provided under the DIP Financing Facility, and (ii) any agreement that contemplates a transaction or series of related transactions, other than the transactions to be consummated under this Agreement, pursuant to which a material portion of

38

the Assets will be acquired by, or transferred to, a third party other than Buyer, whether pursuant to an asset sale, merger, credit bid, stock purchase, a chapter 11 Plan of Reorganization or otherwise (any such transaction, an "Alternative Transaction"); provided, however, that in the event that Buyer is the Back-up Bidder as contemplated by the Bidding Procedures then termination pursuant to this Section 9.1(f) shall not be effective until 10 days after the Auction.

(g)     Automatically, upon the confirmation of a Plan of Reorganization that is not an Alternative Transaction.

(h)     By Buyer, by notice to Sellers, if a Bankruptcy Case of a Seller shall have been dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

(i)     By Buyer, by notice to Sellers, if there is appointed in any Bankruptcy Case of a Seller, a trustee or examiner with enlarged powers under Section 1106(b) of the Bankruptcy Code.

(j)     By Buyer, by notice to Sellers, if: (i) the Bidding Procedures Order including approval of the proposed Breakup Fee and reimbursement of Expenses to be paid to Buyer, has not been entered on or before twenty (25) days after the Execution Date, (ii) following the entry of the Bidding Procedures Order, such order is reversed, vacated or otherwise modified, (iii) the Bidding Procedures Order is stayed as of the date the Auction is scheduled to commence, (iv) the Bidding Procedures Order is not a Final Order prior to the date the Auction commences, or (v) the Sale Order has not been entered on or before sixty (60) days after the Execution Date.

(k)     By Buyer, if Sellers breach any of their covenants contained in Sections 5.1(a) and 5.1(e).

(l)     By Buyer, at any time prior to the later of (i) the date of the Bankruptcy Court's hearing on the Bidding Procedures Order, or (ii) the date that is the 21st day after the Execution Date, if Buyer is not satisfied in its sole and absolute discretion with (i) any matter disclosed by its environmental due diligence, the existence and magnitude of which was not known with specificity to Buyer on the date this Agreement was executed, or (ii) the form or substance of the schedules to this Agreement (other than schedules that pursuant to Section 2.7, Buyer has the right to amend).

(m)     By Buyer, at any time prior to the later of (i) the date of the Bankruptcy Court's hearing on the Bidding Procedures Order, or (ii) the date that is the 21st day after the Execution Date, if Buyer is not satisfied in its sole and absolute discretion with any matter regarding Buyer's discussions with the United Steelworkers of America regarding modifications to the CBAs.

(n)     By Buyer, if on the date that would otherwise be the Closing Date, the certain number of pounds of Sellers' Inventory of copper is less than 85% of amount shown on the "Copper Balance (lbs)" line in the DIP Budget labeled: *Hussey Copper, Ltd. Debtor-in-Possession Cash Budget; Summary of Significant Assumptions; DIP Budget Final 092711* for

such date, or if such date is after the expiration of the current DIP Budget, the amount for the last date of the current DIP Budget.

(o)     By Buyer, at any time prior to the Auction, if during any complete calendar week (12:01 am Monday to 12 midnight Sunday) after the Execution Date and prior to the Auction, the Sellers' total shipments during each of the first four (4) weeks after the Execution Date are less than 85% and in all periods thereafter are less than 90% of the level of shipments for such week (on a three (3) week rolling average basis) as shown in the DIP Budget labeled: *Hussey Copper, Ltd. Debtor-in-Possession Cash Budget; Summary of Significant Assumptions; DIP Budget Final 092711*, on the line labeled HCL Monthly Sales Volume (lbs), or if the Auction occurs after the expiration of the current DIP Budget, the level of total shipments during the last week of the current DIP Budget.

9.2     Effect of Termination.  If this Agreement is validly terminated pursuant to this Section 9, this Agreement will be null and void, and there will be no Liability on the part of any party (or any of their respective officers, directors, trustees, employees, agents, consultants or other representatives) except the parties' obligations as provided for in this Section 9.2 shall survive any termination and shall apply thereafter to the extent applicable and as set forth herein.

(a)     If the Agreement is terminated pursuant to Section 9.1(c), then the Escrow Agent shall pay the Deposit (or such portion thereof paid to the Escrow Agent) to the Sellers as liquidated damages and neither party shall have any further liability to the other.

(b)     If the Agreement is terminated for any reason other than pursuant to Section 9.1(c), then the Escrow Agent shall return the Deposit (or such portion thereof paid to the Escrow Agent) to Buyer and Buyer shall have no liability whatsoever to Sellers. Such return shall be in addition to any additional amounts required to be paid pursuant to Sections 9.2(c) through 9.2(e). Notwithstanding the foregoing to the contrary, the receipt of any amounts by Buyer pursuant to Sections 9.2(b) through 9.2(e) shall be the sole and exclusive remedy of Buyer (except as provided in Section 9.2(f)), and Buyer shall not be entitled to any other amounts for damages, losses, or payment from Sellers, and Sellers shall have no further obligations or liability of any kind to Buyer, any of Buyer's Affiliates, or any third party on account of this Agreement.

(c)     If the Agreement is terminated pursuant to Section 9.1(f), the Sellers, in consideration of Buyer's due diligence, good faith negotiations of and entering into this Agreement, and in recognition of Buyer's work in (i) establishing a bid standard or minimum for other bidders, (ii) placing estate property in a sales configuration mode attracting other bidders to the auction and bidding process, (iii) serving, by its name and its expressed interest, as a catalyst for other bidders, and (iv) as reimbursement of Buyer's Expenses incurred in connection with the proposed sale, shall, at and as a condition precedent to the Closing or consummation of an Alternative Transaction, pay the Breakup Fee to the Buyer with such amount being payable upon the closing or consummation of such Alternative Transaction from the proceeds thereof (and if the Closing fails to occur, from the good faith deposit made by the party that failed to close, to the extent the Sellers are entitled to retain such good faith deposit). The Breakup Fee and any obligations of Sellers hereunder or under the Bidding Procedures Order shall constitute administrative expenses allowable under Section 503(b)(1) of the

40

Bankruptcy Code (which shall also be super-priority administrative expense claims senior to all other administrative expense claims under Section 364(c)(1) of the Bankruptcy Code, except that Buyer's super-priority administrative expense claims shall be junior in priority to the super-priority claims under Section 364(c)(1) of the Bankruptcy Code granted to the DIP Agent for the benefit of itself and the other DIP Lenders and the Pre-Petition Agent for the benefit of itself and the Pre-Petition Lenders (as such terms are defined in the DIP Financing Order) under the DIP Financing Order (including all carve-outs granted pursuant to the DIP Financing Order), shall be earned upon the Bankruptcy Court's approval of an Alternative Transaction and shall be paid by Sellers pursuant to this Agreement from the sale proceeds thereof, after payment of closing costs and all amounts payable to the DIP Agent for the benefit of itself and the other DIP Lenders and the Pre-Petition Agent for the benefit of itself and the Pre-Petition Lenders (as such terms are defined in the DIP Financing Order) under the DIP Financing Order (including all carve-outs granted pursuant to the DIP Financing Order), without any further Bankruptcy Court approval or order, as a super-priority administrative claim under Sections 364(c)(1) and 503(b)(1) of the Bankruptcy Code. The obligation to pay in full in cash when due any amount owed by any Seller to the Buyer under this Agreement, including the Breakup Fee and the reimbursement of Expenses, shall not be discharged, modified or otherwise affected by any Plan of Reorganization or plan of liquidation for any Seller or by any other Order of the Bankruptcy Court.

(d)     If the Agreement is terminated pursuant to Section 9.1(b), 9.1(g), 9.1(h), 9.1(k), 9.1(n) or 9.1(o), or as a result of the DIP Lenders (as defined in the DIP Financing Order) refusal to consent to the sale transaction described herein, Sellers shall reimburse Buyer for its Expenses. The Expenses and any obligations of Sellers hereunder or under the Bidding Procedures Order shall constitute administrative expenses allowable under Section 503(b)(1) of the Bankruptcy Code (which shall also be super-priority administrative expense claims senior to all other administrative expense claims under Section 364(c)(1) of the Bankruptcy Code, except that Buyer's super-priority administrative expense claims shall be junior in priority to the super-priority claims under Section 364(c)(1) of the Bankruptcy Code granted to the DIP Agent for the benefit of itself and the other DIP Lenders and the Pre-Petition Agent for the benefit of itself and the Pre-Petition Lenders (as such terms are defined in the DIP Financing Order) under the DIP Financing Order (including all carve-outs granted pursuant to the DIP Financing Order), and shall be paid by Sellers to Buyer within five (5) Business Days of Sellers' receipt of Buyer's notice of termination, without any further Bankruptcy Court approval or order, as a super-priority administrative claim under Sections 364(c)(1) and 503(b)(1) of the Bankruptcy Code.

(e)     Notwithstanding anything in this Section 9.2 to the contrary, Buyer shall not be entitled to receive the Breakup Fee or the Expenses in the event that this Agreement is terminated as a result of the failure to obtain requisite approval (or the termination of the waiting period) under the HSR Act for the sale of the Acquired Assets to Buyer.

## 10.     SURVIVAL

The representations and warranties of Sellers contained in Article 3 and of Buyer contained in Article 4 of this Agreement shall terminate as of the Closing, and all of such representations and warranties shall be extinguished as of such date. All other covenants and

agreements of the parties contained in this Agreement shall survive the Closing; provided, however, that Sellers' covenants shall survive the Closing for a period of no more than twelve (12) months after the Closing Date.

## 11. GENERAL

11.1 Schedules. The Schedules and all Exhibits and documents referred to in or attached to this Agreement are integral parts of this Agreement as if fully set forth herein and all statements appearing therein shall be deemed to be representations. Nothing in the Schedules shall be deemed adequate to disclose an exception to a representation or warranty made herein unless the Schedule identifies the exception with reasonable particularity.

11.2 Reproduction of Documents. This Agreement and all documents relating hereto, including consents, waivers and modifications that may hereafter be executed, the documents delivered at the Closing, and financial statements, certificates and other information previously or hereafter furnished to any party may be reproduced by any party by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process and the parties may destroy any original documents so reproduced. The parties stipulate that any such reproduction shall be admissible in evidence as the original itself in any judicial, arbitral or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made in the ordinary course of business) and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

11.3 Choice of Law; Submission to Jurisdiction. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to such state's conflicts of laws rules. Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court and irrevocably waives, to the fullest extent permitted by law, any objection to the laying of venue of any such proceeding brought in such Bankruptcy Court and any claim that such Bankruptcy Court is an inconvenient forum.

11.4 Benefit; Assignment. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, successors and assigns. Sellers may not assign any of their rights, interests, or obligations under this Agreement without the prior written consent of Buyer. Buyer, with the prior written consent of Sellers, which consent may not be unreasonably withheld, may assign this Agreement, in whole or in part, to any Affiliate of Buyer and/or to any of Buyer's lenders. Sellers shall be deemed to have provided consent as to any designated affiliate of Buyer that has satisfied the adequate assurance requirements of Section 5.17 herein. In the event Buyer elects to assign this Agreement in whole or in part to any Affiliate of Buyer, Buyer shall remain responsible for payment of the Purchase Price.

11.5 No Third Party Beneficiary. The terms and provisions of this Agreement (including provisions regarding employee and employee benefit matters) are intended solely for the benefit of the parties, and their respective successors and permitted assigns, and are not intended to confer third-party beneficiary rights upon any other Person. Any reference in this Agreement to one or more Employee Benefit Plans of Buyer or Sellers includes provisions, if any, in such plans permitting their termination or amendment and any covenant in this

42

Agreement to provide benefits under any Employee Benefit Plan shall not be deemed or construed to limit Buyer's right to terminate or amend such plan of Buyer in accordance with its terms.

11.6    Waiver of Breach, Right or Remedy.  The waiver by any party of any breach or violation by another party of any provision of this Agreement or of any right or remedy of the waiving party in this Agreement (a) shall not waive or be construed to waive any subsequent breach or violation of the same provision, (b) shall not waive or be construed to waive a breach or violation of any other provision, and (c) shall be in writing and may not be presumed or inferred from any party's conduct. Except as expressly provided otherwise in this Agreement no remedy conferred by this Agreement is intended to be exclusive of any other remedy, and each and every remedy shall be in addition to every other remedy granted in this Agreement or now or hereafter existing at law or in equity, by statute or otherwise.  The election of one or more remedies by a party shall not constitute a waiver of the right of such waiving party to pursue other available remedies. In addition to any other rights and remedies any party may have at law or in equity for breach of this Agreement, each party shall be entitled to seek an injunction to enforce the provisions of this Agreement.

11.7    Notices.  Any notice, demand or communication required, permitted or desired to be given hereunder shall be deemed effectively given if given in writing (a) on the date tendered by personal delivery, (b) on the date received by facsimile or other electronic means, (c) one day after the date tendered for delivery by nationally recognized overnight courier, or (d) three days after the date tendered for delivery by United States mail with postage prepaid thereon, certified or registered mail, return receipt requested, in any event addressed as follows:

If to Buyer:                        KHC Acquisition LLC
                                    c/o Kataman Metals LLC
                                    7733 Forsythe Boulevard
                                    Suite 300
                                    St. Louis, MO  63105
                                    Attn:  Joseph P. Reinmann
                                    Telephone:  314.863.6699
                                    Facsimile:  314.863.5588

And:

                                    c/o Cobalt Ventures
                                    PO Box 1509
                                    Louisville, KY  40201
                                    Attn:  Doug Smith
                                    Telephone:  502.589.8281
                                    Facsimile:  502.589.8291

| with a copy (that shall not | |
|---|---|
| constitute notice) to: | McDonald Hopkins LLC |
| | 600 Superior Avenue, East |
| | Suite 2100 |
| | Cleveland, Ohio 44114 |
| | Attention: David D. Watson |
| | Telephone: (216) 348-5400 |
| | Facsimile: (216) 348-5474 |

| If to Sellers: | Hussey Copper Corp. |
|---|---|
| | 100 Washington Street |
| | Leetsdale, PA 15056 |
| | Attention: Roy D. Allen, Chairman |
| | Telephone: 724.251.4238 |
| | Facsimile: 724.251.4497 |

| with a copy (that shall not | |
|---|---|
| constitute notice) to: | Saul Ewing LLP |
| | Centre Square West |
| | 1500 Market Street, 38th Floor |
| | Philadelphia, PA 19102 |
| | Attention: Jeffrey C. Hampton, Esq. |
| | Telephone: (215) 972-7118 |
| | Facsimile: (215) 972-1848 |

or to such other address or number, and to the attention of such other Person, as any party may designate at any time in writing in conformity with this Section 11.7.

11.8    Misdirected Payments; Offset Rights. Sellers shall remit to Buyer with reasonable promptness any monies received by Sellers constituting or in respect of the Assets, Assumed Contracts and Assumed Liabilities. Buyer shall remit to Sellers with reasonable promptness any monies received by Buyer constituting or in respect of the Excluded Assets, Rejected Contracts and Excluded Liabilities. If any Person determines that funds previously paid or credited to Sellers or the Business in respect of services rendered prior to the Closing Date have resulted in an overpayment or must be repaid, Sellers shall be responsible for the repayment of said monies (and the defense of such actions), except to the extent that the repayment obligation was an Assumed Liability.

11.9    Severability. If any provision of this Agreement is held or determined to be illegal, invalid or unenforceable under any present or future law by a court of competent jurisdiction: (a) such provision will be fully severable; (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof; (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom; and (d) in lieu of such illegal, invalid or unenforceable provision, Sellers and Buyer agree to

44

negotiate in good faith a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

11.10 Entire Agreement; Counterparts; Amendment. This Agreement supersedes all prior or contemporaneous contracts, agreements and understandings and constitutes the entire agreement of whatsoever kind or nature existing between or among the parties representing the subject matter of this Agreement and no party shall be entitled to benefits other than those specified herein. As between or among the parties, any oral or written representation, agreement or statement not expressly incorporated herein, whether given prior to or on the Execution Date, shall be of no force and effect unless and until made in writing and signed by the parties on or after the Execution Date. Each representation, warranty and covenant contained in this Agreement has independent significance and if any party has breached any representation, warranty or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the relative level of specificity) that such party has not breached shall not detract from or mitigate the fact that the party is in breach of the first representation, warranty or covenant. This Agreement may be executed in two (2) or more counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument. This Agreement may not be amended except in a written instrument executed by the parties.

11.11 Drafting. No provision of this Agreement shall be interpreted for or against any Person on the basis that such Person was the draftsman of such provision, and no presumption or burden of proof shall arise favoring or disfavoring any Person by virtue of the authorship of any provision of this Agreement.

*(Remainder of Page Intentionally Left Blank)*

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed in multiple originals by their duly authorized officers as of the Execution Date.

SELLERS:

**HUSSEY COPPER LTD.**
By: Hussey Copper Corp., its general partner

By: _____
Name: Roy D. Allen
Title: President

**COUGAR METALS, INC.**

By: _____
Name: Roy D. Allen
Title: President

**OAP REAL ESTATE, LLC**

By: _____
Name: Roy D. Allen
Title: Managing Director

BUYER:

**KHC ACQUISITION LLC**

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed in multiple originals by their duly authorized officers as of the Execution Date.

SELLERS:

**HUSSEY COPPER LTD.**
By: Hussey Copper Corp., its general partner

By: _____
Name: Roy D. Allen
Title: President

**COUGAR METALS, INC.**

By: _____
Name: Roy D. Allen
Title: President

**OAP REAL ESTATE, LLC**

By: _____
Name: Roy D. Allen
Title: Managing Director

BUYER:

**KHC ACQUISITION LLC**

By: _____
Name: Joseph P. Reinmann
Title: President + CEO

**Exhibit A**

**Bidding Procedures Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| Hussey Copper Corp.,[1] ) | Case No. 11-13010 (BLS) |
| ) | |
| Debtor. ) | |
| ) | |
| In re: ) | Chapter 11 |
| ) | |
| Hussey Copper Ltd., ) | Case No. 11-13012 (BLS) |
| ) | |
| Debtor. ) | |
| ) | |
| In re: ) | Chapter 11 |
| ) | |
| OAP Real Estate, LLC, ) | Case No. 11-13013 (BLS) |
| ) | |
| Debtor. ) | |
| ) | |
| In re: ) | Chapter 11 |
| ) | |
| Cougar Metals, Inc., ) | Case No. 11-13014 (BLS) |
| ) | |
| Debtor. ) | |
| ) | |
| In re: ) | Chapter 11 |
| ) | |
| Orbie Trading, L.P., ) | Case No. 11-13015 (BLS) |
| ) | |
| Debtor. ) | |
| ) | |
| In re: ) | Chapter 11 |
| ) | |
| Hussey Exports Ltd., ) | Case No. 11-13016 (BLS) |
| ) | |
| Debtor. ) | Joint Administration Requested |
| ) | **Related to Docket No. ___** |

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Hussey Copper Corp. (9993); Hussey Copper Ltd. (9994); OAP Real Estate, LLC (1298); Cougar Metals, Inc. (1674); Orbie Trading, L.P. (4969); and Hussey Exports Ltd. (8997). The Debtors' address is 100 Washington Street, Leetsdale, Pennsylvania 15056.

**ORDER GRANTING MOTION OF THE DEBTORS FOR ENTRY OF AN
ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL
OF THE DEBTORS' ASSETS, FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES AND INTERESTS, (B) APPROVING
ASSET PURCHASE AGREEMENT AND (C) GRANTING RELATED RELIEF**

Upon the Motion of the Debtors for Entry of an Order (A) Authorizing the Sale of

Substantially all of the Debtors' Assets, Free and Clear of Liens, Claims, Encumbrances and

Interests, (B) Approving Asset Purchase Agreement and (C) Granting Related Relief [Docket

No. ____](the "Motion");[2]

This Court having held a hearing on _____, 2011 and entered an order dated

_____, 2011 (the "Bid Procedures Order"), pursuant to which this Court, *inter alia*:

    (a)    approved the Bid Procedures;

    (b)    approved the Assumption and Assignment Procedures;

    (c)    approved the Escrow Deposit Agreement;

    (d)    established the date and time for the Auction;

    (e)    established the date and time for the Sale Hearing;

    (f)    approved the form and manner of Auction and Sale Notice; and

    (g)    approved the Break-Up Fee as well as the reimbursement of Expenses as provided
in the Kataman Agreement and the Bid Procedures.

**THE COURT FINDS THAT:**

### JURISDICTION, FINAL ORDER, AND STATUTORY PREDICATES

A.    This Court has jurisdiction over the Motion, the transactions contemplated by the

Kataman Agreement and any other ancillary documents and agreements related thereto pursuant

to 28 U.S.C. §§ 157(b)(1) and 1334(a). This matter is a core proceeding pursuant to 28 U.S.C.

---

[2]    Each capitalized term used but not defined herein shall have the meaning ascribed thereto in the Motion.

§ 157(b)(2)(A), (N) and (O). Venue of these cases and the Motion in this judicial district is proper under 28 U.S.C. §§ 1408 and 1409.

B.     This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Order and expressly directs entry of judgment as set forth herein.

C.     The statutory and rule-based predicates for the relief sought in the Motion are sections 105(a), 363(b), (f) and (m), and 365(a), (b), and (f) of the United States Code, 11 U.S.C. § 101 *et seq.* (as amended, the "Bankruptcy Code"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware.

D.     KHC Acquisition, LLC (the "Buyer") is a party in interest in the Debtors' chapter 11 cases and has standing to raise, appear and be heard on any issue in such cases.

## SOUND BUSINESS PURPOSE

E.     The Debtors seek to convey the Acquired Assets, all of which are related to the Debtors' businesses.

F.     The Debtors have demonstrated both: (1) good, sufficient and sound business purposes and justifications for the sale of the Acquired Assets (the "Sale"); and (2) compelling circumstances for the Sale pursuant to section 363(b) of the Bankruptcy Code prior to, and outside of, a plan of reorganization in that, among other things, the value of the Acquired Assets would be harmed by any delay of the Sale. Time is of the essence in consummating the proposed Sale.

## HIGHEST AND BEST OFFERS

G. On _____, 2011, this Court entered the Bid Procedures Order [Docket No. ___] approving Bid Procedures for the Acquired Assets. The Bid Procedures provided a full, fair and reasonable opportunity for any person to make an offer to purchase the Acquired Assets. The Debtors conducted an Auction in accordance with the Bid Procedures Order and complied with that order in all respects. The Buyer complied with the Bid Procedures Order.

H. As demonstrated by the testimony and other evidence proffered or adduced at the Sale Hearing: (1) the Debtors have adequately marketed the Acquired Assets; (2) the purchase price contained in the Kataman Agreement constitutes the highest and otherwise best offer for the Acquired Assets and provides fair and reasonable consideration therefor; (3) the Sale will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative; (4) no other party has offered to purchase the Acquired Assets for greater economic value to the Debtors or their estates; and (5) the consideration to be paid by the Buyer under the Kataman Agreement constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory or possession thereof or the District of Columbia.

I. The Buyer has provided the Debtors with an aggregate deposit in an amount equal to $6,500,000 (such amount, together with the interest accrued thereon, the "Deposit"), which Deposit is currently being held by U.S. Bank in an interest-bearing account.

J. [_____] is the Back-Up Bidder, by virtue of its final bid at the Auction.

## BEST INTEREST OF CREDITORS

K. Approval of the Kataman Agreement and the consummation of the Sale to the Buyer at this time are in the best interests of the Debtors, their creditors, their estates and other parties in interest.

## GOOD FAITH

L.    The Kataman Agreement and each of the transactions contemplated therein were negotiated, proposed and entered into by the Debtors and the Buyer in good faith, without collusion and from arm's-length bargaining positions after a period in which third parties had ample opportunity to seek information and enter into discussions or negotiations with the Debtors and their retained advisors and professionals concerning a sale of the Acquired Assets. The Buyer is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all the protections afforded thereby. Neither the Debtors nor the Buyer have engaged in any conduct that would cause or permit the Kataman Agreement to be avoided or impose costs and damages under section 363(n) of the Bankruptcy Code or any other provision of the Bankruptcy Code, the Bankruptcy Rules or applicable law. Specifically, the Buyer's discussions and negotiations with non-debtor parties to executory contracts and unexpired leases of the Debtors and other creditors of the Debtors were conducted in good faith, without collusion, from arm's length bargaining positions, and did not impair the ability of the Debtors or the Buyer to fully and faithfully discharge their respective duties and obligations under the Bankruptcy Code.

M.    The Kataman Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code and under the laws of the United States.

## NOTICE OF THE MOTION, THE AUCTION AND THE CURE AMOUNTS

N.    As evidenced by the certificates of service filed with the Court: (1) proper, timely, adequate and sufficient notice of the Motion and the Sale Hearing has been provided by the Debtors; (2) such notice was good, sufficient and appropriate under the particular circumstances; and (3) no other or further notice of the Motion, the proposed Sale, the Bid Procedures, the

Auction or the Sale Hearing is or shall be required. A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities, including, but not limited to:

  (i)  the Office of the United States Trustee for the District of Delaware;

  (ii)  the Debtors' senior secured and subordinated secured creditors;

  (iii)  all parties known or reasonably believed to have asserted a lien, encumbrance, claim or other interest in the Acquired Assets;

  (iv)  all persons or entities known or reasonably believed to have expressed an interest in acquiring the Acquired Assets;

  (v)  all applicable state and local taxing authorities;

  (vi)  non-debtor parties to the Assumed Contracts;

  (vii)  the Debtors' twenty largest creditors; and

  (viii)  all parties that have requested personal notice pursuant to Bankruptcy Rule 2002.

O.  Additionally, the Debtors published notice of the Sale in the _____ edition of the _____. With regard to parties who have claims against the Debtors, but whose identities are not reasonably ascertainable by the Debtors, the Court finds that such publication notice was sufficient and reasonably calculated under the circumstances to reach such parties.

P.  In accordance with the provisions of the Bid Procedures Order, the Debtors have served notice of their intent to assume and assign the Assumed Contracts and of the related proposed Cure Amounts (the "Contract & Cure Schedule") upon each nondebtor counterparty to the Assumed Contracts. The service of such notice was good, sufficient and appropriate under the circumstances and no further notice need be given with respect to the Cure Amounts for the Assumed Contracts listed in the Contract & Cure Schedule and the assumption and assignment

of the Assumed Contracts. All nondebtor parties to the Assumed Contracts identified in the Contract & Cure Schedule have had a reasonable opportunity to object to both the Cure Amounts listed in the Contract & Cure Schedule and the assumption and assignment of the Assumed Contracts.

Q.     The following Assignment Objections (the "Filed Assignment Objections") have been filed with respect to the Motion:

| Docket No. | Objecting Party or Parties |
| --- | --- |
|  |  |
|  |  |
|  |  |

## SECTION 363(F) REQUIREMENTS MET FOR FREE AND CLEAR SALES

R.     The Debtors may sell the Acquired Assets free and clear of all liens, claims, interests, and encumbrances of any kind or nature whatsoever (collectively, "Claims") (except for any Assumed Liabilities), because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied. Those holders of Claims who did not object, or who withdrew their objections, to the Sale or the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Claims who did object to the Sale of the Acquired Assets free and clear of Claims fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Claims, if any, attach to the proceeds of the Sale ultimately attributable to the property against which they have a Claim, in the same order of priority and with the same validity, force and effect that such holder had prior to the Sale, subject to any defenses of the Debtors.

S.     The Buyer would not have entered into the Kataman Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates and their creditors, if the sale of the Acquired Assets were not free and clear of all Claims other than Permitted Encumbrances and Assumed Liabilities, or if the Buyer would, or in the future could, be liable for any such Claims, including, as applicable, certain liabilities (collectively, the "Excluded Liabilities") that will not be assumed by the Buyer, as described in Section 2.4 of the Kataman Agreement.

T.     Without limiting the generality of the foregoing, the Kataman Agreement provides the Debtors with reasonably equivalent value and fair consideration (as those terms are defined in the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and the Bankruptcy Code), and was not entered into for the purpose of, nor does it have the effect of, hindering, delaying or defrauding creditors of the Debtors under any applicable law. Except for the Assumed Liabilities and the obligations of the Buyer specifically set forth in the Kataman Agreement or in connection with this Order or other orders of this Court, the Sale and the transactions comprising the Sale shall not impose nor result in the imposition of any liability or responsibility on Buyer or its affiliates, successors or assigns or any of their respective assets (including the Acquired Assets), and the transfer of the Acquired Assets to the Buyer does not and will not subject the Buyer or its affiliates, successors or assigns or any of their respective assets (including the Acquired Assets), to any liability for any Claims, including, without limitation, for any successor liability, other than as expressly identified as an Assumed Liability.

### ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS

U.     The assumption and assignment of the Assumed Contracts are integral to the Kataman Agreement, are in the best interests of the Debtors and their estates, and represent the reasonable exercise of the Debtors' sound business judgment.

{2921691:}                                    8

V.     With respect to each of the Assumed Contracts, the Debtors have met all requirements of section 365(b) of the Bankruptcy Code. Further, the Buyer has provided all necessary adequate assurance of future performance under the Assumed Contracts in satisfaction of sections 365(b) and 365(f) of the Bankruptcy Code. Accordingly, the Assumed Contracts may be assumed by the Debtors and assigned to the Buyer, as provided for in the Bid Procedures Order, the Motion and the Kataman Agreement and upon such assumption and assignment, the Debtors shall be relieved of liability from any future breach of the Assumed Contracts pursuant to section 365(k) of the Bankruptcy Code, and the Buyer shall have no liability under the Assumed Contracts for any obligation arising prior to assignment or relating to a time period prior to assignment.

## VALIDITY OF THE TRANSFER

W.     As of the closing of the Sale (the "Closing"), the transfer of the Acquired Assets to the Buyer will be a legal, valid and effective transfer of the Acquired Assets, and will vest the Buyer with all right, title and interest in and to the Acquired Assets, free and clear of: (1) all Claims other than Permitted Encumbrances and Assumed Liabilities; and (2) all debts arising under or out of, in connection with, or in any way relating to, any acts of the Debtors, claims (as defined in section 101(5) of the Bankruptcy Code), rights or causes of action (whether in law or in equity, including any rights or causes of action based on theories of transferee or successor liability under any law, statute, rule or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), obligations, demands, guaranties, rights, contractual commitments, restrictions, interests and matters of any kind or nature whatsoever, whether arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, understanding, law, equity or otherwise.

{2921691:}                    9

X.    The Kataman Agreement is not a *sub rosa* chapter 11 plan for which approval has been sought without the protections a disclosure statement would afford.

Y.    The Debtors: (1) have full company power and authority to execute the Kataman Agreement and all other documents contemplated thereby, and the Sale has been duly and validly authorized by all necessary corporate action of the Debtors; (2) have all company power and authority necessary to consummate the transactions contemplated by the Kataman Agreement; (3) have taken all actions necessary to authorize and approve the Kataman Agreement and the consummation by the Debtors of the transactions contemplated thereby; and (4) require no consents or approvals, other than those expressly provided for in the Kataman Agreement, to consummate such transactions.

Z.    The Debtors have good title to the Acquired Assets, and, accordingly the transfer of such Acquired Assets as contemplated by the Kataman Agreement: (1) is or will be a legal, valid and effective transfer of the property of the Debtors' estates to the Buyer; and (2) vests or will vest in the Buyer, all right, title and interest of the Debtors in and to all of the Acquired Assets free and clear of all Claims under sections 363(f) and 105(a) of the Bankruptcy Code.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

### GENERAL PROVISIONS

1.    The Motion is granted in full and the Sale is approved as set forth in this Order.

2.    The findings of fact set forth above and conclusions of law stated herein shall constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

3.      All objections, if any, to the Motion or the relief requested therein that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits, except as expressly provided herein.

## APPROVAL OF THE KATAMAN AGREEMENT

4.      The Kataman Agreement, all transactions contemplated therein and all of the terms and conditions thereof are hereby approved.

5.      Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Debtors are authorized and directed to perform their obligations under and comply with the terms of the Kataman Agreement, with such nonmaterial modifications as may be agreed to by the parties, and consummate the Sale, pursuant to and in accordance with the terms and conditions of the Kataman Agreement and this Order.

6.      The Debtors, as well as their affiliates, officers, employees and agents, are authorized to execute and deliver, and authorized to perform under, consummate and implement, the Kataman Agreement, in substantially the same form as the Kataman Agreement attached hereto as Exhibit 1, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Kataman Agreement and to take all further actions as may be: (a) reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to possession, the Acquired Assets; or (b) necessary or appropriate to the performance of the obligations contemplated by the Kataman Agreement, all without further order of the Court.

## TRANSFER OF ACQUIRED ASSETS

7.      Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Debtors are authorized to transfer the Acquired Assets in accordance with the terms of the Kataman

Agreement. The Acquired Assets shall be transferred to the Buyer, and upon consummation of the Kataman Agreement, such transfer shall: (a) be valid, legal, binding and effective; (b) vest the Buyer with all right, title and interest in the Acquired Assets; and (c) be free and clear of all Claims except for Permitted Encumbrances and Assumed Liabilities with all Claims to attach to the net proceeds of the Sale, in the order of their priority and with the same validity, force and effect which they now have against the Acquired Assets, subject to any claims and defenses the Debtors may possess with respect thereto.

8.      At the Closing, all Claims, if any, on the Acquired Assets shall attach to the proceeds of the sale of the Acquired Assets in the same relative order of priority; and the proceeds from the sale of the Acquired Assets shall be paid in accordance with the relevant provisions of the Bankruptcy Code and any orders of this Court.

9.      Except as otherwise provided in the Kataman Agreement, all persons and entities (and their respective successors and assigns), including all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, holding claims (as defined in section 101(5) of the Bankruptcy Code), except for Permitted Encumbrances and Assumed Liabilities, arising under or out of, in connection with, or in any way relating to, the Debtors, the Acquired Assets, the operation of the Debtors' businesses prior to Closing or the transfer of the Acquired Assets to the Buyer, are hereby forever barred, estopped and permanently enjoined from asserting such claims against the Buyer, its successors or assigns, its property or the Acquired Assets. No such persons or entities shall assert against the Buyer or their successors in interest any such claim arising from, related to or in connection with the ownership or operation of the Acquired Assets prior to the Closing, except for Permitted Encumbrances and Assumed Liabilities.

10.     This Order: (a) shall be effective as a determination that, as of Closing, all Claims other than Permitted Encumbrances and Assumed Liabilities relating to the Acquired Assets have been unconditionally released, discharged and terminated as to the Acquired Assets, and that the conveyances described herein have been effected; and (b) is and shall be binding upon and govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Kataman Agreement.

11.     If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Claims against or in the Debtors or the Acquired Assets shall not have delivered to the Debtors prior to the Closing of the Sale, in proper form for filing and execution by the appropriate parties, termination statements, instruments of satisfaction, releases of all interests which the person or entity has with respect to the Debtors or the Acquired Assets or otherwise, then only with regard to Acquired Assets that are purchased by the Buyer pursuant to the Kataman Agreement and this Order: (a) the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Acquired Assets; and (b) the Buyer is hereby authorized to file, register or otherwise record a certified copy of this

Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against the Acquired Assets other than the Assumed Liabilities. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state or local government agency, department or office.

12.     All persons or entities in possession of some or all of the Acquired Assets are directed to surrender possession of such assets to the Buyer or its designee at the time of Closing of the Sale.

13.     Following the Closing of the Sale, no holder of any Claim shall interfere with the Buyer's title to or use and enjoyment of the Acquired Assets based on or related to any such Claim or based on any actions the Debtors may take in their chapter 11 cases.

14.     All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Acquired Assets to the Buyer in accordance with the Kataman Agreement and Order.

### ASSUMPTION AND ASSIGNMENT OF ASSUMED CONTRACTS

15.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, the Debtors' assumption and assignment to the Buyer of the Assumed Contracts identified on Exhibit 2 to this Order and is hereby approved, and all requirements of section 365 of the Bankruptcy Code are hereby determined to have been satisfied with respect to such Assumed Contracts. Pursuant to section 365(k) of the Bankruptcy Code, the Debtors and their estates shall not be liable for any breach of the Assumed Contracts after the date of assignment to the Buyer.

16.     The Debtors are hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to assume and assign the Assumed Contracts to the Buyer free and clear of all Claims, and to execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assumed Contracts to the Buyer.

17. The Assumed Contracts transferred in accordance with this Order and the Assumption and Assignment Procedures shall be transferred to, and remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms, notwithstanding any provision in any such Assumed Contract (including those of the type described in section 365(e)(1) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer. There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Buyer or the Debtors as a result of the assumption or assignment of the Assumed Contracts. No Assumed Contract may be terminated, or the rights of any party modified in any respect, including pursuant to any "change of control" clause, by any other party thereto as a result of the transactions contemplated by the Kataman Agreement.

18. Except as set forth in Section 5.13(c) of the Kataman Agreement, the Cure Amounts identified on Exhibit 2 hereto arising under the Assumed Contracts identified on Exhibit 2 hereto shall be paid by the Debtors at the Closing of the Sale, subject to the terms of the Kataman Agreement.

19. Payment of the Cure Amounts shall be in full satisfaction of any and all defaults under the Assumed Contracts, whether monetary or non-monetary. Each pre-Closing (as such term is defined in the Kataman Agreement) nondebtor party to an Assumed Contract hereby is forever barred, estopped and permanently enjoined from asserting against the Debtors or the Buyer, their successors or assigns or the property of any of them, any default existing as of the date of the Sale Hearing if such default was not raised or asserted prior to or at the Sale Hearing.

20. The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assumed Contract shall not be a waiver of such terms or conditions, or of

the Debtors' and the Buyer's rights to enforce every term and condition of the Assumed Contracts.

21.     Upon the Closing of the Sale, the Buyer shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Assumed Contracts.

22.     On _____, 2011 at _____:_____ ___.m., the Court shall hear all Assignment Objections outstanding and unresolved as of such date and time, if any, including, if unresolved at that time, the Filed Assignment Objections.

## ADDITIONAL PROVISIONS

23.     Except as expressly set forth in the Kataman Agreement, the Buyer and its successors or assigns shall have no liability for any liability, claim (as that term is defined in section 101(5) of the Bankruptcy Code), damages or other obligation of or against the Debtors related to the Acquired Assets by reason of the transfer of the Acquired Assets to the Buyer. The Buyer shall not be deemed, as a result of any action taken in connection with the purchase of the Acquired Assets, to: (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than with respect to any obligations arising under the Assumed Contracts from and after the Closing); (b) have, *de facto* or otherwise, merged with or into the Debtors; or (c) be a mere continuation or substantial continuation of the Debtors or the enterprise of the Debtors.

24.     The Kataman Agreement does not provide for the Buyer to acquire claims arising under chapter 5 of the Bankruptcy Code.

25.     Notwithstanding that the Debtors' cases are not substantively consolidated, this Order shall have the same effect and binding nature in each of the Debtors' cases as if entered in each case as a separate order.

26.     While the Debtors' bankruptcy cases are pending, this Court shall retain jurisdiction to, among other things, interpret, enforce and implement the terms and provisions of

this Order and the Kataman Agreement, all amendments thereto, any waivers and consents thereunder (and of each of the agreements executed in connection therewith in all respects) and to adjudicate disputes arising under or related to this Order or the Kataman Agreement.

27.     Nothing in this Order or the Kataman Agreement releases, nullifies or enjoins the enforcement of any liability to a governmental unit under environmental statutes or regulations (or any associated liabilities for penalties, damages, cost recovery or injunctive relief) that any entity would be subject to as the owner or operator of property after the date of entry of this Order. Notwithstanding the foregoing sentence, nothing in this Order shall be interpreted to deem the Buyer as the successor to the Debtors under any state law successor liability doctrine with respect to any liabilities under environmental statutes or regulations for penalties for days of violation prior to entry of this Order or for liabilities relating to off-site disposal of wastes by the Debtors prior to entry of this Order.

28.     No bulk sales law or similar law of any state or other jurisdiction shall apply in any way to the transactions contemplated by the Kataman Agreement, the Motion and this Order.

29.     The allocation of Purchase Price contemplated in Section 2.9 of the Kataman Agreement is for tax purposes only and shall not have any impact upon allocation for the purposes of distribution of the proceeds of the Sale.

30.     The transactions contemplated by the Kataman Agreement are undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein of the Sale shall not affect the validity of the Sale to the Buyer, unless such authorization is duly stayed pending such appeal.

{2921691:}                                              17

31. The terms and provisions of the Kataman Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates and their creditors, the Buyer, and their respective affiliates, successors and assigns, and any affected third parties including all persons asserting Claims in the Acquired Assets to be sold to the Buyer pursuant to the Kataman Agreement, notwithstanding any subsequent appointment of any trustee, examiner or receiver under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee, examiner or receiver and shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors, their shareholders or any trustee, examiner or receiver.

32. The provisions of this Order and any actions taken pursuant hereto shall survive the entry of any order that may be entered confirming any chapter 11 plan of the Debtors, converting the Debtors' cases from chapter 11 to cases under chapter 7 of the Bankruptcy Code or dismissing any of the Debtors' chapter 11 cases.

33. The failure specifically to include any particular provisions of the Kataman Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Kataman Agreement be authorized and approved in its entirety.

34. The Kataman Agreement, and any related agreements, documents or other instruments, may be modified, amended or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not materially change the terms of the Kataman Agreement.

35. In the event that there is a direct conflict between the terms of this Order and the Kataman Agreement, the terms of this Order shall control.

36.     Each and every federal, state and local governmental agency, department or official is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Kataman Agreement.

37.     Notwithstanding the provisions of Rules 6004(h) and 6006(d) of the Bankruptcy Rules, this Order shall not be stayed for 14 days after entry and shall be effective immediately upon entry, and the Debtors and the Buyer are authorized to close the Sale immediately upon entry of this Order.

38.     The costs associated with Closing on the Sale, including without limitation any transfer taxes and any fees and expenses payable to the Debtors' investment banker, SSG Capital Advisors, LLC, shall be payable from the gross proceeds of the Sale.

Dated: Wilmington, Delaware
        _____, 2011

                                    _____
                                    UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT 1

## Kataman Asset Purchase Agreement

# EXHIBIT 2

## Assumed Contracts

**[To be provided]**

**Exhibit B**

**Esrow Agreement**

## DEPOSIT ESCROW AGREEMENT

THIS DEPOSIT ESCROW AGREEMENT ("Escrow Agreement") is entered into as of September 27, 2011, by and among Hussey Copper LTD, a Pennsylvania limited partnership ("Hussey"), Cougar Metals, Inc., a Delaware corporation ("Cougar") and OAP Real Estate, LLC, a Pennsylvania limited liability company ("OAP" and together with Hussey and Cougar, collectively "Sellers"), KHC Acquisition LLC, a Delaware limited liability company ("Buyer"), and U.S. Bank National Association, a national banking association ("Escrow Agent").

### RECITALS

A.      The Buyer and Sellers are entering into an Asset Purchase Agreement dated as of the date hereof (the "Purchase Agreement"). Capitalized terms used and not defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

B.      Subject to the terms of Purchase Agreement, in connection with the transactions contemplated therein, Buyer shall deposit a portion of the Purchase Price with the Escrow Agent equal to Six Million Five Hundred Thousand Dollars ($6,500,000) (the "Deposit") to be disbursed in accordance with the terms of this Escrow Agreement.

C.      The Escrow Agent agrees to hold and distribute the Deposit in accordance with the terms of this Escrow Agreement.

NOW, THEREFORE, in consideration of the mutual premises contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      Certain Defined Terms. Capitalized terms used but not otherwise defined herein shall have the respective meanings given such terms in the Purchase Agreement. The Escrow Agent shall be furnished a copy of the Purchase Agreement for reference purposes only, provided that the Escrow Agent shall have no duties, obligations or liabilities arising under the Purchase Agreement.

2.      Designation of the Escrow Agent. Buyer and Sellers hereby designate and appoint the Escrow Agent for the purposes set forth in this Escrow Agreement. The Escrow Agent hereby accepts such appointment under the terms and conditions set forth in this Escrow Agreement.

3.      Creation of the Escrow.

   (a)      Escrow Deposits.

       i. On even date herewith, Buyer has delivered, or shall deliver, the sum of Three Million Two Hundred Fifty Thousand Dollars ($3,250,000) to the Escrow Agent, by wire transfer of immediately available funds.

       ii. Subject to the terms of the Purchase Agreement, upon entry of the Bidding Procedures Order by the Bankruptcy Court, Buyer shall deliver Three

Million Two Hundred Fifty Thousand Dollars ($3,250,000) to the Escrow Agent, by wire transfer of immediately available funds.

(b) Escrow Account. Any deposits made pursuant to Sections 3(a)(i) and 3(b)(ii) above shall be held in an escrow account specified by the Escrow Agent (the "Escrow Funds"). The escrow account name and account number are as follows: KHC Hussey Cougar OAP Escrow Agreement #154507000.

4. Investment. From the date hereof until otherwise directed in writing by Buyer and Sellers, the Escrow Agent shall invest the Escrow Funds in its U.S. Bank Money Market Account as described on Exhibit A attached hereto. In no event shall the Escrow Agent be liable for the results of any investment, including without limitation any loss, cost or penalty resulting from any investment made in accordance with the terms hereof. The Buyer and Sellers acknowledge that regulations of the Comptroller of the Currency grant the Buyer and Sellers the right to receive brokerage confirmations of security transactions as they occur. The Buyer and Sellers specifically waive such notification to the extent permitted by law and acknowledge that the Buyer and Sellers will receive periodic cash transaction statements that will detail all investment transactions.

5. Disbursement of the Escrow Funds.

(a) Subject to Sections 5(b) and (c) below, the Escrow Agent shall distribute the Escrow Funds and interest accrued thereon in accordance with the joint written instructions executed by Buyer and Seller pursuant to the terms of the Purchase Agreement ("Joint Instruction").

(b) Sellers' Termination of Purchase Agreement. In the event the Purchase Agreement is terminated by Sellers pursuant to Section 9.1(c) of the Purchase Agreement, the Certified Restructuring Officer of Sellers shall certify to the Escrow Agent (with a copy to Buyer) that such termination has occurred and the events permitting such termination (the "Sellers' Certification"). If Buyer does not contest the Sellers' Certification by written notice to Escrow Agent (with a copy to Buyer) within forty-eight (48) hours (the "Buyer Notice"), then Escrow Agent shall distribute the Escrow Funds and the interest accrued thereon to Sellers pursuant to Sellers' Certification. If Escrow Agent receives the Buyer Notice, Escrow Agent shall retain the Escrow Funds pursuant to Section 8(f).

(c) Buyer's Termination of Purchase Agreement. In the event the Purchase Agreement is terminated by Buyer pursuant to any section other than Section 9.1(c) of the Purchase Agreement, the Chief Executive Officer of Buyer shall certify to the Escrow Agent (with a copy to Sellers) that such termination has occurred and the events permitting such termination (the "Buyer's Certification"). If Sellers do not contest the Buyer's Certification by written notice to Escrow Agent (with a copy to Buyer) within forty-eight (48) hours (the "Seller Notice"), then Escrow Agent shall distribute the Escrow Funds and the interest accrued thereon to Buyer pursuant to the Buyer's Certification. If Escrow Agent receives the Seller Notice, Escrow Agent shall retain the Escrow Funds pursuant to Section 8(f).

6. <u>Termination</u>. This Escrow Agreement, and the escrow created hereby, shall terminate upon the date that the Escrow Funds are fully and finally disbursed pursuant to Joint Instruction of Buyer and Sellers.

7. <u>Fees and Expenses</u>. In consideration for its services hereunder, Buyer and Sellers agree to equally divide the payment (1/2 paid by Sellers and 1/2 paid by Buyer) of the annual administrative escrow fee of the Escrow Agent set forth in <u>Exhibit B</u> attached hereto, and of all other fees, costs, charges and expenses of the Escrow Agent, if any, including reasonable attorneys' fees, which are incurred by the Escrow Agent in connection with the performance of its duties and obligations hereunder, provided, however, that the Escrow Agent complies with Section 8(a) of this Escrow Agreement.

8. <u>Conditions of the Escrow Agent's Obligations</u>.

(a) <u>Legal Counsel</u>. The Escrow Agent shall be entitled to employ legal counsel and other experts as it may deem reasonably necessary to advise it in connection with its obligations hereunder, may rely on the advice of such counsel, and may pay them reasonable compensation therefore, provided, however, that the fees of such legal counsel shall have been approved in advance by the parties hereto if reimbursement of such fees is to be sought from the parties; provided that such approval shall not be unreasonably withheld and in no event shall it be withheld if the Escrow Agent is subject to actual or threatened litigation not directly caused by its own negligence or willful misconduct .

(b) <u>Resignation</u>. The Escrow Agent may resign by giving written notice thereof to Buyer and Sellers. In the event of any such notice of resignation, the Escrow Agent shall refrain from taking any action with respect to the Escrow Funds until it receives joint written instructions from Buyer and Sellers designating a successor depository which shall be a national bank authorized to exercise corporate trust powers, and having a combined capital and surplus of at least $5,000,000,000. Upon receipt of such joint instructions, the Escrow Agent shall promptly deliver the Escrow Funds then held by it to such successor. Any successor depository shall have all the rights, obligations, and immunities of the Escrow Agent set forth herein. If the Buyer and Sellers have failed to appoint a successor escrow agent prior to the expiration of thirty (30) days following receipt of the notice of resignation from the Escrow Agent, the Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto.

(c) <u>Liability Limitations</u>. Except as to its obligation to keep the Escrow Funds safely in its custody as the Escrow Agent pursuant to the terms of this Escrow Agreement, the Escrow Agent shall be indemnified, on a several basis, by Buyer and Sellers and shall not be liable to anyone whatsoever by reason of any error of judgment or for any act done or step taken or omitted by it in good faith or for any mistake of fact or law or for anything which it may do or refrain from doing in connection herewith unless caused by or arising out of its own negligence or willful misconduct. IN NO EVENT SHALL THE ESCROW AGENT BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY SPECIAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL LOSSES OR DAMAGES OF ANY KIND WHATSOEVER (INCLUDING BUT NOT LIMITED TO LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN

ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES AND REGARDLESS OF THE FORM OF ACTION, UNLESS ARISING IN WHOLE OR IN PART OUT OF ITS OWN NEGLIGENCE OR WILLFUL MISCONDUCT.

(d)     Reliance. The Escrow Agent shall be entitled to rely and shall be protected in acting in reliance upon any Joint Instruction and shall be entitled to treat as genuine, and as the document it purports to be, any letter, paper or other document furnished to it and reasonably believed by it to be genuine and to have been signed and presented by the proper party or parties.

(e)     Tax Matters. The Escrow Agent does not have any interest in the Escrow Funds deposited hereunder but is serving only as escrow holder and having only possession thereof. All interest or other income from all investments and reinvestments of the Escrow Funds shall be paid as directed in the Joint Instruction or upon the earlier of: (i) termination of this Agreement and the escrow established hereby, or (ii) the disbursement of the Escrow Funds. For income tax purposes, income from all investments and reinvestments of the Escrow Funds shall be for the benefit of the party to whom such funds are disbursed, shall be recognized by such party and paid by such party.

(f)     Disputes. In the event that (i) any dispute shall arise between the parties with respect to the disposition or disbursement of any of the assets held hereunder or (ii) the Escrow Agent shall be uncertain as to how to proceed in a situation not explicitly addressed by the terms of this Agreement whether because of conflicting demands by the other parties hereto or otherwise, the Escrow Agent shall be permitted to refuse to comply with any and all claims, demands or instructions with respect to the Escrow Funds until such dispute or conflicting demands shall have been (i) determined by a final order, judgment or decree of a court of competent jurisdiction, which order, judgment or decree is not subject to appeal, or (ii) settled by agreement between the conflicting parties as evidenced in a writing reasonably satisfactory to the Escrow Agent. Notwithstanding anything herein to the contrary, in no event shall the Escrow Agent be required to institute legal proceedings of any kind, or be required to defend any legal proceedings which may be instituted against it with respect to this Agreement unless requested to do so in writing by the other parties hereto and until it is indemnified by such requesting party(ies) to the sole satisfaction of the Escrow Agent, against the cost and expense of such defense, including without limitation the reasonable fees and expenses of its legal counsel.

9.      Action by the Escrow Agent. Nothing herein contained shall be deemed to impose upon Buyer or Sellers any obligation or liability on account of the failure of the Escrow Agent to fulfill its obligations under this Escrow Agreement. The Escrow Agent will not be responsible for determining or calculating amounts to be disbursed from the escrow established hereunder.

10.     Headings. The headings in this Escrow Agreement are intended solely for convenience of reference and shall be given no effect in the construction or interpretation hereof.

11.     Governing Law. This Escrow Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of Delaware without giving effect to the principles of conflicts of laws thereof.

12. <u>Notices</u>. All notices, approvals, consents, requests, and other communications hereunder shall be in writing and shall be delivered by hand, overnight delivery service, electronic mail or facsimile transmitter (with confirmed receipt) to the physical address, electronic address or facsimile number set forth in this section, or to such other address as each party may designate for itself by like notice, and shall be deemed to have been given on the date and time received.

| | |
|---|---|
| If to Buyer: | KHC Acquisition LLC |
| | c/o Kataman Metals LLC |
| | 7733 Forsythe Boulevard |
| | Suite 300 |
| | St. Louis, MO 63105 |
| | Attn: Joseph P. Reinmann |
| | Telephone: 314.863.6699 |
| | Facsimile: 314.863.5588 |
| | |
| with a copy (that shall not | |
| constitute notice) to: | McDonald Hopkins LLC |
| | 600 Superior Avenue, East |
| | Suite 2100 |
| | Cleveland, Ohio 44114 |
| | Attention: David D. Watson |
| | Telephone: (216) 348-5400 |
| | Facsimile: (216) 348-5474 |
| | |
| If to Sellers: | Christine M. Vogel, Controller |
| | 100 Washington Street |
| | Leetsdale, PA 15056 |
| | Telephone: (724) 251-4215 |
| | Facsimile: (724) 251-4228 |
| | |
| with a copy (that shall not | |
| constitute notice) to: | Saul Ewing LLP |
| | Centre Square West |
| | 1500 Market Street, 38th Floor |
| | Philadelphia, PA 19102 |
| | Attention: Jeffrey C. Hampton, Esq. |
| | Telephone: (215) 972-7118 |
| | Facsimile: (215) 972-1848 |

If to the Escrow Agent:          U.S. Bank National Association
One U.S. Bank Plaza
SL-MO-T6CT
St. Louis, MO 63101
Attention: Brian Kabbes
Telephone: (314) 418-3943
Facsimile: (314) 418-1225

or to such other address as may have been designated in a prior notice. Notices sent by registered or certified mail, postage prepaid, return receipt requested, shall be deemed to have been given two business days after being mailed; notices sent by a nationally recognized commercial overnight carrier shall be effective the next business day after receipted delivery to such courier specifying overnight delivery; notices sent by facsimile shall be effective upon confirmation of receipt at the number specified above otherwise, notices shall be deemed to have been given when delivered to the address specified above (or other address specified in accordance with the foregoing). The applicable persons designated on Exhibit C attached hereto are duly authorized signatories for Buyer and Sellers, respectively, and have authority on behalf of the respective parties to execute and deliver this Agreement and any Joint Instruction contemplated by this Agreement. Any modification of such authorized signatories shall be provided by written notice delivered to the Escrow Agent.

      13.    Execution in Counterparts. This Escrow Agreement and any related Joint Instruction may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.

      14.    Modification. This Escrow Agreement may be modified or amended only by joint written instructions to the Escrow Agent, signed by Buyer and Sellers, or by a subsequent writing signed by Buyer, Sellers and the Escrow Agent.

      15.    Binding Effect. This Escrow Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of Buyer, Sellers and the Escrow Agent, and their respective successors and assigns.

      16.    Severability. If any provision of this Escrow Agreement, or the application thereof to any person or circumstance, should, for any reason and to any extent, be invalid or unenforceable, the remainder of this Escrow Agreement and the application of such provision to other persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

      17.    Patriot Act Disclosure. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each individual or entity that opens an account. Therefore, the Escrow Agent must obtain the name, address, taxpayer or other government identification number, and other information, such as date of birth for individuals, for each individual and business entity that is a party to this Escrow Agreement. For individuals signing this Escrow Agreement on their own behalf or on behalf of another, the Escrow Agent requires a copy of a

driver's license, passport or other form of photo identification. For business and other entities that are parties to this Escrow Agreement, the Escrow Agent will require such documents as it deems necessary to confirm the legal existence of the entity. At the time of or prior to execution of this Escrow Agreement, any party providing a tax identification number for tax reporting purposes shall provide to the Escrow Agent a completed IRS Form W-9, and every individual executing this Agreement on behalf of party shall provide to the Agent a copy of a driver's license, passport or other form of photo identification acceptable to the Agent. The parties hereto agree to provide to the Escrow Agent such organizational documents and documents establishing the authority of any individual acting in a representative capacity as the Escrow Agent may require in order to comply with its established practices, procedures and policies. The Escrow Agent is authorized and directed to report all interest and other income earned on the Escrow Funds in accordance with the Form W-9 information provided to the Escrow Agent. Buyer and Sellers understand that, in the event one or more tax identification numbers are not certified to the Escrow Agent, the Internal Revenue Code, as amended from time to time, may require withholding of a portion of any interest or other income earned on the Escrow Funds

[Signature page follows.]

IN WITNESS WHEREOF, this Escrow Agreement has been executed by Buyer, Sellers and the Escrow Agent on the date and year first written above.

SELLERS:

**HUSSEY COPPER LTD**
By: Hussey Copper Corp., its general partner

By: _____
Name: Roy D. Allen
Title: President

**COUGAR METALS, INC.**

By: _____
Name: Roy D. Allen
Title: President

**OAP REAL ESTATE, LLC**

By: _____
Name: Roy D. Allen
Title: Managing Director

BUYER:

**KHC ACQUISITION LLC**

By: _____
Name: _____
Title: _____

ESCROW AGENT:

**U.S. BANK NATIONAL ASSOCIATION**

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, this Escrow Agreement has been executed by Buyer, Sellers and the Escrow Agent on the date and year first written above.

SELLERS:

**HUSSEY COPPER LTD**
By:    Hussey Copper Corp., its general partner

By: _____
Name:  Roy D. Allen
Title:  President

**COUGAR METALS, INC.**

By: _____
Name:  Roy D. Allen
Title:  President

**OAP REAL ESTATE, LLC**

By: _____
Name:  Roy D. Allen
Title:  Managing Director

BUYER:

**KHC ACQUISITION LLC**

By: _____
Name:  Joseph P. Reinmann
Title:  President + CEO

ESCROW AGENT:

**U.S. BANK NATIONAL ASSOCIATION**

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, this Escrow Agreement has been executed by Buyer, Sellers and the Escrow Agent on the date and year first written above.

SELLERS:

**HUSSEY COPPER LTD**
By: Hussey Copper Corp., its general partner

By: _____
Name: Roy D. Allen
Title: President

**COUGAR METALS, INC.**

By: _____
Name: Roy D. Allen
Title: President

**OAP REAL ESTATE, LLC**

By: _____
Name: Roy D. Allen
Title: Managing Director

BUYER:

**KHC ACQUISITION LLC**

By: _____
Name: _____
Title: _____

ESCROW AGENT:

**U.S. BANK NATIONAL ASSOCIATION**

By: _Brian Halbur_
Name: _BRIAN J. KASSES_
Title: _VICE PRESIDENT_

## EXHIBIT A

## U.S. BANK NATIONAL ASSOCIATION
## MONEY MARKET ACCOUNT AUTHORIZATION
## DESCRIPTION AND TERMS

The U.S. Bank Money Market account is a U.S. Bank National Association ("U.S. Bank") interest-bearing money market deposit account designed to meet the needs of U.S. Bank's Corporate Trust Services Escrow Group and other Corporate Trust customers of U.S. Bank. Selection of this investment includes authorization to place funds on deposit and invest with U.S. Bank.

U.S. Bank uses the daily balance method to calculate interest on this account (actual/365 or 366). This method applies a daily periodic rate to the principal balance in the account each day. Interest is accrued daily and credited monthly to the account. Interest rates are determined at U.S. Bank's discretion, and may be tiered by customer deposit amount.

The owner of the account is U.S. Bank as Agent for its trust customers. U.S. Bank's trust department performs all account deposits and withdrawals. Deposit accounts are FDIC Insured per depositor, as determined under FDIC Regulations, up to applicable FDIC limits.

### AUTOMATIC AUTHORIZATION

In the absence of specific written direction to the contrary, U.S. Bank is hereby directed to invest and reinvest proceeds and other available moneys in the U.S. Bank Money Market Account. The U.S. Bank Money Market Account is a permitted investment under the operative documents and this authorization is the permanent direction for investment of the moneys until notified in writing of alternate instructions.

## **EXHIBIT B**

### ESCROW AGENT'S FEE SCHEDULE

I.    Acceptance Fee:                          Waived
        The acceptance fee includes the administrative review of documents, initial set-up of the account, and other reasonably required services up to and including the closing. This is a flat one-time fee, payable at closing.

II.    Annual Administration Fee:                 $1,000
        Annual administration fee for performance of the routine duties of the escrow agent associated with the management of the account. Administration fees are payable in advance without pro-ration for partial years.

III.    Out-of-Pocket Expenses:                 At Cost
Reimbursement expenses associated with the performance of our duties, including but not limited to fees and expenses of legal counsel, accountants and other agents, tax preparation, reporting and filing, publications, and filing fees. Out-of-pocket expenses are subject to prior written approval by both Buyer and Sellers, which approval shall not be unreasonably withheld.

IV.    Extraordinary Fees or Expenses:
Extraordinary fees are payable to the Agent for duties or responsibilities not expected to be incurred at the outset of the transaction, not routine or customary, and not incurred in the ordinary course of business, subject to prior written approval by both Buyer and Sellers, which approval shall not be unreasonably withheld. Extraordinary services might include amendments, specialized reporting, use investments not automated with the Escrow Agent's trust accounting system, and actual or threatened litigation or arbitration proceedings.

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT
To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account. For a non-individual person such as a business entity, a charity, a Trust or other legal entity we will ask for documentation to verify its formation and existence as a legal entity. We may also ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

## EXHIBIT C

**Authorized Signatories:**

**KHC Acquisition, LLC:**

The following person(s) are hereby designated and appointed as authorized representatives of Buyer (only one signature shall be required for any direction):

Joseph P. Reihmann
_____
Name

Specimen signature

SHARON HEIEN
_____
Name

Specimen signature

_____
Name

_____
Specimen signature

**Hussey Copper LTD:**

The following person(s) are hereby designated and appointed as authorized representatives of Sellers (only one signature shall be required for any direction):

_____
Name

_____
Specimen signature

_____
Name

_____
Specimen signature

_____
Name

_____
Specimen signature

**Cougar Metals, Inc.:**

The following person(s) are hereby designated and appointed as authorized representatives of Sellers (only one signature shall be required for any direction):

_____
Name

_____
Specimen signature

_____
Name

_____
Specimen signature

C-1

## EXHIBIT C

**Authorized Signatories:**

**KHC Acquisition, LLC:**

The following person(s) are hereby designated and appointed as authorized representatives of Buyer (only one signature shall be required for any direction):

| | |
|---|---|
| _____ | _____ |
| Name | Specimen signature |
| _____ | _____ |
| Name | Specimen signature |
| _____ | _____ |
| Name | Specimen signature |

**Hussey Copper LTD:**

The following person(s) are hereby designated and appointed as authorized representatives of Sellers (only one signature shall be required for any direction):

| | |
|---|---|
| Roy D. Allen | Roy D All |
| Name | Specimen signature |
| _____ | _____ |
| Name | Specimen signature |
| _____ | _____ |
| Name | Specimen signature |

**Cougar Metals, Inc.:**

The following person(s) are hereby designated and appointed as authorized representatives of Sellers (only one signature shall be required for any direction):

| | |
|---|---|
| Roy D Allen | Roy D All |
| Name | Specimen signature |
| _____ | _____ |
| Name | Specimen signature |

C-1

_____       _____
      Name                               Specimen signature

**OAP Real Estate, LLC:**

The following person(s) are hereby designated and appointed as authorized representatives of Sellers (only one signature shall be required for any direction):

Roy D Allen
_____       _____
      Name                               Specimen signature

_____       _____
      Name                               Specimen signature

_____       _____
      Name                               Specimen signature

**Exhibit C**

**Sale Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Hussey Copper Corp.,[1] | Case No. 11-13010 (BLS) |
| Debtor. | |

| | |
|---|---|
| In re: | Chapter 11 |
| Hussey Copper Ltd., | Case No. 11-13012 (BLS) |
| Debtor. | |

| | |
|---|---|
| In re: | Chapter 11 |
| OAP Real Estate, LLC, | Case No. 11-13013 (BLS) |
| Debtor. | |

| | |
|---|---|
| In re: | Chapter 11 |
| Cougar Metals, Inc., | Case No. 11-13014 (BLS) |
| Debtor. | |

| | |
|---|---|
| In re: | Chapter 11 |
| Orbie Trading, L.P., | Case No. 11-13015 (BLS) |
| Debtor. | |

| | |
|---|---|
| In re: | Chapter 11 |
| Hussey Exports Ltd., | Case No. 11-13016 (BLS) |
| Debtor. | **Joint Administration Requested** |
| | **Related to Docket No. ___** |

---

[1]   The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Hussey Copper Corp. (9993); Hussey Copper Ltd. (9994); OAP Real Estate, LLC (1298); Cougar Metals, Inc. (1674); Orbie Trading, L.P. (4969); and Hussey Exports Ltd. (8997). The Debtors' address is 100 Washington Street, Leetsdale, Pennsylvania 15056.

**ORDER GRANTING MOTION OF THE DEBTORS FOR ENTRY OF AN
ORDER (A) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL
OF THE DEBTORS' ASSETS, FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES AND INTERESTS, (B) APPROVING
<u>ASSET PURCHASE AGREEMENT AND (C) GRANTING RELATED RELIEF</u>**

Upon the Motion of the Debtors for Entry of an Order (A) Authorizing the Sale of

Substantially all of the Debtors' Assets, Free and Clear of Liens, Claims, Encumbrances and

Interests, (B) Approving Asset Purchase Agreement and (C) Granting Related Relief [Docket

No. _____ ](the "<u>Motion</u>");[2]

This Court having held a hearing on _____, 2011 and entered an order dated

_____, 2011 (the "<u>Bid Procedures Order</u>"), pursuant to which this Court, *inter alia*:

    (a)       approved the Bid Procedures;

    (b)       approved the Assumption and Assignment Procedures;

    (c)       approved the Escrow Deposit Agreement;

    (d)       established the date and time for the Auction;

    (e)       established the date and time for the Sale Hearing;

    (f)       approved the form and manner of Auction and Sale Notice; and

    (g)       approved the Break-Up Fee as well as the reimbursement of Expenses as provided
             in the Kataman Agreement and the Bid Procedures.

**THE COURT FINDS THAT:**

**JURISDICTION, FINAL ORDER, AND STATUTORY PREDICATES**

A.      This Court has jurisdiction over the Motion, the transactions contemplated by the

Kataman Agreement and any other ancillary documents and agreements related thereto pursuant

to 28 U.S.C. §§ 157(b)(1) and 1334(a). This matter is a core proceeding pursuant to 28 U.S.C.

---

[2]      Each capitalized term used but not defined herein shall have the meaning ascribed thereto in the Motion.

§ 157(b)(2)(A), (N) and (O). Venue of these cases and the Motion in this judicial district is proper under 28 U.S.C. §§ 1408 and 1409.

B. This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Order and expressly directs entry of judgment as set forth herein.

C. The statutory and rule-based predicates for the relief sought in the Motion are sections 105(a), 363(b), (f) and (m), and 365(a), (b), and (f) of the United States Code, 11 U.S.C. § 101 *et seq.* (as amended, the "Bankruptcy Code"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware.

D. KHC Acquisition, LLC (the "Buyer") is a party in interest in the Debtors' chapter 11 cases and has standing to raise, appear and be heard on any issue in such cases.

### SOUND BUSINESS PURPOSE

E. The Debtors seek to convey the Acquired Assets, all of which are related to the Debtors' businesses.

F. The Debtors have demonstrated both: (1) good, sufficient and sound business purposes and justifications for the sale of the Acquired Assets (the "Sale"); and (2) compelling circumstances for the Sale pursuant to section 363(b) of the Bankruptcy Code prior to, and outside of, a plan of reorganization in that, among other things, the value of the Acquired Assets would be harmed by any delay of the Sale. Time is of the essence in consummating the proposed Sale.

## HIGHEST AND BEST OFFERS

G. On _____, 2011, this Court entered the Bid Procedures Order [Docket No. ___] approving Bid Procedures for the Acquired Assets. The Bid Procedures provided a full, fair and reasonable opportunity for any person to make an offer to purchase the Acquired Assets. The Debtors conducted an Auction in accordance with the Bid Procedures Order and complied with that order in all respects. The Buyer complied with the Bid Procedures Order.

H. As demonstrated by the testimony and other evidence proffered or adduced at the Sale Hearing: (1) the Debtors have adequately marketed the Acquired Assets; (2) the purchase price contained in the Kataman Agreement constitutes the highest and otherwise best offer for the Acquired Assets and provides fair and reasonable consideration therefor; (3) the Sale will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative; (4) no other party has offered to purchase the Acquired Assets for greater economic value to the Debtors or their estates; and (5) the consideration to be paid by the Buyer under the Kataman Agreement constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory or possession thereof or the District of Columbia.

I. The Buyer has provided the Debtors with an aggregate deposit in an amount equal to $6,500,000 (such amount, together with the interest accrued thereon, the "Deposit"), which Deposit is currently being held by U.S. Bank in an interest-bearing account.

J. [_____] is the Back-Up Bidder, by virtue of its final bid at the Auction.

## BEST INTEREST OF CREDITORS

K. Approval of the Kataman Agreement and the consummation of the Sale to the Buyer at this time are in the best interests of the Debtors, their creditors, their estates and other parties in interest.

L.     The Kataman Agreement and each of the transactions contemplated therein were negotiated, proposed and entered into by the Debtors and the Buyer in good faith, without collusion and from arm's-length bargaining positions after a period in which third parties had ample opportunity to seek information and enter into discussions or negotiations with the Debtors and their retained advisors and professionals concerning a sale of the Acquired Assets. The Buyer is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all the protections afforded thereby. Neither the Debtors nor the Buyer have engaged in any conduct that would cause or permit the Kataman Agreement to be avoided or impose costs and damages under section 363(n) of the Bankruptcy Code or any other provision of the Bankruptcy Code, the Bankruptcy Rules or applicable law. Specifically, the Buyer's discussions and negotiations with non-debtor parties to executory contracts and unexpired leases of the Debtors and other creditors of the Debtors were conducted in good faith, without collusion, from arm's length bargaining positions, and did not impair the ability of the Debtors or the Buyer to fully and faithfully discharge their respective duties and obligations under the Bankruptcy Code.

M.     The Kataman Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code and under the laws of the United States.

### NOTICE OF THE MOTION, THE AUCTION AND THE CURE AMOUNTS

N.     As evidenced by the certificates of service filed with the Court: (1) proper, timely, adequate and sufficient notice of the Motion and the Sale Hearing has been provided by the Debtors; (2) such notice was good, sufficient and appropriate under the particular circumstances; and (3) no other or further notice of the Motion, the proposed Sale, the Bid Procedures, the

Auction or the Sale Hearing is or shall be required. A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities, including, but not limited to:

- (i) the Office of the United States Trustee for the District of Delaware;

- (ii) the Debtors' senior secured and subordinated secured creditors;

- (iii) all parties known or reasonably believed to have asserted a lien, encumbrance, claim or other interest in the Acquired Assets;

- (iv) all persons or entities known or reasonably believed to have expressed an interest in acquiring the Acquired Assets;

- (v) all applicable state and local taxing authorities;

- (vi) non-debtor parties to the Assumed Contracts;

- (vii) the Debtors' twenty largest creditors; and

- (viii) all parties that have requested personal notice pursuant to Bankruptcy Rule 2002.

O.  Additionally, the Debtors published notice of the Sale in the _____ edition of the _____. With regard to parties who have claims against the Debtors, but whose identities are not reasonably ascertainable by the Debtors, the Court finds that such publication notice was sufficient and reasonably calculated under the circumstances to reach such parties.

P.  In accordance with the provisions of the Bid Procedures Order, the Debtors have served notice of their intent to assume and assign the Assumed Contracts and of the related proposed Cure Amounts (the "Contract & Cure Schedule") upon each nondebtor counterparty to the Assumed Contracts. The service of such notice was good, sufficient and appropriate under the circumstances and no further notice need be given with respect to the Cure Amounts for the Assumed Contracts listed in the Contract & Cure Schedule and the assumption and assignment

of the Assumed Contracts. All nondebtor parties to the Assumed Contracts identified in the Contract & Cure Schedule have had a reasonable opportunity to object to both the Cure Amounts listed in the Contract & Cure Schedule and the assumption and assignment of the Assumed Contracts.

Q. The following Assignment Objections (the "Filed Assignment Objections") have been filed with respect to the Motion:

| Docket No. | Objecting Party or Parties |
| --- | --- |
| | |
| | |
| | |

## SECTION 363(F) REQUIREMENTS MET FOR FREE AND CLEAR SALES

R. The Debtors may sell the Acquired Assets free and clear of all liens, claims, interests, and encumbrances of any kind or nature whatsoever (collectively, "Claims") (except for any Assumed Liabilities), because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied. Those holders of Claims who did not object, or who withdrew their objections, to the Sale or the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Claims who did object to the Sale of the Acquired Assets free and clear of Claims fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Claims, if any, attach to the proceeds of the Sale ultimately attributable to the property against which they have a Claim, in the same order of priority and with the same validity, force and effect that such holder had prior to the Sale, subject to any defenses of the Debtors.

S.     The Buyer would not have entered into the Kataman Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates and their creditors, if the sale of the Acquired Assets were not free and clear of all Claims other than Permitted Encumbrances and Assumed Liabilities, or if the Buyer would, or in the future could, be liable for any such Claims, including, as applicable, certain liabilities (collectively, the "Excluded Liabilities") that will not be assumed by the Buyer, as described in Section 2.4 of the Kataman Agreement.

T.     Without limiting the generality of the foregoing, the Kataman Agreement provides the Debtors with reasonably equivalent value and fair consideration (as those terms are defined in the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and the Bankruptcy Code), and was not entered into for the purpose of, nor does it have the effect of, hindering, delaying or defrauding creditors of the Debtors under any applicable law. Except for the Assumed Liabilities and the obligations of the Buyer specifically set forth in the Kataman Agreement or in connection with this Order or other orders of this Court, the Sale and the transactions comprising the Sale shall not impose nor result in the imposition of any liability or responsibility on Buyer or its affiliates, successors or assigns or any of their respective assets (including the Acquired Assets), and the transfer of the Acquired Assets to the Buyer does not and will not subject the Buyer or its affiliates, successors or assigns or any of their respective assets (including the Acquired Assets), to any liability for any Claims, including, without limitation, for any successor liability, other than as expressly identified as an Assumed Liability.

## ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACTS

U.     The assumption and assignment of the Assumed Contracts are integral to the Kataman Agreement, are in the best interests of the Debtors and their estates, and represent the reasonable exercise of the Debtors' sound business judgment.

{2921691:}                                                8

V. With respect to each of the Assumed Contracts, the Debtors have met all requirements of section 365(b) of the Bankruptcy Code. Further, the Buyer has provided all necessary adequate assurance of future performance under the Assumed Contracts in satisfaction of sections 365(b) and 365(f) of the Bankruptcy Code. Accordingly, the Assumed Contracts may be assumed by the Debtors and assigned to the Buyer, as provided for in the Bid Procedures Order, the Motion and the Kataman Agreement and upon such assumption and assignment, the Debtors shall be relieved of liability from any future breach of the Assumed Contracts pursuant to section 365(k) of the Bankruptcy Code, and the Buyer shall have no liability under the Assumed Contracts for any obligation arising prior to assignment or relating to a time period prior to assignment.

## VALIDITY OF THE TRANSFER

W. As of the closing of the Sale (the "Closing"), the transfer of the Acquired Assets to the Buyer will be a legal, valid and effective transfer of the Acquired Assets, and will vest the Buyer with all right, title and interest in and to the Acquired Assets, free and clear of: (1) all Claims other than Permitted Encumbrances and Assumed Liabilities; and (2) all debts arising under or out of, in connection with, or in any way relating to, any acts of the Debtors, claims (as defined in section 101(5) of the Bankruptcy Code), rights or causes of action (whether in law or in equity, including any rights or causes of action based on theories of transferee or successor liability under any law, statute, rule or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), obligations, demands, guaranties, rights, contractual commitments, restrictions, interests and matters of any kind or nature whatsoever, whether arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, understanding, law, equity or otherwise.

X.　　The Kataman Agreement is not a *sub rosa* chapter 11 plan for which approval has been sought without the protections a disclosure statement would afford.

Y.　　The Debtors: (1) have full company power and authority to execute the Kataman Agreement and all other documents contemplated thereby, and the Sale has been duly and validly authorized by all necessary corporate action of the Debtors; (2) have all company power and authority necessary to consummate the transactions contemplated by the Kataman Agreement; (3) have taken all actions necessary to authorize and approve the Kataman Agreement and the consummation by the Debtors of the transactions contemplated thereby; and (4) require no consents or approvals, other than those expressly provided for in the Kataman Agreement, to consummate such transactions.

Z.　　The Debtors have good title to the Acquired Assets, and, accordingly the transfer of such Acquired Assets as contemplated by the Kataman Agreement: (1) is or will be a legal, valid and effective transfer of the property of the Debtors' estates to the Buyer; and (2) vests or will vest in the Buyer, all right, title and interest of the Debtors in and to all of the Acquired Assets free and clear of all Claims under sections 363(f) and 105(a) of the Bankruptcy Code.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

### GENERAL PROVISIONS

1.　　The Motion is granted in full and the Sale is approved as set forth in this Order.

2.　　The findings of fact set forth above and conclusions of law stated herein shall constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

{2921691:}　　　　　　　10

3.  All objections, if any, to the Motion or the relief requested therein that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits, except as expressly provided herein.

## APPROVAL OF THE KATAMAN AGREEMENT

4.  The Kataman Agreement, all transactions contemplated therein and all of the terms and conditions thereof are hereby approved.

5.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Debtors are authorized and directed to perform their obligations under and comply with the terms of the Kataman Agreement, with such nonmaterial modifications as may be agreed to by the parties, and consummate the Sale, pursuant to and in accordance with the terms and conditions of the Kataman Agreement and this Order.

6.  The Debtors, as well as their affiliates, officers, employees and agents, are authorized to execute and deliver, and authorized to perform under, consummate and implement, the Kataman Agreement, in substantially the same form as the Kataman Agreement attached hereto as Exhibit 1, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Kataman Agreement and to take all further actions as may be: (a) reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to possession, the Acquired Assets; or (b) necessary or appropriate to the performance of the obligations contemplated by the Kataman Agreement, all without further order of the Court.

## TRANSFER OF ACQUIRED ASSETS

7.  Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Debtors are authorized to transfer the Acquired Assets in accordance with the terms of the Kataman

Agreement. The Acquired Assets shall be transferred to the Buyer, and upon consummation of the Kataman Agreement, such transfer shall: (a) be valid, legal, binding and effective; (b) vest the Buyer with all right, title and interest in the Acquired Assets; and (c) be free and clear of all Claims except for Permitted Encumbrances and Assumed Liabilities with all Claims to attach to the net proceeds of the Sale, in the order of their priority and with the same validity, force and effect which they now have against the Acquired Assets, subject to any claims and defenses the Debtors may possess with respect thereto.

8.      At the Closing, all Claims, if any, on the Acquired Assets shall attach to the proceeds of the sale of the Acquired Assets in the same relative order of priority; and the proceeds from the sale of the Acquired Assets shall be paid in accordance with the relevant provisions of the Bankruptcy Code and any orders of this Court.

9.      Except as otherwise provided in the Kataman Agreement, all persons and entities (and their respective successors and assigns), including all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, holding claims (as defined in section 101(5) of the Bankruptcy Code), except for Permitted Encumbrances and Assumed Liabilities, arising under or out of, in connection with, or in any way relating to, the Debtors, the Acquired Assets, the operation of the Debtors' businesses prior to Closing or the transfer of the Acquired Assets to the Buyer, are hereby forever barred, estopped and permanently enjoined from asserting such claims against the Buyer, its successors or assigns, its property or the Acquired Assets. No such persons or entities shall assert against the Buyer or their successors in interest any such claim arising from, related to or in connection with the ownership or operation of the Acquired Assets prior to the Closing, except for Permitted Encumbrances and Assumed Liabilities.

10. This Order: (a) shall be effective as a determination that, as of Closing, all Claims other than Permitted Encumbrances and Assumed Liabilities relating to the Acquired Assets have been unconditionally released, discharged and terminated as to the Acquired Assets, and that the conveyances described herein have been effected; and (b) is and shall be binding upon and govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Kataman Agreement.

11. If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Claims against or in the Debtors or the Acquired Assets shall not have delivered to the Debtors prior to the Closing of the Sale, in proper form for filing and execution by the appropriate parties, termination statements, instruments of satisfaction, releases of all interests which the person or entity has with respect to the Debtors or the Acquired Assets or otherwise, then only with regard to Acquired Assets that are purchased by the Buyer pursuant to the Kataman Agreement and this Order: (a) the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Acquired Assets; and (b) the Buyer is hereby authorized to file, register or otherwise record a certified copy of this

Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against the Acquired Assets other than the Assumed Liabilities. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state or local government agency, department or office.

12.     All persons or entities in possession of some or all of the Acquired Assets are directed to surrender possession of such assets to the Buyer or its designee at the time of Closing of the Sale.

13.     Following the Closing of the Sale, no holder of any Claim shall interfere with the Buyer's title to or use and enjoyment of the Acquired Assets based on or related to any such Claim or based on any actions the Debtors may take in their chapter 11 cases.

14.     All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Acquired Assets to the Buyer in accordance with the Kataman Agreement and Order.

### ASSUMPTION AND ASSIGNMENT OF ASSUMED CONTRACTS

15.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, the Debtors' assumption and assignment to the Buyer of the Assumed Contracts identified on Exhibit 2 to this Order and is hereby approved, and all requirements of section 365 of the Bankruptcy Code are hereby determined to have been satisfied with respect to such Assumed Contracts. Pursuant to section 365(k) of the Bankruptcy Code, the Debtors and their estates shall not be liable for any breach of the Assumed Contracts after the date of assignment to the Buyer.

16.     The Debtors are hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to assume and assign the Assumed Contracts to the Buyer free and clear of all Claims, and to execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assumed Contracts to the Buyer.

17. The Assumed Contracts transferred in accordance with this Order and the Assumption and Assignment Procedures shall be transferred to, and remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms, notwithstanding any provision in any such Assumed Contract (including those of the type described in section 365(e)(1) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer. There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Buyer or the Debtors as a result of the assumption or assignment of the Assumed Contracts. No Assumed Contract may be terminated, or the rights of any party modified in any respect, including pursuant to any "change of control" clause, by any other party thereto as a result of the transactions contemplated by the Kataman Agreement.

18. Except as set forth in Section 5.13(c) of the Kataman Agreement, the Cure Amounts identified on Exhibit 2 hereto arising under the Assumed Contracts identified on Exhibit 2 hereto shall be paid by the Debtors at the Closing of the Sale, subject to the terms of the Kataman Agreement.

19. Payment of the Cure Amounts shall be in full satisfaction of any and all defaults under the Assumed Contracts, whether monetary or non-monetary. Each pre-Closing (as such term is defined in the Kataman Agreement) nondebtor party to an Assumed Contract hereby is forever barred, estopped and permanently enjoined from asserting against the Debtors or the Buyer, their successors or assigns or the property of any of them, any default existing as of the date of the Sale Hearing if such default was not raised or asserted prior to or at the Sale Hearing.

20. The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assumed Contract shall not be a waiver of such terms or conditions, or of

the Debtors' and the Buyer's rights to enforce every term and condition of the Assumed Contracts.

21. Upon the Closing of the Sale, the Buyer shall be fully and irrevocably vested with all right, title and interest of the Debtors under the Assumed Contracts.

22. On _____, 2011 at ____:_____ ___.m., the Court shall hear all Assignment Objections outstanding and unresolved as of such date and time, if any, including, if unresolved at that time, the Filed Assignment Objections.

## ADDITIONAL PROVISIONS

23. Except as expressly set forth in the Kataman Agreement, the Buyer and its successors or assigns shall have no liability for any liability, claim (as that term is defined in section 101(5) of the Bankruptcy Code), damages or other obligation of or against the Debtors related to the Acquired Assets by reason of the transfer of the Acquired Assets to the Buyer. The Buyer shall not be deemed, as a result of any action taken in connection with the purchase of the Acquired Assets, to: (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than with respect to any obligations arising under the Assumed Contracts from and after the Closing); (b) have, *de facto* or otherwise, merged with or into the Debtors; or (c) be a mere continuation or substantial continuation of the Debtors or the enterprise of the Debtors.

24. The Kataman Agreement does not provide for the Buyer to acquire claims arising under chapter 5 of the Bankruptcy Code.

25. Notwithstanding that the Debtors' cases are not substantively consolidated, this Order shall have the same effect and binding nature in each of the Debtors' cases as if entered in each case as a separate order.

26. While the Debtors' bankruptcy cases are pending, this Court shall retain jurisdiction to, among other things, interpret, enforce and implement the terms and provisions of

{2921691:} 16

this Order and the Kataman Agreement, all amendments thereto, any waivers and consents thereunder (and of each of the agreements executed in connection therewith in all respects) and to adjudicate disputes arising under or related to this Order or the Kataman Agreement.

27. Nothing in this Order or the Kataman Agreement releases, nullifies or enjoins the enforcement of any liability to a governmental unit under environmental statutes or regulations (or any associated liabilities for penalties, damages, cost recovery or injunctive relief) that any entity would be subject to as the owner or operator of property after the date of entry of this Order. Notwithstanding the foregoing sentence, nothing in this Order shall be interpreted to deem the Buyer as the successor to the Debtors under any state law successor liability doctrine with respect to any liabilities under environmental statutes or regulations for penalties for days of violation prior to entry of this Order or for liabilities relating to off-site disposal of wastes by the Debtors prior to entry of this Order.

28. No bulk sales law or similar law of any state or other jurisdiction shall apply in any way to the transactions contemplated by the Kataman Agreement, the Motion and this Order.

29. The allocation of Purchase Price contemplated in Section 2.9 of the Kataman Agreement is for tax purposes only and shall not have any impact upon allocation for the purposes of distribution of the proceeds of the Sale.

30. The transactions contemplated by the Kataman Agreement are undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein of the Sale shall not affect the validity of the Sale to the Buyer, unless such authorization is duly stayed pending such appeal.

31.     The terms and provisions of the Kataman Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates and their creditors, the Buyer, and their respective affiliates, successors and assigns, and any affected third parties including all persons asserting Claims in the Acquired Assets to be sold to the Buyer pursuant to the Kataman Agreement, notwithstanding any subsequent appointment of any trustee, examiner or receiver under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee, examiner or receiver and shall not be subject to rejection or avoidance by the Debtors, their estates, their creditors, their shareholders or any trustee, examiner or receiver.

32.     The provisions of this Order and any actions taken pursuant hereto shall survive the entry of any order that may be entered confirming any chapter 11 plan of the Debtors, converting the Debtors' cases from chapter 11 to cases under chapter 7 of the Bankruptcy Code or dismissing any of the Debtors' chapter 11 cases.

33.     The failure specifically to include any particular provisions of the Kataman Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Kataman Agreement be authorized and approved in its entirety.

34.     The Kataman Agreement, and any related agreements, documents or other instruments, may be modified, amended or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not materially change the terms of the Kataman Agreement.

35.     In the event that there is a direct conflict between the terms of this Order and the Kataman Agreement, the terms of this Order shall control.

36.     Each and every federal, state and local governmental agency, department or official is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Kataman Agreement.

37.     Notwithstanding the provisions of Rules 6004(h) and 6006(d) of the Bankruptcy Rules, this Order shall not be stayed for 14 days after entry and shall be effective immediately upon entry, and the Debtors and the Buyer are authorized to close the Sale immediately upon entry of this Order.

38.     The costs associated with Closing on the Sale, including without limitation any transfer taxes and any fees and expenses payable to the Debtors' investment banker, SSG Capital Advisors, LLC, shall be payable from the gross proceeds of the Sale.

Dated:  Wilmington, Delaware
        _____, 2011

        _____
        UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT 1

## Kataman Asset Purchase Agreement

# EXHIBIT 2

## Assumed Contracts

**[To be provided]**

# EXHIBIT 2

## Assumed Contracts

**[To be provided]**